## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

JOHN DOE,
Address Withheld,

                Plaintiff,

          v.

AMERICAN UNIVERSITY,
4400 Massachusetts Avenue NW
Washington, DC 20016,

                Defendant.

Civil Action No. _____

## **COMPLAINT**

John Doe, by his counsel, files this Complaint for gender-based discrimination in violation of 20 U.S.C. § 1681 (commonly known as Title IX) and the D.C. Human Rights Act (D.C. Code § 2-1402.41), as well as breach of contract and negligence.  In support of his Complaint, Mr. Doe alleges upon information and belief as follows:

## **INTRODUCTION**

1.     John Doe attended American University (the "University" or "AU") from the fall of 2015 through the spring of 2019.  Mr. Doe grew up in a strict Muslim household in Kuwait—which is a conservative Muslim country with strict laws, customs, and traditions regarding physical intimacy before marriage.  When he came to the United States to attend AU, Mr. Doe had never had a girlfriend; he had not yet had his first kiss; and he had never even held hands with a member of the opposite sex.  Mr. Doe focused his free time largely on things like Star Trek and creative writing, not pursuing a dating life.

2.     On April 22, 2016, during the second semester of his freshman year, Mr. Doe's friend, H.S., and H.S.'s friend, Jane Roe, came over to Mr. Doe's apartment to hang out. Ms. Roe ate a piece of a marijuana-laced brownie H.S. had given her, while H.S. and Mr. Doe drank alcohol.  Mr. Doe didn't know Ms. Roe very well.

3.     At some point in the night, H.S. got sick from drinking too much alcohol and went to the bathroom to vomit.  While H.S. was in the bathroom, Ms. Roe kissed Mr. Doe.  It was his first kiss.  Mr. Doe was inexperienced and awkward, so Ms. Roe took the lead.  While both Mr. Doe and Ms. Roe were completely clothed, Ms. Roe put her hands on Mr. Doe's head and guided him towards her breasts.  Mr. Doe then touched Ms. Roe's breasts over her clothes. Ms. Roe did not object or otherwise express discomfort.  Ms. Roe then guided Mr. Doe's head toward her lower body.  When his head was near her crotch, and he was close to touching her over her clothes, Mr. Doe asked Ms. Roe, "is this what you want me to do?"  She responded, "yes."  Both Ms. Roe and Mr. Doe knew what he was asking—whether she wanted him to perform oral sex.  Mr. Doe fumbled around and at one point clumsily put his mouth over Ms. Roe's clothes in the area of her vulva.  He was positioned awkwardly and stopped (without performing oral sex) after only a few seconds.

4.     Throughout the time that they were physical with each other in his apartment, Mr. Doe asked for Ms. Roe's consent.  After all, this was the first time he had done anything like this.  None of it came naturally.  And Mr. Doe was not confident that he was doing it right.

5.     Soon after Mr. Doe and Ms. Roe's interaction ended, Ms. Roe ordered an Uber for herself and H.S., who lived on the same dormitory hall as Ms. Roe.  Before she left, Ms. Roe hugged Mr. Doe goodbye and thanked him for being so "caring" and asking her before he did things, unlike "someone else" in her past.

6.      After Ms. Roe got back to her dorm room, she texted Mr. Doe to let him know that H.S. had vomited in the car ride home.  She said, "he's OK though" and "he's fine."  The next evening Ms. Roe checked in on Mr. Doe, texting him to ask if he was "okay with everything."  When he responded, "Yeah, I am," and asked her "And you?," she responded, "*Yeah I'm tired but okay*."  (Emphasis added.)

7.      On January 9, 2019—over two-and-a-half years later and just a few months before Mr. Doe was to graduate—Ms. Roe filed a complaint with the University's Title IX Office against Mr. Doe.  She claimed that, as part of a plan to get her incapacitated so he could take sexual advantage of her, Mr. Doe somehow caused her to eat the marijuana brownie that night.  And according to Ms. Roe, when she became incapacitated—and thus couldn't consent to any sexual activity—Mr. Doe kissed her, touched her sexually, and digitially penetrated her.

8.      About a month after Ms. Roe filed her complaint against Mr. Doe, Mr. Doe learned—during his initial interview with the University's Title IX Investigator, Fariha Quasem—that Ms. Roe had also filed a complaint against H.S.  Ms. Quasem told Mr. Doe little about Ms. Roe's allegations against H.S.—only that Mr. Doe would be a witness in H.S.'s case and H.S. would be a witness in Mr. Doe's case.  Ms. Quasem did not tell Mr. Doe, even generally, what Ms. Roe was alleging H.S. had done.

9.      Mr. Doe later learned from H.S. that Ms. Roe's claims against H.S. were similar to the claims she made against Mr. Doe.  Ms. Roe claimed that, like Mr. Doe, H.S. somehow induced her incapacitation using the marijuana brownie.  And Ms. Roe alleged that, when she was so intoxicated from the marijuana brownie that she could not give her consent to any sexual activity, H.S. grabbed her hair with one hand, grabbed one of her breasts with another, and "violently" kissed her.

10.     Mr. Doe learned from H.S. that Ms. Roe had also brought a complaint against H.S. related to an alleged incident that had occurred in February 2016 (something Ms. Quasem never mentioned to Mr. Doe).  According to Ms. Roe, after she left a party with H.S. and his friend, C.S., H.S. and C.S physically assaulted her, exposed their penises to her, and urinated in front of her.  Ms. Roe also alleged that H.S. grabbed her breast.

11.     Ms. Quasem investigated and adjudicated all three of Ms. Roe's complaints.  And she found in favor of H.S. as to each of Ms. Roe's allegations against him.

12.     Mr. Doe was not as lucky.  Ms. Quasem found him responsible for "Sexual Assault" (i.e., intentionally touching Ms. Roe in a sexual way without her consent), and American University suspended him for a year and a half, which will be permanently recorded on Mr. Doe's transcript.  The conduct for which Ms. Quasem found Mr. Doe responsible was that he had misread Ms. Roe's words (i.e., saying "yes" when he asked whether she "wanted to do this") and actions (i.e., physically moving his head to her breasts and then moving his head to her crotch) as giving him consent to touch her breasts and vulva over her clothes.  The interaction lasted seconds.  And Ms. Roe herself stated that Mr. Doe stopped the encounter when Ms. Roe said "stop."

13.     Ms. Quasem did, however, find Mr. Doe not responsible for "Sexual Exploitation" (i.e., getting Ms. Roe incapacitated so that he could commit sexual misconduct) and Rape (i.e., digitally penetrating Ms. Roe's vagina without her consent).

14.     This case arises from the way AU reached its decision.

15.     Ms. Quasem conducted a deeply flawed investigation and adjudication of Ms. Roe's claims against Mr. Doe.

16.     Ms. Quasem turned a blind eye to any piece of information that did not support Ms. Roe's story, including: witness statements that contradicted Ms. Roe; contemporaneous text messages that undermined Ms. Roe's claims; Ms. Roe's own inconsistent statements; and the fact that Ms. Roe withheld key evidence that undermined her allegations.

17.     Ms. Quasem misrepresented evidence to support Ms. Roe's claims and lessen Mr. Doe's credibility, including by: selectively quoting a witness, leaving out key language that undermined Ms. Roe's allegations; and brushing aside a key text message exchange that contradicted Ms. Roe's claims, reasoning, in part, that Ms. Roe was only responding to Mr. Doe (when, in fact, Ms. Roe initiated the exchange).

18.     And during her investigation and adjudication of Ms. Roe's claims against H.S., Ms. Quasem gathered evidence relevant to Ms. Roe's claims against Mr. Doe—but never shared it with Mr. Doe.  She took the statement of at least one witness who had information relevant to Ms. Roe's allegations against Mr. Doe—but never provided it to Mr. Doe or gave him the opportunity to propose follow-up questions.  And she weighed the credibility of Ms. Roe and H.S. regarding Ms. Roe's claims against H.S.—but kept her analysis from Mr. Doe.

19.     While Ms. Quasem kept Mr. Doe in the dark as to her investigation and adjudication of Ms. Roe's allegations against H.S., Ms. Roe was not.  As the complainant in H.S.'s case, Ms. Roe had access to all of the infromation Ms. Quasem withheld from Mr. Doe.

20.     Ms. Quasem found H.S. not responsible.  So any credibility determination she made in his case regarding H.S. and/or Ms. Roe would have been exculpatory as to Mr. Doe. Ms. Roe could not be credible in Mr. Doe's case but not credible in H.S.'s case.  She's either trustworthy or not.  H.S. cannot be credible in his own case but not credible as the key witness—

who contradicted Ms. Roe's claims—in Mr. Doe's case.  And Mr. Doe cannot be credible as a key witness in H.S.'s case but not credible in his own.

21.     After Ms. Quasem found Mr. Doe responsible for Sexual Assault, the University's Student Conduct and Conflict Resolution Services convened a three-person "Sanctioning Panel" to make a recommendation to the Dean of Students regarding a sanction.  From start to finish, the Sanctioning Panel process violated AU's own policies and procedures and was biased against Mr. Doe:

- The University denied Mr. Doe the right to challenge the members of the Sanctioning Panel—a right the University's policies and procedures said he was "entitled" to.

- The University denied Mr. Doe the right to have his Advisor present at his Sanctioning Panel—another promise the University made (and broke) to Mr. Doe.

- And the University refused to provide all of the relevant evidence and information to the Panel.

22.     The Sanctioning Panel ultimately decided to suspend Mr. Doe, and the University's Dean of Students rubber-stamped the Panel's decision.

23.     Mr. Doe then appealed the decisions of Ms. Quasem and the Sanctioning Panel to the University's Appellate Board of the Conduct Council.  Mr. Doe's appeal was limited to the grounds permitted by the University's Code of Conduct; namely, (i) new information that significantly alters the finding of fact; (ii) evidence of improper procedure; and/or (iii) insufficient/excessive sanctions.  Mr. Doe argued in his appeal that:

- There was new evidence that would significantly alter the findings of fact—specifically, information he had learned concerning the investigation and adjudication of Ms. Roe's claims against H.S. (which the University had withheld from him);

- He did not receive a thorough and impartial investigation—noting, among other things, that the Investigator failed to provide him with relevant information and failed to interview potentially key witnesses; and

- His sanction—a one-and-a-half year suspension, which will be permanently noted on his academic transcript—was excessive, especially in light of the conduct for which he had been found responsible.

Without any explanation (beyond reciting that it had reviewed Mr. Doe's submission), the Appellate Board decided Mr. Doe's appeal was not "viable," and affirmed his suspension.

24. Although he has all of the credits he needs to graduate, the University will not award Mr. Doe his diploma until at least January 1, 2021, after his suspension ends.

25. The investigation and adjudication of Ms. Roe's claims against Mr. Doe and the decisions the University and Ms. Quasem made throughout the process make little sense. But since Mr. Doe and Ms. Roe arrived at AU as freshman, the school has been under relentless pressure to appear tough at all costs on sexual misconduct claims brought by women against men, and it has responded to that pressure by infusing its Title IX enforcement regime with gender bias. The unfair investigation and adjudication of Ms. Roe's claims against Mr. Doe are the direct result of that pressure.

26. The pressure on AU began in at least April 2014, when leaked text messages and emails revealed members of a popular male society at the University making sexist comments and bragging about assaulting women. There were soon protests on campus and calls from students for the University to do something about the "misogyny" and "rape culture" that, according to the student newspaper, "pervaded the campus climate."

27. The public pressure continued over the next couple of years. The Department of Education's Office for Civil Rights ("OCR") opened two investigations, in 2015 and 2016, respectively, into how the University handled complaints of sexual misconduct. The student whose complaint prompted the 2016 investigation, Faith Ferber, went public with her claims against the school, alleging that the University administration tried to silence her when she

wanted to speak out about her sexual assault.  Ms. Ferber wrote an op-ed in the student newspaper, spoke with national media outlets, and starred in a viral online video about her case (which, as of April 22, 2016, had been viewed over 370,000 times on Facebook).  In response to the OCR complaints, alumni threatened to withhold financial support from the University if it did not take some action against sexual assault on campus; and over 75,000 people signed a petition urging the University to get tougher on accused students.

28.     And getting tougher on accused students is exactly what AU did.  In the fall of 2017:

- The University scrapped the hearing process it had in place for sexual misconduct disciplinary cases, which had allowed the parties to make their cases to a three-person panel and to cross-examine witnesses in person.

- The University adopted, what its student newspaper referred to as, a "survivor-friendly" model, in which a single investigator investigates and adjudicates all claims of sexual misconduct without holding any hearing.

- And the person the University hired to be that single investigator was Fariha Quasem, who it announced had "significant experience" in "advocacy."

29.     When AU hired Ms. Quasem in August 2017, her advocacy had been biased against male respondents.  She promoted an approach to sexual assault education and training that focused on teaching about "rape culture"—i.e., the idea that rape is prevalent on college campuses because society's views on gender has normalized sexual violence by men against women.  Whatever one thinks of the merits of Ms. Quasem's advocacy position, a person who holds it cannot be impartial in these cases.

30.     Beyond the formal changes the University made to its sexual misconduct disciplinary process, it also became a much more hostile place for accused male students and those who support due process rights for them:

- When, in September 2017, Education Secretary Betsy DeVos rescinded the U.S. Education Department's 2011 and 2014 guidance to schools on sexual misconduct over concerns that the guidance created a system that treated the accused unfairly (almost all of whom are men), the "lead investigators" in AU's Title IX Office met with students opposed to Secretary DeVos's decision—and reassured them that they would follow the 2011 and 2014 guidance, despite the fact that they had been rescinded.

- That same week, the University cancelled an event on campus that likely would have been critical of the Title IX disciplinary process after a women's student group complained that it would traumatize marginalized students.

- And in November 2017, the Title IX Office began referring students who wanted to learn about their rights under the law—including male respondents—to an organization that actually advocated for fewer legal rights for male respondents and focused on protections for non-male victims of sexual misconduct.

31.     American University has wanted to appear tough on male students accused of sexual misconduct.  So when Ms. Roe made her hard-to-believe allegations against Mr. Doe regarding an incident that happened over two-and-a-half years earlier, the University conducted an investigation and adjudication of her claims that was not fair to Mr. Doe.  Because of his gender, the University violated a number of its own policies and procedures in order to find Mr. Doe responsible for sexual assault and suspended him through at least January 1, 2021, with a permanent mark on his record.

## PARTIES

32.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a citizen of Kuwait.  Mr. Doe matriculated as a freshman at American University in August 2015 and completed all of his coursework in the summer of 2019.  He was scheduled to have his degree conferred at the end of AU's summer term.  His degree conferral, however, was held in abeyance pending the disciplinary proceeding at issue in this suit, and he was suspended from the University for one-and-a-half years on July 25, 2019.

33.     Defendant American University is a federally chartered university and a non-profit corporation incorporated in the District of Columbia.  Its principal place of business is in the District of Columbia.

## JURISDICTION AND VENUE

34.     The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Mr. Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.  This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because Mr. Doe is a citizen of a foreign state, the University is a citizen of the District of Columbia, and the amount in controversy exceeds $75,000.

35.     The Court has supplemental jurisdiction over Mr. Doe's state law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

36.     Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

I.   **American University's Policies and Procedures**

A.   **The Contractual Relationship Between Mr. Doe and the University**

37.   Under District of Columbia law, the University's codes and policies are terms in a contractual relationship between Mr. Doe and the University.

38.   That contractual relationship began in at least August 2015, when Mr. Doe matriculated as a freshman at AU.

39.   Upon his enrollment, Mr. Doe received a copy of the University's Discrimination and Sexual Harassment Policy (the "2014 Policy," attached as Exhibit 1), which the University amended on August 31, 2015 (the "2015 Policy," attached as Exhibit 2) and again on August 31, 2017 (the "Policy," attached as Exhibit 3) (collectively, the "Policies").

40.   Mr. Doe also received a copy of the University's Code of Student Conduct (the "2015-2016 Code," attached as Exhibit 4) when he matriculated at AU.  The University's Codes of Conduct for the 2016-2017 school year (the "2016-2017 Code") and the 2018-2019 school year (the "Code") are attached as Exhibits 5 and 6, respectively (the "2015-2016 Code," "2016-2017 Code," and the "Code" are collectively referred to as the "Codes").

41.   The University's Discrimination and Sexual Harassment Policies and the Codes of Conduct established the University's standards for acceptable conduct and also described the procedures by which the University would investigate and adjudicate alleged violations of its standards.

42.   In consideration for his tuition and attendance at the University, Mr. Doe received and was given assurances by the University that it would follow and comply with numerous

policies and procedures adopted and put forth by the school, including those in its Policies and Codes.

**B.      The University's Statute of Limitations**

43.      At the time Ms. Roe alleges that Mr. Doe assaulted her, the 2015-2016 Code contained a one-year deadline for filing a claim for an "*alleged violation [of the Code] involving . . . rape [or] sexual assault.*" (2015-2016 Code at 12 (emphasis in original).) The 2016-2017 Code—i.e., the Code that applied one year after the alleged incident—contained the same one-year deadline. (2016-2017 Code at 13.)

44.      A person could request an extension of the one-year deadline "in writing to the director of Student Conduct and Conflict Resolution Services or designee." (Id.) The request would have been "evaluated based on whether a reasonable person might be justified in filing after the deadline because of relevant circumstances." (Id.)

45.      The 2014 and 2015 Policies similarly provided a one-year deadline for filing a complaint under the University's Discrimination and Sexual Harassment Policy. They noted that a complaint filed after the deadline "may be considered . . . when requested in writing" and there are "extenuating circumstances." (2014 Policy at 6; 2015 Policy at 6.)

46.      In 2019, when Ms. Roe filed her claim, AU's Policy and Code no longer contained a one-year deadline for sexual misconduct claims. Instead, the University told students only that they should "file a formal complaint as soon as possible." (Code at 18; Policy at 7 (similar language).) The Policy and Code did not say anything about this new rule applying retroactively, such that it could resurrect previously time-barred complaints (like Ms. Roe's).

47.     There was good reason why the University made the promise it made when Mr. Doe matriculated.  The one-year statute of limitations recognized that, over time, memories fade, evidence is lost, and witness accounts become less reliable.

**C.     Proscribed Conduct**

48.     The Policy and the Code prohibit certain conduct by students at the University, including "Rape," "Sexual Assault," and "Sexual Exploitation" (as earlier versions had also done).  (Policy at 4; Code at 7.)

49.     The Policy and the Code define "Rape" as "any act of sexual intercourse or sexual penetration of any orifice of the body with a body part or other object that takes place against a person's will or without consent or that is accompanied by coercion or the threat of bodily harm."  (Id.)  The Policy and the Code define "Sexual Assault" as "any intentional sexual touching with any object(s) or body part(s) that is against a person's will or without consent or that is perpetrated through coercion or threat of bodily harm."  (Id.)  And the Policy and Code define "Sexual Exploitation" as "taking advantage of another, for one's own benefit, or to benefit or advantage anyone other than the one being exploited."  (Id.)

50.     The Policy and Code also define the term "Consent" as "words or conduct indicating a freely given agreement to have sexual intercourse or to participate in sexual activities."  (Policy at 3; Code at 5.)  The Policy notes that "[s]exual contact will be considered 'without consent' if no clear consent, verbal or nonverbal, is given; if inflicted through force, threat of force, or coercion; or if inflicted upon a person who is unconscious or who otherwise reasonably appears to be without the mental or physical capacity to consent."  (Policy at 3.)  The Code notes that "[s]ilence or lack of resistance does not imply consent" and that "[c]onsent for

one sexual act does not imply consent for any subsequent sexual act and consent must be on-going."  (Code at 5-6.)

51.     The Code defines the term "incapacitation" as "a temporary or permanent state in which an individual is unable to give consent to sexual contact due to mental, developmental, or physical impairment, to include incapacitation voluntarily or involuntarily, from alcohol or drug use."  (Id. at 6.)  The Code explains that "[s]tates of incapacitation include but are not limited to: sleep, unconsciousness, intermittent consciousness, or any other state where an individual is unaware that sexual contact is occurring" and "[w]here alcohol or drug use is involved, incapacitation is a state beyond mere intoxication, or impairment of judgment."  (Id.)

### D.     Procedures for Adjudicating Sexual Misconduct Claims

52.     In addition to proscribing certain forms of conduct, the Policy and the Code also prescribe the procedures the University is required to follow when investigating and adjudicating claims of misconduct.

53.     The Policy and the Code establish a tiered system of resolution for claims of sexual misconduct.

54.     The University first requires students to file a written "formal complaint" with the University's Title IX Program Officer, Regina Curran.  (Code at 12, 17.)  The University's website provides a form for students to submit their complaint.  The form requires students to identify the "Date/Time of Incident" and an "Incident Description," which asks for the student to "provide as much detail as possible concerning the alleged incident(s)."  The form also asks the student to identify the "[l]ocation of [the] [i]ncident" and any "students who may have information related to the alleged violation(s)."

55.     Next, the University's policies require its investigator to conduct a "thorough and impartial investigation that afford[s] all parties notice and opportunity to present evidence in determining whether a policy violation has occurred."  (Policy at 8.)

56.     According to the Code, "[d]uring the investigation, the parties will have an equal opportunity to be heard, to submit information and corroborating evidence, to identify witnesses who may have relevant information, and to submit questions that they believe should be addressed by the investigator to the other party or to any witness."  (Code at 18.)  The Investigator is also required to "notify and seek to meet separately with the complainant, the respondent, and third party witnesses" and "gather relevant evidence and information."  (Id.)

57.     When the investigation is complete, the Investigator "prepare[s] a draft investigation report, summarizing the information gathered."  (Id.)  The complainant and respondent then have no more than five days to "review the draft investigation report and submit additional comments, questions, or information to the investigator."  (Id.)  The Code refers to this as the "Case Review Period."  (Id.)

58.     Following the Case Review Period, the Investigator prepares a final report (the "Investigation Report" or the "Report"), which includes "a finding of responsible or not responsible, by a Preponderance of the Evidence, for each alleged violation of the Policy and/or Student Conduct Code."  (Id. 18.)

59.     The Code allows the complainant to appeal an Investigator's finding that there "is insufficient evidence, by a Preponderance of Evidence, to support a finding of responsibility of all the allegations."  (Id. at 19.)

60.     If the Investigator finds the respondent responsible as to any of the complainant's claims then the case is referred to the Student Conduct and Conflict Resolution Services to

initiate a Sanctioning Panel, which is "comprised of . . . one (1) student and two (2) faculty/staff members." (Id. at 7, 19.)

61.     The Code permits either party to "challenge a member of the Sanctioning Panel or Sanctioning Panel Administrator on grounds of conflicts of interest." (Id. at 19.)

62.     The Code requires the Sanctioning Panel to "review the Investigation Report and determine the appropriate sanction(s)." (Id. at 19.)  The complainant and respondent may also submit written statements to the Panel, which they can read orally if they would like.  (Id.)

63.     The Sanctioning Panel then makes a recommendation to the University's Dean of Students or designee, who makes the final decision regarding sanction. (Id. at 19-20.)

64.     Either party may appeal the outcome of the case.  (Id. at 20.)

65.     An appellate board consisting of "one (1) student and two (2) members of the faculty/staff" meets "as soon as possible after [an] appeal is received" to determine whether the either party has a viable appeal, such that the appeal should go to the University's "vice president of Campus Life or designee for review and decision." (Id. at 20.)

66.     An appeal is "viable" under the Code if it is based on "[n]ew information that significantly alters the finding of fact," "[e]vidence of improper procedure," and/or "[i]nsufficient/excessive sanctions." (Id.)

## II.     Title IX at the University

### A.     The Pressure on American University to Be Tough on Male Respondents

67.     Since Mr. Doe and Ms. Roe matriculated to American University, the school has continuously been subjected to extraordinary pressure—by media coverage, OCR complaints, and its own alumni and students—to be tough on allegations of sexual misconduct made by women against men, no matter their merit.

68.     The drumbeat of pressure began in at least April 2014, when a scandal erupted on campus related to a well-known all-male society, Epsilon Iota.  Leaked internal emails and text messages showed members of the group making graphic comments about sexually assaulting women.  The anonymous students who published the documents said they wanted "to expose rape culture" at AU.  As the University's student newspaper, The Eagle, later explained, the Epsilon Iota scandal revealed a culture of "misogyny and sexual assault at AU," which "pervaded the campus climate" and "blistered the community for far too long."

69.     The Epsilon Iota scandal put pressure on the University to do something about this alleged culture of "misogyny and sexual assault" on campus.  The anonymous students behind the document release demanded that the University put "better policies in place to reduce the amount of victims of rape culture."  Other students marched on campus, "calling for the AU administration to take action" against the male group.

70.     The negative publicity regarding sexual assault at AU did not end there.  In March 2015, OCR opened an investigation into the University for allegedly mishandling an allegation of sexual assault.  Although the school did not tell students what prompted the investigation, the University indicated at the time that the investigation stemmed from a complaint brought by a former complainant in a sexual misconduct disciplinary proceeding.  AU publicly stated that it "provided information [to OCR] about [its] case management and [its] programs to prevent sexual assault and support survivors."  Dean of Students Robert Hradsky also wrote to the student body that "AU does not tolerate any form of sexual violence or sexual misconduct" and "University complaints are investigated promptly, reported properly, and steps are immediately taken to stop discriminatory behavior, prevent its recurrence and remedy its effects, especially through support to the survivor."

71.     In a statement she made regarding the OCR investigation, the Student Government President, Sophia Wirth, referenced students' attitudes towards the University in the wake of the Epsilon Iota scandal, stating that the OCR investigation was "a pretty clear indication, as students ha[d] been saying for the last year, that AU is not picture-perfect on this issue."

72.     A year after AU announced the first OCR investigation into its handling of sexual misconduct claims, the University revealed that the government had opened a second investigation.  Then-student Faith Ferber claimed that the University forced her to sign an illegal confidentiality agreement that prevented her from openly discussing the outcome of her sexual misconduct complaint in a Facebook post.  Ms. Ferber wrote in an Op-Ed in The Eagle that she "filed a Title IX complaint against AU and spoke out because [she] d[id] not believe AU did enough to protect [her], [the AU] campus, or uphold [its] obligations under Title IX."  The Washington Post, Huffington Post, and BuzzFeed, among others, published stories concerning Ms. Ferber's OCR complaint.  Then-Student Body President Sasha Gilthorpe released a statement lamenting the fact that this was "the second time in two years American University ha[d] been thrust into the national media for the way [it] handle[s] sexual assault on [its] campus."

73.     Ms. Ferber's allegations galvanized the AU community.  The media reported that alumni were calling the University and telling administrators they would withhold donations until the school improved its record on sexual misconduct cases.  And more than 75,000 people signed a petition "asking the school to bolster its policy for handling student sex assault cases with additional disciplinary and training requirements."   The petition's goal, according to a former student who helped draft it, was to change the "culture . . . on campus within the

administration and in the entire community," such that "survivors [are] believe[d] . . . as [a] first

instinct and [are] take[n] . . . seriously when they say something has gone wrong."

B.      **The University's Response to Public Pressure**

74.      The University bowed to the public pressure that followed the Epsilon Iota

scandal and OCR complaints.  It adopted a "survivor-friendly investigative model for

complainants"—doing away with the live hearings on sexual misconduct allegations that it had

been using.  And it made an exception to its confidentiality policy for University disciplinary

proceedings, allowing parties in a sexual misconduct case to openly discuss their case—a change

it made to benefit complainants.

75.      Before the 2017-2018 school year, AU held live hearings on sexual misconduct

allegations.  Among other things, the "complainant w[as] required to present a case that me[t] the

standard of a preponderance of the evidence."  (See 2015-2016 Code at 14.)  The hearings were

recorded, transcripts of which both parties could access.  (Id.)  And both complainants and

respondents were able to question witnesses.  (Id. at 15.)

76.      Then, in August 2017—in response to "student activism"—the University

eliminated live hearings for sexual misconduct allegations.  In their place, the University

instituted a system in which a single person handles the investigative and adjudicative process

and decides innocence and guilt.

77.      While AU made significant changes to its process for resolving claims of sexual

misconduct, its process for resolving other violations of the Conduct Code remained materially

unchanged.  Students accused of physical assault, hazing, or discriminating against someone on

the basis of their race, for example, could still choose to have a hearing.  They could still have

their cases decided by a three-person panel.  And they still had the right to directly question relevant witnesses.

78.     In the new system for allegations of sexual misconduct, however, the Investigator decides what information is relevant and which witnesses are worth interviewing.  (Code at 18.)  The parties are not allowed to question witnesses live or be present when the Investigator interviews the witnesses.  They can submit questions to the Investigator to ask a witness, but it is up to the Investigator whether to ask the questions or even speak with that particular witness.  (Id. at 18.)  At the end of the investigation, the parties receive only truncated summaries of the Investigator's interviews; there is no way to know what exactly the Investigator asked, whether the Investigator accurately captured the witness's responses, whether the Investigator left any pertinent information out of her summary, etc.  The change from a live hearing to a single-investigator model made it impossible for male students accused of sexual misconduct to effectively defend themselves.

79.     To make matters worse, the University did not entrust the Title IX Investigator position to a person who could impartially investigate and adjudicate sexual misconduct cases.  It hired Fariha Quasem—who, the University noted in its announcement of her hiring—came to the the school "with significant experience in . . . advocacy."  Ms. Quasem has in the past advocated for "[a]ppropriate training and educations programs" regarding "rape culture."  She has argued that "[d]iscussing rape culture involves talking about the societal attitudes regarding sexuality and gender that normalizes sexual abuse."

80.     Ms. Quasem's status as an advocate should have disqualified her from being an impartial adjudicator.  Instead, the University celebrated her past advocacy when it hired her and

made her the sole arbiter in the first instance of sexual misconduct claims by women against men in its single-investigator system.

81.     In addition to putting Ms. Quasem in charge of investigating and adjudicating claims of sexual misconduct, AU made another change to its procedures to benefit female complainants.  In response to Ms. Ferber's claim that the University's confidentiality policy for its disciplinary proceedings silenced her and other victims of sexual violence, the University made an exception to the policy for students involved in a case regarding sexual violence. Students in those cases would be able to "openly discuss the [formerly confidential] proceedings."

82.     The University acknowledged that this change benefited complainants. Dr. Gail Hanson, the Vice President for Campus Life explained: "In Title IX cases, there are instances when, probably a complainant more than a respondent, would have occasion to talk about things that occurred in a hearing and that would be appropriate."

83.     To be sure, OCR's investigations into American University did not stop after the school began making changes to the way it handled claims of sexual misconduct.  But the people bringing complaints to OCR did.  In 2017, after two consecutive years in which OCR opened an investigation into the University stemming from complaints by female complainants, OCR began investigating AU in connection with a male respondent's complaint.

84.     The University's disregard for the rights of male respondents was also evident in its response to the Department of Education's September 22, 2017, decision to formally rescind Obama-era guidance—namely, a "Dear Colleague Letter" the Education Department's Office for Civil Rights issued in April 2011—on how schools should handle sexual misconduct claims under Title IX.  Critics of the previous guidance, including Secretary DeVos, had argued that it

denied basic due process rights to the accused.  The Department of Education announced that it would craft new rules, pursuant to the Administrative Procedure Act, concerning schools' Title IX responsibilities; and it provided schools a Q&A in September 2017 outlining how they should handle allegations of sexual misconduct in the meantime (the "September 2017 Q&A").

85.     Among other things, the September 2017 Q&A advised schools that interim measures in sexual misconduct disciplinary proceeding must be "necessary and effective" and cannot "rely on fixed rules or operating assumptions that favor one party over another"; a school's investigation must be led by someone who is "free of actual or reasonably perceived conflicts of interests and biases for or against any party"; rights afforded to the parties should be on "equal terms"; schools should not rely on sex stereotypes and generalizations in their disciplinary proceedings; and schools may use either a preponderance of the evidence standard or the clear and convincing standard.

86.     Many AU students reacted angrily to OCR's new guidance—some alleging that Secretary DeVos was engaging in "victim blaming" and "perpetuating the stigma, isolation and fear that is associated with sexual assault and violence."  And student groups like Students Against Sexual Violence questioned how the reforms would affect the University's sexual misconduct disciplinary process.

87.     According to The Eagle, "Members of Students Against Sexual Violence . . . discussed the potential ramifications of DeVos' . . . actions with lead investigators in AU's Title IX offices."  The head of Students Against Sexual Violence reported that, "during this meeting, administrators assured the students present that they w[ould] do their best to adhere to the Dear Colleague Letter and guidance written during the Obama administration, though there is only so much they can do to evade federal regulations and guidelines."

88.     The statement by "lead investigators in AU's Title IX offices" that they would

continue to follow the April 2011 Dear Colleague letter, even though the Department of

Education had rescinded it, reveals their gender bias—because it was no secret that the view of

sexual violence OCR was enforcing in 2011 was a gendered view that saw men as the

paradigmatic perpetrators of that violence and heterosexual women as its paradigmatic targets.

89.     The then-head of OCR in 2011, Catherine Lhamon, made that clear on numerous

occasions after 2011.  As one national media outlet reported in October 2016, in a story on

OCR's Title IX campaign:

> Lhamon says she is frustrated.  As she sat in her Washington, D.C.
> office during an interview with SI.com, she said she couldn't help
> but to think about the women who are suffering every day.

Similarly, an OCR press release notified the public that, on May 1, 2014, Ms. Lhamon would be

speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will

raise awareness about sexual assault and highlight men's roles in preventing sexual violence."

And in August 2015 she would tell a different national media publication, "We don't treat rape

and sexual assault as seriously as we should," citing a statistic about the rate of unwanted sexual

activity experienced specifically by college women.

90.     The University showed its support for female complainants, and antagonism

towards male respondents, in other ways too.  In September 2017, the University cancelled a

student-sponsored on-campus panel discussion regarding feminism, free speech, and Title IX

that the Association of University Women of AU—a women's student group at the school—

claimed would have subjected "marginalized students to hate speech and other forms of violence

and trauma."

91.     The panel, sponsored by AU's chapter of Young Americans for Liberty ("YAL") (a libertarian student group), would have presented a critical view of how colleges apply Title IX in the student disciplinary process.  YAL had invited several notable experts, including a former president of the American Civil Liberties Union from 1991 to 2008, the head of the Foundation for Individual Rights in Education, and an associate editor at *Reason* magazine (who was also an AU alumna) to take questions on issues related to feminism, free speech, and Title IX.

92.     Days before the talk was to take place, the University cancelled the panel, claiming that YAL had wrongly classified it as a "meeting," rather than an "event."  (The group ultimately held a scaled-down version of the discussion at a private, off-campus location.)

93.     But AU's reason for cancelling the YAL panel was undoubtedly pretextual.  YAL classified the panel as a "meeting" because that was the standard practice for YAL and other student groups when reserving space for a talk or panel that did not involve paid speakers or refreshments.  Indeed, when the student leader of YAL asked the University's Student Activities Associate Director Calvin Haney whether the school would have cancelled the panel if the topic were less controversial, he reportedly told her that she "wouldn't be remiss to make that assumption."

94.     The Title IX Office doubled down on its gendered view of sexual misconduct a few months after it met with members of Students Against Sexual Violence.  In November 2017, the Office began referring students to Know Your IX, a political advocacy group, for information regarding their rights under the law.  AU's Title IX Office describes "Know Your IX" as a "campaign that aims to educate all college students in the U.S. about their rights under Title IX," giving the impression that it is a neutral resource for all students.

95.     But the University's description of Know Your IX is inaccurate.  Know Your IX focuses its advocacy and resources on non-male victims of sexual misconduct.  In the description of the organization on its website, Know Your IX explains that it "believe[s] that women, transgender, and gender non-conforming students will not have equality in education or opportunity until the violence ends."  And under a tab titled "Support Resources," Know Your IX has a section "For Survivors" and "For Friends and Family," but nothing for respondents in sexual misconduct disciplinary proceedings.  The fact that AU's Title IX Office refers all students to Know Your IX for information on their legal rights under the law—when the organization does not provide any significant resources to accused male students—is further evidence that the University does not give equal weight to the rights of accused male respondents as it does to female complainants.

## III.     The Incident

96.     On April 22, 2016, Jane Roe and H.S.—then both freshmen at AU, just like Mr. Doe—came over to Mr. Doe's off-campus apartment.  At the time, Mr. Doe and H.S. were good friends.  And, although Mr. Doe didn't know Ms. Roe well, she had expressed to H.S. that she was interested in getting to know Mr. Doe better.

97.     H.S. and Ms. Roe brought a marijuana brownie—which another AU student, B.F., had sold to H.S. a few days earlier—to Mr. Doe's apartment.  Ms. Roe ate a piece of the brownie, while Mr. Doe and H.S. drank alcohol.

98.     The brownie did not appear to have a noticeable effect on Ms. Roe while she was at Mr. Doe's apartment.  Mr. Doe did not observe that she was unsteady on her feet.  He did not observe that she had any trouble walking.  He did not observe her having difficulty sitting and standing.  And her speech was normal.

99.     Ms. Roe, H.S., and Mr. Doe hung out in Mr. Doe's living room, spending most of their time listening to music and talking.  At some point while they were talking, Mr. Doe mentioned that he was really good at giving shoulder massages—and he showed them by massaging, first, Ms. Roe's shoulders and, then, H.S.'s shoulders.

100.    At some point in the evening, H.S. began a video chat on his phone with a friend of his, C.S.  When H.S. left the living room to speak with C.S. in the bathroom, Mr. Doe and Ms. Roe stayed in his living room.

101.    Ms. Roe soon placed her head on Mr. Doe's lap, and then moved her head up to kiss him.  While Mr. Doe and Ms. Roe were kissing, Ms. Roe placed her hands on Mr. Doe's head and moved his head towards her chest area.  Mr. Doe then touched Ms. Roe's breasts with his hand over her clothing.  Ms. Roe did not object to this touching or make any verbal comment.

102.    Instead, after Mr. Doe touched Ms. Roe's breasts, Ms. Roe moved Mr. Doe's head towards the lower part of her body.  Mr. Doe had not done anything like this before.  He awkwardly fumbled around at first and then unsuccessfully tried to stimulate Ms. Roe by putting his mouth on her crotch area over her clothes.

103.    Throughout their interaction, Mr. Doe asked for Ms. Roe's consent to touch her. She said "yes" each time he asked.  For example, after Ms. Roe brought Mr. Doe's head down to her lower body, Mr. Doe asked Ms. Roe whether this was "what [she] want[ed] [him] to do," and she responded, "yes."  At no point during the encounter did Ms. Roe say or otherwise indicate that she wanted Mr. Doe to stop what he was doing or that what Mr. Doe did was done without her consent.

104.    H.S. then came out of the bathroom and asked Ms. Roe whether she was ready to go.  Ms. Roe said that she was.

105.    After Ms. Roe got home that night, she texted Mr. Doe at approximately 1:47 a.m. to tell him that H.S. had "puked in the uber," adding that she thought he was "okay though."

106.    The next day, Mr. Doe texted Ms. Roe to ask, "how's your morning."  Ms. Roe responded that she was "doing okay."  In response, Mr. Doe said that was "great to hear" and that "[y]ou sometimes wake up with a headache when you eat" a marijuana brownie.  (Mr. Doe didn't actually know if a marijuana brownie could cause a headache.  He had never eaten one before—or anything else laced with marijuana, for that matter.  But he was trying to show off for Ms. Roe.)  Ms. Roe replied, "yeah I've been really tired this morning."

107.    A few hours later, Ms. Roe texted Mr. Doe, asking him whether he was "okay with everything," and he replied: "Yea, I am. . . . And you?"  Ms. Roe responded: "Yeah I'm tired but okay."

108.    Several days after the alleged incident, H.S. told Mr. Doe that Ms. Roe was upset about that night.  Neither H.S. nor Mr. Doe fully understood why, and text messages the two exchanged on April 27, 2016, show their puzzlement.  In the text messages, Mr. Doe asked H.S. why Ms. Roe didn't "like [them] now" and if it was "because of the edible."  When H.S. told Mr. Doe that "what happened Friday night made [Ms. Roe] uncomfortable and probably brought back thoughts of what happened in her pas[t]," Mr. Doe reminded him that Ms. Roe "gave her full consent every time [he] asked, and [he] asked more than once . . . [m]ultiple times actually." H.S. responded: "Yeah I know.  But it still could have brought something back up from her past."

IV.     **The Allegations**

109.    Based on information and belief, on January 9, 2019, nearly three years after the incident, Ms. Roe submitted a formal, written complaint against Mr. Doe to AU's Title IX Office.

110.    Both Ms. Roe and Mr. Doe had prior notice that there was a one-year deadline for Ms. Roe to file her complaint under the Student Conduct Code in effect at the time of the incident in question.  The deadline passed in April 2017, more than a year-and-a-half before Ms. Roe filed her complaint against Mr. Doe.  Upon information and belief, Ms. Roe did not ask for an extension before the deadline expired; nor did she provide a justification for her nearly three-year delay in filing her claim; and the University did not grant her an extension on its own accord.  Instead, the University just ignored the promise it made to Mr. Doe that it would enforce a one-year deadline on sexual misconduct claims barring a reasonable justification for the delay.

111.    Moreover, to this day, the University has not provided Ms. Roe's written complaint to Mr. Doe.  The only documents Mr. Doe received reflecting Ms. Roe's allegations are a January 24, 2019 Notice of Investigation and Ms. Quasem's summary of the interviews she conducted during her investigation.

112.    According to Ms. Quasem, Ms. Roe alleged during her initial interview that H.S. gave her a piece of a "small" marijuana brownie at Mr. Doe's off-campus apartment.  Forty-five minutes later, the marijuana in the piece of the small brownie allegedly caused Ms. Roe to become so inebriated that she spontaneously "hit the floor like a rock."  Ms. Roe claimed she was unable to stand or walk without assistance.

113.    Ms. Roe told the Title IX Office that she has only a "blurry" memory of what happened that night after she "hit the floor like a rock."

114.    Ms. Roe also alleged that while she, H.S., and Mr. Doe were at Mr. Doe's apartment, she felt "confused" and "disoriented," and she had "difficulty processing" what was going on.

115.    Although Ms. Roe claimed she was so inebriated that she lost critical physical and mental faculties, when she met with Ms. Quasem in January 2019, she was still able to provide very specific details about what supposedly happened to her over two-and-a-half years earlier.

116.    Ms. Roe alleged she was able to remember that, in Mr. Doe's living room, Mr. Doe asked her if she wanted a back massage and she agreed, and that during the massage, he asked her "where [she] want[ed] [him] to put [his] hand," whether she "want[ed] [him] to go lower," and whether she "consent[ed]" to him touching her. Ms. Roe claimed she remembered that she said, "yes," "maybe," and "what" in response to these questions.

117.    Ms. Roe claimed that H.S. was in the room when Mr. Doe began giving her a massage, and that H.S. asked questions regarding consent too. She alleged that both H.S. and Mr. Doe asked her questions for what felt to her like a long time regarding whether she consented to Mr. Doe massaging her. And when they asked her whether she "consented," she said she answered "yes"—but only because she had "difficulty processing" everything.

118.    Ms. Roe claimed that, when Mr. Doe moved his hands closer to her breasts during the massage, and began to brush her hair with his hands, she tried to get up from the couch. Ms. Roe alleged she was not able to stand, however, and she immediately fell (for the second time that night), hitting her hip on a coffee table in the process. Ms. Roe alleged that H.S. then helped her walk to and from the bathroom, which is where she claimed she told them she was attempting to go when she fell.

119.    Ms. Roe alleged that when she got back to the couch, Mr. Doe began to massage her again and both Mr. Doe and H.S. continued to ask her whether she consented.  According to Ms. Roe, they (the two of them) specifically asked her: "you want this, right?"

120.    Ms. Roe claimed that she then heard Mr. Doe and H.S. having a hushed conversation that sounded like an argument.  She alleged she heard H.S. reassuring Mr. Doe that everything they were doing was fine because she had consented to it; and, if anyone said otherwise, they would just tell them that Ms. Roe was "crazy."

121.    Ms. Roe claimed that, when Mr. Doe and H.S. got back to the couch, H.S. put the rest of the marijuana brownie in her mouth and told her to eat it.  She was afraid, so she did.  And after she had eaten it, Ms. Roe claimed that H.S. took some brownie crumbs and made her eat those too.

122.    Ms. Roe alleged that, after she ate the rest of the brownie, she became dizzy and even more disoriented and confused than she had already been.

123.    Ms. Roe claimed that Mr. Doe then pulled up her shirt, put his hand under her bra, kissed her mouth and neck, put his tongue in her mouth, and touched her butt and crotch over her pants.  While he was doing these things, Ms. Roe claimed that Mr. Doe was also telling her how pretty and smart she was and that he had always liked her.

124.    Then, Ms. Roe alleged, she heard a third voice in the room and realized that H.S. was video chatting with C.S.  Ms. Roe claimed that C.S. was able to see Mr. Doe assaulting her.  And according to Ms. Roe, she heard C.S. say that Ms. Roe "doesn't look good," and ask H.S., "why is she on [John] like that?," and "why is [John] touching her?"

125.    According to Ms. Roe, after C.S. allegedly made those comments over video chat, H.S. then left the room to speak with C.S. in the bathroom.

126.     While she and Mr. Doe were alone, Ms. Roe reported that Mr. Doe kissed her and touched her breasts.  When H.S. returned from the bathroom, he asked Ms. Roe whether she consented.  Ms. Roe reported that she did not respond because she could not understand the question.  Ms. Roe claimed that Mr. Doe then told her to "say yes" so she said "yes."

127.     According to Ms. Roe, H.S. then leaned down over her and "violently" kissed her, grabbing her hair with one hand and her breasts with the other.  Ms. Roe reported that H.S. then "stood up and started screaming." He then allegedly began "breathing heavily," said "what are we doing," and vomited.  Ms. Roe alleged that H.S. then went to the bathroom to throw up.

128.     Ms. Roe claimed that Mr. Doe then returned to the room—although she never claimed he left—and, without saying anything, pulled her leggings and underwear down her legs and inserted his fingers into her vagina.

129.     Ms. Roe alleged that she screamed "no . . . no . . . stop," and Mr. Doe stopped.

130.     Ms. Roe claimed she then decided she had to leave the apartment.

131.     Ms. Roe told the Title IX Office that at this point in the evening she was so inebriated that she had to concentrate to be able to tie her shoes.

132.     Ms. Roe claimed that she ordered an Uber ride home on her phone, got up from the couch, and walked to the door.  Ms. Roe alleged that H.S. came out of the bathroom while she was leaving Mr. Doe's apartment, and he insisted on going with her.

133.     Before Ms. Roe and H.S. got into the Uber, H.S.—who Ms. Roe claimed had just been throwing up in the bathroom—turned to her and told her not to "tell anyone what happened."  Ms. Roe claimed H.S. continued to vomit on the car ride home.

134.     Ms. Roe alleged that when they arrived back on campus, she apologized to the Uber driver and told H.S. to go upstairs.

135.    Ms. Roe claimed that when she got back to her room, she collapsed onto the floor and started crying.  Ms. Roe then alleged she told her roommate to go check on H.S. because she was concerned that he had "alcohol sickness."

## V.    The Investigation

136.    It was Ms. Quasem's responsibility under the University's policies and procedures to thoroughly and impartially investigate Ms. Roe's allegations.  But her investigation did not come close to meeting that standard.

### A.    The Investigator's Failure to Ask Key Follow-Up Questions and Conduct Critical Follow-Up Investigation

137.    Ms. Quasem failed to pose key follow-up questions—to both Ms. Roe and H.S.—regarding what Ms. Roe claims happened that night in Mr. Doe's apartment.

138.    Ms. Roe alleged that on the night of the incident she had been too intoxicated to consent—indeed, that she had been virtually catatonic.  Ms. Roe claimed that she could not: stand without immediately falling to the ground; walk from Mr. Doe's couch to his bathroom without H.S.'s help; or participate in a conversation between Mr. Doe and H.S.  Ms. Roe also claimed that when she was in Mr. Doe's apartment, she felt "confused" and "disoriented," and had "difficulty processing."

139.    Ms. Roe apparently told her friends similar stories.  One of Ms. Roe's friends told Ms. Quasem that sometime in the spring of 2016, Ms. Roe had said that she "almost passed out and felt as if she was floating in and out of consciousness."  According to Ms. Quasem's Report, Ms. Roe texted another friend about a week after that night to tell her that she had actually "passed out."

140.    But these allegations could not have been true—because when Ms. Roe left Mr. Doe's apartment, she was able to do all of the following:

- Order herself an Uber;

- Walk from the couch to Mr. Doe's front door (a longer walk than the one from the couch to the bathroom, which Ms. Roe claimed had required H.S.'s assistance);

- Take an elevator from the fourth floor (where Mr. Doe lived) to the lobby of Mr. Doe's building;

- Walk through the lobby of Mr. Doe's building and past a 24/7 doorman;

- Walk through the front door and down a set of stairs in front of Mr. Doe's building;

- Apologize to the Uber driver for H.S. vomiting in his car;

- Direct H.S. to his room;

- Walk up a set of stairs to get to the front door of her dormitory;

- Take out her keycard and swipe it to open the front door;

- Show her University ID to a person sitting at a desk in the lobby;

- Swipe her keycard to take the elevator up to her floor;

- Ask her roommate to check on H.S., who Ms. Roe feared had "alcohol sickness";

- Text Mr. Doe that H.S. had "puked in the Uber," and that she "think[s] he's okay though"; and

- Respond "Yes he's fine" to Mr. Doe's text message asking whether "everything [was] ok" with H.S.

141.    Ms. Roe simply could not have done all of these things in the physical and mental state she alleged she was in that night (i.e., "floating in and out of consciousness").

142.    But Ms. Quasem did not follow up on any of the inconsistencies in Ms. Roe's story:

- Ms. Quasem did not ask Ms. Roe how she could have possibly done everything she did that night in her alleged state;

- Ms. Quasem did not try to obtain video footage from Mr. Doe's apartment building showing Ms. Roe walking through the lobby that night;

33

- Ms. Quasem did not interview the doorman on duty that night to see if he or she saw Ms. Roe;

- Ms. Quasem did not investigate whether the University had any video footage that showed Ms. Roe that night in front of and/or inside her dormitory; and

- Ms. Quasem did not make any effort to identify who had been checking residents' Student ID cards at Ms. Roe's dormitory that night and whether he or she recalled seeing Ms. Roe.

143.    When she knew the answers would potentially hurt Ms. Roe's credibility or the investigation would uncover that Ms. Roe was not telling the truth, Ms. Quasem avoided asking the questions and conducting the investigation thoroughly and impartially.

144.    Ms. Quasem did the same thing when it came to interviewing H.S.  Ms. Roe alleged that she screamed "no . . . no . . . stop," when she claims Mr. Doe was digitally penetrating her.  If this had happened, H.S. would have heard it.  According to Ms. Roe, H.S. was in the bathroom at the time.  And the bathroom in Mr. Almtuairi's apartment was right off the living room, no more than approximately 20 feet away from where Mr. Doe and Ms. Roe were sitting.  But Ms. Quasem apparently did not ask H.S. anything about Ms. Roe screaming "no . . . no . . . stop"—because she knew what he was going to say: this did not happen.

145.    There were many more questions that Ms. Quasem should have asked H.S.—the only other person in Mr. Doe's apartment that night—but did not:

- Ms. Roe alleged that Mr. Doe and H.S. got into an argument over whether Ms. Roe consented to Mr. Doe's massage and that H.S. said they would just tell everybody she was "crazy" if she said they did anything wrong.  Ms. Quasem never asked H.S. if this had happened.

- Ms. Roe claimed that, while H.S. was in the room, Mr. Doe brushed her hair and moved his hands close to her breasts.  Ms. Quasem never asked H.S. if this had happened.

- Ms. Roe claimed that, after Mr. Doe brushed her hair and came near her breasts, she tried to get up from the couch, but fell (because she was too inebriated to

34

stand) and hit her hip on a coffee table.  Ms. Quasem never asked H.S. if this had happened.

- Ms. Roe claimed that H.S. then helped her walk to the bathroom.  Ms. Quasem never asked H.S. if this had happened.

- Ms. Roe claimed that when she got back from the bathroom, after H.S. had helped her to walk there, Mr. Doe pulled up her shirt, put his hand under her bra, kissed her mouth and neck, put his tongue in her mouth, and touched her butt and crotch over her pants—while, at the same time, telling her how pretty and smart she was and that he had always liked her.  Ms. Quasem never asked H.S. if this had happened.

- Ms. Roe claimed that H.S. asked her whether she consented to Mr. Doe touching her.  Ms. Roe reported that Mr. Doe told her to "say yes," so she said "yes." Ms. Quasem never asked H.S. if this had happened.

- And Ms. Roe claimed that when she and H.S. were waiting for the Uber to arrive outside of Mr. Doe's apartment, he told her not to "tell anyone what happened." Ms. Quasem never asked H.S. if this had happened.

146.    By avoiding asking any questions or conducting any investigation that she knew would likely undermine Ms. Roe's claims and credibility, Ms. Quasem conducted an investigation that was neither thorough nor impartial.

### B.    The Investigator's Failure to Investigate Two Contemporaneous Accounts

147.    Mr. Doe could not rely on Ms. Roe to produce all the evidence she had, but he should have been able to rely on Ms. Quasem to conduct a thorough investigation and gather all of the relevant evidence she could.  But that didn't happen.

148.    Ms. Quasem failed to gather information regarding at least two contemporaneous accounts of the incident by Ms. Roe.  Specifically, according to the Investigation Report, Ms. Roe spoke to her Residential Advisor and her Residential Advisor's supervisor about the incident shortly after it.  Although the Report includes Ms. Roe's brief summary account of what she told these people, it does not appear that Ms. Quasem spoke with or even tried to speak with the Residential Advisor or the Residential Advisor's supervisor or to gather any relevant

documentation that the Residential Advisor or the Residential Advisor's supervisor may have made of the conversation.

149.    Ms. Roe also apparently met with Sara Yzaguirre, an advocate at American University's Office of Advocacy Services for Interpersonal and Sexual Violence ("OASIS"), about the alleged incident.  Ms. Quasem did not talk to her either.

150.    What Ms. Roe reported to these people would have been critical information.  As a result, we do not know whether anything she said to these people was inconsistent with what she told the Investigator.  We do not know whether anything further came of her reports.  We do not know whether the Residential Advisor or the Residential Advisor's supervisor did anything in response.  To Mr. Doe's detriment, we are missing all of this critical information.

### C.    The Investigator's Decision to Deny John Doe the Opportunity to Identify and Discover Relevant Evidence and Information

151.    In addition to Ms. Quasem, the parties also play an important role in the investigative process at American University.  As noted above, under the University's policies and procedures, the parties "have an equal opportunity to be heard" during the investigation; they are able to "identify witnesses who may have relevant information"; and the parties can "submit questions that they believe should be addressed by the investigator to the other party or to any witness."  (Code at 18.)  However, in Mr. Doe's case, the University effectively denied him these rights—by withholding information about Ms. Quasem's investigation of H.S., including even the existence of Ms. Roe's complaint against H.S. regarding an incident in February 2016.

152.    AU's failure to share with Mr. Doe the evidence and information Ms. Quasem gathered during her investigation of H.S.—evidence and information it provided to Ms. Roe because she was the complainant in H.S.'s case—made no sense.  Whatever information or

evidence Ms. Quasem gathered during her investigation of H.S. regarding Ms. Roe's credibility would have been highly relevant to Mr. Doe's case.

153.    And H.S. was the key witness in Mr. Doe's case.  He was the only person other than Ms. Roe and Mr. Doe who was in Mr. Doe's apartment during the alleged incident.  He was with them most of the time except for a few minutes when he left the room to video chat with a friend and then got sick in the bathroom.  The credibility of H.S.'s account—which directly contradicted Ms. Roe's allegations—was key to Mr. Doe's case.

154.    Moreover, Ms. Roe charged that both Mr. Doe and Mr. Scheoch committed Sexual Exploitation based on her consumption of a marijuana edible.  But it was H.S. who procured the edible from someone else, brought it to Mr. Doe's apartment, and broke a piece off to give to Ms. Roe.  If Ms. Roe gathered evidence or information relevant to the marijuana edible, she should have showed that to Mr. Doe.

155.    To this day, AU has never shared with Mr. Doe the details of its investigation into Ms. Roe's allegations against H.S. related the alleged April 2016 incident—or that it also investigated and adjudicated another set of allegations Ms. Roe made against H.S. regarding an alleged incident in February 2016.

156.    But based upon information and belief, Ms. Quasem interviewed at least one witness who had important, relevant information as to both Mr. Doe and H.S.—B.F.—*but excluded the entirety of that interview from the Investigation Report in Mr. Doe's case.* According to H.S., B.F. sold him the marijuana brownie that he provided to Ms. Roe.  B.F. could have provided information regarding how much marijuana was in the brownie, the potency of the marijuana, and the size of the brownie, among other topics.

157.    Based upon information and belief, B.F. was also a witness with respect to Ms. Roe's claims that H.S. had assaulted and exposed himself to her in February 2016.  Given that H.S. was found not responsible as to that claim, whatever B.F. told Ms. Quasem with respect to Ms. Roe's allegations likely undermined Ms. Roe's credibility.

158.    But Mr. Doe had no opportunity to review the summary of B.F.'s interview, respond to or rely on her statements, or propose follow-up questions for Ms. Quasem to ask B.F. (like Ms. Roe, who had access to the report, did).  Ms. Quasem denied him these rights.

## VI.   The Decision

159.    On May 22, 2019, Ms. Quasem found Mr. Doe responsible for Sexual Assault.  In making her decision, Ms. Quasem misrepresented key evidence.  She explained away—or completely ignored—any evidence that undermined Ms. Roe's story.  She drew every inference against Mr. Doe, even when they should have been made in his favor.  And she improperly shifted the burden of proof to Mr. Doe to prove Ms. Roe consented, rather than require proof from Ms. Roe that she did not consent.

### A.    The Finding that Jane Roe Looked Visibly Impaired to John Doe

160.    The first finding Ms. Quasem made was that Ms. Roe "was and reasonably appeared to be impaired after consuming the edible."  Although Ms. Roe claimed that she did not have the capacity to consent to sexual activity due to her consumption of the marijuana brownie, Ms. Quasem did *not* find that Ms. Roe was incapacitated and unable to give consent.  As noted above, under the Code, "incapacitation is a state *beyond* mere intoxication or *impairment* of judgment."  (Code at 6 (emphasis added).)

161.    Ms. Quasem used this finding—that there was not a preponderance of the evidence to support Ms. Roe's allegation that she did not have the capacity to consent that

night—against Mr. Doe, writing in the Report that Mr. Doe's "claim that [Ms. Roe's] behavior was not affected, even the slightest, by her marijuana consumption decreases the credibility of his account." But Ms. Quasem's finding misrepresented the evidence and turned a blind eye to the overwhelming amount of evidence that Ms. Roe was not telling the truth (to her friends or to the Investigator) about her level of inebriation that night.

162.    Ms. Quasem first misrepresented what Mr. Doe told her during his interview. He did not say that Ms. Roe's behavior was not affected "even the slightest." That was something Ms. Quasem added to the Investigation Report. Mr. Doe told Ms. Quasem that, from his perspective, Ms. Roe didn't seem inebriated in his apartment after she ate the marijuana brownie. And that was the truth. Mr. Doe did not hear Ms. Roe have difficulty communicating and he did not see Ms. Roe stumble or fall to the ground—i.e., the typical signs of inebriation.

163.    H.S. told Ms. Quasem the same thing—he didn't notice Ms. Roe having trouble communicating or difficulty standing or walking either. In the Investigation Report, however, Ms. Quasem misrepresented what H.S. told her about Ms. Roe's level of inebriation. Ms. Quasem wrote in her decision that H.S. reported that Ms. Roe looked "high and inebriated," and that his testimony supported Ms. Roe's claim and undermined Mr. Doe's credibility. What Ms. Quasem didn't mention was that H.S. *directly* contradicted Ms. Roe's description of her level of inebriation—i.e., loss of balance, inability to communicate, etc.

164.    Ms. Quasem failed to note in her analysis that H.S. said he could tell Ms. Roe was inebriated because "she seemed more relaxed *than usual*." (Emphasis added.) H.S. knew Ms. Roe well. They were close friends at the time. As H.S.'s statement to Ms. Quasem made clear, the basis for his belief that Ms. Roe was inebriated that night was his own past experiences with her—not objective signs of inebriation that a person who didn't know Ms. Roe well (like

Mr. Doe) would have seen.  Ms. Quasem ignored that part of H.S.'s statement entirely—and found that H.S.'s statement supported her decision that Ms. Roe "*reasonably* appeared to be impaired after consuming the edible."  (Emphasis added.)  It did not.

165.    Ms. Quasem also relied on what Ms. Roe's roommate told her about Ms. Roe's behavior that night—without ever mentioning that more reliable evidence (contemporaneous text messages) contradicted it.  According to the Report, Ms. Roe's roommate said that when Ms. Roe came back to their room, Ms. Roe was "unable to effectively communicate because she was 'high and crying.'"

166.    But there are contemporaneous text messages showing that this wasn't true.  When Ms. Roe got back to her dorm room, she wrote Mr. Doe to tell him that H.S. had vomited in the car on the way home.  She then said, "he's OK though" and later said, "Yes, he's fine."  Ms. Roe appears to have withheld these messages from the Investigator, but Mr. Doe produced them.  The text messages Ms. Roe sent to Mr. Doe that night showed definitively that Ms. Roe was able to effectively and clearly communicate.  Nevertheless, Ms. Quasem credited Ms. Roe's roommate's account about a night nearly three years earlier *without ever even mentioning those contemporaneous text messages*.

167.    Ms. Quasem also wrote that conversations Ms. Roe had with a couple of her friends in the days and weeks after the alleged incident supported her account of that night.  Ms. Quasem noted that Ms. Roe sent her friend a text message a week after the incident, stating that "got so high that [she] passed out."  And Ms. Quasem referenced a statement by one of Ms. Roe's friends (that she made in 2019 during the investigation) that sometime in the spring of 2016, Ms. Roe told her that she "almost passed out and felt as if she was floating in and out of consciousness."

168.    According to Ms. Quasem, the information provided by Ms. Roe's friends—combined with the statements by H.S. (which undermined Ms. Roe's allegations) and Ms. Roe's former roommate (which were contradicted by contemporaneous text messages between Mr. Roe and Mr. Quasem)—"provide(d) a preponderance of the evidence that [Ms. Roe] was and reasonably appeared to be impaired after consuming the edible on April 22nd."

169.    When crediting these nearly three-years-old hearsay statements, Ms. Quasem made no mention of the contemporaneous text messages Ms. Roe sent to Mr. Doe, which showed she could not have possibly been "so high that [she] passed out" or "floating in and out of consciousness."

170.    Ms. Roe also failed to note that Ms. Roe could not have been "floating in and out of consciousness," and at the same time: get up from Mr. Doe's couch; order an Uber; take the elevator from his apartment down to the lobby; walk past a 24/7 doorperson; walk down a set of stairs; apologize to the Uber driver for H.S. vomiting; walk up a set of stairs to the front door her dormitory; swipe her keycard; walk past another security person; swipe her key card again to use the elevator; take an elevator up to her room; and tell people to look after H.S. because she thought he might have alcohol poisoning.  All of which she did without anybody else's help.

171.    Ms. Quasem thus relied on hearsay statements to find that Ms. Roe's description of her level of inebriation in Mr. Doe's apartment that night was credible—without ever mentioning that more reliable evidence existed undermining Ms. Roe's claims.

### B.    The Finding that Jane Roe Did Not Give Her Consent

172.    Because Ms. Quasem did not find that Ms. Roe was incapacitated, the only way she could have found Mr. Doe responsible for Sexual Assault was if she found that Ms. Roe's

"words or conduct [did not] indicat[e] a freely given agreement to . . . participate in sexual activities," (Code at 5).  So that is what she found.

173.    Ms. Quasem—relying on statements Mr. Doe made during his investigative interview—decided that the following conduct by Ms. Roe was not enough to show that she consented to what happened that night:

- Ms. Roe placed her head on Mr. Doe's lap;

- Ms. Roe kissed Mr. Doe;

- Ms. Roe placed her hands on Mr. Doe's head and moved his head towards her chest area (Mr. Doe then touched Ms. Roe's breasts over her clothes);

- Ms. Roe did not object or otherwise make any indication that she had not consented to Mr. Doe touching her breasts over her clothes;

- Ms. Roe moved Mr. Doe's head towards the lower part of her body;

- While Mr. Doe's head was near her crotch area, he asked Ms. Roe: "is this what you [want] me to do," and Ms. Roe responded, "yes" (Mr. Doe then touched Ms. Roe's vulva area with his mouth over her clothes); and

- Ms. Roe did not object or otherwise make any indication that she had not consented to Mr. Doe touching her vulva area.

According to Ms. Quasem, it was unreasonable for Mr. Doe to believe that these actions and words meant that Ms. Roe consented to him touching her breasts with his hands over her clothing and touching her vulva area with his mouth over her clothing.

174.    Ms. Roe's conduct was not ambiguous.  Ms. Roe physically moved Mr. Doe's head so that it was close to her chest.  Ms. Roe brought Mr. Doe's head to her crotch area.  Any reasonable person in Mr. Doe's position would have thought that Ms. Roe was bringing Mr. Doe's head to her breasts and head to her crotch for him to touch her in those places.  There is no other reasonable way to interpret her actions.

175.    Ms. Quasem also found that it was "unreasonable to conclude that when [Mr. Doe] said 'is this what you want me to do,' that he either was referring to oral sex or that [Ms. Roe] knew he was referring to oral sex."  Ms. Roe had just physically moved Mr. Doe's head with her hands to her crotch area.  His head was directly in front of her vulva (over her clothes) when he looked up and asked Ms. Roe this question.

176.    The Code requires "words or conduct *indicating* a freely given agreement . . . to participate in sexual activities."  (Code at 5 (emphasis added).)  Ms. Quasem's words and actions meet that standard for any reasonable person.

177.    Even if it were American University's policy that Mr. Doe had to verbally and explicitly ask for Ms. Roe's consent that night—and it was not—there was evidence that Mr. Doe did just that.  A few days after the incident, nearly three years before Ms. Roe filed her complaint, Mr. Doe expressed confusion to H.S. about why Ms. Roe was upset, telling him that "she gave her full consent every time i [sic] asked, and I asked more than once . . . Multiple times actually."  H.S. responded: "Yeah I know."

178.    Not only did Ms. Quasem not properly consider this evidence, she actually used it to attack Mr. Doe's credibility.  In her view, Mr. Doe lost credibility because the text messages "contradicted" what he told her nearly three years later in February 2019 when he only gave one basis upon which he received consent, rather than all of them:

> In text conversations with [H.S.], Doe stated that Roe 'gave her full consent every time i asked, and I asked more than once—Multiple times actually" . . . .  Doe's texts with [H.S.] *contradict his statements during the investigation*, which only indicate that he asked Roe for consent when she moved his head towards her crotch area.  *Doe's inconsistent statements, regarding asking Roe for consent, negatively impacts his credibility.*

.       . .

> Doe's text messages with [H.S.] . . . which *negatively impacted Doe's credibility, contradicts his statements during the investigation*, which indicate that he only asked Roe for consent when she moved his head towards her crotch area.

(Emphasis added.)

179.    In other words, Ms. Quasem discarded the text messages sent just *a few days after the night in question*—where Mr. Doe told H.S. that Ms. Roe gave her full consent every time he asked, and he asked more than once—because he did not say the same thing when she asked him open-endedly to describe what happened nearly three years later.  And Ms. Quasem made this key determination *without ever asking Mr. Doe or H.S. about this text message exchange.*

180.    Besides, there is no actual contradiction between the two accounts.  Mr. Doe told Ms. Quasem one specific sequence of events that he remembered about how Ms. Roe gave consent.  That Ms. Quasem asked an open-ended question and Mr. Doe gave her one event he remembered doesn't mean that there weren't other ways Ms. Roe gave consent that he didn't remember at the time—nearly three years later.  Ms. Quasem created a contradiction where none had existed.

181.    And these weren't the only exculpatory text messages helpful to Mr. Doe that Ms. Quasem misrepresented and diminished.  The day after the incident, Ms. Roe initiated an exchange to ask Mr. Doe, who before that night had never had sexual contact of any kind, whether he was okay with what had happened.  He said he was.  When Mr. Doe asked the same question to her, Ms. Roe said that she was "fine" and "okay" with what had happened the night before too.

182.    Ms. Quasem dismissed this exchange, writing that: "While Roe may have responded to Doe's messages on April 23rd, by April 27th she was no longer responding to his

text messages." Even worse, Ms. Quasem never addressed the substance of the exchange—i.e., that Ms. Roe said she was "fine" and "okay" with their interaction.

183.    Ms. Quasem's reason for dismissing the day-after text messages was also plain wrong.  Ms. Roe did not "respond[ ]" to Mr. Doe.  She initiated the conversation on April 23, 2016, at 9:22 p.m.  Mr. Doe did not say anything to prompt Ms. Roe's message to him.

184.    Ms. Roe did not tell the truth about these text messages either.  Indeed, it appears that she withheld them from the University, even though she provided other text messages.  And when Ms. Quasem asked her about the messages, after Mr. Doe produced them, Ms. Roe said the only reason she texted Mr. Doe was because "by nature she is a polite person, so she did not know how to communicate how she actually felt."  But she initiated the exchange; she didn't respond out of politeness.  Ms. Quasem's decision mentioned none of this.

185.    Ms. Quasem's decision that Ms. Roe did not consent that night also included no discussion of the text messages Ms. Roe sent Mr. Doe that night, to tell him that H.S. had gotten sick on the car ride home, but that he was "OK" and "fine."  In addition to showing that Ms. Roe was able to communicate (contrary to her claim otherwise), the text messages undermined Ms. Roe's claim that Mr. Doe had *just* violently assaulted her.  It also undermines her statement that she hugged Mr. Doe goodbye because she was "afraid" that "something bad would happen" if he knew she was upset.  She reached out to him voluntarily unprompted; he did not reach out to her.

186.    Ms. Quasem, though, accepted Ms. Roe's purported reason for sending those messages—i.e., that she sent them because she wanted Mr. Doe to check up on H.S., who she feared had alcohol poisoning.  But if Ms. Roe had wanted Mr. Doe to check up on H.S., Ms. Roe

would not have told Mr. Doe that H.S. was "fine" and "okay."  In short, Ms. Roe's account was clearly not credible.  Yet Ms. Quasem accepted it.

### C.    The Credibility Findings Fariha Quasem Did Not Make in John Doe's Case

187.    In her decision, Ms. Quasem cast doubt on Mr. Doe's credibility on the thinnest of reeds—mining for inconsistencies (where none actually existed) between Mr. Doe's text messages in 2016 and his responses to her open-ended questions nearly three years later.

188.    At the same time, Ms. Quasem overlooked, or decided not to mention, the overwhelming amount of evidence that Ms. Roe was not credible:

- Ms. Quasem did not question Ms. Roe's credibility when Ms. Roe reported that she got so inebriated in Mr. Doe's apartment that she could not stand or walk without assistance, even though those statements were provably false.  Ms. Roe acknowledged that before she left Mr. Doe's apartment, she ordered herself an Uber and then got up from Mr. Doe's couch without any help.  Based on her own account, Ms. Roe did not need any assistance to get from Mr. Doe's apartment to her dorm room—a trip in which she walked without help past two security guards and stood in two elevators without falling.  Ms. Roe was clearly able to stand and walk on her own that night.  That she lied about that apparently didn't diminish her credibility for Ms. Quasem.

- Ms. Quasem did not question Ms. Roe's credibility when Ms. Roe told her that she felt "confused" and "disoriented," and had "difficulty processing" what was going on that night—or when Ms. Roe told a friend that she "almost passed out and felt as if she was floating in and out of consciousness"—even though the objective evidence showed those statements weren't true.  Ms. Roe had the wherewithal to, among other things, order an Uber, apologize to the Uber driver for H.S. having vomited in the car, evaluate H.S.'s need for her assistance, direct H.S. to his room, and send cogent text messages to Mr. Doe expressing concern over how much H.S.'s drank.

- Ms. Quasem did not question Ms. Roe's credibility, even though she didn't tell the truth about why she texted Mr. Doe that night and the next day—looking the other way when Ms. Roe she gave the obviously false explanations that she texted Mr. Doe the night of the incident because she wanted Mr. Doe to check up on H.S. and she texted him the next day to be polite.

- Ms. Quasem did not question Ms. Roe's credibility, even when she appeared to have withheld these text messages from the University.  There was no apparent reason why Ms. Roe didn't produce these text messages before her initial

interview—or at the very least mentioned these conversations during her initial interview—other than that they undermined her claims.  Ms. Roe turned over a number of other text messages to the Title IX Office that she had kept from around the time of the incident.  So it is not as though Ms. Roe had deleted her text messages from that period.  And given how much detail Ms. Roe was able to recall from that night, it is unlikely that she simply forgot these key conversations had taken place.

- Ms. Quasem did not question Ms. Roe's credibility even when C.S.—the eyewitness Ms. Roe identified as having seen Mr. Doe allegedly assaulting her—directly contradicted everything Ms. Roe reported about what he had said and witnessed that night.  Ms. Roe claimed that while C.S. was video chatting with H.S., he saw Mr. Doe touching Ms. Roe inappropriately while she didn't have the capacity to consent.  According to Ms. Roe, C.S. stated, "[Jane] doesn't look good" and asked H.S. "why is she on [John] like that?" and "why is [John] touching her?"  C.S. told Ms. Quasem during his interview that he didn't "speak to or see [Mr. Doe] or [Ms. Roe]" over video chat that night.

- Ms. Quasem did not question Ms. Roe's credibility even when Ms. Roe was able to recite, in January 2019, very specific details about a night in April 2016—even though she had previously told Ms. Quasem that her memory went "blurry" after she "hit the floor like a rock."

- Ms. Quasem did not question Ms. Roe's credibility even when, during her initial interview, Ms. Roe made no mention of the fact that she hugged Mr. Doe when she was leaving his apartment—admitting later that this had happened after Mr. Doe brought it up during his interview.

189.    And Ms. Quasem did not even question Ms. Roe's credibility when the only other person in Mr. Doe's apartment that night—H.S.—provided the Investigator an account of what had happened that night that differed substantially from Ms. Roe's story.

190.    Ms. Roe, for instance, told Ms. Quasem that she was "surprised" that H.S.—her good friend, who lived on the same dormitory hall as her—brought her to Mr. Doe's apartment to eat a marijuana brownie.  H.S., however, told Ms. Quasem that he and Ms. Roe decided together that they would go over to Mr. Doe's apartment because Mr. Doe "did not belong to a friend group and [Ms. Roe] was interested in expanding her network."

191.    Ms. Roe told Ms. Quasem that about 45 minutes after she ate the marijuana brownie, she "hit the floor like a rock."  According to Ms. Roe, Mr. Doe and H.S. then picked her up and moved her to the couch.  Ms. Roe also told Ms. Quasem that later in the night she fell again, hit her hip on a coffee table, and H.S. had to help her walk to the bathroom.  But when he spoke with Ms. Quasem, H.S. told the Investigator that he never saw Ms. Roe fall to the ground that night or have any other mobility issues.

192.    Ms. Roe claimed that, when H.S. was in the room, Mr. Doe pulled up her shirt, put his hands under her bra, kissed her neck and mouth, touched her butt and crotch over her pants, and told her she was pretty, smart, and that he had always liked her.   On the other hand, H.S. said he didn't see any sexual activity between Mr. Doe and Ms. Roe that night.

193.    Ms. Roe claimed that at some point in the night, H.S. "leaned over the couch and kissed her 'violently.'"  She stated that H.S. "put his tongue in her mouth and as he was kissing her he grabbed her hair and with his other hand he grabbed her breast."  Ms. Roe also reported that, "immediately after [H.S] finished kissing her he stood up and started screaming . . . [He] then began breathing heavily and said 'what are we doing' and vomited."  For his part, H.S. said Ms. Roe was the aggressor.  He told Ms. Quasem that Ms. Roe asked him to kiss her.  H.S. claimed that when he went to peck her on the lips, Ms. Roe forcefully put her tongue down his throat.  After he pulled away, Ms. Roe joked that he was a "bad kisser" and asked if he wanted to "kiss [her] again."  H.S. said no.  H.S. also denied ever touching Ms. Roe's breasts, screaming, or vomiting in the middle of Mr. Doe's living room floor.

194.    Ms. Roe alleged that before she left Mr. Doe's apartment, and after she ordered herself an Uber, H.S. came out of the bathroom and insisted on going with her back to their dormitory.  Ms. Roe claimed that she said "no," but that he persisted, and she eventually gave in.

But H.S. told Ms. Quasem that when he left the bathroom towards the end of the night in Mr. Doe's apartment, Ms. Roe told him she was ready to go and then ordered an Uber for both of them to take.

195.    It is impossible to reconcile Ms. Roe's and H.S.'s stories.  And in her decision to find Mr. Doe responsible, Ms. Quasem did not even try.  Indeed, Ms. Quasem never mentioned the fact that the only other person in Mr. Doe's apartment that night told her that what Ms. Roe alleged happen did not, in fact, happen.  Ms. Quasem could not decide that Ms. Roe was credible, and that Mr. Doe was not, without taking into account what H.S. told her.

196.    What makes Ms. Quasem's omission even worse is that Ms. Quasem did weigh H.S.'s credibility versus Ms. Roe's credibility—in connection with her adjudication of Ms. Roe's complaints against H.S.  She just didn't share what she found with Mr. Doe.

197.    Ms. Quasem had to believe H.S. or Ms. Roe.  Both couldn't have been telling the truth.  Their stories were completely different from one another.  Given that Ms. Quasem found H.S. not responsible, she must have made the determination that he was credible and Ms. Roe was not.  But Ms. Quasem omitted that determination from the Investigation Report.  That wasn't fair to Mr. Doe.

## VII.    The Sanctioning Panel

198.    Following Ms. Quasem's decision to find Mr. Doe responsible for Sexual Assault, she submitted the Investigation Report (which contained no mention of Ms. Roe's complaints against H.S., including what credibility determinations Ms. Quasem made in her adjudication of those complaints) to Student Conduct and Conflict Resolution Services, which convened a Sanctioning Panel.

199.    Katherine Porras, the director of Student Conduct and Conflict Resolution Services, was responsible for selecting the members of the Sanctioning Panel and "ensur[ing] a fair and expedient administration of the sanctioning process."  (Code at 19.)

200.    On June 3, 2019, Bobby Howard, American University's Assistant Director of Student Conduct and Conflict Resolution Services, informed Mr. Doe that he could participate in the Sanctioning Panel by "submit[ting] a written statement . . . that w[ould] be read aloud by the sanctioning panel administrator during the sanctioning panel."  Mr. Howard then told Mr. Doe that he "may also choose to share a statement via Skype or phone at [his] assigned time (2:00 p.m. EST)."

201.    Mr. Howard told Mr. Doe that his "advisor [would] be permitted to attend the sanctioning panel at 2pm EST."

202.    Mr. Doe, who was in Kuwait at the time, submitted a written statement and informed the University that his Advisor would attend the Sanctioning Panel.

203.    A few hours before the Sanctioning Panel was scheduled to meet, and after Mr. Doe had already sent his written statement to the University, he received an email from Student Conduct stating: "**Since you are not attending, this unfortunately also means your advisor cannot attend.**"  (Emphasis in the original.)  Mr. Doe's Advisor did not receive Student Conduct's message—so he showed up to the Sanctioning Panel meeting anyway.  When he got there, AU barred him from entering the room, even for the portion of the hearing when Ms. Porras read Mr. Doe's statement out loud.

204.    The University's decision that Mr. Doe's Advisor could not attend his Sanctioning Panel—after it explicitly told him he could attend and Mr. Doe relied on that communication when he decided to submit a written statement—was contrary to both the

instructions Mr. Doe initially received from Mr. Howard and the University's own policies and procedures. There is *nothing* in the University's policies and procedures that says an Advisor cannot attend a Sanctioning Panel if his or her advisee submits a written statement. Indeed, the Code explicitly states: "[A]dvisors may be present at disciplinary proceedings" (Code at 12) or "any meeting" (Code at 18). The University does not limit Advisors' attendance in any way when his or her advisee participates in a disciplinary proceeding via a written statement. In Mr. Doe's case, the University made this rule up and denied Mr. Doe a right it had promised him.

205.    And while the University denied Mr. Doe the right to have his Advisor attend the Sanctioning Panel, it allowed Ms. Roe's Advisor to be there. There was nobody looking out for Mr. Doe's interests at the Sanctioning Panel.

206.    Had Mr. Doe's Advisor been allowed to attend his Sanctioning Panel, he would have witnessed a hearing that was biased against Mr. Doe and blatantly violated the University's own policies and procedures (and he would have stopped it).

207.    At the outset of the Hearing, Ms. Porras asked Ms. Roe whether she had "any concerns of personal bias to raise with regard to the panel members or [Ms. Porras]." Ms. Roe said "no."

208.    After Ms. Roe gave her statement to the Sanctioning Panel—and no members of the Panel decided to ask her any questions about her claims—Ms. Porras told the members of the Sanctioning Panel that "[i]n accordance with the Student Conduct Code, members of the Sanctioning Panel may be disqualified on the grounds of personal bias, with a final decision to be made by the Sanctioning Panel administrator," and "[t]he Sanctioning Panel administrator

may be disqualified on the grounds of personal bias, with a final decision to be made by a

majority vote of the Sanctioning Panel members."

209.    Ms. Porras then stated: "*So if the Respondent is not here, he does not have the*

*opportunity to recuse anyone.*"

210.    Ms. Porras's instructions violated the University's policies and procedures in

multiple ways.

211.    First, there is *nothing* in the Code that says a respondent does not have the right to

challenge a member of the Sanctioning Panel if he submits his statement in writing.  The Code

states:

- "Students accused of conduct violations are entitled to . . . request that any person conducting a disciplinary proceeding or serving as a Conduct Council member or hearing administrator, be disqualified on the grounds of conflict of interest" (Code at 4); and

- "Any party may challenge a panel member or the hearing administrator on the ground of a conflict of interest" (Code at 14).

The University simply broke its promise to Mr. Doe.  He was "entitled" to challenge the

members of the Sanctioning Panel and the Sanctioning Panel administrator—and the University

denied him that right.

212.    Second, Ms. Porras stated the wrong standard for challenging a member of the

Sanctioning Panel and the Sanctioning Panel administrator.  A respondent's challenge need not

be limited to "personal bias."  The Code states that members of the Panel and the Panel

administrator could be disqualified for "conflicts of interest"—which is broader than just

"personal bias."  "Personal bias" implies that the only way a Panel member or the administrator

could be disqualified is if they knew one or both of the parties.  But a "conflict of interest" could

be present any time a person has two competing interests.

213.    To this day, the University has not provided Mr. Doe with the identities of two out of the three Panel members.  Mr. Doe thus has no way of knowing whether they have a conflict of interest.

214.    The Sanctioning Panel ultimately decided that Mr. Doe should be suspended.

215.    Accordingly, on July 1, 2019, Dean Jeffrey Brown imposed the following sanctions: (1) suspension from the University through December 31, 2020, which will be permanently recorded on Mr. Doe's academic transcript; and (2) completion of a "Reflection Paper," which must include, among other things, a discussion by Mr. Doe about "how [his] actions resulted in [him] ultimately being found responsible for a sexual misconduct charge."

## VIII.   The Appeal

216.    On July 15, 2019, Mr. Doe appealed the decision to find him responsible and sanction him to a year-and-a-half suspension on three bases.

217.    First, Mr. Doe argued that he did not receive a fair and thorough disciplinary process.  The University had promised him that he would get "an equal opportunity to be heard" and that the Investigator would "gather relevant evidence and information."  But he received none of that.  Instead:

- The University failed to provide him with relevant information, evidence, and the findings made concerning the investigation of H.S., a critical witness and the only other person in his apartment that night.

- The University failed to provide him with Ms. Roe's written complaint.

- The University failed to gather critical evidence, including reports Ms. Roe made to her Resident Assistant, the Resident Assistant's supervisor, and an OASIS representative.  The fact that Ms. Roe reported the incident to these people was used against Mr. Doe by Ms. Quasem in her findings, even though she made no effort to speak to these witnesses or gather any written evidence.

- Mr. Doe was never provided with the names of the Sanction Panel members or the Sanctions Panel Administrator so he had no opportunity to challenge them on the basis of a conflict of interest.

218.    Second, Mr. Doe presented new information.  After he was suspended, Mr. Doe's Advisor spoke with H.S. about Ms. Quasem's investigation regarding Ms. Roe's allegations against him. H.S. informed Mr. Doe's Advisor that it was his understanding, based on conversations with Mr. Doe soon after the incident, that there had been a very coherent dialogue between Ms. Roe and Mr. Doe about consent at each step in their physical interaction and that the word "consent" was used at each step—information that Ms. Quasem did *not* include in the Investigation Report.

219.    H.S. also provided new information regarding B.F..  After the Sanctioning Panel, H.S.'s Advisor had learned that Ms. Quasem had interviewed B.F. and included a summary of her interview in the report she wrote for H.S.'s case.  Ms. Quasem, however, did not include the summary of her interview of B.F.—who had key information regarding Ms. Roe's credibility and the potency of the marijuana brownie she ate on April 22, 2016—in Mr. Doe's Investigation Report.

220.    And, third, Mr. Doe argued that the sanctions imposed on him were excessive—especially given that what Ms. Quasem ultimately found him responsible for was that, after Ms. Roe initiated kissing with him, Ms. Roe's words and actions were insufficient to allow him to touch her breasts and vulva through her clothing for a few seconds.  The sanction—a one-and-a-half-year suspension and a permanent notation on his academic record—will follow Mr. Doe for the rest of his life and will severely hamper his ability to pursue his chosen career.  Such a lifetime sanction is grossly excessive.

**CAUSES OF ACTION**

I.     **Count I – Violation of Title IX (20 U.S.C. § 1681)**

221.    John Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

222.    The University receives federal funding, including in the form of federal student loans given to students.

223.    Because it receives federal funding, the University is subject to the requirements of Title IX.

224.    Title IX prohibits gender discrimination in the educational setting.

225.    Ms. Roe's complete lack of credibility; her inconsistent statements; the lack of any credible evidence that Ms. Roe was so inebriated from eating a marijuana edible that she could not stand, walk, or think clearly, as she alleged; the testimony of H.S. and C.S. (i.e., the two people who Ms. Roe claimed saw Mr. Doe sexually assault her that night); contemporaneous text messages, which Ms. Roe failed to produce; the finding of non-responsibility in H.S.'s case; and the University's gross mishandling of the investigation and adjudication of Mr. Doe cast serious doubt on the University's finding of responsibility and show that the decision against him was based on his gender and the gender of his accuser.

226.    At the time Ms. Roe's claims were reported, investigated, and adjudicated, the University was under tremendous pressure, from multiple sources, to appear tough on sexual misconduct.  It initiated its investigation and adjudication of the allegations against Mr. Doe in the midst of multiple active OCR investigations, and in the aftermath of several public scandals that prompted complaints by students and alumni regarding misogyny, "rape culture," and sexual misconduct on the University's campus.

227.    As a reaction to these sources of pressure and scrutiny, the University was motivated to be perceived as aggressively addressing women's claims of sexual misconduct on its campus.  It has therefore treated male students accused of sexual misconduct by female students, including Mr. Doe, more aggressively than it otherwise would, and more aggressively than it would treat similar complaints made by male students against female students.

228.    The steps the University has taken in response to public pressure that it do something about its "rape culture" and "culture of misogyny and sexual assault," betrays the fact that gender bias pervades the process by which the University now investigates and adjudicates sexual misconduct claims.

229.    The University adopted a "survivor-friendly investigative model for complaints," drastically limiting the due process rights respondents receive throughout the sexual misconduct disciplinary process.  The University eliminated the use of hearings to adjudicate claims of sexual misconduct, instead giving the authority to investigate and adjudicate all claims of sexual misconduct to a single person.  It also chose Fariha Quasem—who has advocated for a gender-biased view of sexual assault—to be the investigator and adjudicator of sex assault claims, touting her "advocacy" work when it hired her.

230.    In response to an OCR complaint by a former female complainant, who alleged that the University was silencing victims and not doing enough to protect them, the University changed its confidentiality policy for sexual misconduct cases to allow the parties to publicly discuss the formerly confidential proceedings.  The University acknowledged when it made the change that it would benefit complainants (who are overwhelmingly female) more than respondents (who are overwhelmingly male).

231.    When the United States Education Department's adopted new guidance on Title IX for colleges and universities in 2017—which provided for additional due process protections for respondents, but which women's rights groups criticized as being discriminatory against female students—the Title IX Office pledged that it would not follow the new guidance. Rather, the Title IX Office said it would adhere to the guidance the Education Department had rescinded, which enforced a gendered view of sexual assault.

232.    The gender bias with which the University investigates and adjudicates claims of sexual misconduct influenced every level of the proceedings. The Title IX Office failed to apply the University's one-year statute of limitations to Ms. Roe's complaints—failing to even ask Ms. Roe why it had taken nearly three years for her to file her complaints. The Investigator then used the passage of time to diminish Mr. Doe's credibility—without doing the same for Ms. Roe with respect to the numerous inconsistencies in her testimony.

233.    Ms. Quasem exhibited gender bias when she failed to question Ms. Roe's hard-to-believe story about being virtually catatonic that night. Not only did Ms. Quasem not pose any follow-up questions to Ms. Roe regarding her claimed state, she did not gather any information or evidence about the time period between when Ms. Roe left Mr. Doe's apartment and when she arrived at her dormitory room.

234.    Ms. Quasem failed to ask H.S.—the only other person in Mr. Doe's apartment—about a number of Ms. Roe's claims regarding that night. For example, Ms. Roe claimed she screamed "no . . . no . . . stop," when Mr. Doe allegedly digitally penetrated her. Despite the fact that H.S. would have been no more than approximately 20 feet away from them, Ms. Quasem did not ask him whether he heard Ms. Roe scream. Nor did Ms. Quasem ask H.S. about Ms. Roe's claims that H.S. witnessed Mr. Doe putting his hands under Ms. Roe's bra without her consent.

235.     Ms. Quasem did not interview three people with whom Ms. Roe spoke shortly after that night—Ms. Roe's Residential Advisor, her RA's supervisor, and her OASIS advocate. At the same time, Ms. Quasem used the fact that Ms. Roe told these three people that something had happened to her that night to bolster Ms. Roe's credibility.

236.     When adjudicating Ms. Roe's allegations, Ms. Quasem gave greater weight to Ms. Roe's account of that night, as well as hearsay statements provided by Ms. Roe's witnesses (all of whom were female), than she did to the accounts of Mr. Doe, H.S., and C.S., as well as contemporaneous text messages.

237.     Ms. Quasem also misrepresented evidence to make it seem as though it supported Ms. Roe's story, when it actually undermined it (e.g., H.S.'s statements regarding Ms. Roe's signs of inebriation that night).

238.     Ms. Quasem drew every inference in Ms. Roe's favor, even when they should have been made in Mr. Doe's favor.

239.     And Ms. Quasem required Mr. Doe to put forward enough evidence to prove that Ms. Roe gave her consent, even though the burden was on Ms. Roe to prove, by a preponderance of the evidence, that she did not give her consent that night.

240.     Ms. Quasem also denied Mr. Doe the right to submit questions to the witnesses Ms. Quasem interviewed in H.S.'s case, even though those witnesses would have had relevant information with respect to Ms. Roe's allegations against Mr. Doe, including as to Ms. Roe's credibility.  Indeed, Ms. Quasem denied Mr. Doe the right to address any relevant information gathered by Ms. Quasem in her investigation of H.S.

241.     The University exhibited gender bias during the sanctioning phase of the disciplinary proceeding as well.  In violation of the University's policies and procedures, the

Director of Student Conduct, Ms. Porras denied Mr. Doe the right to have an Advisor attend the Sanctioning Panel (but allowed Ms. Roe's Advisor to attend). And Ms. Porras informed the Sanctioning Panel (but not Mr. Doe) that Mr. Doe could not challenge any of them (or Ms. Porras herself) for "personal bias" because he submitted a written statement, even though there is nothing in the University's policies and procedures that says that.

242.    The Appellate Board exhibited gender bias when it summarily found, without any meaningful explanation, that Mr. Doe's appeal was not "viable," thus denying Mr. Doe the opportunity to have his appeal decided by the Dean of Students.

243.    Upon information and belief, the University has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students. Upon information and belief, the University has not acted comparably with respect to allegations of sexual misconduct made against female students.

244.    As a direct result of the University's violation of Title IX, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; lost the ability to graduate at the end of AU's 2019 summer term, thereby delaying the time at which he can begin a career and shortening the length of that career; and he will suffer a permanent reduction in lifetime earnings.

245.    Accordingly, Defendant the University is liable to Mr. Doe for violations of Title IX and for all damages arising out of that violation.

**II.**    **Count II – Violation of the D.C. Human Rights Act (D.C. Code § 2-1402.41)**

246.    John Doe incorporates by reference all of the preceding paragraphs of this

Complaint as though fully set forth herein.

247.    Section 2-1402.41 of the D.C. Human Rights Act states:

> It is an unlawful discriminatory practice, subject to the exemptions
> in § 2-1401.03(b), for an educational institution:
>
> To deny, restrict, or to abridge or condition the use of, or access to,
> any of its facilities, services, programs, or benefits of any program
> or activity to any person otherwise qualified, wholly or partially, for
> a discriminatory reason, based upon the actual or perceived: race,
> color, religion, national origin, sex, age, marital status, personal
> appearance, sexual orientation, gender identity or expression,
> familial status, family responsibilities, political affiliation, source of
> income, or disability of any individual[.]

248.    That provision bars acts of intentional discrimination and acts that merely have

the effect of burdening a protected class.

**A.    Disparate Treatment**

249.    For all of the reasons stated in Count I, Mr. Doe's finding of responsibility and

the sanction against him are the product of intentional gender discrimination and therefore

violate his rights under the D.C. Human Rights Act.

250.    The disparate impact of the University's Title IX enforcement regime, as

explained below, is additional evidence that the University engaged in intentional gender

discrimination in finding Mr. Doe responsible and suspending him.

**B.    Disparate Impact**

251.    Upon information and belief, the vast majority of respondents in the University's

Title IX proceedings since the University switched to a single-investigator model have been

male.

252.    The University uses training designed specifically for the investigation and adjudication of claims of sexual misconduct for the purpose of training individuals to handle such claims.  It does not employ that same training for the purpose of training individuals to handle claims of non-sexual misconduct.

253.    The University employs as a Title IX investigator a person who brings a bias in favor of female complainants into every case she investigates and adjudicates.

254.    The process by which the University trains the individuals involved in sexual misconduct proceedings, conducts investigations of such claims, and adjudicates or otherwise resolves such claims has the effect of producing false findings of responsibility.

255.    The false findings of responsibility for claims of sexual misconduct exceed those for claims of non-sexual misconduct.

256.    The University's Title IX enforcement regime has the effect of disproportionately burdening male students based upon their sex.

257.    No business necessity justifies the disparate impact of the University's Title IX enforcement regime upon male students.  A less discriminatory process, such as the regime the University uses to resolve claims of non-sexual misconduct or the system the University previously used, would suffice for claims of sexual misconduct as well.

258.    As a direct result of the University's violation of the D.C. Human Rights Act, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; lost the ability to graduate at the end of AU's 2019 summer

term, thereby delaying the time at which he can begin a career and shortening the length of that career; and he will suffer a permanent reduction in lifetime earnings.

259.     Accordingly, the University is liable to Mr. Doe for violations of the D.C. Human Rights Act and for all damages arising out of that violation.

## III.     Count III – Breach of Contract

260.     John Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

261.     At all times relevant hereto, a contractual relationship existed between the University and John Doe.

262.     The University's Policies and Codes were a part of that contract.  Under that contract, the University was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, in the process of sanctioning students, and in resolving appeals.

263.     Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.

264.     The covenant required the University to implement the contractual provisions identified below in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

265.     The University breached this contract with John Doe, and the covenant of good faith inherent in it, by failing to comply with the Policy in at least the following ways:

A.      **Statute of Limitations**

266.    The University failed to apply its one-year statute of limitations to Ms. Roe's nearly three-year old claims against Mr. Doe.

267.    The 2015-2016 Code required complainants to file a claim for an "*alleged violation [of the Code] involving . . . rape [or] sexual assault*" within one year of the incident's occurrence.  (2015-2016 Code at 12 (emphasis in original).)

268.    Ms. Roe alleges that Mr. Doe assaulted her on April 22, 2016.  Under the University's policies, Ms. Roe could therefore not file her claim after April 21, 2017, unless she made a request for an extension "in writing to the director of Student Conduct and Conflict Resolution or designee."  (Id.)  The Student Conduct and Conflict Resolution or designee would evaluate any request for an extension "based on whether a reasonable person might be justified in filing after the deadline because of relevant circumstances."  (Id.)

269.    Based on information and belief, Ms. Roe did not request an extension to file her complaints on January 9, 2019—nearly three years after the alleged incident.  Nor were there any relevant circumstances that would have justified Ms. Roe's long delay to file her complaints.

270.    In permitting Ms. Roe to file her time-barred complaints, the University failed to apply the policies and procedures it promised to Mr. Doe, thereby breaching its contract with him.

B.      **Failure to Provide a "Thorough and Impartial Investigation"**

271.    The University's Policy requires its Investigator to conduct a "thorough and impartial investigation that afford[s] all parties notice and opportunity to present evidence in determining whether a policy violation has occurred."  (Policy at 8.)  For all of the reasons explained in detail above, the University breached its promise.

272.    The University failed, for example, to adequately investigate Mr. Doe's case, by (among other things), not posing any follow-up questions to Ms. Roe or H.S. when the answers would have undermined Ms. Roe's allegations; not obtaining information and evidence related to Ms. Roe's trip from Mr. Doe's apartment to her dormitory room, which would have showed that she was not telling the truth about her physical and mental state that night; and not interviewing Ms. Roe's Residential Advisor, the Residential Advisor's supervisor, or Ms. Yzaguirre (her OASIS advocate), all of whom Ms. Roe provided contemporaneous accounts of what happened in Mr. Doe's apartment.

273.    And it failed, for example, to be impartial when it withheld any information and evidence it gathered in the investigation of H.S.—when Ms. Roe, because she was the complainant in that case, had access to such information and evidence.

**C.    Failure to Provide an Investigation That Afforded John Doe the Opportunity to Present Evidence**

274.    The University's Policies require its Investigator to provide "all parties notice and opportunity to present evidence."  Likewise, the Code provides that, "[d]uring the investigation, the parties will have an equal opportunity to be heard, to submit information and corroborating evidence, to identify witnesses who may have relevant information, and to submit questions that they believe should be addressed by the investigator to the other party or to any witness."  (Code at 18.)

275.    The University broke its promises when it withheld from Mr. Doe the details of to its investigation of H.S. for alleged acts he committed in Mr. Doe's apartment on April 22, 2016, including what Ms. Roe was alleging he did, the witnesses Ms. Quasem interviewed, and the evidence Ms. Quasem gathered.  And the University broke its promises when it did the same thing with respect to Ms. Roe's complaint against H.S. for something that allegedly happened in

February 2016; indeed, as to that complaint, the University didn't even tell Mr. Doe that Ms. Roe had made the allegations or that Ms. Quasem was investigating and adjudicating them.

276.    The University denied Mr. Doe the right to be heard with respect to the relevant evidence and information Ms. Quasem gathered in her investigation.  He was denied the right to submit information in connection with what Ms. Quasem learned during her investigation of H.S., identify witnesses who could refute or support what Ms. Quasem found during her investigation of H.S., or pose follow-up questions to the witnesses Ms. Quasem interviewed during her investigation of H.S.

277.    At the very least, given the nature of Ms. Roe's claims against H.S., Ms. Quasem gathered information and evidence in the investigations of H.S. that are relevant to the credibility of each of them, including with respect to the events that took place in Mr. Doe's apartment on April 22, 2016.  H.S. was the key witness in Mr. Doe's case; Ms. Roe was the complainant. Mr. Doe had the right to be heard with respect the evidence and information Ms. Quasem gathered related to their credibility.  But the University denied him that right.

**D.    Application of the Preponderance Standard**

278.    The University also failed to apply the preponderance of the evidence standard in concluding that the evidence tending to show that Ms. Roe did not consent to sexual activity that night outweighed the evidence to the contrary.

279.    The University, through Ms. Quasem and the Appellate Board, was aware of a large amount of evidence that called Ms. Roe's credibility into question and therefore undermined her claims.  Among other things:

- Her claim that that she could not stand or walk without assistance, and was "floating in and out of consciousness," was contradicted by all of the available, objective evidence.

- Her claim that her memory went "blurry" after she "hit the floor like a rock" was contradicted by her own ability to remember very specific details from an incident that allegedly occurred nearly three years earlier.

- Her claims that both H.S. and C.S. witnessed Mr. Doe touch her sexually without her consent was refuted by both witnesses.

- Her failure to state, during her initial interview, that she hugged Mr. Doe goodbye before she left his apartment—only admitting that later after Mr. Doe told the Investigator she had done that.

- Her failure to mention that she had texted Mr. Doe when she got back to her dorm room that night and that she texted him the next day.

- The content of Ms. Roe's text messages to Mr. Doe, which undermined her claims regarding her level of inebriation and consent to sexual activity.

- Her plainly false stated reasons for sending Mr. Doe text messages the night of the incident and the next day.

- Her apparent decision to withhold these text messages from the Investigator.

- And her claims against H.S. were all found to be without merit.

280.    In finding that Ms. Roe did not consent that night, despite the fact that, among other things, (1) Ms. Roe was plainly not credible, (2) contemporaneous text messages she sent to Mr. Doe, which she apparently withheld, disproved her claims regarding her level of inebriation and claims regarding consent, (3) the two witnesses she identified as having seen Mr. Doe assault her at some point in the night refuted her story, (4) she made several other allegations against Mr. Doe and H.S. that were found to be without merit, and (5) the only evidence in support of her claims was unreliable, Ms. Quasem found Mr. Doe responsible for Sexual Assault based on less than a preponderance of the evidence.  Her decision was arbitrary and capricious, was without reasoned basis, ignored contrary evidence, and was the product of her pre-determined bias in favor of Ms. Roe.

### E.      The Sanctioning Panel

281.     The University did not sanction Mr. Doe in a way that complied with its policies and procedures.

282.     Student Conduct and Conflict Resolution Services told Mr. Doe that he had a choice between submitting a written statement or attending the Sanctioning Panel (in person or via Skype).  Student Conduct presented Mr. Doe with the option to submit a written statement first.  Because he was in Kuwait at the time, and because Mr. Doe understood at the time that his Advisor could attend the hearing, Mr. Doe decided to submit a written statement.

283.     Student Conduct and Conflict Resolution Services never told Mr. Doe that, by choosing to submit a written statement, the University would revoke his right to have an Advisor attend the hearing and his right to challenge members of the Sanctioning Panel.

284.     Mr. Doe was told that his Advisor could not attend the Sanctioning Panel.  The Sanctioning Panel Administrator also told the Sanctioning Panel members, but not Mr. Doe, that Mr. Doe could not challenge any of the members for "personal bias."

285.     The University's actions, through Student Conduct, violated the promises it made to Mr. Doe in its policies and procedures.

### F.      Denial of Mr. Doe's Appeal

286.     Likewise, the University did not provide Mr. Doe with an appeals process that complied with its obligations.

287.     Mr. Doe submitted an appeal that argued (1) he had new information that significantly altered the findings of fact, (2) the process by which he was investigated, adjudicated and sanctioned violated the University's policies and procedures, and (3) his sanction was excessive.

288.     According to the Code, the Appellate Board's role is to determine whether the appeal is based on one or more of the above three bases.  Mr. Doe's appeal argued all three bases.  Yet, without any meaningful explanation, the Appeal Panel found that his appeal was not "viable"—which allowed the University to avoid having to actually decide the arguments Mr. Doe made in his appeal.

289.     As a direct result of the University's breaches of its contract with Mr. Doe, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; lost the ability to graduate at the end of AU's 2019 summer term, thereby delaying the time at which he can begin a career and shortening the length of that career; and he will suffer a permanent reduction in lifetime earnings.

## IV.     Count IV – Breach of the Covenant of Good Faith and Fair Dealing

290.     Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

291.     Inherent in the University's contract with Mr. Doe was an implied covenant of good faith and fair dealing.  That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring Mr. Doe's right to receive the fruits of the contract.

292.     The covenant required the University to implement the contract in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Mr. Doe's disciplinary proceeding to a predetermined conclusion.

293.     For all of the reasons stated above, including by conducting an inadequate investigation of Ms. Roe's claims, failing to provide him with a Sanction Panel hearing that complied with the University's policies and procedures, and concluding through the Appellate Board that the threshold for an appeal had not been met, the University breached the covenant of good faith and fair dealing.

294.     As a direct result of the University's violation of the covenant of good faith and fair dealing, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; lost the ability to graduate at the end of AU's 2019 summer term, thereby delaying the time at which he can begin a career and shortening the length of that career; and he will suffer a permanent reduction in lifetime earnings.

295.     Accordingly, the University is liable to Mr. Doe for violation of the covenant of good faith and fair dealing and for all damages arising out of that violation.

**V.     <u>Count V – Negligence</u>**

296.     Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

297.     In conducting its investigation and adjudication of Ms. Roe's complaint against John Doe, the University owed a common law duty to Mr. Doe to exercise reasonable care, with due regard for the truth and to apply procedures evenhandedly, with due consideration of the important and irreversible consequences of its actions, as well as Mr. Doe's various liberty and property rights and interests generally.

298. Through the acts set forth above, the University, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process that violated the rights and interests of Mr. Doe.

299. In particular, the University has negligently trained and supervised the people it employs to investigate claims of sexual misconduct, adjudicate those claims, or otherwise implement its policies and procedures.

300. Upon information and belief, those individuals are trained (1) to implement the goal of combating "rape culture," a chief element of which is to express any doubt about the veracity of sexual assault claimants; (2) to believe that only 2-8% of campus sexual assault claimants, or some similar number, make false accusations, even though that statistic was derived in the criminal context, where deterrents against false reports are far greater; and (3) to otherwise credit the testimony of sexual assault claimants unless there is clear and convincing evidence, or something akin to that, of its falsity, in contravention of the requirement that all facts be determined by a preponderance of the evidence.

301. The University furthermore employs as its Title IX investigator an individual who brings a bias in favor of complainants into every case she investigates.

302. The University also negligently trained the members of Mr. Doe's Sanctioning Panel and the Sanctioning Panel administrator with respect to the University's policies and procedures regarding the respondent's right to have his Advisor attend the Sanctioning Panel hearing and the respondent's right to challenge members of the Panel based on a conflict of interest.

303.     The University also negligently trained the members of Mr. Doe's Appellate Board with respect to their roles in determining the threshold issue viability—not the substance of any underlying appeal.

304.     As a direct result of the University's negligence, and as a direct and proximate cause thereof, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; lost the ability to graduate at the end of AU's 2019 summer term, thereby delaying the time at which he can begin a career and shortening the length of that career; and he will suffer a permanent reduction in lifetime earnings.

305.     Accordingly, the University is liable to John Doe for negligence and for all damages arising out of that violation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against the University, and order relief against Defendant as follows:

a.     That this Court issue permanent injunctive relief: (1) ordering the University to vacate its finding of Responsibility as to Mr. Doe; (2) restraining the University from reflecting, in any manner whatsoever, in John Doe's records or elsewhere, the findings or sanctions imposed upon Mr. Doe based on its adjudication of Ms. Roe's complaint; and (3) restraining the University from maintaining any records related to that sanction, as it was the product of the University's erroneous finding that he violated the Policy and Code, which was itself the product of a flawed disciplinary process; and

b.      That the University be ordered to pay compensatory damages as appropriate to

compensate John Doe for his losses caused by the its misconduct; and

c.      That the University be ordered to pay punitive damages; and

d.      That this Court award John Doe his costs and expenses incurred in this action, as

well as such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED: October 9, 2019

Matthew G. Kaiser (D.C. Bar No. 486272)
Scott Bernstein (D.C. Bar No. 1013922)
William E. Zapf (D.C. Bar No. 987213)
KAISERDILLON PLLC
1099 14th Street NW, 8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
mkaiser@kaiserdillon.com
sbernstein@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Plaintiff John Doe*