**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN DOE,<br><br>Plaintiff,<br>v.<br><br>AMERICAN UNIVERSITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:19-cv-03097-APM<br><br>**MOTION TO DISMISS COMPLAINT** |

## MOTION TO DISMISS COMPLAINT

Defendant American University hereby moves to dismiss this matter pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

As explained in the attached Memorandum of Points and Authorities in Support of this Motion, Plaintiff John Doe has not alleged facts sufficient to state a claim of gender-based discrimination in violation of 20 U.S.C. § 1681 (commonly known as Title IX) or the D.C. Human Rights Act (D.C. Code § 2-1402.41), and also has failed to allege facts sufficient to state claims for breach of contract, breach of the covenant of good faith and fair dealing, and negligence. Dismissal of this Complaint is therefore warranted.

DATED: December 9, 2019

Respectfully submitted,

/s/ Laurel Pyke Malson
Laurel Pyke Malson (#317776)
Aryeh S. Portnoy (#464507)
Nathiya Nagendra (#1031055)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2576
LMalson@crowell.com
APortnoy@crowell.com
NNagendra@crowell.com
*Counsel for Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:19-cv-03097-APM |
| v. | ) | |
| | ) | |
| AMERICAN UNIVERSITY, | ) | **MEMORANDUM OF POINTS AND** |
| | ) | **AUTHORITIES IN SUPPORT OF** |
| Defendant. | ) | **MOTION TO DISMISS COMPLAINT** |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS COMPLAINT**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 3

LEGAL STANDARD ........ 7

ARGUMENT ........ 8

I. DOE'S COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF UNDER TITLE IX. ........ 8

- A. Doe fails to allege facts sufficient to cast articulable doubt on the University's findings. ........ 10
- B. Doe fails to allege any facts that plausibly demonstrate any causal connection between the University's investigation and gender bias. ........ 13

II. DOE'S COMPLAINT FAILS TO STATE A CAUSE OF ACTION UNDER THE D.C. HUMAN RIGHTS ACT. ........ 19

- A. Doe does not plausibly allege intentional gender discrimination. ........ 19
- B. Doe fails to allege sufficient facts to state a disparate impact claim. ........ 20

III. DOE'S COMPLAINT FAILS TO STATE VIABLE CONTRACT CLAIMS. ........ 21

- A. Doe has not alleged the breach of an enforceable contract. ........ 21
  - 1. The University's Policy and Code are not enforceable contracts. ........ 21
  - 2. AU and its employees complied with the Code and Policy. ........ 24
    - (i) The investigation process ........ 24
    - (ii) The reporting provision ........ 26
    - (iii) The Sanctioning Panel ........ 29
    - (iv) Doe's appeal ........ 30
- B. Doe fails to state a claim for breach of the implied covenant of good faith and fair dealing. ........ 30

IV. DOE'S COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENCE. ........ 32

- A. AU owed no actionable duty of care to Doe. ........ 32
- B. Doe has not pled facts sufficient to show negligence by AU employees. ........ 33
- C. Doe's negligence claim must be dismissed as duplicative of his contract claim. ........ 35

V. DOE'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. ........ 36

CONCLUSION ........ 37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amin v. Nyack Sch. of Adult & Distance Educ.*,
710 F. Supp. 2d 80 (D.D.C. 2010) ....................35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................3, 7, 15

*Austin v. Univ. of Oregon*,
205 F. Supp. 3d 1214, 1226-27 (D. Or. 2016), *aff'd*, 925 F.3d 1133
(9th Cir. 2019) ....................17

*Austin v. Univ. of Oregon*,
925 F.3d 1133 (9th Cir. 2019) ....................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................7, 15, 34

*Booker v. Lehigh Univ.*,
800 F. Supp. 234 (E.D. Pa. 1992) ....................33

*Borkowski v. Balt. Cty., Md.*,
Civ. No. DKC 18-2809, 2019 WL 4750296 (D. Md. Sept. 30, 2019) ....................13, 14

*Bradshaw v. Rawlings*,
612 F.2d 135 (3d Cir. 1979) ....................33

*Brown v. Rector & Visitors of Univ. of Va.*,
No. 3:07cv00030, 2008 WL 1943956 (W.D. Va. May 2, 2008),
*aff'd sub nom.*, 361 F. App'x 531 (4th Cir. 2010) ....................24

*Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*,
357 F. Supp. 2d 89 (D.D.C. 2004) ....................31

*Carroll v. Fremont Inv. & Loan*,
636 F. Supp. 2d 41 (D.D.C. 2009) ....................23

*Chandamuri v. Georgetown Univ.*,
274 F. Supp. 2d 71 (D.D.C. 2003) ....................19

**Chenari v. George Wash. Univ.*,
847 F.3d 740 (D.C. Cir. 2017) ....................31

*Choharis v. State Farm Fire & Cas. Co.*,
961 A.2d 1080 (D.C. 2008) ....................................................................................35

*D.C. v. Harris*,
770 A.2d 82 (D.C. 2001) ........................................................................................32

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1999)................................................................................................11

*Doe v. Belmont Univ.*,
334 F. Supp. 3d 877 (M.D. Tenn. 2018)..................................................................21

*Doe v. Brandeis Univ.*,
177 F. Supp. 3d 561 (D. Mass. 2016)...............................................................26, 29

*Doe v. Case W. Reserve Univ.*,
No. 1:14CV2044, 2015 WL 5522001 (N.D. Ohio Sept. 16, 2015) ..........................15

*Doe v. Coll. of Wooster*,
243 F. Supp. 3d 875 (N.D. Ohio 2017).............................................................17, 18

*Doe v. Columbia Coll. Chi.*,
299 F. Supp. 3d 939 (N.D. Ill. 2017) ...............................................................19, 32

*Doe v. Columbia Coll. Chi.*,
933 F.3d 849 (7th Cir. 2019) ....................................................................................8

*Doe v. Cummins*,
662 F. App'x 437 (6th Cir. 2016) ................................................................... *passim*

*Doe v. George Wash. Univ.* ("*GWU I*"),
366 F. Supp. 3d 1 (D.D.C. 2018)......................................................................20, 32

*Doe v. George Washington University* ("*GWU II*"),
321 F. Supp. 3d 118 (D.D.C. 2018)..........................................................................23

*Doe v. N. Mich. Univ.*,
393 F. Supp. 3d 683 (W.D. Mich. 2019) ..................................................................15

*Doe v. Oberlin Coll.*,
No. 1:17 CV 1335, 2019 WL 1439115 (N.D. Ohio Mar. 31, 2019)..........................18

*Doe v. Princeton Univ.*,
No. 17-cv-1614 (PGS), 2018 WL 2396685 (D.N.J. May 24, 2018),
*aff'd*, No. 18-1477, 2019 WL 5491561 (3d Cir. Oct. 25, 2019) ..............................30

*Doe v. Princeton Univ.*,
No. 18-1477, 2019 WL 5491561 (3d Cir. Oct. 25, 2019)...........................................8

*Doe v. Rider Univ.*,
No. 3:16-cv-4882-BRM-DEA, 2018 WL 466225 (D.N.J. Jan. 17, 2018)...........................8, 10

*Doe v. Univ. of Ark.-Fayetteville*,
No. 5:18-CV-05182, 2019 WL 1493701 (W.D. Ark. Apr. 3, 2019) .........................8, 9, 10, 11

*Doe v. Univ. of Cincinnati*,
173 F. Supp. 3d 586 (S.D. Ohio 2016) ...................................................................17, 18

*Doe v. Univ. of Cincinnati*,
No. 1:16cv987, 2018 WL 1521631 (S.D. Ohio Mar. 28, 2018) ...........................................18

*Doe v. Univ. of Colo., Boulder through Bd. of Regents of Univ. of Colo.*,
255 F. Supp. 3d 1064 (D. Colo. 2017).......................................................................17

*Doe v. Univ. of Dayton*,
766 F. App'x 275 (6th Cir. 2019) ...........................................................................16

*Doe v. Univ. of the S.*,
687 F. Supp. 2d 744 (E.D. Tenn. 2009).................................................................11, 15

*Doe v. Univ. of St. Thomas*,
240 F. Supp. 3d 984 (D. Minn. 2017)........................................................................17

*Doe v. Va. Polytechnic Inst. & State Univ.*,
400 F. Supp. 3d 479 (W.D. Va. 2019) ...................................................................8, 15

*Doe v. W. New England Univ.*,
228 F. Supp. 3d 154 (D. Mass. 2017).........................................................................13

*E. Sav. Bank, FSB v. Papageorge*,
31 F. Supp. 3d 1 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015)...............................36

*Freeman v. Busch*,
349 F.3d 582 (8th Cir. 2003) .................................................................................33

*Friends Christian High Sch. v. Geneva Fin. Consultants*,
39 F. Supp. 3d 58 (D.D.C. 2014)...............................................................................35

*Giles v. Shell Oil Corp.*,
487 A.2d 610 (D.C. 1985) .......................................................................................34

*Holert v. Univ. of Chi.*,
751 F. Supp. 1294 (N.D. Ill. 1990) ..........................................................................28

*Holloway v. Howard Univ.*,
206 F. Supp. 3d 446 (D.D.C. 2016)...........................................................................9

*Hunter ex rel. A.H. v. D.C.*,
64 F. Supp. 3d 158 (D.D.C. 2014) ....................................................................................36

*Int'l Bhd. Of Teamsters v. United States*,
431 U.S. 324 (1977)...............................................................................................................20

*Islar v. Whole Foods Mkt. Grp., Inc.*,
217 F. Supp. 3d 261 (D.D.C. 2016) ...........................................................................35, 36

*Kerr v. Johns Hopkins Univ.*,
Civ. No. L-10-3294, 2011 WL 4072437 (D. Md. Sept. 12, 2011) .......................................28

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994).................................................................................................7

*Lannan Found. v. Gingold*,
300 F. Supp. 3d 1 (D.D.C. 2017)..............................................................................................7

*Manago v. D.C.*,
934 A.2d 925 (D.C. 2007) ..............................................................................................19, 22

*Mero v. City Segway Tours of Wash., DC, LLC*,
826 F. Supp. 2d 100 (D.D.C. 2011)........................................................................................30

*Messeri v. Univ. of Colorado, Boulder*,
No. 18-CV-2658-WJM-SKC, 2019 WL 4597875 (D. Colo. Sept. 23, 2019) ..........................8

*Middlebrooks v. Godwin Corp.*,
722 F. Supp. 2d 82 (D.D.C. 2010)............................................................................................7

*Morris v. Brandeis Univ.*,
804 N.E.2d 961 (Mass. App. Ct. 2004) (unpublished) ..........................................................28

**Mosby-Nickens v. Howard University*,
864 F. Supp. 2d 93 (D.D.C. 2012)...................................................................21, 22, 23

*Nguyen v. Mass. Inst. of Tech.*,
96 N.E.3d 128 (Mass. 2018) ..................................................................................................33

**North v. Catholic Univ. of Am.*,
310 F. Supp. 3d 89 (D.D.C. 2018)..........................................................................................32

*Prasad v. George Wash. Univ.*,
390 F. Supp. 3d 1 (D.D.C. 2019)............................................................................................34

*Quick v. EduCap, Inc.*,
318 F. Supp. 3d 121 (D.D.C. 2018)........................................................................................36

*Raihan v. George Wash. Univ.*,
324 F. Supp. 3d 102 (D.D.C. 2018) .......... 8

*Rhaney v. Univ. of Md. E. Shore*,
880 A.2d 357 (Md. 2005) .......... 33

**Richter v. Catholic Univ. of Am.*,
2019 WL 481643 (D.D.C. Feb. 7, 2019) .......... *passim*

**Robinson v. Howard Univ., Inc.*,
335 F. Supp. 3d 13 (D.D.C. 2018) .......... 9, 10, 13, 35

*Roe v. Doe*,
401 F. Supp. 3d 159 (D.D.C. 2019) .......... 33

*Ruff v. Bd. of Regents of Univ. of N.M.*,
272 F. Supp. 3d 1289 (D.N.M. 2017) .......... 8, 13

*Sahm v. Miami Univ.*,
110 F. Supp. 3d 774 (S.D. Ohio 2015) .......... 14, 15

*Shin v. Univ. of Md. Med. Sys. Corp.*,
369 F. App'x 472 (4th Cir. 2010) .......... 28

**Shinabargar v. Bd. of Trs. of Univ. of D.C.*,
164 F. Supp. 3d 1 (D.D.C. 2016) .......... 22

*Tolu v. Ayodeji*,
945 A.2d 596 (D.C. 2008) .......... 33

*WMATA v. Quik Serve Foods, Inc.*,
Civ. No. 04-687(RCL), 2006 WL 1147933 (D.D.C. Apr. 28, 2006) .......... 31

*Wright v. Howard Univ.*,
60 A.3d 749 (D.C. 2013) .......... 31

*Xereas v. Heiss*,
933 F. Supp. 2d 1 (D.D.C. 2013) .......... 31

*Z.J. v. Vanderbilt Univ.*,
355 F. Supp. 3d 646 (M.D. Tenn. 2018) .......... 13

**Statutes**

20 U.S.C. § 1232g .......... 26

20 U.S.C. § 1681(a) .......... 9

D.C. Code § 2-1402.41(1) .......... 19

**Rules**

Fed. R. Civ. P. 12(b)(6)....................1, 7

**Other Authorities**

66 Fed. Reg. 5512 (Jan. 19, 2001)....................27

Defendant American University ("AU" or "the University"), by and through counsel, respectfully submits this Memorandum in Support of its Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

This lawsuit arises from a 2019 disciplinary proceeding in which AU investigated and adjudicated, pursuant to its Student Conduct Code ("Code")[1] and its Discrimination and Sexual Harassment Policy ("Policy"),[2] allegations that John Doe ("Doe") had violated the Policy in connection with his actions with a fellow student, Jane Roe. The incident took place on April 22-23, 2016 and involved allegations of the following Prohibited Conduct, in violation of the Code: (1) Rape, (2) Sexual Assault, and (3) Sexual Exploitation. *See* Complaint ("Compl.") ¶¶12-13.

Over a four-month period beginning January 24, 2019, an Investigator designated by the University's Title IX Office met with Doe and Roe multiple times each, interviewed five additional witnesses identified by Doe and Roe, and reviewed documentary evidence including various text messages provided by Doe, Roe, and the witnesses. May 22, 2019 Investigation Report ("Report") at 1-2 (Ex. 1).[3] The Investigator found Doe "not responsible" for the charges of Rape and Sexual Exploitation and "responsible" for the charge of Sexual Assault, specifically

---

[1] *See* Complaint Ex. 6 ("2018-2019 Code" or "Code").

[2] *See* Complaint Ex. 3 ("2017 Policy" or "Policy").

[3] Doe expressly references, quotes, and relies upon the Report in his Complaint. *See, e.g.*, Compl. ¶¶112-35, 138-39. On a motion to dismiss, "[i]n addition to the complaint's factual allegations, the Court may consider 'documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim.'" *Richter v. Catholic Univ. of Am.*, 2019 WL 481643, at *2 (D.D.C. Feb. 7, 2019) (citation omitted). Due to the confidential and sensitive nature of the Report and related documents, Defendant has moved to file portions of them under seal.

with respect to two sexual touchings that Doe admitted occurred and which the Investigator found "non-consensual," because Roe had not given "clear consent" as required by the Code. *See* Compl. ¶¶12-13; Code at 5-6 ("sexual contact will be considered 'without consent' if no clear consent . . . is given"); Report at 16, 18.

Following presentations by both Doe and Roe to a three-person Sanctioning Panel, the Panel recommended, and the Dean of Students approved as a sanction for Doe's misconduct, suspension until December 31, 2020 and a requirement that Doe write a paper reflecting on how his actions resulted in him being found responsible for a sexual misconduct charge.[4] Compl. ¶215. Consistent with the Code, AU granted both Doe and Roe the opportunity to appeal the Investigator's findings to an Appellate Board of the Conduct Council, a review committee comprised of yet another group of decision-makers. *Id.* ¶23. Doe appealed both the finding and the sanction, and the Appellate Board on July 25, 2019 determined that his appeal was not "viable" based on the limited grounds permitted for appeals set out in the Code.[5] *Id.* ¶¶23, 32.

In a further attempt to reverse AU's finding and the sanction imposed, Doe filed this lawsuit seeking injunctive relief and money damages against the University alleging (1) violations of Title IX; (2) violations of the D.C. Human Rights Act; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; and (5) negligence. Doe's Complaint, however, fails to allege any plausible facts that support any of these claims. Reduced to their essence, Doe's allegations constitute nothing more than "threadbare recitals of [the] cause[s] of action's elements, supported by mere conclusory statements" and therefore should be dismissed.

[4] A separate Sanctioning Panel, consisting of two faculty/staff members and one student, determined the sanction pursuant to Section XIX(A)(2)(c) of the Code.

[5] Under Section XIX(A)(3)(d) of the Code, the Appellate Board determines "viability" based on whether there is: (1) "New information that significantly alters the finding of fact;" (2) "Evidence of improper procedure;" and/or (3) "Insufficient/excessive sanctions." Code at 20.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, because Doe not only has failed to allege plausible facts sufficient to support his claims, but has alleged facts and referenced documents that *refute* those claims, the Complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND

**The Alleged Assault.** Doe entered AU as an undergraduate in Fall 2015. Compl. ¶1. The incident giving rise to the misconduct proceeding, and Doe's claims in this litigation, took place on April 22-23, 2016, when Doe allegedly sexually assaulted Roe in Doe's apartment, during a visit by Roe and H.S., a fellow student and mutual friend. *Id.* ¶¶2-3. While at Doe's apartment, Roe ate a marijuana brownie, and Doe and H.S. drank alcohol. *Id.* Although Roe and Doe disagree on the series of events that occurred that night, as well as Roe's level of intoxication, Doe admitted that he engaged in sexual activity with Roe, including touching Roe's breasts and her vulva over her clothing. *Id.* ¶3.

According to Doe, Roe kissed Doe and then pushed his head down towards her breasts. *Id.* ¶3*;* Report at 7. Doe then touched Roe's breasts over her clothes, without asking for, or receiving a clear indication of, Roe's consent. Compl. ¶3; Report at 7. Rather, according to Doe, he proceeded and "Roe did not object or otherwise express discomfort." Compl. ¶3. Then, according to Doe, Roe pushed his head towards her lower body and Doe moved his head near her crotch and asked Roe "is this what you want me to do?" without further specification. Compl. ¶3; Report at 7-8. Doe told the Investigator that he "*assumed* [Roe] wanted him 'to go down on her,'" but he did not clarify this assumption with Roe. Report at 8 (emphasis added). According to Doe, Roe said "yes" and Doe then began to perform oral sex on Roe over her clothing. Compl. ¶3; Report at 7-8.

After the encounter, Roe and H.S. took an Uber back to their dormitory hall. Compl. ¶5. According to both Roe and Roe's roommate, when Roe returned to her dorm room she was "very

upset and not able to communicate because she was high and crying." Compl. ¶165; Report at 12. Roe did text Doe on the night of the incident that H.S. had vomited on the way back to campus, and the following day that she was "doing okay," but subsequently stopped communicating with Doe. Compl. ¶¶181-82; Report at 8, 17.

The Investigator found that on the night of the incident and in the days that followed, Roe told her roommate that Doe had kissed and touched her without her consent. Report at 12-13. Roe also told two other friends that she had been sexually assaulted by Doe, spoke to her RA and the Community Director for her floor about what she had experienced that night, met with a confidential Office of Advocacy Services for Interpersonal and Sexual Violence (OASIS) advocate, and went to the University's Health Center for a physical exam based on what she was feeling after her experience at Doe's apartment. Report at 6, 11-13.

**The University's Investigation.** On January 24, 2019, AU informed Doe that the Title IX Office had received a report that he may have violated the University's Student Conduct Code and that it was beginning an investigation into the allegations. Specifically, Doe was informed that the Office had received information that Doe had "engaged in nonconsensual sexual activity with [Roe] who was intoxicated" on April 22-23, 2016 and that these behaviors, if substantiated, would violate the Code's prohibition of (1) Sexual Assault, (2) Sexual Exploitation, and (3) Rape. Compl. ¶¶110-11; Notice of Investigation at 1 (Ex. 2).[6] The Notice of Investigation informed Doe of his ability "to challenge the assigned investigator due to conflict of interest" within two days of receiving the Notice, referenced the Code for the definitions of Prohibited Conduct and information regarding the investigation process, and invited Doe to schedule an interview with the Investigator. *See* Notice of Investigation (Ex. 2).

[6] Doe expressly references and relies upon the Notice of Investigation in his Complaint and it is therefore properly considered on a motion to dismiss. *See* Compl. ¶110; *supra* at n.3.

Over the course of the investigation, the Investigator interviewed Doe and H.S. each twice, and Roe three times. Report at 1-2. The Investigator also interviewed four additional witnesses and reviewed text messages, photos, and other evidence provided by Doe, Roe, and the witnesses. *Id.* During the University's "case review period," Doe was given an opportunity to review and respond to the case file, including a draft report of the Investigation. Compl. ¶57; Report at 2, 14. On March 29, 2019, Doe provided a written statement with detailed comments regarding the draft Report, including the Report's recounting of his first interview with the Investigator, and submitted additional evidence for the Investigator to consider. Report at 2, 14; *see also* Report Ex. K (Ex. 3) (inadvertently referenced in the Report as Ex. L). The Investigator subsequently interviewed Doe, Roe, and H.S. on April 2-10, 2019 to address follow-up questions raised by Doe's and Roe's comments on the draft Report. Report at 2.

On May 22, 2019, the Investigator notified Doe that she had found him "not responsible" for Sexual Exploitation and Rape, and "responsible" for Sexual Assault with respect to the two sexual touchings Doe admitted had occurred. Compl. ¶¶12-13; Report at 17-18; Notice of Finding (Ex. 4).[7] The Investigator's 18-page Report outlined the evidence she had reviewed and the bases for her findings, including that "*[b]ased on [Doe's] account of what occurred*, he never asked [Roe] if he could touch her breasts or perform oral sex on her, nor did [Roe] ever vocalize that she wanted [Doe] to touch her breasts or perform oral sex on her." Report at 16 (emphasis added). In light of the Investigator's findings, the University's Student Conduct & Conflict Resolution Services office then convened a three-person "Sanctioning Panel" on June 19, 2019 to make a recommendation to the Dean of Students regarding an appropriate sanction. Compl. ¶21; June 19, 2019 e-mail from Student Conduct & Conflict Resolution Services office

[7] Doe expressly references and relies upon the Notice of Finding in his Complaint and it is therefore properly considered on a motion to dismiss. *See* Compl. ¶¶159, 198; *supra* at n.3.

to Doe (Ex. 5).[8] Doe had the opportunity to attend the Sanctioning Panel and present an oral statement either in-person or via Skype, but chose instead to submit a written statement to be read to the Panel in lieu of presenting it himself. Compl. ¶202. On July 1, 2019, based on the Sanctioning Panel's recommendations, the Dean of Students informed Doe that he would be suspended until December 31, 2020 and would be required to write a "Reflection Paper" as a sanction for being found "responsible" for Sexual Assault. *Id.* ¶215.

On July 15, 2019, Doe appealed the Investigator's findings and the sanction to the Appellate Board of the Conduct Council, alleging: (1) a flawed investigation process; (2) purportedly "new" information arising from an investigation of alleged misconduct by H.S, and bearing on Roe's credibility; and (3) that the sanction imposed on him was excessive.[9] Compl. ¶¶216-220; *see also* Doe's Appeal at 2 (Ex. 6).[10] The University's Appellate Board reviewed Doe's submission and determined, under the standards set out in the Code for an appeal to move forward, that his appeal was not "viable." Compl. ¶23. Although not required by the Code or Policy, the Appellate Board provided Doe with a letter explaining its decision, including that it "did not find evidence that the procedures outlined in the Student Conduct Code were improperly followed" and that it "did not find that the new information provided significantly

[8] Doe expressly references and relies upon the June 19, 2019 e-mail in his Complaint and it is therefore properly considered on a motion to dismiss. *See* Compl. ¶203; *supra* at n.3.

[9] *See supra* at n.5 for the grounds on which an appeal may be deemed "viable" under the Code and move forward for review and a decision by the Vice President of Campus Life. Code at 20.

[10] Doe expressly references and relies upon his Appeal in his Complaint and it is therefore properly considered on a motion to dismiss. *See* Compl. ¶¶216-20; *supra* at n.3. In his Appeal, Doe also suggested that the process was flawed because the Investigator was biased against him due to his race and national origin; he never asserted any gender-bias as affecting the integrity of AU's adjudication of Roe's claims against him.

altered the original finding[s] of fact outlined in the investigative report." July 25, 2019 Appeal Decision (Ex. 7).[11]

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must "credit the plaintiff's well-pleaded factual allegations[,] . . . draw all reasonable inferences from them in [his] favor, and dispose of the challenge accordingly." *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 13 (D.D.C. 2017) (internal quotation marks and citation omitted). However, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Lannan*, 300 F. Supp. 3d at 13 (court must "assess the complaint to determine whether it contains sufficient facts that, when accepted as true, evidence a claim that is 'plausible on its face'") (quoting *Twombly*, 550 U.S. at 570). Furthermore, while the allegations in the complaint are presumed true at this stage and all reasonable factual inferences construed in plaintiff's favor, "the [C]ourt need not accept inferences . . . unsupported by the facts set out in the complaint." *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 86 (D.D.C. 2010) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

The Court is also "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted); *see also Iqbal*, 556 U.S. at 678 ("an unadorned, the-defendant-unlawfully-harmed-me accusation" will not survive a motion to dismiss, nor will a complaint comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action").

Courts—including in this district—routinely have dismissed Title IX claims at the

---

[11] Doe expressly references and relies upon the Appeal Decision in his Complaint and it is therefore properly considered on a motion to dismiss. *See* Compl. ¶23; *supra* at n.3.

12(b)(6) stage where, as here, the complaint is based on mere "labels" or "conclusions," fails to allege facts from which intentional gender discrimination plausibly could be inferred, or includes allegations which refute that the challenged conduct was motivated by gender bias. *See, e.g., Raihan v. George Wash. Univ.*, 324 F. Supp. 3d 102, 114 (D.D.C. 2018); *see also, e.g.*, *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 856 (7th Cir. 2019); *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019); *Doe v. Princeton Univ.*, No. 18-1477, 2019 WL 5491561 (3d Cir. Oct. 25, 2019) (unpublished); *Messeri v. Univ. of Colorado, Boulder*, No. 18-CV-2658-WJM-SKC, 2019 WL 4597875, at *16 (D. Colo. Sept. 23, 2019) (appeal filed); *Doe v. Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 503 (W.D. Va. 2019); *Doe v. Univ. of Ark.-Fayetteville*, No. 5:18-CV-05182, 2019 WL 1493701, at *12 (W.D. Ark. Apr. 3, 2019) (appeal filed); *Doe v. Rider Univ.*, No. 3:16-cv-4882-BRM-DEA, 2018 WL 466225, *12 (D.N.J. Jan. 17, 2018) (unpublished); *Ruff v. Bd. of Regents of Univ. of N.M.*, 272 F. Supp. 3d 1289, 1302 (D.N.M. 2017). Dismissal is similarly warranted here.

## ARGUMENT

### I. Doe's Complaint Fails to State a Claim for Relief Under Title IX.

Dissatisfied with the Investigator's finding, the sanctions imposed, and the results of his subsequent appeal, Doe now alleges for the first time that the University's actions in resolving the complaint against him were the result of unlawful gender bias in violation of Title IX. Doe asks the Court to second-guess those actions, alleging that "[b]ecause of his gender, the University violated a number of its own policies and procedures in order to find [ ] Doe responsible for sexual assault" (Compl. ¶31) and, further, that "the decision against [Doe] was based on his gender and the gender of his accuser." *Id.* ¶225. But Doe pleads no *facts* that plausibly support these conclusory assertions.

Title IX provides, in pertinent part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity" that receives federal funding. 20 U.S.C. § 1681(a). Title IX does *not*, however, provide an opportunity for dissatisfied participants in school disciplinary proceedings to obtain a second bite at the apple by subjecting the university's merits decision to judicial review. Rather, it provides a carefully circumscribed process, by which students can seek relief where the school's decision was the result of gender discrimination, rather than the merits. Accordingly, while Courts evaluate Title IX claims under various theories, to survive a motion to dismiss, all claims require plausible allegations that gender bias motivated the university's challenged actions. *See, e.g.*, *Holloway v. Howard Univ.*, 206 F. Supp. 3d 446, 452 (D.D.C. 2016) ("[A]bsent allegations that the [u]niversity's decision was based on plaintiff's gender, the claim fails.").

Although Doe does not specify in his Complaint which theory of Title IX liability he is pursuing, his allegations suggest that his claim is based on an "erroneous outcome" theory. *See* Compl. ¶¶225-45. To state an "erroneous outcome" claim, Doe must plausibly allege that "he was innocent and wrongfully found responsible [for] an offense *due to gender bias*." *Robinson v. Howard Univ., Inc.*, 335 F. Supp. 3d 13, 27 (D.D.C. 2018) (appeal filed) (citation omitted) (emphasis added). Thus, Doe must allege *specific facts* sufficient to: (1) "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding;" *and* (2) demonstrate a "particularized . . . causal connection between the flawed outcome and gender bias." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016) (citation omitted); *Univ. of Ark.-Fayetteville*, 2019 WL 1493701, at *12. In other words, Doe must allege *particular* facts that plausibly suggest that "gender bias was a motivating factor behind the erroneous finding." *Robinson*, 335

F. Supp. 3d at 27. And, importantly, "[a]llegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Id.* (citation omitted).

Doe's claims of discrimination are premised on his disagreement with the Investigator's ultimate *conclusions* in finding Doe responsible for just one of the three conduct violations with which he was charged. Doe, however, fails to allege any *facts* that plausibly suggest the Investigator's determinations were motivated by gender bias—a *sine qua non* of any claim under Title IX. Indeed, his allegations refute that there was any gender bias. A plaintiff cannot state a viable claim under Title IX with bare-bones and conclusory allegations that the defendant's actions were motivated by gender-bias, wholly unsupported by any specific factual allegations that could plausibly support such a claim. But that is all Doe alleges here.

### A. Doe fails to allege facts sufficient to cast articulable doubt on the University's findings.

The key to alleging an actionable "articulable doubt" is "the record before the disciplinary tribunal;" if that record does not support such doubt, "the claim must fail." *Rider Univ.*, 2018 WL 466225, at *8 (citation omitted). "To show 'articulable doubt' in the outcome of the hearing panel, the plaintiff must demonstrate evidentiary weaknesses behind the finding of the offense such as a motive to lie, particular strengths of the defense, or procedural flaws affecting the record." *Univ. of Ark.-Fayetteville*, 2019 WL 1493701, at *12. While Doe attempts to raise questions regarding the finding of non-consensual touching, none of those questions "affect the record" on which that finding was made here—including *Doe's own statements* showing the absence of "clear consent."

Far from raising an "articulable doubt" about the outcome of the disciplinary proceeding, Doe's allegations amount to nothing more than his disagreement with the Investigator's ultimate conclusion—regarding the one finding that was not favorable to him—after weighing the evidence. He alleges no facts to suggest that the Investigator's finding that he sexually touched Roe twice without first obtaining her "clear consent" to those touchings was inaccurate, unsupported, or "doubtful." *Id.* at *12 (finding insufficient allegation of articulable doubt where plaintiff claimed that "the hearing panel made a credibility determination to decide which version of events to believe" but failed to allege facts to support that "his side of the events [wa]s particularly more believable"). Courts have rejected such arguments regarding "articulable doubt" even where the University found against the respondent based on an adverse credibility determination, *see id.*, but here, the Investigator's finding of non-consensual touching was based *entirely on Doe's own factual account of the events*. Doe *admitted* to touching Roe's breasts without seeking her consent first and he *admitted* to commencing oral sex on Roe's vulva over her clothing, on the assumption that that is what she wanted him to do. Report at 6, 16.

Doe's mere disagreement with the Investigator's conclusions based on those two admitted touchings is not sufficient to raise an "articulable doubt" or warrant judicial review. As the Supreme Court has held, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Nor should courts substitute their credibility and fact determinations and conclusions for those made by the Investigator. *See, e.g.*, *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) ("[T]he law does not allow th[e] Court to retry the [u]niversity's disciplinary proceeding.") (citation omitted).

This case in particular demonstrates why courts exercise restraint when reviewing university disciplinary proceedings. Doe acknowledges the thorough and diligent steps the Investigator took in conducting her lengthy investigation consistent with the Code and Policy. Compl. ¶¶136-58. The Investigator met on multiple occasions with Doe and Roe; interviewed five witnesses Doe and Roe had identified; reviewed evidence Doe, Roe, and their witnesses submitted, including contemporaneous text messages and photos; and gave Doe and Roe the opportunity to review a draft of the Investigation Report and provide comments and additional evidence.

Given the disparate accounts of the evening, the Investigator credited and relied upon *Doe's* factual account, finding insufficient evidence to substantiate the charges of Rape and Sexual Exploitation (findings Doe presumably does not consider "erroneous"), but concluding, based on the preponderance of the evidence (and Doe's own statements), that Doe did not obtain Roe's "clear consent" under the Policy or Code for his sexual contact with Roe. Specifically, Doe told the Investigator that he touched Roe's breasts over her clothes and that "Roe did not object or otherwise express discomfort." Compl. ¶3. But Doe did not state that he had *asked* Roe whether she consented to that touching, or that she ever *provided* consent, much less any "clear consent" as required. *See* Compl. ¶50; Policy at 3 ("[s]exual contact will be considered 'without consent' if *no clear consent*, verbal or nonverbal, is given") (emphasis added). Doe also acknowledged that he only "*assumed*" Roe's consent to the oral sex. Report at 8 (emphasis added); Compl. ¶3. Based on Doe's own factual account, the Investigator found that Roe had not provided "clear consent" and therefore found Doe "responsible" for non-consensual sexual contact. That Doe may disagree with AU's definition of "consent" does not mean he has alleged *facts* that render the Investigator's conclusion "clearly erroneous." Title IX is not a vehicle for

students found guilty of sexual misconduct to second-guess the University's decision by simply asserting that the University got it wrong. But that is precisely what Doe has alleged here.

In short, Doe has alleged no facts that cast any "articulable doubt" on the University's process or the Investigator's findings as a matter of law, and his erroneous outcome claim fails for this reason alone. *See Borkowski v. Balt. Cty., Md.*, Civ. No. DKC 18-2809, 2019 WL 4750296, at *22 (D. Md. Sept. 30, 2019) (dismissing erroneous outcome claim where plaintiff's only allegations of a flawed proceeding stemmed from the investigator's conclusions).

**B. Doe fails to allege any facts that plausibly demonstrate any causal connection between the University's investigation and gender bias.**

Even *were* the Court to find that Doe alleged plausible facts casting some articulable doubt on the Investigator's conclusions, Doe's erroneous outcome claim still would fail because Doe has failed to allege any plausible facts demonstrating that the outcome was the result of gender bias. Mere "[a]llegations of a . . . flawed proceeding that has led to an . . . erroneous outcome combined with a conclusory allegation of gender discrimination [are] not sufficient to survive a motion to dismiss." *Robinson*, 335 F. Supp. 3d at 27 (citation omitted) (emphasis added). Thus, to withstand dismissal, Doe must advance "*particularized factual allegations* to support a 'causal connection'" between the flawed outcome and gender bias, or that gender bias was a "motivating factor" behind the decision. *Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 190 (D. Mass. 2017) (emphasis added); *see also Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 679 (M.D. Tenn. 2018); *Ruff*, 272 F. Supp. 3d at 1298.

Doe has alleged no such particularized facts here. Indeed, Doe alleges no facts *at all* of the type required to support a plausible Title IX claim—*i.e*. "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Cummins*, 662 F. App'x at 452 (citation

omitted). And the facts that Doe does allege—that the same Investigator found H.S., another *male* respondent, "not responsible" for similar charges of misconduct alleged by Roe (Compl. ¶11), and that the most recent U.S. Department of Education Office of Civil Rights ("OCR") investigation of the University stemmed from a complaint filed by a *male* respondent (Compl. ¶83)—belie his claim that the University was motivated by gender bias in adjudicating Roe's claims against Doe.

Significantly, Doe does not allege that the Investigator, Sanctioning Panel, Appellate Board, or any University official made *any* biased statements, or engaged in *any* conduct that suggests that the investigation and adjudication of the charges against him was infected with, much less motivated by, gender bias. Courts routinely have dismissed erroneous outcome claims where there are no plausible allegations of such gender-biased statements or conduct by decision-makers. *See Borkowski*, 2019 WL 4750296, at *22 (dismissing erroneous outcome claim where plaintiff failed to allege that members of the disciplinary tribunal made statements indicating gender bias); *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) (same).

While Doe insinuates that the Investigator was biased against males because she has experience in "advocacy" and has advocated for "appropriate training and education[] programs" regarding "rape culture" (Compl. ¶79), such allegations do not support a plausible inference of *gender*-bias. First, Doe acknowledges that the same investigator found "in favor of H.S."—a *male* respondent—"as to each of Ms. Roe's allegations against him," which significantly undercuts Doe's implication that the Investigator was biased against males. Compl. ¶11. Second, courts have held that even a perceived bias in favor of sexual assault *victims* does not equate to actionable gender bias against male perpetrators. *See, e.g.*, *Cummins*, 662 F. App'x at

453 (alleged procedural deficiencies showing bias in favor of sexual assault complainants "do[] not equate to gender bias because sexual-assault victims can be both male and female"); *Sahm*, 110 F. Supp. 3d at 778 ("[d]emonstrating that a university official is biased in favor of the alleged victims [ ], and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students"); *Doe v. N. Mich. Univ.*, 393 F. Supp. 3d 683, 698 (W.D. Mich. 2019) (dismissing erroneous outcome claim where the complaint alleged merely that defendants "showed a bias in favor of alleged victims of sexual assault who are often female, and against alleged perpetrators of sexual assault who are often male").

Nor does Doe allege facts plausibly demonstrating "patterns of decision-making that also tend to show the influence of gender." *Cummin*s, 662 F. App'x at 452 (citation omitted). "[A] single case by an individual who was displeased by the result of a disciplinary proceeding cannot constitute a pattern of decision-making." *Doe v. Case W. Reserve Univ.*, No. 1:14CV2044, 2015 WL 5522001, at *6 (N.D. Ohio Sept. 16, 2015) (citing *Univ. of the S.,* 687 F. Supp. 2d at 756). And, "an allegation that males were 'invariably found guilty, regardless of the evidence, or lack thereof,' without any supporting data or 'credible anecdotal references,' [is] 'the type of conclusory statements that *Iqbal* and *Twombly* do not allow the court to consider.'" *Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d at 503 (citation omitted). Here again, Doe's allegations *refute* his Title IX claim as the only other instance of the University's decision-making that Doe points to is a case where AU found the male respondent "not responsible" for all charges. Compl. ¶11. And even in Doe's own case, the Investigator found in Doe's favor—and against Roe—on two of the three charges.

Doe further alleges that "pressure" on AU by the federal government and the media to prosecute sexual misconduct demonstrates that the Investigator's findings and the sanction

imposed were motivated by gender bias. *See, e.g.*, Compl. ¶¶67-95. Such allegations are both unsupported by the alleged facts and materially misleading. For example, Doe points to OCR investigations of the University, AU's adherence to Dear Colleague Letters from OCR,[12] AU's use of a "single investigator" model to adjudicate Title IX complaints, and AU's revisions to its confidentiality policy to reduce barriers to the ability of victims of sexual assault to speak about their experiences, as evidence that AU felt pressure "to be tough on male respondents." *Id.* ¶¶67-95. All of these actions, however, are gender-neutral and say nothing about punishing or prosecuting males.[13] Moreover, Doe's own allegations state that the most recent OCR investigation of AU stemmed from a complaint filed by an accused *male* student. Compl. ¶83. Under Doe's theory of the University responding to outside "pressure," AU would feel pressure to treat accused male students *more* favorably than non-males.

Even if Doe sufficiently alleged actual "pressure" on the University, courts overwhelmingly have rejected such allegations as insufficient to raise an inference of gender bias under Title IX. As one court recently observed, "pressure from the federal government to investigate sexual assault allegations more aggressively—either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the [u]niversity, or both—says nothing about the [u]niversity's alleged desire to find men

---

[12] Doe misleadingly asserts that AU "would not follow [ ] new guidance" the Department of Education ("DoE") has issued that he alleges is different from the prior "Dear Colleague Letters." Compl. ¶231. While DoE has promulgated *proposed* Title IX regulations, these are not "final" and thus no "new guidance" exists. A university's adherence to the status quo, pending new guidance, manifestly does not demonstrate "bias," much less gender bias.

[13] Moreover, to establish "pressure," Doe points to events from 2014, 2015, and 2016, which precede the investigation and adjudication of Roe's complaint by a number of years. Doe does not even attempt to draw any connection, and certainly no "particularized" causal connection, between such remote events and the 2019 investigation of his misconduct. *See Doe v. Univ. of Dayton*, 766 F. App'x 275, 282 (6th Cir. 2019) (finding references to events that occurred two years prior to the disciplinary proceeding at issue to be "temporally removed" and unpersuasive in raising an inference of discrimination).

responsible *because they are men*." *Doe v. Univ. of Colo., Boulder through Bd. of Regents of Univ. of Colo.*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017) (emphasis added); *see also Cummins*, 662 F. App'x at 452 (allegation that defendant adopted bias against male students accused of sexual assault to appease DoE insufficient to support plausible inference of gender bias); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 886-87 (N.D. Ohio 2017) (same with respect to Dear Colleague Letter); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 992 (D. Minn. 2017) ("[T]his Court joins the majority of federal courts in finding a general reference to federal pressure, by itself, [ ] insufficient to show gender bias.").[14] Or, as another court recently held, "it is not reasonable to infer that [a university] has a practice of railroading students accused of sexual misconduct simply to appease the Department of Education and preserve its federal funding. Plaintiffs' mere belief that Defendants acted with such ulterior motives is insufficient to state a claim for relief." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016).

Universities must be able to conduct investigations and make decisions based on the weight of the evidence and their own conduct standards, without fear that the mere existence of public pressure to protect victims will subject them to legal action whenever they rule in a

---

[14] Indeed, allowing Title IX claims to proceed on such a slim reed would threaten serious adverse ramifications for both victims of sexual assault and the courts. First, it would open the floodgates to protracted litigation by effectively rendering the courts an appellate tribunal for every sanctioned sex offender based on the mere possibility that the public interest in the promotion of safe campuses may have impacted the university's decision. And, second, by shifting the final decision-making process from universities to the courts, allowing such claims could have a chilling effect on universities faced with sexual assault allegations. If the mere existence of such pressure were enough, those institutions would face the dilemma of "[e]ither [ ] com[ing] under public fire for not responding to allegations of sexual assault aggressively enough or [ ] open[ing] themselves to Title IX claims simply by enforcing rules against alleged perpetrators." *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1226-27 (D. Or. 2016), *aff'd*, 925 F.3d 1133 (9th Cir. 2019).

victim's favor. Therefore, "it stands to reason that evidence that a university has endeavored to comply with federal guidance on Title IX cannot support a violation of Title IX." *Wooster*, 243 F. Supp. 3d at 887; *see also Univ. of Cincinnati*, 173 F. Supp. 3d at 607 ("[A]ctions taken by [university] to comply with guidance to implement Title IX cannot have been in violation of Title IX.").

Perhaps most fatally, Doe does not assert a single fact that connects the alleged "pressure" to gender bias in Doe's own case. Like Doe, numerous students found responsible for sexual misconduct have sought judicial review, alleging gender bias based on "pressure." The courts have responded by imposing exacting standards on such claims, including requiring that the alleged "pressure" *relate to the specific disciplinary investigation at issue*. *See, e.g.*, *Doe v. Oberlin Coll.*, No. 1:17 CV 1335, 2019 WL 1439115, at *7-8 (N.D. Ohio Mar. 31, 2019) (appeal filed) (finding no "particularized causal connection" because the plaintiff "did not allege that the circumstances pertaining to his . . . case were widely known on campus and subject to widespread debate[,] . . . media attention or criticism"); *Doe v. Univ. of Cincinnati*, No. 1:16cv987, 2018 WL 1521631, at *6 (S.D. Ohio Mar. 28, 2018) (dismissing a Title IX complaint and noting "[i]n the cases where public pressure was found to support claims of erroneous outcome, *that public pressure targeted the specific disciplinary action being challenged*") (emphasis added). Here, Doe does not even attempt to connect his disciplinary proceeding to the events that he alleges pressured AU to find male students "responsible" for sexual misconduct. Thus, Doe's allegations of "pressure" are insufficient to state a claim of gender discrimination under Title IX. In short, it is well settled that universities "have a legitimate basis in complying with the Department of Education's instructions and ensuring that [the university] protects

victims of sexual assault." *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 956 (N.D. Ill. 2017).

Accordingly, Doe has failed to allege sufficient plausible facts to demonstrate that AU's investigation and adjudication of Roe's claims against Doe was motivated by gender bias.

## II. Doe's Complaint Fails to State a Cause of Action Under the D.C. Human Rights Act.

The D.C. Human Rights Act ("DCHRA") prohibits "educational institution[s]" from "deny[ing], restrict[ing], or … abridg[ing] or condition[ing] the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason," including a student's gender. D.C. Code § 2-1402.41(1). Doe alleges both disparate treatment and disparate impact claims under the DCHRA. Both claims fail.

### A. Doe does not plausibly allege intentional gender discrimination.

Doe's disparate treatment claim under the DCHRA is premised upon the same arguments and allegations he advances for his claim under Title IX. *See* Compl. ¶249. Therefore, for the same reasons that Doe has failed to state a claim under Title IX—specifically, that he fails to raise a plausible inference that AU discriminated against him on the basis of his gender—he has likewise failed to allege a disparate treatment claim under the DCHRA. *See, e.g.*, *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 79 (D.D.C. 2003) (dismissing DCHRA claim where "contradictory factual allegations" undermined an inference of discrimination); *Manago v. D.C.*, 934 A.2d 925, 927 (D.C. 2007) (dismissing DCHRA claim where the complaint "fails to allege reasons to believe that [plaintiff] was treated differently than similarly situated students because of her race, color, or national origin").

**B. Doe fails to allege sufficient facts to state a disparate impact claim.**

Doe's disparate impact claim also should be dismissed. A disparate impact claim must be premised on "facially neutral" policies or practices that have the effect of "fall[ing] more harshly on one group than another." *See Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Doe nakedly asserts that AU's Title IX enforcement regime "has the effect of disproportionately burdening male students based upon their sex," but does not allege a single fact to support his vague and speculative allegation of disproportionate impact based on sex. Compl. ¶256. Doe effectively concedes the point, alleging only "[u]pon information and belief, [that] the vast majority of respondents in the University's Title IX proceedings since the University switched to a single-investigator model have been male." *Id*. ¶251. But he does not allege any factual basis for this assertion.

Indeed, Doe's assertions that the vast majority of respondents in Title IX proceedings are males further undercuts his disparate impact claim. As a sister court recently recognized, the school "is not responsible for selecting the parties who are the subjects of its proceedings—that happens through complaints by alleged victims" and therefore the fact that predominantly men may have been accused of sexual assault at the school does not create a viable disparate impact claim. *Doe v. George Wash. Univ.* ("*GWU I*"), 366 F. Supp. 3d 1, 13-14 (D.D.C. 2018). Furthermore, Doe fails to allege, as is necessary for a disparate impact claim, that non-males go through the same disciplinary process and receive disproportionately more favorable outcomes than males. *See id.* ("[W]ithout showing that women go through the same disciplinary process and receive disproportionately different outcomes, there is no showing of disparate impact; there is no comparator group."). Indeed, the *only* point of comparison Doe presents at all is H.S.—a *male* respondent who was found "*not responsible*" for all of the applicable charges during a disciplinary proceeding that involved the same exact process and, indeed, investigator, as in

Doe's disciplinary proceeding. This wholly refutes Doe's claim that AU's policies and procedures have had a disparate impact on males. Accordingly, Doe's DCHRA claims should be dismissed.

## III. Doe's Complaint Fails to State Viable Contract Claims.

### A. Doe has not alleged the breach of an enforceable contract.

Under D.C. law, to state a viable claim for breach of contract, a party must allege the existence of: (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Richter*, 2019 WL 481643, at *2. Here, Doe alleges that AU failed to follow the terms of the Code and Policy when adjudicating the allegations against him and thereby breached a contract. But Doe has failed to plead facts sufficient to establish that the Code and Policy are enforceable contracts at all. Further, even were they enforceable contracts, Doe has not pled plausible facts that could establish that AU breached the provisions of the Code or Policy. Rather, Doe's breach of contract claim reflects merely Doe's disagreement with one of the Investigator's ultimate conclusions. Accordingly, such claim should be dismissed. *See e.g.*, *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 894-95 (M.D. Tenn. 2018) ("Doe is just dissatisfied with the *result* of the investigation. This is an insufficient basis for Doe's breach of contract claim.").

#### 1. The University's Policy and Code are not enforceable contracts.

While, as a "general rule," "the relationship between a university and its students can be contractual in nature," *Mosby-Nickens v. Howard University*, 864 F. Supp. 2d 93, 98 (D.D.C. 2012), "[t]hat general proposition . . . does not absolve a plaintiff of his burden as '[t]he party asserting the existence of an enforceable contract' to 'prove that the parties entered into an enforceable contract.'" *Richter*, 2019 WL 481643, at *3 (citation omitted). Thus, to avoid dismissal, "a plaintiff must . . . 'allege sufficient facts to demonstrate . . . the terms of the

contract"' in each case that arises. *Mosby-Nickens*, 864 F. Supp. 2d at 98 (dismissing breach of contract claim where the plaintiff failed to prove that university intended to be bound by school regulations) (citation omitted). "For a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations." *Richter*, 2019 WL 481643, at *3 (citation omitted).

Doe alleges that AU's Code and Policy constitute enforceable contracts with its students, but points to no language in these documents indicating AU's intent to be bound by their terms. Compl. ¶262; *see also Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016) (holding that university honor code lacked evidence of the university's intent to be bound and mutuality of obligation, rendering it not enforceable); *Mosby-Nickens*, 864 F. Supp. 2d at 99 (finding "Graduate School Rules and Regulations" was not an enforceable contract where there was no language in the document demonstrating the school's intent to be bound by its terms); *Manago*, 934 A.2d at 927 (finding that student failed to demonstrate terms of the contract). Here, the Code and Policy reflect the University's intent to communicate to the community AU's values and expectations of its members, but lack any language evidencing an intent to be bound strictly and contractually by their provisions. *See* Code at Preamble ("This Student Conduct Code is designed to support a safe, honest, and inclusive community with a shared commitment to acting with mutual respect and forming the highest standards of ethics and morals among its members. It fosters the university's commitment to excellence, equity, and inclusion and affirms the shared values that make community life possible."); Code at Statement of Common Purpose ("The central commitment of American University is to the development of thoughtful, responsible human beings in the context of a challenging yet supportive academic community."); Code at 8 ("American University expects its students, wherever they are, to adhere to high

standards of honor and good citizenship and to conduct themselves in a responsible manner that brings credit to themselves and the university."); Policy at 5 ("AU Community members are expected to cooperate in the resolution or investigation of discrimination complaints.").

Although the Code sets out certain standards and processes for University disciplinary proceedings, it also acknowledges their flexible application, noting that "deviations from prescribed procedures [will not] necessarily invalidate a decision" in some circumstances. Code at 12. Accordingly, on the face of these documents themselves, it is clear that AU does not intend for them to act as enforceable contracts, binding, unchangeable, and subject to strict and rigid application of legal contract principles. *See Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 49 (D.D.C. 2009) ("To determine whether the parties intended to be bound, the Court must examine the parties' objective manifestations of intent."); *see also Richter*, 2019 WL 481643, at *3 (finding "Academic Rules" did not reflect obligations mutually assumed as "[m]utuality exists when each party agrees to do something it otherwise is under no legal obligation to do, or to refrain from doing something it has a legal right to do") (citation omitted); *Mosby-Nickens*, 864 F. Supp. 2d at 98-99 (finding "Graduate School Rules and Regulations" was not an enforceable contract and citing cases from other jurisdictions refusing "to construe university handbooks as binding, unchangeable contracts").[15]

[15] Importantly, the Code and Policy, by their terms, allow AU to modify them at any time without notice to, or the consent of, students. *See* Code at 4 ("The [U]niversity reserves the right to amend this Student Conduct Code at any time according to established procedures."). In fact, AU did unilaterally modify these documents several times over the course of Doe's tenure at AU. *Compare* 2014 Policy (Compl. Ex. 1), *with* 2015 Policy (Compl. Ex. 2), *and* 2017 Policy (Compl. Ex. 3); *compare* 2015-2016 Code (Compl. Ex. 4), *with* 2016-2017 Code (Compl. Ex. 5), *and* 2018-2019 Code (Compl. Ex. 6). While one court in this district found recently that a different university's unilateral right to modify its code of conduct did not prevent the code from being an enforceable contract, *Doe v. George Washington University* ("*GWU II*"), 321 F. Supp. 3d 118, 123 (D.D.C. 2018), other courts in this district (including more recently) have reached different conclusions. *See, e.g., Richter*, 2019 WL 481643, at *3 (finding school's "Academic

In short, Doe has failed to allege facts showing AU's intent to be legally bound to the provisions of the Code and Policy, and for that reason alone, Doe's contract claim must fail.

**2. AU and its employees complied with the Code and Policy.**

Even had Doe sufficiently alleged that the Code and Policy are enforceable contracts, Doe's contract claim still should be dismissed as he fails to plausibly allege that AU breached the specific provisions cited in the Complaint.

**(i) The investigation process**

While Doe broadly asserts that AU violated the Code and Policy because it failed to provide a "thorough and impartial investigation," "fail[ed] to provide an investigation that afforded [ ] Doe the opportunity to present evidence," and failed to apply the "preponderance standard," the Complaint and documents incorporated therein refute such claims. *See* Compl. ¶¶271-80.

The Policy provides that "[d]epending on the nature of the allegations, the investigation *could include* interviews with the Complainant, the Respondent and/or witnesses; review of written documentation and relevant policies; review of evidence; and any other steps necessary to thoroughly investigate the allegations." Policy at 9 (emphasis added). The Policy further notes that "[d]uring the investigation, the Complainant and Respondent will have an equal opportunity to identify witnesses and evidence . . . ." Policy at 9. And the Code expressly vests the investigator with "the *discretion* to determine the relevance of any submitted evidence and to include or exclude certain types of evidence." Code at 18 (emphasis added).

Here, the Report shows that the Investigator diligently investigated the claims against

---

Rules" was not an enforceable contract where the Rules noted that the school could alter or amend the Rules at any time); *see also Brown v. Rector & Visitors of Univ. of Va.*, No. 3:07cv00030, 2008 WL 1943956, at *6 (W.D. Va. May 2, 2008), *aff'd sub nom.*, 361 F. App'x 531 (4th Cir. 2010) (reservation of right to change student handbook rendered contract illusory due to lack of mutuality of obligation).

Doe over a four-month period, including by conducting multiple interviews of Doe, Roe, and H.S., interviewing four other witnesses identified by the parties, and reviewing text messages and photos submitted by them. AU also afforded Doe the opportunity to identify witnesses and evidence during the investigation, as well as to review a draft of and comment on the Investigation Report and exhibits, and to provide additional evidence for the Investigator to consider. Thus, contrary to Doe's conclusory allegations, the Report shows that the Investigator thoroughly investigated the claims against Doe, affording both Doe and Roe the opportunity to submit evidence, and critiquing and comparing *all* of the testimony, including that of other witnesses. *See* Report at 16-18.

Doe also argues that the Investigator failed to elicit certain follow-up testimony or evidence (*e.g*., pose certain questions to Roe or other witnesses, obtain certain information regarding Roe's trip back to her dormitory, and interview individuals with whom she spoke). None of these alleged "failures," however, even if proven, would have violated the Code or Policy. As noted above, the Investigator has discretion to determine the relevance and use of any specific evidence in disciplinary proceedings. Code at 18. Nor does Doe anywhere allege what any other witnesses would have said that might have compelled a different result. Title IX is not a vehicle for accused sexual assailants to second guess how the university assesses the evidence before it, especially where the procedures specifically afford discretion in that regard.

Moreover, Doe alleges no facts that suggest that the evidence he asserts should have been elicited would have altered the Investigator's ultimate finding regarding the Sexual Assault charge. Indeed, that evidence pertained to the two charges for which she found in Doe's *favor*—and *not* to the conduct to which Doe admitted. *See* Compl. ¶¶138-50; Report at 15-18. Doe further alleges that the Investigator improperly withheld information from Doe regarding her

investigation of misconduct allegations by Roe against H.S., but there is no requirement in the Code or the Policy that the University disclose information about a disciplinary matter to a student other than to the Complainant and Respondent in the proceeding at issue. Indeed, such a disclosure could run afoul of the Family Educational Rights and Privacy Act (FERPA). *See* 20 U.S.C. § 1232g (precluding, generally, disclosure of a student's education records without that student's authorization). Finally, as to the Investigator's application of the "preponderance" evidentiary standard as prescribed in the Code and Policy, Doe again fails to allege any facts to suggest that the Investigator misapplied the "preponderance" standard in weighing the evidence. Indeed, it is clear that she conducted a careful assessment of the evidence, including weighing evidence of Roe's credibility.[16]

**(ii) The reporting provision**

Doe also alleges that AU breached the Case Resolution Procedures of the 2015-2016 Code by investigating his alleged misconduct *at all* because Roe did not report the alleged misconduct within one year of the incident. This argument fails for several obvious and important reasons.

First, apart from the fact that even the 2016 version of the Code and the Policy recognized the need for flexibility in considering allegations of sexual misconduct that may have occurred more than one year prior to being brought to the University's attention, the applicable procedures governing adjudication of such complaints are those in effect at the time the school receives the information and commences the investigation. *See, e.g.*, *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 596-97 (D. Mass. 2016) (noting that "[i]n general, a student does not have a contractual right to have disciplinary proceedings conducted under the specific procedures in

[16] The Investigator did *not* find, *e.g.*, that Roe was incapacitated, that Doe had engaged in digital penetration, or that Doe had kissed Roe or touched her buttocks without her consent.

effect at the time of the student's matriculation" and that a student "ha[s] no reasonable expectation that the procedures under the [h]andbook w[ill] be frozen for all four years"). As AU investigated and adjudicated Doe's alleged violations during the 2018-2019 year, the applicable procedures are those in the 2018-2019 Code, which provide only that complaints should be filed "as soon as possible following the alleged discrimination" so as to fully allow the University to "take steps to end the alleged Prohibited Conduct, prevent its recurrence, and address its effects." Code at 21.

Second, more importantly, Doe's suggestion that AU should have *ignored* or was barred from investigating the allegations of serious sexual misconduct against him because of the delay in receiving the information flies directly in the face of AU's fundamental obligations under Title IX to respond to, and remediate, gender-based discrimination on campus whenever it is reported.[17] It also runs directly counter to the statements that have existed consistently in AU's policies (including in 2016) regarding its commitment to address such conduct on its campus. *See* 2014 Policy at 2 (Compl. Ex. 1); 2015 Policy at 2 (Compl. Ex. 2); 2017 Policy at 2 (Compl. Ex. 3) ("The university will respond promptly and effectively to reports of discrimination and will take appropriate action to prevent, to correct, and if necessary, to discipline individuals who violate this policy."); *see also* 2014 Policy at 1; 2015 Policy at 1; 2017 Policy at 1 ("This policy is intended to be consistent with applicable local and federal laws and regulations."). Thus, while it is entirely reasonable for a university to encourage prompt reporting of discrimination and sexual harassment in its policies directed at the *students*, as AU did in the 2015 version of its

---

[17] *See, e.g.*, Office for Civil Rights, Revised Sexual Harassment Guidance (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf , at iii ("A critical issue under Title IX is whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects.").

Policy, that does not supersede AU's independent commitment *under the same policy* to address concerns as they come to its attention.

Consider the ramifications of Doe's argument here. Under his theory, and despite AU's commitments and obligations, respectively, under the Policy and applicable local and federal laws, AU would be able to respond to reports of discrimination and sexual misconduct that come to its attention 364 days after it occurs, but would have to ignore the information (and possible danger to the community) if it did not surface until later. That is not what the Policy requires or contemplates, and it makes no sense, given the overarching goal of Title IX to eliminate from campus sexual harassment and other gender-based discrimination. Indeed, it is for this very reason that the one-year *reporting* period for students was not absolute even in the 2015-2016 Code and that the 2018-2019 Code eliminated it entirely. *See* 2015-2016 Code at 12 (Compl. Ex. 4); 2018-2019 Code at 18 (Compl. Ex. 6).

Finally, and for these very reasons, courts routinely accord universities deference when interpreting and applying their own policies and procedures. *See, e.g.*, *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 482 (4th Cir. 2010) ("[W]e defer to the views of [the university] on the standards for professional and academic achievement."); *Kerr v. Johns Hopkins Univ.*, Civ. No. L-10-3294, 2011 WL 4072437, at *7 n.6 (D. Md. Sept. 12, 2011) (dismissing professor's breach of contract claim "[b]ecause of the deference that must be accorded to the [u]niversity's disciplinary decision making"); *Morris v. Brandeis Univ.*, 804 N.E.2d 961, at *1 (Mass. App. Ct. 2004) (unpublished) (noting, when evaluating a breach of contract claim, that "[g]reat deference is extended to university decision-making on academic and disciplinary matters"); *Holert v. Univ. of Chi.*, 751 F. Supp. 1294, 1301 (N.D. Ill. 1990) (commenting that courts adopt a deferential standard regarding university disciplinary decisions because of a

reluctance to interfere with the regulation of student conduct in a private university). And, courts have rejected breach of contract claims based on such interpretations, including specifically of a university's sexual misconduct procedures. *See, e.g.*, *Brandeis Univ.*, 177 F. Supp. 3d at 597 (dismissing contract claim, finding that "[a] college is clearly entitled to modify its rules and regulations so as to properly exercise its educational responsibility") (internal quotation marks and citation omitted). The same logic applies here.

**(iii) The Sanctioning Panel**

With respect to the Sanctioning Panel, Doe alleges that AU breached both the Policy and the Code by prohibiting Doe's advisor from attending the Sanctioning Panel in his absence and by not affording Doe an opportunity to challenge members of the Sanctioning Panel for conflicts of interest. However, the Policy limits the role of advisers in sexual misconduct proceedings to "*advis[ing] and accompanyi[ng] [the student] during* any meeting related to the complaint," and emphasizes that "[t]he advisor may not participate directly in any meeting or contact the Designated Official." Policy at 8 (emphases added). Doe admits that he decided ultimately to forego attending the Sanctioning Panel meeting in-person or via Skype (Compl. ¶202), and opted to submit his statement in writing. *See* June 19, 2019 e-mail (Ex. 5). Further, he was advised by the Student Conduct & Conflict Resolution Services office that his written statement would be read to the Panel by the Sanctioning Panel Administrator. *Id*. In view of the limited role of the adviser set out in the Code, it is clear that if the student did *not* attend the meeting (whether in-person or via Skype), there would be no opportunity to "advise" or "accompany" that student "during [the] meeting."

Doe also argues that he was not given the right to challenge members of the Sanctioning Panel for conflicts of interest. The Code provides that "[t]he complainant and the respondent may challenge a member of the Sanctioning Panel or Sanctioning Panel Administrator on the

grounds of conflicts of interest." Code at 19. Thus, Doe had the information regarding his right to challenge the Sanctioning Panel members, Compl. ¶¶200-04; *see also* Notice of Finding (Ex. 4), but he does not allege that ever he sought to do so, much less that the university prohibited him from doing so. Once again, Doe has not alleged any breach of the specific language in the Code or Policy that he claims serve as contractual terms.

**(iv) Doe's appeal**

Finally, regarding his appeal, Doe argues that the Appellate Board breached the Code by finding that his appeal was not "viable" without any meaningful explanation. This too fails. In reaching its determination, the Board followed the procedures outlined in the Code. Though not required anywhere in the Code, the Board also provided an explanation of the bases of its determination, reviewing Doe's appeal in light of the standards for "viability" set out in the Code. *See* Appeal Decision (Ex. 7).

Thus, even if the Code or Policy *could* be considered an enforceable contract, Doe has not alleged facts showing that AU failed to comply with their terms. In short, "[t]he fact that the [u]niversity did not reach the conclusion [that p]laintiff desired is not a breach of contract[.]" *Doe v. Princeton Univ.*, No. 17-cv-1614 (PGS), 2018 WL 2396685, at *8 (D.N.J. May 24, 2018), *aff'd*, No. 18-1477, 2019 WL 5491561 (3d Cir. Oct. 25, 2019).

**B. Doe fails to state a claim for breach of the implied covenant of good faith and fair dealing.**

Doe's claim for breach of the implied covenant of good faith and fair dealing fares no better. Doe cannot assert such a claim here because, as discussed above, there was no enforceable contract between AU and Doe. Absent such a contract, there can be no breach of an implied covenant of good faith and fair dealing. *See Mero v. City Segway Tours of Wash., DC, LLC*, 826 F. Supp. 2d 100, 107 (D.D.C. 2011) ("[T]he absence of a contract alone is sufficient to

defeat [an] implied covenant claim."); *Cambridge Holdings Grp., Inc. v. Fed. Ins. Co.*, 357 F. Supp. 2d 89, 96 (D.D.C. 2004) (dismissing implied covenant claim where plaintiff failed to allege "any express or implied agreement that could give rise to a breach of good faith and fair dealing").

Doe's contract and good faith and fair dealing claims also are impermissibly duplicative. Under D.C. law a "breach of the implied covenant is not an independent cause of action when the allegations are identical to other claims for relief under [an] established cause of action," such as a breach of contract claim. *See WMATA v. Quik Serve Foods, Inc.*, Civ. No. 04-687(RCL), 2006 WL 1147933, at *5 (D.D.C. Apr. 28, 2006); *see also Xereas v. Heiss*, 933 F. Supp. 2d 1, 8 (D.D.C. 2013). Because the requested remedies are identical and the claims duplicative, the breach of the covenant of good faith and fair dealing claim is improper and should be dismissed. *See* Compl. ¶¶263-64, 289, 291-92, 294.

Even if Doe's implied covenant claims survived either of those fatal deficiencies, his failure to allege facts that would plausibly support "either bad faith or conduct that is arbitrary and capricious'" also requires dismissal. *See Chenari v. George Wash. Univ.*, 847 F.3d 740, 745 (D.C. Cir. 2017). As the D.C. Circuit has held, "the standards for breach of contract and implied covenant [of good faith and fair dealing] cases overlap" and "[a] university '[is] entitled to . . . judgement [absent] evidence from which a fact finder could conclude that there was no rational basis for the decision or that it was motivated by bad faith or ill will . . . .' Similarly, to show that a university breached the implied covenant of good faith and fair dealing, a plaintiff must allege 'either bad faith or conduct that is arbitrary and capricious.'" *Id.* (citation omitted) (quoting *Wright v. Howard Univ.*, 60 A.3d 749, 754-55 (D.C. 2013)); *see also Richter*, 2019 WL 481643, at *5 (dismissing good faith and fair dealing claim because there was no factual basis

for allegations that the university acted arbitrarily or in bad faith even where the student made conclusory allegations of "disparate treatment"); *GWU I*, 366 F. Supp. 3d at 7 (noting that in assessing breach of contract and good faith and fair dealing claims involving university procedures, "the question is whether those procedures were carried out fairly and in good faith"). The Complaint includes no such allegations here.

## IV. <u>Doe's Complaint Fails to State a Claim for Negligence</u>.

In the District of Columbia, the three elements of a negligence claim are: (1) a duty owed by the defendant to protect plaintiff from injury; (2) failure to fulfill that duty; and (3) injuries to plaintiff proximately caused by defendant's failure to meet the duty. *D.C. v. Harris*, 770 A.2d 82, 87 (D.C. 2001). Doe's allegations, even if true, fail to adequately plead at least two of these requirements and thus Doe's negligence claim must be dismissed.

### A. AU owed no actionable duty of care to Doe.

First, Doe cannot establish that AU owed him an actionable duty of care in the conduct of its investigation. Doe claims that AU had a "common law duty" to "exercise reasonable care" in conducting its investigation and adjudicating the complaint against Doe. Compl. ¶297. But Doe has not alleged the basis for any such duty, much less any *facts* sufficient to show that AU owed him any such duty.

Courts—including courts in the District of Columbia—have *specifically declined* to find a duty of care where universities are conducting student disciplinary proceedings. *See, e.g.*, *North v. Catholic Univ. of Am.*, 310 F. Supp. 3d 89, 96 (D.D.C. 2018) (holding that student who was suspended after being found responsible for sexual assault failed to state a negligence claim as there is no common law "duty of basic fairness" in a university's investigative and disciplinary process under D.C. law); *Columbia Coll. Chi.,* 299 F. Supp. 3d at 963 (holding that a

college "does not owe a duty to its students 'relating to the implementation of student disciplinary proceedings'") (citation omitted).

To the extent Doe seeks to base his assertion of a duty on the mere fact that he was a student at AU, that too fails. Although the D.C. Court of Appeals has not addressed the issue directly, the prevailing view is that no general duty of care or "special relationship" exists between a university and its students. *See Bradshaw v. Rawlings*, 612 F.2d 135, 143 (3d Cir. 1979) (no duty of care arises from student-university relationship); *Freeman v. Busch*, 349 F.3d 582, 587-88 (8th Cir. 2003) (finding no special relationship because "a college is not an insurer of the safety of its students"); *Nguyen v. Mass. Inst. of Tech.*, 96 N.E.3d 128, 141 (Mass. 2018) (there is no "general duty of care to all students in all aspects of their collegiate life") (citation omitted); *Rhaney v. Univ. of Md. E. Shore*, 880 A.2d 357 (Md. 2005) (no special relationship between student and university); *Booker v. Lehigh Univ.*, 800 F. Supp. 234, 237-41 (E.D. Pa. 1992) (same). Because AU owed no duty of care to Doe, Doe's negligence claim fails as a matter of law. *See Roe v. Doe*, 401 F. Supp. 3d 159, 165 (D.D.C. 2019) ("Negligence is a breach of duty; if there is no duty, there can be no breach, and hence no negligence.") (citation omitted).

**B. Doe has not pled facts sufficient to show negligence by AU employees.**

Even if Doe could identify a duty of care, he has not pled facts sufficient to show that AU acted negligently. To sustain a negligence claim under D.C. law, a plaintiff must plausibly allege that the defendant did not exercise "that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances." *Roe*, 401 F. Supp. 3d at 165 (quoting *Tolu v. Ayodeji*, 945 A.2d 596, 603 (D.C. 2008) (*per curiam*)). While Doe makes the conclusory assertion that AU acted negligently "by carelessly, improperly, and negligently performing its assigned duties" (Compl. ¶298), this is the classic mere "formulaic recitation of the elements of a cause of action," which is insufficient to plead a valid claim. *Roe*, 401 F. Supp.

3d at 164 (quoting *Twombly*, 550 U.S. at 555) (emphasizing that "the District of Columbia Court of Appeals has chastised this kind of deficiency specifically in the negligence context").

Further, Doe's own allegations demonstrate that AU acted reasonably in investigating and adjudicating the sexual misconduct allegations against him. The Complaint and documents incorporated therein show that:

- The Investigator interviewed Doe and Roe multiple times, in addition to five other witnesses;
- The Investigator provided Doe the case file, containing evidence compiled by the Investigator in the course of her investigation along with a draft of the Investigation Report, and afforded him the opportunity to submit a written response to those materials and additional evidence;
- The University gave Doe a written explanation of the Investigator's decision regarding all charges and an opportunity to respond and appeal; and
- The Investigator found Doe "not responsible" for two of the three charges.

*See* Compl. ¶¶12-13, 111, 159; Report at 17-18. Therefore, Doe's own allegations refute the notion that AU acted negligently in conducting his disciplinary proceeding.

While Doe half-heartedly attempts to fold in a negligent supervision claim, that too is based on unfounded speculation and conclusory statements. A claim for negligent supervision requires a showing that "an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985). Doe alleges none of those elements.[18] Far from acting in a

[18] Moreover, as discussed above in Section IV(A), the negligent supervision claim also would fail because Doe has not predicated it on a common law cause of action as required by D.C. law. *See Prasad v. George Wash. Univ.*, 390 F. Supp. 3d 1, 42 (D.D.C. 2019) (dismissing negligent supervision/retention claim where the plaintiff failed to establish the existence of a common law duty of care on the part of the university that was "separate and apart" from Title IX or the purported contract).

dangerous or incompetent manner, the employees involved in the disciplinary proceeding followed AU's procedures and afforded Doe multiple opportunities to raise arguments in his favor and submit supporting evidence. *See Robinson*, 335 F. Supp. 3d at 31.

**C. Doe's negligence claim must be dismissed as duplicative of his contract claim.**

Doe also cannot state a claim for negligence because his claim arises entirely from an alleged contractual relationship. Under District of Columbia law, a tort claim "must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship." *Friends Christian High Sch. v. Geneva Fin. Consultants*, 39 F. Supp. 3d 58, 63 (D.D.C. 2014) (quoting *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008)). Accordingly, a "negligence claim based solely on a breach of the duty to fulfill one's obligations under a contract . . . is duplicative and unsustainable." *Friends Christian High Sch.*, 39 F. Supp. 3d at 63-64.

Here, the allegations in Doe's negligence claim are entirely linked to the "contractual" relationship that Doe alleges exists between himself and the University, and the negligence claim is duplicative of his breach of contract claim. Indeed, his negligence claim alleges that the University "negligently trained and supervised the people it employs to investigate claims of sexual misconduct, adjudicate those claims, *or otherwise implement its policies and procedures*"—the very same "policies and procedures" Doe alleges act as enforceable contracts between AU and Doe. Compl. ¶299 (emphasis added). Courts in this district have dismissed tort claims by students against colleges and universities where the student is also asserting a contractual relationship with the university. *See, e.g.*, *Amin v. Nyack Sch. of Adult & Distance Educ.*, 710 F. Supp. 2d 80, 83 (D.D.C. 2010) (finding plaintiff could not maintain an action in tort when the alleged tort arose from an alleged contractual relationship and noting that the tort must stand in its own right, independent of the contract); *see also Islar v. Whole Foods Mkt.*

*Grp., Inc*., 217 F. Supp. 3d 261, 266 (D.D.C. 2016) (finding a breach of contract claim an improper basis for a negligent supervision claim and noting that, under plaintiff's theory, any time an employee breached a contract, and the employer should have known the breach was likely, the party suffering from the breach would have a cause of action not just in contract but also in tort).

"D.C. law is clear, however, that 'the mere negligent breach of a contract … is not enough to sustain an action sounding in tort.'" *Id.* at 267 (quoting *Hunter ex rel. A.H. v. D.C.*, 64 F. Supp. 3d 158, 186 n.18 (D.D.C. 2014)). In short, Doe's failure to allege any breached duty distinct from AU's purported contractual obligations, requires the dismissal of his negligence claim.

## V. **Doe's Complaint Should Be Dismissed With Prejudice.**

Doe's Complaint fails to state a claim against Defendant under the causes of action asserted in the Complaint, and therefore should be dismissed. Moreover, because the Complaint and the documents incorporated therein include facts that *refute* Doe's claims, Doe's Complaint should be dismissed with prejudice. *See E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 22 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015) (unpublished) (dismissing complaint with prejudice where there were no allegations in the plaintiff's fifty-eight page complaint that "could give rise to legal liability under any of the theories advanced by the plaintiff"); *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 141-42, 144 (D.D.C. 2018) (dismissing plaintiff's RICO claims with prejudice because plaintiff failed to plead two essential elements).

**CONCLUSION**

For the reasons above, the Amended Complaint should be dismissed with prejudice.

Dated: December 9, 2019

Respectfully submitted

*s/ Laurel Pyke Malson*

Laurel Pyke Malson (#317776)
Aryeh S. Portnoy (#464507)
Nathiya Nagendra (#1031055)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2576
LMalson@crowell.com
APortnoy@crowell.com
NNagendra@crowell.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Motion to Dismiss the Complaint was served today, December 9, 2019, on the following counsel of record for Plaintiff via the Court's CM/ECF system:

**Scott Bernstein**
KaiserDillon PLLC
1099 14th Street, NW
8th Floor West
Washington, DC 20005
Email: sbernstein@kaiserdillon.com

/s/ Laurel Pyke Malson
Laurel Pyke Malson