REDACTED

# EXHIBIT 6

**[redacted] Appeal of Finding of Responsibility**
**<u>and Sanctions for Sexual Assault</u>**

**To:** **Appellate Board of the Conduct Council**
**From:** [redacted]
**Date:** **July 15, 2019**
**Re:** **Statement in Support of Appeal**

I am appealing the determination that I sexually assaulted [redacted] and the sanctions that were imposed on me. I did not sexually assault [redacted]

I am appealing for three reasons. First the investigation against me was flawed and was not the investigation I was promised by the Code of Student Conduct. Second, new evidence has come to light which was not included in my investigation report that alters the findings of fact. Third, the sanction against me is excessive.

The specific flaws in this investigation and new information are discussed in detail below, but the bottom line is that the investigator in this case abandoned her responsibility to fully investigate the case and neutrally determine what happened. She ignored key evidence and statements, she failed to follow up on disputed statements on important issues, she didn't provide me with full and complete information relevant to my case, and she ultimately shifted the burden of proof to me to prove that [redacted] consented, rather than require proof from [redacted] that she did not consent. As one major example, [redacted] filed two complaints against the only other witness who was with us that night, [redacted], including one case alleging that [redacted] sexually exploited and assaulted [redacted] at my apartment that night. [redacted] was completely exonerated in both cases, but I was never provided any details about those cases, the evidence in those cases, the witness statements, the investigator's analysis, or the findings of fact—all of which are critical to my case.

This case is about events that happened more than three years ago, yet the investigator discounted or ignored key text exchanges that happened immediately after the alleged incident and, instead, credited [redacted] plainly incredible account. I provided text messages (that [redacted] had on her phone but did not provide to the investigator) that show she was not traumatized when she left my apartment, she was able to communicate, and she was chatting as if no assault happened with a man she later accused of sexually exploiting and sexually assaulting her, all contrary to the incredible story she told the investigator three years later. See Investigation Report Exhibit J.

In an additional set of text messages a few days after the incident three years ago, I expressed confusion to [redacted] about why [redacted] was upset, telling him that "she gave her full consent every time i asked, and I asked more than once—Multiple

times actually." See Report, Exhibit F. Instead of crediting that contemporaneous statement I made before any complaint was filed, the investigator actually used it against me and said I wasn't credible because, when I was interviewed years later, I only mentioned one example of how I verbally requested consent. And, once she determined I wasn't credible, she found me responsible because there wasn't sufficient evidence to prove that I had consent. But, of course, if the Code had been applied correctly, it is never be my burden to prove that I'm innocent. The Code says that I am presumed innocent. But the investigator made me prove my innocence. When she didn't believe me, she found me guilty.

Even on [redacted] story, what is clear is that I asked about her consent, multiple times. [redacted] construes this as an ominous thing; that [redacted] and I "asked her questions regarding consent for what felt like a long time." The investigator found that I asked [redacted] about consent. [redacted] seems to suggest that this focus on her consent was a part of a conspiracy between me and [redacted] to assault her. A far more likely explanation is that I wanted to make sure that she was comfortable with what was happening and that she consented to what we were doing. The investigator's task was to decide between these two accounts of what happened. Instead, she shortcut the process, decided that I was inconsistent (when I wasn't) then concluded that [redacted] account that I was focused on consent so I must have been trying to sexually assault her. That doesn't make sense.

There are many more flaws in this process that are set out below. But the overarching conclusion that comes from this is that I did not get a fair investigation. I was supposed to be considered not responsible until proven otherwise, but I wasn't. The entire process was slanted to result in me being found responsible for sexual assault. Meanwhile, [redacted], a white American from Colorado, was exonerated based on evidence that was either the same or that I didn't have a chance to see. How can [redacted] be believable in my case but not believable in [redacted], especially when text messages undermine her story? This is not consistent with American University's Code and is unfair.

This submission has four main parts: (1) Case Background and Grounds for Appeal; (2) Relevant Facts and Findings; (3) Violations of the Student Conduct Code; and (4) Excessive Sanctions.

## CASE BACKGROUND AND GROUNDS FOR APPEAL

On May 22, 2019, Title IX Investigator Ms. Fariha Quasem found me to be responsible for sexual assault of [redacted] based on an incident that allegedly occurred more than three years ago. Specifically, Ms. Quasem found that I had "touch[ed] [redacted] breasts and vulva without her consent" on the night of April 22, 2016. *See* May 22, 2019 Investigation Report, p. 18 (hereafter "Report"). Notably, Ms. Quasem found that I was ***not*** responsible for [redacted] charges that I sexually exploited her and committed rape by penetrating her vagina with my finger. Based on Ms. Quasem's finding of sexual assault, however, Dean Jeffrey Brown suspened

me from the University through December 31, 2020 and assigned me to write a "Reflection Paper," as described in the July 1, 2019 letter from Dean Brown.

Under the Student Conduct Code, I was promised a fair and thorough investigation. Under Section XIX.1.e. of the Student Conduct Code, I was guaranteed "an equal opportunity to be heard." The investigator was supposed to "gather relevant evidence and information." The draft investigation report was supposed to summarize the information gathered. Section XIX 1.g. And I was entitled to be considered not responsible for the allegations until found responsible based on what is more likely than not to have occurred. I thought that is the process that I would receive, but none of this happened.

There are several other specific ways in which the investigation against me violated the procedures guaranteed in the University's Code of Conduct:

1. I was never provided with relevant information, evidence, and the findings made concerning the two parallel investigations of complaints by [redacted] against [redacted] a critical witness and the only other person in my apartment on the night in question.

2. I was not provided with [redacted] written complaint against me. This is a written statement by [redacted] concerning the events and should have been provided to me.

3. Ms. Quasem failed to gather critical evidence, including reports [redacted] made to her Resident Assistant, the RA's supervisor, and an OASIS representative. The fact that [redacted] reported the incident to these people was used against me by Ms. Quasem in her findings, even though it appears she made no effort to speak to these witnesses or gather any written evidence.

4. I was never provided with the names of the Sanctions Panel members or the Sanctions Panel Administrator so I would have an opportunity to challenge their participation on the basis of conflicts of interest. I still do not know who the panel members were.

The provisions of the Student Code of Conduct are a promise to me by the school, and that promise was broken.

In addition, new information is now available from a key witness. Following the sanctions decision, my attorney spoke with [redacted] about the events on the night in question and the investigations against [redacted]. *See* Exhibit 1. For example, [redacted] stated that his understanding after talking with me soon after the night in question was that there had been a very coherent dialogue between [redacted] and me about consent at each step in our physical interaction and that the word "consent" was used at each step. The information [redacted] provided about his

own investigation, including information about a witness who was not interviewed for my investigation—[redacted]—is also new information.

Finally, the sanctions imposed on me are excessive. At bottom, I was found responsible because Ms. Quasem concluded that, after [redacted] initiated kissing with me, [redacted] consent was insufficient to allow me to touch her breasts and vulva through her clothes for a few seconds. The 1.5 year suspension and permanent notation on my academic record will follow me for the rest of my life and will severely hamper my ability to pursue my chosen career. Even if [redacted] findings are accepted without question, such a lifetime sanction far outstrips what would be appropriate under the circumstances. .

**RELEVANT FACTS AND FINDINGS**

As I start to describe the relevant facts, I must stress again that this entire case is based on events that happened more than three years ago. [redacted] did not file her formal complaint "as soon as possible" following the alleged incident, like she was supposed to do under Section XIX.1.b. of the Code. Instead, she waited nearly three years. And no explanation was given for why she waited so long.

As a result, the evidence in my case unfortunately consists of "best recollections" and imperfect human memories—most made under the influence of alcohol or marijuana—along with some text messages witnesses happened to have maintained. Many of the statements Ms. Quasem relied upon for her finding were second-hand accounts made in 2019 about what people, e.g., [redacted] roommate, allegedly were told about what happened that night in 2016. Given this long lapse in time, the involvement of substances, and the use of second-hand accounts, it was crucial that all available information be gathered and—where information is no longer available or may have been inconsistent—it should not have been held against me. If anything, it should mean it is harder to meet her burden of proof. It was [redacted] who delayed in bringing her complaint, but I'm the one who has been prejudiced because of her delay.

This is what happened. On May 22, 2016, [redacted] and [redacted] came to my apartment to hang out. I was pretty good friends with [redacted] at the time. While I knew [redacted] some, I did not know her as well as I knew [redacted] and had not spent a lot of time around her. [redacted] and [redacted] brought a marijuana "brownie" to my apartment. I understand that [redacted] wanted to try marijuana. She tried the brownie and [redacted] and I drank alcohol. I think [redacted], and I largely agree on those basic facts, but there is a huge disparity between what [redacted] says happened after that versus what actually happened. Many of the things [redacted] says happened are totally inconsistent with accounts given by both [redacted] and me, and contemporaneous texts [redacted] and I provided to Ms. Quasem.

### A. No Incapacitation

Importantly, although [redacted] claimed that she did not have the capacity to consent to sexual activity due to her consumption of the brownie, Ms. Quasem did ***not*** find that [redacted] was incapacitated and unable to give consent. Ms. Quasem found only that [redacted] was and reasonably appeared to be impaired after consuming the edible on April 22nd." Report, p. 15. Under the Student Conduct Code's definition of incapacitation, however," "incapacitation is a state ***beyond*** mere intoxication or *impairmen*t of judgment." Even Ms. Quasem agrees that [redacted] was not incapacitated.

Nevertheless, even though incapacitation played no part in Ms. Quasem's conclusion, Ms. Quasem said that my credibility "decreased" because I did not recognize during my interview that [redacted] was "impaired." Specifically, Ms. Quasem said I told her that [redacted] "behavior was not affected, even in the slightest, by her marijuana consumption." Report, p. 15. First, I never said "in the slightest." That is Ms. Quasem's own addition. I did say, *truthfully*, that [redacted] consumption of the brownie did not seem to affect her and that she did not appear to me to be high. One reason I said that is that [redacted] did not have mobility or speech issues and I did not see her stumble or fall to the ground that night. Report, p. 7. That is the truth. I should not be penalized because of that.

Notably, much of the evidence Ms. Quasem cited to support her conclusion that [redacted] was impaired (but not incapacitated)—and that my observation was so inaccurate, in her opinion, that it decreased my credibility—were statements made several hours after [redacted] came to my apartment and consumed the brownie.[1] For example, Ms. Quasem cited the following:

- [redacted] stated that, when [redacted] returned to her dorm room *around 2-3 a.m.* she was unable to effectively communicate because she was high and crying.

- [redacted] told someone *six days later on April 28, 2016* that she "got so high that I [redacted] passed out."

- [redacted] stated in *late Spring 2016* semester that she had almost passed out and felt as if she was floating in and out of consciousness.

Report, p. 15.

One thing Ms. Quasem seems to ignore in all this is that [redacted] consumed a marijuana brownie. Ms. Quasem's own footnote says that "edibles, which take

---

[1] The Report on discusses [redacted] recollection that she arrived at my apartment around 10 pm. I recall it could have been earlier, possible 9 pm. In any event, it was several hours before she was said to be unable to communicate.

longer to digest, take longer to produce an effect." Report, p. 15, footnote 1. The fact that [redacted] roommate said [redacted]—much later in the evening—could not communicate is completely consistent with my recollection earlier in the evening. It's also completely consistent with texts [redacted] sent me after she got home saying that [redacted] vomited (as discussed in further detail below). Report, Exhibit J. Perhaps most clearly, [redacted] did not pass out in my apartment. To the contrary, she claims to have recalled a lot of details about what supposedly happened at each moment, even though much of it is false. It is [redacted] recollection that should be labeled "not credible."

[redacted] reported that, from his perspective, [redacted] was "high and inebriated," but his conclusion was based on his observation that "she seemed more relaxed than usual." [redacted] clarified that he was "unable to discern her level of inebriation." Report, p. 9. Consistent with my statement (and inconsistent with [redacted] also stated that he did not see [redacted] fall to the ground nor did it seem to him that she had any other mobility issues as a result of the edible. Report, p. 9. He said she did not have trouble walking downstairs when she left.[2] Report, p. 10. Given that I did not know [redacted] nearly as well as [redacted] did, and given that I had no experience with marijuana edibles[3], it is not surprising that I did not pick up on the fact that [redacted] "seemed more relaxed than usual."

Whether she was impaired, seemed more relaxed than usual, or did not seem to be affected by the brownie, the bottom line is that she was ***not*** incapacitated. She was aware of her surroundings and events around her, she was capable of consenting, and she gave me consent to touch her, as discussed below.

### B. Consent

Ms. Quasem found by a preponderance of the evidence that I touched [redacted] breasts and vulva without her consent. As I told Ms. Quasem at my interview, I don't dispute that I touched [redacted] breasts and vulva over her clothes. I do, however, vehemently deny that I did so without [redacted] consent. If

---

[2] Contrary to what [redacted] and I both said, [redacted] stated that she fell after eating a portion of the brownie; specifically, she said that she "hit the floor like a rock"; the report states that she reported she began to feel dizzy and all of a sudden, she was on the floor. She even claimed that [redacted] and I "moved to her a couch" and "put a blanket on her." Report, p. 3. She also stated that [redacted] "helped her and took her to the bathroom, since she was unable to walk on her own." Report, p. 4. This inconsistency is another reason why [redacted] is not credible though, as I note elsewhere in this report, Ms. Quasem did very little to evaluate [redacted] credibility

[3] Everyone agrees that [redacted] acquired the brownie, brought it to my apartment, and gave it to [redacted]. Ms. Quasem recognized that "[n]one of the parties were aware of the potency of the marijuana in the brownie, how the brownie was made, or what the dosage was related to consuming the brownie." Report, p. 15.

the burden was not placed on me to prove consent, I would have been found not responsible.

For example, [redacted] provided texts to Ms. Quasem showing that approximately four days after the alleged incident, I told [redacted] that [redacted] "gave her full consent every time I asked, and I asked more than once—Multiple times actually." Report, Exhibit F. As mentioned, [redacted] has now confirmed this fact. He told my attorney recently that I told him within a few days of the alleged incident that [redacted] and I had a very coherent dialogue about consent and that the word "consent" was used at each step. See Exhibit 1 attached. Ms. Quasem never asked me about the texts provided by [redacted] at Exhibit F. If she had, I could have provided more detail about the dialogue I had with [redacted]

Instead of crediting the contemporaneous text messages with [redacted], however, Ms. Quasem focused on what I was able to recall during my interview three years later in February 2019 when Ms. Quasem asked me what happened. When interviewed, I told to Ms. Quasem that, as I was massaging [redacted] shoulders, [redacted] kissed me. [redacted] initiated the kissing. For her finding of responsibility, Ms. Quasem then focuses on the fact that, as [redacted] and I continued to kiss and [redacted] was lying on her back on the couch while I was seated/kneeling on the floor next to her, I recalled in my interview that [redacted] put her hands on my head and physically moved my head from in front of her face to above her chest. Based on the way that [redacted] moved my body in relation to hers, I said I thought that [redacted] was communicating to me that she wanted me to touch her breasts, which I did for a few seconds over her shirt.[4]

Next, I told Ms. Quasem in February 2019 that [redacted] put her hands on my head again and moved my head toward her crotch area. I told Ms. Quasem I then said, "is this what you want me to do," to which [redacted] said, "yes." I said to Ms. Quasem that I understood from that movement of my head and her verbal agreement that she wanted me to "go down on her." I told Ms. Quasem I then touched [redacted] vulva over her pants with my mouth for a few seconds.

I should note that, if I wrong about what [redacted] was communicating during our encounter, she did not object or make any expression that she had not wanted me to do that.

That is what I remembered when I sat down in February 2019 and was asked to narrate what had happened one night three years ago strictly from recall. Notably, the text exchange between [redacted] and me where I said [redacted] "gave her full consent every time I asked, and I asked more than once—Multiple times

---

[4] It is not even clear how I could be held responsible for touching [redacted] with my mouth because [redacted] "ha[d] no memory of whether or not [redacted] placed his mouth on or near her crotch area." Report, p. 16. She does not remember that, even though she claims to recall many details about that night.

actually," was not provided to me until the draft investigation report was made available. I was only able to review the report for about two hours and did not even notice this statement in the exhibits that I had made three years ago. If I had noticed it, I would have remembered (as I do now) that the dialogue between [redacted] and me regarding consent was much more detailed than I told Ms. Quasem in February 2019. [redacted] has also confirmed to my attorney that this is what I told him three years ago.

Not only did Ms. Quasem not properly consider the contemporaneous text messages, she actually used those texts against me to attack my credibility again. In her view, I lost credibility because the text messages to [redacted] (which were favorable to me) "contradicted" what I told her three years later in February 2019:

> In text conversations with [redacted] stated that [redacted] 'gave her full consent every time i asked, and I asked more than once—Multiple times actually" (Exhibit F) . . . . [redacted] texts with [redacted] ***contradict his statements during the investigation***, which only indicate that he asked [redacted] for consent when she moved his head towards her crotch area. [redacted] ***inconsistent statements, regarding asking*** [redacted] ***for consent, negatively impacts his credibility.***
>
> . . .
>
> [redacted] text messages with [redacted] (Exhibit F), which ***negatively impacted*** [redacted] ***credibility, contradicts his statements during the investigation***, which indicate that he only asked [redacted] for consent when she moved his head towards her crotch area.

Report, p. 17.[5] (emphasis added)

In other words, Ms. Quasem discarded the contemporary text message sent just a few days after the night in question—where I told [redacted] that [redacted] gave her full consent every time I asked, and I asked more than once—because she thinks I did not say the same thing when she asked me open-endedly in 2019 to describe what happened three years before. Moreover, she said that the inconsistency hurt my credibility. This does not make sense. Why would I purposely change my story in 2019 to make things worse for me? What I said in 2019 was the best I could recall, but the texts from 2016 are more accurate in terms of how thorough I was about obtaining consent.

---

[5] Moreover, Ms. Quasem improperly required that [redacted] consent needed to be "clear." Specifically, she said that [redacted] moving my head was "not a clear indication of consent." Report, p. 16-17. The definition of consent, however, does not include any requirement that the consent be "clear."

Moreover, there is no actual contradiction between the two accounts. I told Ms. Quasem one specific sequence of events that I remembered about how [redacted] gave consent. That Ms. Quasem asked an open-ended question and I gave her one event I remembered doesn't mean that there were other ways [redacted] gave consent that I didn't remember at the time—three years later. There is no contradiction. Ms. Quasem made one up to make her job easier.

### C. [redacted] FaceTime Call with [redacted]

As another example of how [redacted] story does not match up with reality, [redacted] stated that, while at my apartment, she heard [redacted] speaking with [redacted] via video chat. She also stated that she heard [redacted] say that she "doesn't look good," and asked, "Why is she on [him] like that" and "why is [he] touching her." Report, pp. 4-5. This never happened and Ms. Quasem never followed up on this to see if other witnesses said it happened. At least three other people were "present" for this alleged statement, if it happened (it didn't): me, [redacted], and [redacted]. She did not ask me whether I heard such a statement by [redacted], and it does not appear that Ms. Quasem asked [redacted] or [redacted] either, even though [redacted] was interviewed before any of us were interviewed.

[redacted] for example, reported that [redacted] and I said hello to [redacted] before [redacted] left the room to continue his conversation. Report, p. 9. There is nothing in [redacted] statement about [redacted] saying anything about [redacted] appearance or inquiring about her being on me or me touching her. I understand that [redacted] has told my attorney that he strongly denies that [redacted] said these things. See Exhibit 1. If he is asked, I expect he will confirm this.

[redacted] himself stated that, during the call, "he did not speak to or see [redacted] or [redacted] via Facetime that night." Report, p. 11. [redacted] further stated that [redacted] "may have said 'hi' on his behalf to both to both [redacted] and [me] but was not sure." Again, [redacted] could have confirmed that he did not say what [redacted] says he said, but it does not appear that Ms. Quasem asked him. But she didn't, denying me my right to a full and fair investigation.

### D. After [redacted] Left My Apartment

Ms. Quasem states in her report that [redacted] consistent disclosures to others about her experience on the night in question "increase her credibility." Report, p. 17. The investigator does not acknowledge that [redacted] text messages with me after she left my apartment are inconsistent with the notion that [redacted] and I both sexually assaulted her and are also inconsistent with other statements she made. Report, Exhibit J. These texts are crucial evidence, in view of the differing accounts of the parties three years later, because they are the only contemporaneous written exchange between [redacted] and me and between [redacted] and [redacted] immediately following the alleged incident.

Specifically, [redacted] initiated a text string with me at 1:47 am after she arrived at her room, telling me that [redacted] vomited in the Uber. She then said, "he's OK though" and then later said, "Yes, he's fine." Exhibit J. This exchange is important for several reasons.

First, the texts with me are inconsistent with the notion that [redacted] was so impaired that she was unable to communicate as [redacted] roommate claimed. Second, her statements that [redacted] was "OK" and "fine" are completely contradictory to her explanation for texting me that she was "concerned it was possible he had alcohol poisoning and I wanted to not have to check up on him, but still let someone know that he was not feeling well so they could check on him." See Report page 6. Why would she say he was "OK" and "fine" if she though he might have alcohol poisoning? And she never indicated that I should check up on [redacted]. Finally, this text string is inconsistent with the notion that [redacted] left my apartment traumatized, as she says she did. [redacted] account is completely inconsistent with what these text messages say. This inconsistency should decrease [redacted] credibility.

The texts I provided Ms. Quasem continue the next day. Ms. Quasem attempts to explain away the next-day texts by saying that, "[w]hile [redacted] may have responded to [redacted] messages on April 23rd, by April 27th she was no longer responding to his text messages." But it is incorrect that she only "responded." [redacted] actually initiated a text string with me at 9:22 pm on April 23, 2016, after she had responded to my last text and after we had not texted for some time, asking me if I was "okay with everything." When I responded, "Yeah, I am," and asked her "And you?," she responded, "Yeah I'm tired but okay." The fact that [redacted] re-initiated a new set of texts is also inconsistent with the explanation that [redacted] gave to Ms. Quasem, which was that she "by nature she is a polite person, so she did not know how to communicate how she actually felt." Report, pp. 6-7. If she was just "being polite," she wouldn't have restarted the text conversation. Instead, [redacted] took affirmative steps to see if I was ok with what happened and to let me know that she was ok with what happened the night before. This is the objective reading of the text messages, which both Ms. Quasem and [redacted] misconstrue.

It is also noteworthy that [redacted] apparently did not turn over these texts between me and her to the investigator, even though she turned over many other texts favorable to her case.

## VIOLATIONS OF THE STUDENT CONDUCT CODE

The investigation in this case was completely unfair and did not fulfill the promises made to me in the Student Conduct Code.

Ms. Quasem did not gather all of the relevant evidence. Given how she viewed my statements as compared to [redacted] I did not have an equal opportunity to be

heard. And although I was supposed to be considered not responsible until proven otherwise, I was not. Rather, it seems like I started off as being deemed responsible, and it was my job to prove otherwise. When Ms. Quasem decided my story wasn't credible, that was the end of it for her; she decided at that moment that I was guilty. That is not what the Student Code of Conduct provides.

If the fair and correct procedures had been followed, and all relevant information was gathered, considered and analyzed, no reasonable person could conclude that I sexually assaulted [redacted].

### A. The Investigations of [redacted]

First and foremost, this entire investigation has been fundamentally flawed from the outset, both procedurally and factually, because it failed to take into account two completely separate but parallel investigations of allegations [redacted] made against [redacted]. One of those investigations of [redacted] concerned an alleged assault by [redacted] that occurred that ***same night in my apartment***. I understand that [redacted] however, was found not responsible for the allegations leveled against him and he graduated this past May. I further understand that [redacted] appealed the finding in favor of [redacted] and her appeal was denied.

[redacted] is obviously a critical witness for my case because he is the only person other than [redacted] and me who was in my apartment during the alleged incident. He was with us most of the time except for a few minutes when he left the room to Facetime a friend and then got sick in the bathroom. However, the fact that (1) [redacted] brought a complaint against [redacted], (2) Ms. Quasem investigated the complaint against [redacted], and (3) Ms. Quasem found [redacted] not responsible is mentioned nowhere in the draft or final investigation reports in my case. Moreover, it appears that in [redacted] case, Ms. Quasem must have made a determination that [redacted] was not credible because her statement is completely inconsistent with [redacted], as discussed below. The investigator had to believe [redacted] or [redacted]. [redacted] is either credible or not—she can't be a liar when it comes to [redacted] but a truthteller when it comes to me. This failure to account for the investigation of [redacted] throughout my investigation is a critical procedural failure. The inclusion of such information would also be new information that significantly alters the findings of fact.

I also understand that [redacted] actually brought a second complaint against [redacted] for sexual assault and sexual exploitation around the same time she brought her complaint against me. And [redacted] was found ***not*** responsible for that one also. I understand that the second complaint against [redacted] was based on alleged incident in February 2016, a couple of months before the night at issue in my case (after which she remained friends with [redacted], as shown by the fact that she came to my apartment with him). I know that people who believe they are victims of sexual assault are entitled to have their claims investigated thoroughly, but the fact that she brought two claims against [redacted], also three years after the fact, and both were

found to be without merit, raises questions about her truthfulness. What she claimed in those cases and how it matched up with the evidence and accounts of other witnesses is relevant to her credibility. That's evidence I didn't get access to.

My understanding is that Ms. Quasem interviewed at least some witnesses (e.g., [redacted], and me) for purposes of both my investigation and [redacted] investigation pertaining to the night at my apartment. Even though the entire interview is relevant to the credibility of each witness, my understanding is that I only saw part of the interview reports. And I understand that at least one witness was interviewed for [redacted] case that did not provide information for mine. I understand that [redacted] provided information and was a witness for [redacted]. I also understand that [redacted] was the person who provided the brownie to [redacted] that [redacted] consumed that night. Given that both [redacted] and I were accused of sexual exploitation based on the brownie, I have no idea why [redacted] information would not have been included in my report. It seems like it should have been.[6] There's no reason why [redacted], the white student from Colorado, should get a complete investigation and I don't deserve the same.

The investigation and findings related to the complaints against [redacted] for sexually exploiting and sexually assaulting [redacted] are crucial to my case for several reasons, including at least:

1. The fact that [redacted] was under investigation *at all* at the same time he was speaking with Ms. Quasem about my case is highly relevant to [redacted] credibility. He would obviously have a motivation to deemphasize his own role, while emphasizing my own role in events at my apartment.

2. To the extent that any statements by witnesses or other evidence gathered in [redacted] case were not identical to what was included in the investigation report regarding my case should have been highly relevant to my case. This omission deprived me of my ability to address such evidence, comment on it, and provide further questions to ask those witnesses. Ms. Quasem also had to have at least thought about evidence like that as she did both reports at basically the same time. It was also unfair for her to have that information in front of her while she was deciding whether I committed sexual assault and not let me know about it.

3. To the extent that any statements by witnesses or other evidence were added to [redacted] investigation report after the Case Review period in [redacted] case, this omission deprived me of a fair hearing before the Sanctions Panel and in this appeal, which would be the first

---

[6] Section XIX.1.f. states that the draft investigation report will "summariz[e] the information gathered."

time I would be able to address such new facts. In fact, we know that I have not been able to address [redacted] statement.

4. Ms. Quasem's analysis of the allegations against [redacted] and her conclusions as to whether [redacted] was responsible for the alleged misconduct are relevant to her analysis and conclusions in my case because she was (presumably) evaluating the credibility of many of the same witnesses and weighing much of the same evidence as she did in my case, and possibly more. I should be able to see that analysis.

Yet, despite the critical importance of [redacted] as a witness in my case, the fact that [redacted] accused [redacted] of misconduct ***twice*** is not discussed at all in either the draft investigation report or the final report concerning my case, nor was any information from the investigation of [redacted] shared with me. This complete failure to take into account the investigation of [redacted] in the analysis of my case and to disclose the evidence and facts developed in that investigation is a flagrant violation of the basic procedural protections that should have been afforded to me. It denied me my equal opportunity to be heard.

In addition, Section XIX.1.a. of the Student Conduct Code provides that notice to both parties at the start of the case will include "***the identity of those involved***, the date, location, and nature of the alleged Prohibited Conduct, and the potential Student Conduct Code violations." The Notice provided to me on January 24, 2019 makes no mention of [redacted] or any indication that he was involved or accused and that he too was being investigated for violations of the Student Conduct Code based on events at my apartment on the same night. Importantly, [redacted] allegations against me and [redacted] include Sexual Exploitation based on her consumption of a marijuana edible. Yet, it was [redacted] who got the edible from someone else, brought it to my apartment, and "broke off a portion of the marijuana brownie and gave it to [redacted]." Report, p. 4. In addition, [redacted] described that both [redacted] and I were asking her questions about her consent "for what felt like a long time." Given this, [redacted] was certainly "involved" in my case—indeed, she brought a separate case against him based on some of the same conduct. I should have received formal notice of his involvement.

To this day, I have not been provided a copy of the investigation report—either the draft report or the final one—and the findings by Ms. Quasem for the complaint against [redacted]. I also do not know whether the copy of the final investigation report for [redacted] was provided to the Sanctions Panel in my case—presumably, it was not. And for witnesses who are addressed in my report, I do not know whether the summaries of witness statements in the report regarding [redacted] are identical to the statements in my report. And I do not know anything about the analysis Ms. Quasem included in her report regarding [redacted], including any analysis regarding the credibility of [redacted] statements or lack of support for her assertions against [redacted] I do know that she believed [redacted] and didn't believe [redacted]

[redacted]. And if she didn't believe [redacted] in [redacted] case, that's a strong reason not to believe her in my case.

Ms. Quasem had to believe either [redacted] or [redacted] because their stories are completely different from one another. For example, [redacted] apparently told the investigator that "when [redacted] returned to the living room he asked her if she consented. [redacted] stated that [redacted] then said 'say yes' so [redacted] said 'yes.'" Then, [redacted] said, [redacted] "leaned over the couch and kissed her 'violently.'" She stated that [redacted] "put his tongue in her mouth and as he was kissing her he grabbed her hair and with his other hand he grabbed her breast. [redacted] stated that the kiss lasted about 10 seconds." [redacted] also reported that, "immediately after [redacted] finished kissing her he stood up and started screaming . . . [He] then began breathing heavily and said 'what are we doing' and vomited."[7] Report, p. 5.

[redacted], on the other hand, told a very different story. He said that, "at one point during the night [redacted] asked him to kiss her." He stated that, after he agreed and tried to give her a "peck on her lips," [redacted] "was forceful during the kiss and tried to put her tongue in [his] mouth." He further recalled that, "after he pulled away [redacted] "jokingly told him 'you are a bad kisser' and asked 'do you want to kiss me again.'" [redacted] denied placing his hands on [redacted] breasts during the kiss or that he "start[ed] screaming after" the kiss. Report, p. 9.

Despite this stark contrast, it does not appear that Ms. Quasem asked any follow-up questions of either [redacted] or [redacted] about these inconsistencies. Ms. Quasem's investigation report for my case includes only a brief summary of follow-up questions the investigator asked of [redacted]. All of the questions appear to have related to the edible, covering things like where [redacted] obtained it, whether he made it or purchased it, how many edibles [redacted] purchased, how big the edible was, what it looked like, whether he knew whether "any other substances were in the edible." Report, p. 10. Ms. Quasem apparently made no effort to resolve the differences in the stories that [redacted] and [redacted] told regarding the kiss between them on the night in question—or at least there is no indication in my report that she attempted to do so; maybe she did so in [redacted] report.

Moreover, the only questions Ms. Quasem apparently asked [redacted] after she interviewed [redacted] related to the text messages that I provided after I reviewed the draft report, i.e., her texts to me about [redacted] vomiting in the Uber and the texts between me and her the following day. The investigator also asked [redacted] about her knowledge of the marijuana edible.

---

[7] It should be noted that [redacted] did NOT vomit in my living room, which is what this statement appears to claim. I certainly would have remembered that because it would have required substantial clean up. [redacted] also denies that he vomited in my living room.

Only one of those accounts can be true. Given that [redacted] was found not responsible, the investigator must have determined that [redacted] account was more (or at least equally) credible as [redacted] account. Yet that credibility determination is not discussed anywhere in the report about me. And if [redacted] was not believable for [redacted] case, why is she believable for mine?

### B. Other Missing Information

Ms. Quasem is obligated under the Student Code of Conduct to "gather relevant evidence and information." However, it appears that she completely failed to gather or provide to me certain relevant information. Such missing information, which [redacted] obviously knew and had access to, also denied me an equal opportunity to present evidence in my favor.

First, she failed to gather information regarding at least two contemporaneous accounts of the incident by [redacted]. Specifically, the report says that [redacted] spoke to her RA and her RA's supervisor about the incident shortly after the incident. Report, p. 6. Although the report includes [redacted] account of what she told these people, it does not appear that Ms. Quasem spoke with or even tried to speak with the RA or the RA's supervisor. In addition, [redacted] apparently met with Sara Yzaguirre, an advocate at OASIS about the alleged incident. Report, p. 6. Determining what [redacted] reported to these people is crucial to know for my case. For example, why did nothing further come of these reports. What did the RA or the RA's supervisor do in response? What exactly did [redacted] say to them. We don't know because Ms. Quasem did not ask.

In addition, I understand that [redacted] filed a written complaint about the alleged incident at the beginning of my case. Her statements in that complaint are certainly relevant and Ms. Quasem considered them. I would like to find out if they are consistent with what she said during her interview and what she said at other times. Because [redacted] had this statement and I did not, it also deprived me of an equal opportunity to be heard. In order for me to have an equal opportunity to present evidence, I should have been provided a copy of the complaint.

### C. Identities of Sanctions Panel Members

Finally, I was never provided the names of the Sanctions Panel members or the name of the Sanctions Panel Administrator. The notice provided to me on June 10 does not list the Sanctions Panel Administrator or the Sanctions Panel members. Under Rule XIX.2.e., I was entitled to know the names of the Sanctions Panel members in advance in order to potentially challenge them on grounds of a conflict of interest. This basic procedural right was not given to me.

**EXCESSIVE SANCTIONS**

Finally, even if I were still found to be responsible for sexual assault—a devastating thought—the sanctions I received are extreme and excessive in this case. The suspension and permanent record of sexual assault on my transcript threaten to destroy my entire future.

The Sanctions are simply not commensurate with my conduct. Again, assuming for purposes of sanctions, that there is a preponderance of the evidence to find me responsible, the most I did is briefly touch [redacted] breast and vulva over her clothes after mutual kissing where she physically moved my head close to her chest and then to her crotch area, and after which I asked if "this is what you want," to which she said yes. I certainly did not intend to touch her without her consent. I was honest about my interactions, I did not try to hide the fact that I touched [redacted] from the investigator. Given these facts, and given all of the conflicting evidence, including questionable and contradictory statements given by [redacted], I do not deserve to suffer punishment for the rest of my life. At this point, I will not graduate until Fall 2019 anyway. My family has already missed seeing me graduate on time, which has already been devastating punishment.

This punishment also impacts my immigration status and potentially my scholarship. My student visa will expire before the end of my suspension. Also, I am attending AU based on a scholarship through the Kuwaiti government. I am required to report to the Kuwaiti embassy each semester to update them on my coursework and tell them when I finish my coursework and verify my graduation. The government knows that my coursework is finished, but I cannot tell them I have graduated. I am concerned what will happen if they find out I am finished with coursework but cannot graduate. They may say that I have not fulfilled my scholarship and I must pay back the tuition funds due to this delay.

The charges in the underlying case concern freshman-year allegations, but they were brought against me in my senior year. I provided the Sanctions Committee letters attesting to my character and a sample of my academic work at the University. I have no civil or criminal record. I have not had as much as a traffic ticket in my entire time in the United States, or in Kuwait. As I have stated in my filings, I have never harmed anyone in my life and would never touch anyone without their consent. I am a scholarship student and I was an active member of AU. I have been an Eagle feature writer for years.

Spring 2019 was to be my last semester before graduation: a time for my family and I to rejoice in the achievement. Instead, my family and I spent the semester under a considerable amount of stress because of the nature of the allegations. I attempted to balance study, work, and school activities but it was extremely difficult. My mother experienced and continues to experience medical issues as a result of these allegations.

If the Appellate Board for some reason upholds the finding of responsibility—and, again, I wholeheartedly believe that such a finding is not supported in this case—I ask the Appellate Board for justice so that I can eventually move on from this painful episode in my life. If such a finding is upheld, I ask that the Appellate Board lift the suspension and provide that such a finding and suspension will not be recorded on my academic record.

* * *

I trusted, and I continue to hope, that AU's procedures would ultimately show the truth of what happened. That truth can be gleaned from my statements, the evidence I provided, and from the lack of evidence against me. At the very least, I hope and trust that the Conduct Council will overrule the Sanction and permit me to graduate and to pursue my career goals. It is my sincere hope to join the ranks of many proud AU graduates, including many members of my own family,

Thank you for considering my appeal.

**EXHIBIT 1**

**Declaration of William E. Zapf**

I, William Zapf, hereby declare as follows:

1. I am an attorney with the law firm of KaiserDillon PLLC. I represent [redacted] in connection with his campus disciplinary case at American University and related issues.

2. As part of my representation of [redacted], I called and subsequently spoke with [redacted] by telephone on Wednesday, July 10, twice on Friday, July 12, and once on Sunday, July 14. Below is a summary of certain statements [redacted] made during our calls. This statement is made to the best of my recollection.

3. [redacted] informed me that in January 2019 [redacted] brought two separate complaints against him for violating American University's Student Code of Conduct for alleged sexual assault and sexual exploitation. [redacted] told me that one of the complaints was based on an allegation by [redacted] that [redacted] kissed her and touched her breast without consent on the evening of April 22, 2016, at the off-campus apartment of [redacted], the same evening and location at issue in [redacted] case. I understand that the second complaint against [redacted] related to an alleged incident that occurred in February 2016. [redacted] informed me that he had been found not responsible with respect to both complaints. He also informed me that [redacted] appealed the decision regarding the April 22 allegations against [redacted] and her appeal was denied; [redacted] said that [redacted] did not appeal the decision regarding the February 2016 decision.

4. [redacted] informed me that he graduated from American University after Spring semester 2019.

5. I also asked [redacted] about the witnesses who gave statements in his case regarding April 22, 2016. [redacted] identified [redacted] as a person who was a witness for him. [redacted] explained that [redacted] had provided the marijuana edible to him that [redacted] later consumed on April 22, 2016, and that [redacted] also provided other information for his case to the investigator.

6. [redacted] also told me that he was present in [redacted] apartment on April 22, 2016, the night at issue in [redacted] case. [redacted] told me that he left [redacted] apartment with [redacted] that night.

7. [redacted] declined to provide me with a copy of the redacted version of the investigation report in his case because he was unsure if he was permitted to do so.

8. I also asked [redacted] about his recollection about certain events that may have occurred on April 22, 2016.

a. I asked [redacted] about the FaceTime call he had with [redacted] during the evening of April 22, 2016. I asked [redacted] if [redacted] had said

something like, “Why is she on top of him like that?” or “Why is he touching her?” [redacted] strongly denied that [redacted] had said anything like that or commented on the appearance or interactions of [redacted] or [redacted] at all. [redacted] stated that he understood that [redacted] was completely sober in his dorm room in Boston at the time of the call.

b. [redacted] recalled that [redacted] had told him within a week or so after April 22, 2016, that [redacted] and [redacted] had engaged in a very coherent dialogue about consent at each step in their physical interaction that night and that the word “consent” was used each time.

c. [redacted] stated that [redacted] description of their kiss is false. He stated that he did not stand up and scream or say “what are we doing.” He denied that he vomited in the living room at [redacted] apartment, as [redacted] described. Instead, [redacted] indicated that he only vomited in [redacted] bathroom and later in the Uber on the way to the dorm.

d. [redacted] stated that [redacted] statement that he put the remainder of the marijuana edible in her mouth was false.

I affirm under penalty of perjury that the foregoing is true to the best of my recollection and is based on personal knowledge.

Dated: July 15, 2019

*/s/ William E. Zapf*
William E. Zapf

Attorney for [redacted]