**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOHN DOE,<br><br>        Plaintiff,<br><br>    v.<br><br>AMERICAN UNIVERSITY,<br><br>        Defendant. | 19 Civ. 03097 (APM) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

December 23, 2019

KAISERDILLON PLLC
Matthew G. Kaiser (D.C. Bar No. 486272)
Scott S. Bernstein (D.C. Bar No. 1013992)
William E. Zapf (D.C. Bar No. 987213)
1099 14th Street NW, 8th Floor West
Washington, DC 20009
(202) 640-2850
mkaiser@kaiserdillon.com
sbernstein@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

**TABLE OF CONTENTS**

Preliminary Statement ................................................................................................................ 1

Factual Allegations .................................................................................................................... 2

    I.    THE EVENTS OF APRIL 22, 2016 .................................................................................. 3

    II.   JANE ROE'S CLAIMS ..................................................................................................... 4

        A.   Jane Roe's Allegation That H.S. and C.S. Assaulted Her in February 2016 ................ 4

        B.   Jane Roe's Allegation That H.S. and John Doe Assaulted Her in April 2016 .............. 4

    III.  THE INVESTIGATION ..................................................................................................... 5

        A.   The Investigation Concerning Jane Roe's Allegations Against H.S. .............................. 5

        B.   The Investigation Concerning Jane Roe's Allegations Against Mr. Doe ...................... 6

    IV.  THE DECISIONS ............................................................................................................... 7

        A.   The Investigator's Decision as to Jane Roe's Allegations Against H.S. ........................ 7

        B.   The Investigator's Decision as to Jane Roe's Allegations Against Mr. Doe .................. 8

    V.   THE SANCTIONING PANEL .......................................................................................... 10

    VI.  THE APPEAL ..................................................................................................................... 11

Argument ..................................................................................................................................... 12

    I.    THE COMPLAINT OVERWHELMINGLY PLEADS A VIOLATION OF TITLE IX UNDER THE "ERRONEOUS OUTCOME" THEORY. ................................................. 12

        A.   John Doe Has Cast Substantial Doubt on the Accuracy of the Outcome. ..................... 13

        B.   John Doe Has Pled Facts That Amply Support an Inference of Gender Bias. ............... 17

    II.   JOHN DOE HAS SUFFICIENTLY PLED A VIOLATION OF THE D.C. HUMAN RIGHTS ACT. ................................................................................................................... 31

        A.   Mr. Doe States a Claim for Disparate Treatment. ......................................................... 31

B.  Mr. Doe Also States a Claim for Disparate Impact. ................................................. 31

III.  JOHN DOE HAS SUFFICIENTLY PLED A BREACH OF CONTRACT CLAIM. ..... 33

A.  The Code and Policy Are Parts of an Enforceable Contract. .................................. 33

B.  John Doe Has Sufficiently Pled Six Breaches of Contract. .................................... 33

IV.  AU BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR
DEALING. .................................................................................................................. 40

V.  JOHN DOE HAS SUFFICIENTLY PLED A NEGLIGENCE CLAIM. ......................... 41

A.  American University Owes Its Students a Duty of Care. ....................................... 41

B.  Mr. Doe Pleads His Negligence Claim with Specificity. ........................................ 44

C.  Mr. Doe's Negligence and Breach of Contract Claims Are Not Duplicative. .......... 45

Conclusion ....................................................................................................................... 45

## TABLE OF AUTHORITIES

**CASES**

*Amin v. Nyack Sch. of Adult and Distance Educ.*, 710 F. Supp. 2d 80 (D.D.C. 2010)................ 45

*Boykin v. Gray*, 895 F. Supp. 2d 199 (D.D.C. 2012) ................................................... 32

*Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149 (D.D.C. 2017) ........................ 43

*Case Western Reserve Univ.*, Case No. 1:17 Civ. 414, 2017 WL 3840418 (N.D. Ohio Sept. 1, 2017) ................................................................................................ 42

*Collick v. William Paterson Univ.*, 2016 WL 6824374 (D.N.J. Nov. 17, 2016) .................... 20, 24

*Doe v. Amherst Coll.*, 238 F. Supp. 3d. 195 (D. Mass. 2017) ....................................... 20, 22, 26

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018).................................................... 24, 25, 26, 27

*Doe v. Brown*, 166 F. Supp. 3d 177 (D.R.I. 2016) ........................................... 24, 26, 32

*Doe v. Coastal Carolina Univ.*, 359 F. Supp. 3d 367 (D.S.C. 2019) ........................... 32

Doe v. *Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) ..................................... 20, 24, 25, 26

*Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016)................................... 19, 20, 25, 26

*Doe v. George Washington Univ.*, 366 F. Supp 3d 1 (D.D.C. 2018)................................... passim

*Doe v. Lynn Univ.*, 235 F. Supp. 3d 1336 (S.D. Fla. 2017)............................... 20, 21, 26

*Doe v. Marymount Univ.*, 297 F. Supp. 3d 573 (E.D. Va. 2018).................................... 13

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018).................................................. 21, 25

*Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048 (S.D. Ohio 2017) ......................... 21, 26

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) ..................................................... 25

*Doe v. Rector & Visitors of George Mason Univ.*, 132 F.Supp.3d 712 (E.D. Va. 2015)............. 14

*Doe v. Rider Univ.*, 3:16 Civ. 4882, 2018 WL 466225 (D.N.J. Jan. 17, 2018) .......................... 13

*Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205 (M.D. Fla. 2019) ......................... 22, 24, 29

*Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748 (D. Md. 2015)....................................... 15

*Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125(N.D.N.Y. 2018) ............................... 20, 24

*Doe v. Syracuse Univ.*, Case No. 5:18 Civ. 377, 2019 WL 2021026 (N.D.N.Y. May 8, 2019) .................................................................................................................. 13

*Doe v. Trustees of the University of Pa.*, 270 F. Supp. 3d 799 (E.D. Pa. 2017) ............... 20, 21, 26

*Doe v. Univ. of Oregon*, Case No. 6:17-cv-01103, 2018 WL 1474531 (D. Or. March 26, 2018) .................................................................................................................. 14

*Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984 (D. Minn. 2017) ................................................ 42

*Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104 (E.D. Tenn. March 31, 2011) .................................................................................................................. 42

*Doe v. University of Dayton*, 766 F. App'x 275 (6th Cir. 2019) ..................................................... 27

*Doe v. Washington and Lee Univ.*, Case No. 6:14 Civ. 00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015) ................................................................................................. 15

*Fogel v. Univ. of the Arts*, Case No. 18 Civ. 5137, 2019 WL 1384577 (E.D. Pa. March 27, 2019) .............................................................................................................. 14

*Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961 (S.D. Ohio 2018) ........................................ 13

*Harnois v. Univ. of Mass. at Dartmouth*, Case No. 19 Civ. 10705, 2019 WL 5551743 (D. Mass. Oct. 28, 2019) .......................................................................................... 14

*Harris v. St. Joseph's Univ.*, Case No. 12 Civ. 3937, 2014 WL 12618072 (E.D. Pa. Nov. 26, 2014) .............................................................................................................. 26

*Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011) .......................................... 41, 42

*Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40 (D.D.C. 2010) ............................................. 40

*Islar v. Whole Foods Mkt. Grp., Inc.*, 217 F. Supp. 3d 261 (D.D.C. 2016) ................................... 45

*Jbari v. District of Columbia*, 304 F. Supp. 3d 201 (D.D.C. 2018) ............................................... 32

*Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172 (D.D.C. 2016) ............................. 35, 41

*McNair v. District of Columbia*, 213 F. Supp. 3d 81 (D.D.C.) ....................................................... 12

*McNamara v. Picken*, 866 F. Supp. 2d 10 (D.D.C. 2012) .............................................................. 36

*Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019) ................................................... 12, 18, 20

*Millennium Square Residential Ass'n v. 2200 M Street LLC*, 952 F. Supp. 2d 234 (2013) ......... 44

*Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397 (N.D.N.Y. 2019) .............................. 14, 20, 22, 24

*Norris v. Univ. of Colo., Boulder*, 362 F. Supp. 3d 1001 (D. Colo. 2019) ................. 15, 16, 24, 30

*North v. Catholic University of America*, 310 F. Supp. 3d 89 (D.D.C. 2018) ............................. 43

*Oliver v. Univ. of Texas Sw. Med. School*, Case No. 3:18 Civ. 1549, 2019 WL 536376
  (N.D. Tex. Feb. 11, 2019) ........................................................................................... 24

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81 (2d Cir. 2011) .................... 42

*Paulin v. George Washington School of Med. and Health Sci.*, 878 F. Supp. 2d 241
  (D.D.C. 2012) .............................................................................................................. 41

*Pharm. Research and Mfrs. of Am. v. United States Dep't of Health and Human Servs.*,
  43 F. Supp. 3d 28 (D.D.C. 2014) ............................................................................... 27

*Prasad v. Cornell Univ.*, Case No. 5:15 Civ. 322, 2016 WL 3212079 (N.D.N.Y. Feb. 24,
  2016) ........................................................................................................................... 14

*Ritter v. Okla. City Univ.*, Case No. 16 Civ. 0438, 2016 WL 3982554 (W.D. Okla. July
  22, 2016) ..................................................................................................................... 32

*Robinson v. Howard Univ.*, 335 F. Supp. 3d 13 (D.D.C. 2018) ............................................. 17, 18

*Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464 (Minn. Ct. App. 1981) ................................. 42

*Rolph v. Hobart and William Smith Colls.*, 271 F. Supp. 3d 386 (W.D.N.Y. 2017) .............. 20, 24

*Taylor v. Howard Univ.*, 200 F. Supp. 3d 196 (D.D.C. 2016) ...................................................... 41

*Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107, Docket No. 13 (D.S.D. June 16, 2016) ....... 42, 45

*Washington Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ..................................................... 21

*Wells v. Xavier*, 7 F. Supp. 3d 746 (S.D. Oh. 2014) .............................................................. 20, 26

*Wu v. Special Counsel*, No. 14-7159, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015) ................ 32

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994) ......................................................... 13, 19, 29

*Zaidan v. Trump*, 317 F. Supp. 3d 20 (D.D.C. 2018) ................................................................ 13

## STATUTES

D.C. Code. § 2-1402.41 ................................................................................................................ 31

## OTHER AUTHORITIES

U.S. Dep't of Educ., Ltr. from Assistant Sec'y Candice Jackson (Sept. 22, 2017) ...................... 28

U.S. Dep't of Educ., Q&A on Campus Sexual Misconduct (Sept. 22, 2017) .............................. 28

<u>Preliminary Statement</u>

American University's motion to dismiss does not withstand scrutiny.

First, on the law, AU often claims the law is something it is not. Take, for example, AU's efforts to dismiss John Doe's Title IX claim. The framework for AU's argument that Mr. Doe does not state a plausible allegation of gender bias is a quote from an unpublished Sixth Circuit opinion. But AU omits key words from the quote that change the meaning of it in ways that undermine AU's purported framework. AU argues that the pressure it has been under from the Department of Education regarding its handling of sexual misconduct cases—*five* open investigations by the Office for Civil Rights, more than any other school in the country—does not support a plausible inference of gender bias. But AU fails to mention Judge Collyer's recent decision in *Doe v. George Washington Univ.*, 366 F. Supp 3d 1 (D.D.C. 2018)—in which the court found the exact same sort of evidence (two open OCR investigations) supported the plaintiff's Title IX claim in that case. With respect to Mr. Doe's negligence claim, AU argues that the claim fails because another court in this District has already "*specifically declined* to find a duty of care where universities are conducting student disciplinary proceedings" (emphasis by AU). But the case to which AU cites says nothing about a "duty of care," "negligence," or anything else that could support its assertion.

And so on. In support of its motion to dismiss, AU repeatedly misstates the law—all in an effort to give the (mis)impression that Mr. Doe does not state a plausible claim for relief.

Second, on the facts, AU misrepresents them, sometimes in egregious ways. For example, to excuse its Title IX Investigator's failure to conduct a thorough and impartial investigation, AU repeats one particular canard throughout its memorandum: that "[Mr.] Doe did not state that . . . [Ms. Roe] ever *provided* consent" (emphasis by AU). This is not only ludicrous,

it is also totally made up. AU never says what exactly Mr. Doe "admitted"—or the basis for its decision that what Mr. Doe admitted to doing violated the school's Discrimination and Sexual Harassment Policy and Student Conduct Code. AU knows that to state the facts of the case would show just how incomplete and unfair its disciplinary process was for Mr. Doe.

But here are the facts: Mr. Doe has consistently stated that Ms. Roe consented to him touching her chest (over her clothes) when she physically moved his head to her chest; and that Ms. Roe consented to him touching her pelvic area (over her clothes) when she physically moved his head to her lower body and said "yes," when Mr. Doe asked whether she "wanted to do this." AU's Title IX Investigator found—inexplicably—that it was not reasonable for Mr. Doe to think that these actions and words by Ms. Roe were clear signs of consent. When AU argues in its memorandum that Mr. Doe's Title IX and Breach of Contract claims fail because Mr. Doe "admitted" to, what AU labels, "Sexual Assault," these are the facts AU doesn't mention.

The weakness of AU's motion is highlighted by how it tries to have Mr. Doe's claims dismissed—by using distraction and a smorgasbord of legally deficient arguments. For these reasons, and the reasons discussed in detail below, AU's motion to dismiss should be denied.

<u>Factual Allegations</u>

The facts are alleged in detail in the Complaint. (ECF No. 3.) In summary:

In April 2016, John Doe was an inexperienced freshman in his second semester of college. (¶ 1.)[1] Mr. Doe came to the United States to attend college after growing up in a strict Muslim household in Kuwait, a country with strict laws, customs, and traditions regarding physical intimacy before marriage. (¶ 1.) Before April 22, 2016, Mr. Doe had never had a

---

[1] All references to "¶ __" refer to the Complaint (ECF No. 3).

girlfriend; he had not yet had his first kiss; he had never even held hands with a member of the opposite sex. (¶ 1.)

## I.    THE EVENTS OF APRIL 22, 2016

On April 22, 2016, John Doe's friend, H.S., and H.S.'s friend, Jane Roe, came over to his apartment to hang out. (¶ 2.) H.S. and Ms. Roe brought a marijuana-laced brownie with them. (¶ 2.) H.S. and Mr. Doe drank alcohol, while Ms. Roe ate some of the brownie. (¶ 2.) Sometime later, H.S. got sick from drinking too much alcohol and went to the bathroom to throw up. (¶ 3.) When H.S. was in the bathroom, Ms. Roe kissed Mr. Doe. (¶ 3.) It was Mr. Doe's first kiss. (¶ 3.) Ms. Roe took the lead. (¶ 3.) She pulled Mr. Doe's head towards her breasts. (¶ 3.) Mr. Doe then touched her breasts over her shirt. (¶ 3.) Ms. Roe then put her hands on Mr. Doe's head and moved him down to her lower body. (¶ 3.) When Mr. Doe's face was in front of Ms. Roe's pelvic area, he asked Ms. Roe: "is this what you want me to do?" (¶ 3.) She responded: "yes." (¶ 3.) Mr. Doe then awkwardly put his mouth on Ms. Roe's vulva (over her clothes) for a few seconds. (¶ 3.)

Not long after their interaction ended, Ms. Roe ordered an Uber for herself and H.S. (who lived in the same dormitory). (¶ 5.) Before she left, Ms. Roe hugged Mr. Doe goodbye, thanking him for being so "caring" and asking her before he did things, unlike "someone else" in her past. (¶ 5.) When Ms. Roe got back to her dorm room, she texted Mr. Doe to let him know that H.S. had vomited in the car ride home. (¶ 6.) She said, "he's OK though" and "he's fine." (¶ 6.) The next evening Ms. Roe reached out to Mr. Doe. (¶ 6.) She texted him asking whether he was "okay with everything." (¶ 6.) Mr. Doe told Ms. Roe, "Yeah, I am," and asked her "And you?," she responded, "Yeah I'm tired but okay." (¶ 6.)

3

## II.     JANE ROE'S CLAIMS

On January 9, 2019, just a few months before Mr. Doe was to graduate, Ms. Roe filed a complaint with AU's Title IX Office, making a number of allegations against several people regarding events that had occurred over two-and-a-half years earlier. (¶¶ 7-8, 109.)

### A.     Jane Roe's Allegation That H.S. and C.S. Assaulted Her in February 2016

Ms. Roe reported that, in February 2016, H.S. and his friend, C.S. (who was not a student at AU), had physically assaulted her, exposed their penises to her, and urinated in front of her. (¶ 10.) Ms. Roe alleged that H.S. had also grabbed her breast. (¶ 10.)

### B.     Jane Roe's Allegation That H.S. and John Doe Assaulted Her in April 2016

Ms. Roe also reported that, on April 22, 2016, H.S. and Mr. Doe sexually assaulted her in Mr. Doe's apartment. Specifically, Ms. Roe claimed that she became incapacitated from eating a "small" marijuana-laced brownie. She claimed she could not stand without falling; she could not walk without assistance; she was unable to communicate; and it felt like she was "floating in and out of consciousness." (¶¶ 112, 139.) Ms. Roe told the Title IX Office that her memory of what had happened was "blurry." (¶ 113.)

But during her initial interview with the Title IX Office, Ms. Roe was able to recall that at some point in the night, after she had eaten some of the marijuana brownie, Mr. Doe pulled up her shirt, put his hand under her bra, kissed her mouth and neck, put his tongue in her mouth, and touched her butt and crotch over her pants. (¶ 123.) Ms. Roe alleges that, while this was happening, she heard H.S. talking to his friend, C.S., on video chat. (¶ 124.) Ms. Roe alleges that C.S. saw her and said Ms. Roe "doesn't look good," and asked why Mr. Doe was touching her. (¶ 124.)

After H.S. got off the phone with C.S., Ms. Roe claims that he "violently" kissed her, grabbing her hair with one hand and her breasts with the other. (¶ 127.) Ms. Roe claimed that she then "stood up and started screaming"—and H.S. vomited. (¶ 127.) According to Ms. Roe, she then sat back down on Mr. Doe's couch. While H.S. was in the bathroom throwing up, Ms. Roe claims that Mr. Doe, without saying a word, pulled her leggings and underwear down and inserted his fingers into her vagina. (¶ 128.) She claims she yelled "no . . . no . . . stop," and Mr. Doe stopped. (¶ 129.)

Ms. Roe claims that she then took an Uber back home with H.S. and that, during the ride, H.S. vomited in the car. (¶¶ 132-33.) When she and H.S. arrived at their dormitory, she directed H.S. to his room, apologized to the Uber driver, and went upstairs. (¶ 134.) She alleged that she then told her roommate to go check on H.S. because she was concerned he had "alcohol sickness." (¶ 135.)

## III.    THE INVESTIGATION

After Ms. Roe submitted her complaint to AU's Title IX Office, AU's Title IX Investigator, Fariah Quasem, (the "Investigator") investigated each of Ms. Roe's allegations.

### A.    <u>The Investigation Concerning Jane Roe's Allegations Against H.S.</u>

AU told Mr. Doe nothing about its investigation into H.S. (¶¶ 151-58.) However, based upon information and belief, one witness the Investigator interviewed during her investigation was B.F.—the AU student who sold H.S. the marijuana brownie. (¶¶ 156-58.) The Investigator did not include the summary of her interview with B.F. in Mr. Doe's Investigation Report, nor did she provide Mr. Doe the opportunity to pose questions to B.F. (¶¶ 156-58.) Because she was the complainant in the case against H.S., Ms. Roe knew that the Investigator interviewed B.F., could pose questions to B.F., and reviewed the Investigator's summary of her interview. (¶ 158.)

5

Mr. Doe does not know if there are any other witnesses like B.F.—*i.e.*, witnesses with relevant information to whom Ms. Roe had the opportunity to ask questions but Mr. Doe did not— because AU has refused to share that information with him. (¶¶ 151-58.)

**B.      The Investigation Concerning Jane Roe's Allegations Against Mr. Doe**

In her investigation into Ms. Roe's allegations against Mr. Doe, the Investigator spoke to the two people who, according to Ms. Roe, witnessed Mr. Doe sexually assaulting her—C.S. and H.S. (¶¶ 123-24.) Both directly contradicted Ms. Roe's account. Yet that fact had no impact on the Investigator's conclusion about Ms. Roe's credibility.

C.S. told the Investigator that, contrary to Ms. Roe's story, he did not witness Mr. Doe assaulting her. (¶ 188.) And he refuted Ms. Roe's statement that, when he saw her over video chat, he said "[Ms. Roe] doesn't look good" and "why is [Mr. Doe] touching her?" (¶ 188.) H.S. likewise contradicted Ms. Roe's account. Ms. Roe claimed she was "surprised" that H.S. brought her to Mr. Doe's apartment; but H.S. said he and Ms. Roe decided together that they would go to Mr. Doe's apartment because Ms. Roe "was interested in expanding her network." (¶ 190.) Ms. Roe alleged that she was so inebriated that H.S. had to carry her; but H.S. reported that he never saw Ms. Roe fall to the ground that night or have any other mobility issues. (¶ 191.) Ms. Roe alleged that, when H.S. was in the room, Mr. Doe sexually assaulted her; H.S. said he didn't see Mr. Doe and Ms. Roe engage in any sexual activity. (¶ 192.) Ms. Roe alleged that H.S. "violently" kissed her and grabbed her hair and breast; but H.S. said that Ms. Roe was the aggressor and that she asked him to kiss her. (¶ 193.)

The Investigator also spoke with friends of Ms. Roe's and collected text messages, including from H.S., Ms. Roe, and Mr. Doe.

There were a significant number of avenues of investigation that the Investigator did not pursue. They include:

- Refusing to interview the three AU officials with whom Ms. Roe claimed she spoke in the week after the incident. (¶¶ 147-50.)

- Refusing to question Ms. Roe's statements regarding her mental state and balance that night. The Investigator did not ask how Ms. Roe could have been virtually catatonic but also be able to, *inter alia*: order herself an Uber; walk up and down a number of stairs; take a couple of elevators; walk past a couple of security guards; ask her roommate to check on H.S. who she feared had "alcohol sickness"; and reach out to Mr. Doe to (clearly and cogently) tell him about H.S. getting sick. (¶¶ 138-41.)

- Refusing to ask Ms. Roe why she did not produce her text messages with Mr. Doe after the alleged incident—even though she provided other text messages to the Investigator from around the same period. (¶¶ 184, 188.)

- Refusing to challenge Ms. Roe's implausible purported reason for texting Mr. Doe later that very same night (*viz.*, that she wanted Mr. Doe to check up on H.S., ¶ 184) when her texts told Mr. Doe H.S. was "fine" and "okay" (¶ 186)—the opposite of what anyone would say to get someone to check in on H.S.

- Refusing to challenge Ms. Roe's equally implausible reason why she *again* texted with him the next day (to be "polite," ¶ 184) when it was Ms. Roe—not Mr. Doe— who had initiated that text conversation and told Mr. Doe that she felt "tired but okay." (¶¶ 183-84.)

## IV. THE DECISIONS

### A. <u>The Investigator's Decision as to Jane Roe's Allegations Against H.S.</u>

The Investigator found in favor of H.S. as to all of the allegations against him. (¶ 11.) AU has refused to provide Mr. Doe any details about that decision. He doesn't know, for example, how the Investigator resolved the inconsistencies between their two accounts, specifically with respect Ms. Roe's allegations against Mr. Doe. He doesn't know, most critically, why the Investigator determined that Ms. Roe was not credible in H.S.'s case but credible when she told basically the same story in John Doe's.

**B.      The Investigator's Decision as to Jane Roe's Allegations Against Mr. Doe**

As for Mr. Doe, the Investigator found him responsible for "Sexual Assault." The Investigator made a number of findings in support of her decision, none of which suggest how someone in Mr. Doe's shoes reasonably could have known that Ms. Roe was so impaired that her "yes" couldn't have meant yes.

**1.      The Decision that Ms. Roe Was, and Appeared to be, Impaired**

The Investigator first found that "Ms. Roe was and reasonably appeared to be impaired after consuming the edible on April 22nd." (¶¶ 160-71.) The Investigator based her finding, in part, on H.S.'s statement that Ms. Roe looked "high and inebriated." (Def.'s Mem. Ex. 1 ("Report") at 14.),[2] without noting that H.S. thought that only "because she seemed more relaxed than usual" (*id.* at 9). The Investigator also relied on (1) a statement by Ms. Roe's roommate about how Ms. Roe appeared sometime between 2-3 a.m.; Ms. Roe's text message to a friend that she "got so high that [she] passed out"; and a statement by Ms. Roe's friend that Ms. Roe told her that she "felt as if she was floating in and out of consciousness." (*Id.* at 9.)

Based on her unsupported finding that Ms. Roe reasonably appeared to be impaired, the Investigator decided that this "decrease[d] the credibility of [Mr. Doe's] account of what occurred." (Report at 15.)

**2.      The Decision that Jane Roe Did Not Provide Clear Signs of Consent, Given Her Impairment**

The Investigator next found that, "given Ms. Roe's impairment," the following were not "clear indication[s] of consent" (Report at 17):

- Ms. Roe physically bringing Mr. Doe's head to her breasts was not a clear sign that she consented to him touching her breasts over her clothes. (¶ 12.)

---

[2] We refer to Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss Complaint (ECF No. 13) as "Def.'s Mem."

- Ms. Roe physically pushing Mr. Doe's head down to her crotch was not a clear sign that she consented to him touching her crotch over her clothes. (¶ 12.)

- Ms. Roe saying "yes," when Mr. Doe asked her, while his face was in front of her pelvic area, whether she "wanted to do this," was not a clear sign that she consented to him touching her crotch over her clothes. (¶ 12.)

The Investigator failed to identify any alternative explanations for Ms. Roe's actions and words. She did not say, for instance, that "do this" was not specific enough about what Ms. Roe wanted him to do, and any such argument would have been facetious. Ms. Roe unmistakably gave consent to something when she said "yes." The Investigator's failure to identify anything that Ms. Roe could have been consenting to short of what Mr. Doe did speaks volumes.

### 3.    Other Credibility Determinations

The Investigator also found that a text message Mr. Doe sent H.S. days after the incident, in which he stated that Ms. Roe "gave her full consent every time [he] asked, and [he] asked more than once – [m]ultiple times actually," "negatively impact[ed] his credibility" because it "contradicted" what he had told the Investigator. (Report at 17.) The contradiction, according to the Investigator, was that during his investigative interview—over two-and-a-half years later—Mr. Doe said he asked for and received consent only once, but didn't say he asked for Ms. Roe's consent more than once. (*Id.*) The Investigator does not note in the Report that Mr. Doe's comment to her came in response to her open-endedly asking him to tell her what had happened that night. (*See id.*) Nor does the Investigator consider in the Report that Mr. Doe may have been providing her with the one time he recalled asking for Ms. Roe's consent, and that there may have been other ways he just didn't remember two-and-a-half years later. (*See id.*)

On the other hand, the Investigator found that Ms. Roe was credible. She based her finding, in part, on the fact that Ms. Roe told three "AU staff members" the week after the

9

incident that Mr. Doe had "kissed and touched" her without her consent. (Report at 17.) The Investigator, however, did not interview those staff members and ask them what Ms. Roe reported. The Investigator dismissed the fact that Ms. Roe exchanged text messages with Mr. Doe the next day, stating that "[w]hile [Ms. Roe] may have responded to [Mr. Doe's] messages on April 23rd, by April 27th she was no longer responding to his text messages." (¶ 182.) (That was not true. Ms. Roe in fact initiated a conversation with Mr. Doe at 9:22 p.m. on April 23, she did not merely "respond" to Mr. Doe.) The Investigator did not address the substance of the messages—including that Ms. Roe said she was "okay" with what had happened. (¶ 182.)

The Investigator did not resolve the inconsistencies between the accounts of the two eyewitnesses, H.S. and C.S., on the one hand, and Ms. Roe, on the other hand. Indeed, the Investigator did not even mention in her decision that the two people Ms. Roe identified as being eyewitnesses reported that she wasn't telling the truth. Nor did the Investigator resolve the inconsistencies between Ms. Roe's alleged mental and physical state (*i.e.*, "floating in and out of consciousness") and the facts.

## V.    THE SANCTIONING PANEL

After Mr. Doe was found responsible for Sexual Assault, the University's Student Conduct and Conflict Resolution Services convened a three-person "Sanctioning Panel" to make a recommendation to the Dean of Students regarding a sanction based on the Investigator's Report (¶ 21.)

A couple of weeks before the Sanctioning Panel hearing, Bobby Howard, the Assistant Director of Student Conduct, emailed Mr. Doe, who would be in Kuwait when the Sanctioning Panel convened, to let him know that he could participate in the hearing by "submit[ting] a

written statement." (¶ 200.) Mr. Howard also told Mr. Doe that his "advisor [would] be permitted to attend the sanctioning panel." (¶ 201.) Mr. Doe decided to submit a written statement and have his advisor attend the hearing in person. (¶ 202.)

A few hours before the hearing, Katherine Porras, AU's Director of Student Conduct, emailed Mr. Doe, stating: "**Since you are not attending, this unfortunately also means your advisor cannot attend**." (¶ 203 (emphasis added by Ms. Porras).) She did not explain the reason behind that purported rule. Mr. Doe's advisor, who did not receive Student Conduct's message, showed up to the Sanctioning Panel hearing. (¶ 203.) AU would not let him in. (¶ 203.)

At the outset of the hearing, Ms. Porras asked Ms. Roe whether she had "any concerns of personal bias to raise with regard to the panel members or [Ms. Porras]." (¶ 207.) Ms. Roe said "no." (¶ 207.) Then, after Ms. Roe made her statement, Ms. Porras stated: "So if the Respondent is not here, he does not have the opportunity to recuse anyone." (¶ 209.)

The Sanctioning Panel ultimately decided that Mr. Doe should be suspended. (¶ 214.) And based on the Panel's recommendation, on July 1, 2019, Dean Jeffrey Brown suspended Mr. Doe through December 31, 2020. (¶ 215.)

## VI.   THE APPEAL

Mr. Doe appealed the decision and his sanction on three bases (¶ 216): (1) he did not receive a fair and thorough disciplinary process (¶ 217); (2) there was new information from H.S. concerning Mr. Doe and Ms. Roe's interactions that night, as well as new information regarding his own investigation (that B.F. had been interviewed) (¶ 218); and (3) Mr. Doe's sanction was excessive (¶ 220). Under the Code, before an appeal is decided, an Appellate Board determines whether it is "viable," such that it can be decided by Vice President of Campus Life. (¶ 65.) An appeal is "viable" if it is based on "[n]ew information that significantly alters the finding of

11

fact," "[e]vidence of improper procedure," and/or "[i]nsufficient/excessive sanctions"—*i.e.*, the three bases of Mr. Doe's appeal. (¶ 66.) Without any explanation—beyond reciting that it had reviewed the appeal—the Appellate Board found that Mr. Doe's appeal was not "viable." (¶ 23.)

<u>Argument</u>

## I.    THE COMPLAINT OVERWHELMINGLY PLEADS A VIOLATION OF TITLE IX UNDER THE "ERRONEOUS OUTCOME" THEORY.

Students who are erroneously disciplined due to gender bias have a Title IX claim under an "erroneous outcome" theory of liability. *See*, *e.g.*, *Doe v. George Washington Univ.*, 366 F. Supp 3d 1, 11 (D.D.C. 2018). To succeed on such a claim, "a plaintiff must show [1] 'particular facts sufficient to cast some articulable doubt on the outcome of the disciplinary proceeding' and [2] circumstances showing 'that gender bias was a motivating factor behind the erroneous finding.'" *Id.*

Although neither this Court nor the D.C. Circuit has spoken to the pleading standard for an "erroneous outcome" claim, this Court has observed that, with respect to claims brought under Title VII,[3] "at the motion-to-dismiss stage, a plaintiff does not need to prove a *prima facie* case of discrimination." *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86-87 (D.D.C.) (internal quotation marks, citations, and alterations omitted) (Mehta, J.). Recognizing the "ease" with which a plaintiff can survive a motion to dismiss, this Court explained that "the factual detail required . . . can be quite limited." *Id.* And as with each of Mr. Doe's causes of actions, he is not

---

[3] Courts throughout the country apply the Title VII pleading standard to Title IX claims. *See*, *e.g.*, *Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019) ("We have . . . long interpreted Title IX by looking to the caselaw interpreting Title VII and we have therefore held that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." (internal quotation marks, alteration, and citation omitted); *cf. GW*, 366 F. Supp. 3d at 12 ("Title VII pleading standards . . . have been cross-applied to Title IX").

"require[d] . . . to allege the *most* plausible set of facts, but merely *a* plausible set of facts."

*Zaidan v. Trump*, 317 F. Supp. 3d 8, 20 (D.D.C. 2018) (emphasis in original).

### A.      John Doe Has Cast Substantial Doubt on the Accuracy of the Outcome.

AU is silent as to the pleading standard plaintiff must meet to satisfy the first prong of an "erroneous outcome" claim. But as a case AU relies upon states, the burden is "not heavy." *Doe v. Rider Univ.*, 3:16 Civ. 4882, 2018 WL 466225, at *8 (D.N.J. Jan. 17, 2018) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). The "articulable doubt" prong may be satisfied "in a number of ways including: (i) pointing to procedural flaws, . . . (ii) noting inconsistencies or errors in the . . . findings, or (iii) challenging the overall sufficiency and reliability of the evidence." *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018).

John Doe's Complaint sails over this low bar. Mr. Doe alleges significant reasons not to believe Ms. Roe's allegations, including that:

- Ms. Roe made incredible and inconsistent statements, especially regarding her level of intoxication that night.[4]

- Ms. Roe's story was contradicted by other evidence, including her statements, the statements of the eyewitnesses, and contemporaneous text messages.[5]

- Ms. Roe withheld key exculpatory evidence from the Investigator (her text messages with Mr. Doe).

Mr. Doe also alleges significant errors in his disciplinary process, including that:

---

[4] *See*, *e.g.*, *Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961, 972 (S.D. Ohio 2018) (allegation that complainant "gave investigators erroneous, or at least contradictory, evidence regarding how much alcohol she had consumed" supported "articulable doubt" showing).

[5] *See*, *e.g.*, *Doe v. Syracuse Univ.*, Case No. 5:18 Civ. 377, 2019 WL 2021026, at *7 (N.D.N.Y. May 8, 2019) (allegation the plaintiff alleged witnesses did not corroborate parts of complainant's story supported "articulable doubt" showing).

- The Investigator failed to investigate or question Ms. Roe's implausible and contradictory allegations.[6] (*See*, *e.g.*, ¶ 142.)

- The Investigator drew prejudicial conclusions against Mr. Doe without any evidentiary support.[7] (*See, e.g.*, ¶¶ 161-64, 182-86.)

- The Investigator ignored eyewitness testimony from male witnesses, instead relying on less credible statements from female witnesses.[8] (*See, e.g.*, ¶¶ 163-64.)

- The Investigator ignored the substance of text messages that contradicted Ms. Roe's story, as well as the fact that Ms. Roe failed to produce them.[9] (*See, e.g.*, ¶ 166)

- The Investigator ignored a key text message exchange on the basis that Mr. Doe initiated it—when, in fact, Ms. Roe initiated the exchange.[10] (*See, e.g.*, ¶¶ 181-84.)

- The Investigator failed to interview key witnesses. (*See, e.g.*, ¶¶ 147-50.)[11]

- The Investigator misquoted H.S. to make it seem as though he contradicted Mr. Doe—when, in fact, his statement undermined Ms. Roe's credibility and was consistent with Mr. Doe's statements.[12] (*See, e.g.*, ¶ 163-64.)

- The Investigator failed to provide Mr. Doe with the evidence she gathered or the findings she made in H.S.'s case.[13] (*See, e.g.*, ¶¶ 18-20, 151-58.)

---

[6] *See*, *e.g.*, *Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 414 (N.D.N.Y. 2019) (allegation investigators ignored evidence that would have shown complainant's claims were "impossible" supported "articulable doubt" showing).

[7] *See*, *e.g.*, *Prasad v. Cornell Univ.*, Case No. 5:15 Civ. 322, 2016 WL 3212079, at *14-16 (N.D.N.Y. Feb. 24, 2016) (allegation that the Investigator "drew prejudicial conclusions without sufficient evidentiary support" supported "articulable doubt" showing).

[8] *See*, *e.g.*, *Doe v. Rector & Visitors of George Mason Univ.*, 132 F.Supp.3d 712, 732 (E.D. Va. 2015) (allegation that university failed to consider witness statements supported "articulable doubt" showing).

[9] *See*, *e.g.*, *Fogel v. Univ. of the Arts*, Case No. 18 Civ. 5137, 2019 WL 1384577, at *5 (E.D. Pa. March 27, 2019) (finding that plaintiff alleged facts casting doubt on the accuracy of the outcome where Title IX Coordinator ignored exculpatory evidence).

[10] *See id*.

[11] *See*, *e.g.*, *Harnois v. Univ. of Mass. at Dartmouth*, Case No. 19 Civ. 10705, 2019 WL 5551743, at *6 (D. Mass. Oct. 28, 2019) (allegation that investigator failed to interview witnesses supported "articulable doubt" prong).

[12] *See*, *e.g.*, *id.*

[13] *See*, *e.g.*, *Doe v. Univ. of Oregon*, Case No. 6:17-cv-01103, 2018 WL 1474531, at *15 (D. Or. March 26, 2018) (allegation that the university declined to give the respondent "full access to the record" supported "articulable doubt" showing).

14

- The Investigator interviewed a relevant witness but failed to provide her witness summary to Mr. Doe, denying Mr. Doe the opportunity to review the witness's statements and propose follow-up questions.[14] (*See, e.g.*, ¶¶ 156-58)

- AU never provided Mr. Doe with Ms. Roe's written complaint. (*See, e.g.*, ¶ 111.)

On top of all of these flaws, the Investigator made a finding that was divorced from the facts.

Mr. Doe alleges significant violations of the Code during the sanctioning phase of his case as well. AU denied Mr. Doe the "opportunity" to challenge the members of the Sanctioning Panel[15] (*see, e.g.*, ¶¶ 209, 207-11), as well as the right to have his Advisor attend the Sanctioning Panel hearing. (*See, e.g.*, ¶¶ 200-06.) And Mr. Doe alleges that the flaws in his disciplinary proceeding continued through his appeal, when the Appellate Board refused to consider his appeal, stating—without explanation—that it was not "viable" (even though under AU's policies it was). (*See, e.g.*, ¶¶ 23, 65-66, 288.)

The allegations Mr. Doe makes in this case are precisely the sort of allegations that courts in other cases have found support a showing under the first prong of an "erroneous outcome" claim. (*See* cases cited *infra* notes 4-15.)

AU's response to this host of allegations is effectively ignore them. It says nothing at all about them in arguing that the first prong of Mr. Doe's "erroneous outcome" claim is not met. Instead, AU argues that "Doe's allegations amount to nothing more than his disagreement with

---

[14] *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 766 (D. Md. 2015) (allegation that plaintiffs were prohibited from reviewing witness statements and were prohibited from posing follow-up questions supported "articulable doubt" showing); *Doe v. Washington and Lee Univ.*, Case No. 6:14 Civ. 00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (allegation that there were "critical omissions in what [the investigators] included in the witness summaries" supported "articulable doubt" showing).

[15] *See*, *e.g.*, *Norris v. Univ. of Colo., Boulder*, 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019) (finding that plaintiff alleged facts casting doubt on the outcome's accuracy where he alleged, in part, that he did not receive "any information on the Standing Review Committee").

the Investigator's ultimate conclusion." (Def.'s Mem. at 11.) This is a tired argument that colleges and universities use (unsuccessfully) all the time.[16] To state the obvious, every student who sues after being disciplined disagrees with the outcome. The actual legal question is whether they can plead "procedural flaws," "inconsistencies or errors . . . in the findings," or problems with the "sufficiency and reliability of the evidence" that cast "some articulable doubt" on that outcome. And here, Mr. Doe has pled a litany of problems in every phase of his case, none of which AU is interested in actually addressing. (*See supra* pp. 13-15.)

Instead, in an argument that is disingenuous at best, AU effectively fabricates testimony by Mr. Doe and then pretends it were pled in the Complaint. AU argues that the Investigator's decision was "[b]ased on Doe's own factual account," which is true enough, but AU then says that Mr. Doe, as part of that account, **admitted** that Ms. Roe never "*provided* consent." (*See* Def.'s Mem. at 12 (emphasis in original).). And that is absurd, as AU's attempt to support that argument effectively demonstrates. In support of that argument, AU cites to a *single* paragraph in the Complaint, which literally does nothing more than recite the definition of "Consent" under the Policy and Code. (Def.'s Mem. at 12 (citing ¶ 50).) AU does not cite to any allegation in the Complaint, or statement in the Report, in which Mr. Doe says that Ms. Roe never provided consent. That's because they can't. Mr. Doe has consistently said that Ms. Roe provided her consent, by her actions, to him touching her breasts over her shirt (*see, e.g.*, ¶¶ 101; 173; 174), and that she provided her consent, by her actions and words, to him touching her pelvic area over her pants (*see e.g.*, ¶¶ 102; 103).

---

[16] *See*, *e.g.*, *id.* ("Defendants posit that, at most, Plaintiff merely disagrees with the Investigator's findings that this interaction was non-consensual and Defendants conclude that this does not sufficiently cast doubt on the finding. Defendants' argument fails. Plaintiff notes he does not simply disagree with the Investigator's findings, but instead his Complaint sets forth a litany of grievances which he argues denied him of a fair and impartial process.").

As a last resort, AU claims that Mr. Doe really just "disagree[s] with AU's definition of 'consent.'" (Def.'s Mem. at 12.) But the Complaint could not be any clearer:  Mr. Doe alleges that, applying AU's definition of "consent," he was not responsible for sexual misconduct. (¶¶ 174-76.) Any reasonable person in Mr. Doe's position would have thought that Ms. Roe, after having kissed him, was bringing his head to her breasts and head to her crotch for him to touch her in those places. There is no other way to interpret her actions—and tellingly the Investigator did not propose *any* in the Report. Even for AU, the Investigator's decision is indefensible—which is probably why AU doesn't actually try to defend it, but instead pretends that Mr. Doe somehow admitted to wrongdoing. AU's *ipse dixit* arguments do not hold up to scrutiny. Mr. Doe has easily met his "not heavy" burden of casting "some articulable doubt" on the outcome of his disciplinary proceeding.

**B.      John Doe Has Pled Facts That Amply Support an Inference of Gender Bias.**

**1.      American University Misstates the Law—and Ignores the Only
Decision Applying the Law on a Motion to Dismiss.**

In *Doe v. George Washington University*, 366 F. Supp. 3d 1 (D.D.C. 2018) ("*GW*"), Judge Collyer decided that a "combination" of factors—two investigations by OCR into GW's handling of sexual misconduct cases, public protests, and a gender-neutral statement by the university—were "sufficient" to "avoid dismissal" at the motion-to-dismiss stage. *Id.* at 13. Judge Collyer's decision is the only one in this District applying the second prong of an "erroneous outcome" claim on a motion to dismiss, and the only one at any stage that involves similar allegations.[17] And AU did not cite to it in its section concerning the "gender bias" prong.

---

[17] In the only other case applying the "erroneous outcome" theory, *Robinson v. Howard Univ.*, 335 F. Supp. 3d 13 (D.D.C. 2018) (on appeal), the court considered documents outside the pleadings and granted the defendant's motion for summary judgement. AU nonetheless cites to

Not even once. It is not hard to see why. AU knows that Mr. Doe's Title IX Claim survives under the standard used by Judge Collyer. So in an attempt to dismiss Mr. Doe's Title IX claim, AU crafts a new standard based on legally untenable grounds.

In order for Mr. Doe's Title IX claim to pass muster at this stage of the litigation, he must plead "circumstances showing 'that gender bias was a motivating factor behind the erroneous finding.'" *Id.* (quoting *Yusuf*, 35 F.3d at 715). Each alleged "circumstance" does not need to meet a particular threshold in order for a court to find a plausible inference of gender bias. Thus, in *GW*, Judge Collyer noted that the Court would "read little" into a gender-neutral statement by the University that "of 16 cases reported between 2015 and 2017, 10 went before a hearing and all 10 resulted in a violation." *Id.* at 12. But the statement, in "combination" with "OCR investigations" and "publicized demonstrations," raised a plausible inference of gender bias. *Id.* at 13.[18]

AU does not apply the same standard Judge Collyer applied in *GW*. AU creates its own. It isolates certain of Mr. Doe's allegations and argues that each one, on its own, does not raise a plausible inference of gender bias. AU argues, for example, that the public pressure AU is "insufficient to raise an inference of gender bias" (Def.'s Mem. at 16). As *GW* and the cases

---

the case in support of their argument Mr. Doe does not "plausibly allege" gender bias. (Def.'s Mem. at 9.) Moreover, the allegations in *Robinson* are not at all similar to this case. The court granted summary judgment in short order because the plaintiff made *only* conclusory allegations—*i.e.*, that "the University 'gave undue evidentiary weight' to the 'spurious allegations'" and that "agents and employees in the Title IX Office have an anti-male bias." *Robinson*, 335 F. Supp. 3d at 25.

[18] Recently, in *Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019), the Second Circuit confirmed that courts do not consider allegations in isolation. In *Menaker*, the court explained that while "press coverage" alone "does not automatically give rise to an inference" of discrimination, "this does not mean that the press coverage or public pressure must reach a particular level of severity." *Id.* at 33. "[W]hen combined with clear procedural irregularities, . . . even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *Id.* (emphasis in original).

cited herein show, that is not the right standard. Courts look at all of the alleged circumstances *combined* to determine whether gender bias is plausible—not each on its own.

Moreover, quoting *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016), AU argues that, in order to state a viable Title IX claim, Mr. Doe is "required" to allege "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." (Def.'s Mem. at 13.) Mr. Doe alleges each of these types of allegations—but he is not "required" to. AU omits key words from the *Cummins* quote, which show that these three type of allegations are *examples* of allegations that could support a plausible inference of gender bias—not an exclusive list.[19] *See also GW*, 366 F. Supp. 3d at 12 ("Such allegations *might* include, *inter alia*, statements by members of the disciplinary tribunal . . . ." (emphasis added).)). Indeed, in *Cummins*, the court noted that "being investigated by the federal government for potential Title IX violations"—which is one of Mr. Doe's allegations—is another relevant allegation suggesting gender bias. *See id.* at 453. What's worse, AU then uses these three purportedly "required" allegations as the framework for its entire argument that Mr. Doe does not satisfy the second prong of his "erroneous outcome" claim. (*See* Def.'s Mem. at 13-19.) That is a testament to the weakness of AU's motion.

---

[19] What AU writes: "Doe alleges no facts at all of the type *required* to support a plausible Title IX claim—*i.e.*, 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" (Defs.' Mem. at 13 (quoting *Cummins*, 662 F. App'x at 452) (emphasis added).) What Cummins says: "Causation *sufficient* to state a Title IX discrimination claim *can* be shown via 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" *Cummins*, 662 F. App'x at 452 (citing *Yusuf*, 35 F.3d at 715) (emphasis added).

### 2.    Mr. Doe Pleads More than Enough Evidence of Gender Bias.

Courts—like in *GW*—generally find a plausible inference of gender bias based on some combination of (1) pressure (whether from OCR, students, national media, or otherwise) and (2) procedural irregularities.[20] Here, Mr. Doe pleads both in spades—as well a number of other facts that support a plausible inference of gender bias.

*First*, when AU suspended Mr. Doe, it was under at least five active OCR investigations, one of which OCR opened while Mr. Doe was being investigated and just a few months before he was suspended. (*See* Att. A.) According to Judge Collyer in *GW*, and other courts from around the country (including *Cummins*),[21] these active investigations support an inference of gender bias.

*Second*, AU was under intense media scrutiny in connection with a culture of "misogyny and sexual assault," which "pervaded the campus climate." (¶ 26.) When one female student, Faith Ferber, went public with her OCR complaint against AU, she wrote in an Op-Ed that AU did not do "enough to protect [her], [the AU] campus, or uphold [its] obligations under Title IX" when it went too easy on the male respondent in her case and then silenced her when she wanted to speak out. (¶ 72.) Ms. Ferber's story was picked up by the national media, including The Washington Post and The Huffington Post. (¶ 26.) And she starred in a viral online video, which has been viewed over 370,000 times. (¶ 27.) This kind of media focus on the mishandling of a

---

[20] *See, e.g.*, *Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016); *Noakes*, 369 F. Supp. 3d at 414; *Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125 (N.D.N.Y. 2018);  *Doe v. Lynn Univ.*, 235 F. Supp. 3d 1336, 1340-42 (S.D. Fla. 2017); *Doe v. Trustees of the University of Pa.*, 270 F. Supp. 3d 799 (E.D. Pa. 2017); *Doe v. Amherst Coll.*, 238 F. Supp. 3d. 195, 222 (D. Mass. 2017); *Rolph v. Hobart and William Smith Colls.*, 271 F. Supp. 3d 386, 400 (W.D.N.Y. 2017); *Collick v. William Paterson Univ.*, Case No. 16 Civ. 471, 2016 WL 6824374, at *11 (D.N.J. Nov. 17, 2016).
[21] *See, e.g.*, *Cummins*, 662 F. App'x at 453; *Noakes*, 369 F. Supp. 3d at 414; *Wells v. Xavier*, 7 F. Supp. 3d 746, 747, 751 (S.D. Oh. 2014).

sexual assault claim brought by a female student against a male student has routinely been found to support a plausible inference of gender bias.[22]

*Third*, AU was under pressure from its own community. AU's student newspaper ran articles, editorials, and op-eds critical of how AU mishandled allegations of sexual misconduct.[23] There were protests. (¶ 26.) There was a petition signed by more than 75,000 people. (¶ 73.) Alumni threatened administrators that they would withhold donations until the school improved its record on sexual misconduct cases. (¶ 73.)

And when the Department of Education issued new guidance in 2017 and proposed new regulations in 2018, many AU students reacted angrily, claiming, among other things, that it was "perpetuating the stigma, isolation and fear that is associated with sexual assault and violence." (¶ 86.) In an op-ed—published in the student newspaper a little more than a month before Mr. Doe's investigation began—a student wrote that the proposed Title IX regulations are "an insult to survivors who already have to cope with the trauma of facing sexual violation."[24]

---

[22] *See, e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018) (pressure and publicity from lawsuit supported inference of gender bias); *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1073 (S.D. Ohio 2017) (same); *Trustees of the Univ. of Pa.*, 2017 WL 4049033 at *16 (media attention regarding school's handling of assault allegations supported inference of gender bias); *Lynn Univ., Inc.*, 235 F. Supp. 3d at 1340-41 (same).

[23] *See, e.g.*, *Staff editorial: University's lack of transparency on fourth Title IX complaint is self-defeating*, THE EAGLE, Feb. 3, 2019, https://www.theeagleonline.com/article/2019/02/staff-editorial-university-lack-of-transparency-on-title-ix-complaint; *Faces of activism Senior reflects on changes in sexual assault awareness, prevention at AU*, THE EAGLE, Dec. 11, 2017, https://www.theeagleonline.com/article/2017/12/faces-of-activism-senior-reflects-on-changes-in-sexual-assault-awareness-prevention-at-au. The Court may take judicial notice of news articles for the fact that they exist. *See, e.g.*, *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991).

[24] *Opinion: AU students should participate in the Notice and Comment period for new Title IX guidelines*, THE EAGLE, Nov. 29, 2018, https://www.theeagleonline.com/article/2018/11/opinion-au-students-should-participate-in-notice-and-comment-period-for-title-ix-guidelines.

The pressure AU has faced from within its own community to be tough on male respondents has been extreme. It supports a plausible inference of gender bias. *See*, *e.g.*, *Doe v. Rollins Coll.*, 352 F. Supp. 3d 1205, 1210 (M.D. Fla. 2019) (finding that "substantial criticism from the student body," including a September 2017 student newspaper "piece critiquing the Department of Education's recent changes to Title IX guidance," supported finding of plausible inference of gender bias).[25]

*Fourth*, AU was sensitive to the pressure it faced—in ways that often *directly* affected Mr. Doe's proceeding. In response to public pressure, AU transformed the way it handled claims of sexual misconduct (*see*, *e.g.*, ¶¶ 74-82). AU got rid of its statute of limitations for sexual misconduct claims. (*See*, *e.g.*, ¶¶ 43-47.) AU altered its confidentiality policy for Title IX proceedings. (¶¶ 81-82.) AU adopted a "survivor-friendly investigative model for complaints"—by doing away with live hearings, in which the "complainant w[as] required to present a case that me[t] the standard of preponderance of evidence," the hearings were recorded, and the parties could question witnesses. (¶¶ 74-75.) AU adopted a "single-investigator" model, in which one person investigates and adjudicates claims of sexual misconduct. (¶ 76.) AU entrusted this critical position to a person whose work in "advocacy" (discussed below) AU touted. (¶ 79.) And AU began referring students on to "Learn More About Title IX"—by sending them to a political advocacy group, Know Your IX, that focuses on advocating for and providing resources to non-male victims of sexual assault. (¶¶ 94-95.) At the same time, AU didn't change how it resolved other violations of the Conduct Code, like assault. (¶ 77.)

AU responded to the public pressure in other ways too. When a student group organized a panel of experts, including a former president of the ACLU, to critically discuss how colleges

---

[25] *See also Amherst Coll.*, 238 F. Supp. 3d at 222; *Noakes*, 369 F. Supp. 3d at 414.

apply Title IX, AU cancelled it—after the Association of University Women of AU claimed it would have subjected "marginalized students to hate speech and other forms of violence and trauma." (¶ 90.) Then, when the Department of Education issued new guidance in September 2017, and rescinded guidance issued in 2011 and 2014, AU's Title IX Office told students, according to AU's student newspaper, that "they w[ould] do their best to adhere to the [2011] Dear Colleague Letter and guidance written during the Obama administration, though there is only so much they can do to evade federal regulations and guidelines." (¶ 87.)

*Fifth*, Mr. Doe alleges that Ms. Quasem has advocated for sexual assault training on campuses that focuses on "rape culture," which she has noted "involves talking about the societal attitudes regarding sexuality and gender that normalizes sexual abuse." (¶ 79.) "Rape culture" is not a gender-neutral term. It describes a culture that normalizes sexual abuse *by men against women*. In the balancing that must be done between the legitimate interests of a school in protecting women on campus and the fundamental fairness that a school should provide to men accused, using a term like "rape culture" reveals which side of the scale Ms. Quasem believes should receive more weight. Had Ms. Quasem written her words into AU's Sexual Misconduct Policy, there is little doubt how that policy would be viewed. At a minimum, it is plausible to infer that Ms. Quasem's finding that Ms. Roe did not provide "clear signs" of consent was due at least in part to gender bias, in light of her views on "rape culture."

*Sixth*, the irregularities in the investigation and adjudication of Ms. Roe's allegations against Mr. Doe (*see supra* pp. 13-15) contribute to a plausible inference of gender bias. Mr. Doe has alleged, for example, that the Investigator failed to credit two eye-witness accounts of male students but credited the accounts provided by Ms. Roe's female friends, several of which were

23

pure hearsay. (*See*, *e.g.*, ¶¶ 189-97.)[26] The other irregularities in the investigation and adjudication of Mr. Doe's case—even those that are, on their face, not gender-specific—also contribute to an inference of gender bias, when combined with allegations of public pressure.[27]

Mr. Doe has thus pled: pressure from OCR, national media, students, and alumni; the drastic reduction of rights afforded to accused AU students; the hiring of an "advocate" to be the sole investigator and adjudicator of sexual misconduct claims; the cancellation of a student group's event concerning Title IX after criticism from the Association of University Women of AU; the Title IX Office's statement regarding the Department of Education's 2017 guidance documents; the Know Your IX materials; Ms. Quasem's "rape culture" comment; and extensive procedural irregularities in the investigation and adjudication of Mr. Doe's case. Based on the allegations in the Complaint, it at least *plausible* that Mr. Doe's gender was *a* motivating factor in his suspension.

### 3.    AU's Efforts to Rebut This Evidence Rely on Bald Assertions—and Are Undermined by GW, the Second, Sixth, and Seventh Circuit Courts of Appeals, and Common Sense.

Without reference to Judge Collyer's decision in *GW*—or to any published decision by a United States Court of Appeals—AU asserts that Mr. Doe does not adequately plead an inference of gender bias. None of AU's arguments have merit.

---

[26] *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("When viewing the evidence in the light most favorable to Doe, as we must, one plausible explanation is that the Board discredited all males, including Doe, and credited all females, including Roe, because of gender bias."); *see also Rollins Coll.*, 352 F. Supp. 3d at 1211.

[27] *See, e.g.*, *Columbia Univ.*, 831 F.3d at 58; *Oliver v. Univ. of Texas Sw. Med. School*, Case No. 3:18 Civ. 1549, 2019 WL 536376, at *18 (N.D. Tex. Feb. 11, 2019); *Rolph*, 271 F. Supp. 3d at 403; *Norris*, 362 F. Supp. 3d at 1012; *Collick*, 2016 WL 6824374 at *11-12; *Syracuse Univ.*, 341 F. Supp. 3d at 138; *Noakes*, 369 F. Supp. 3d at 414; *Doe v. Brown*, 166 F. Supp. 3d 177, 189-90 (D.R.I. 2016).

*First*, AU argues that that pressure it faced from OCR and the changes it made to its sexual misconduct disciplinary process cannot support an inference of gender bias because they "say nothing about punishing or prosecuting males." (Def.'s Mem. at 16.) AU does not cite a single source for its sweeping argument.

But AU would not have had to look far for cases that undermine their point. In *GW*, 366 F. Supp. 3d at 12, Judge Collyer found that OCR complaints supported a plausible inference of gender bias. Judge Collyer also found that the school's statement that "of 16 cases reported between 2015 and 2017, 10 went before a hearing board and all 10 resulted in a finding of violation" supported an inference of gender bias—even though the statement said "nothing about punishing or prosecuting males." *Id.* Likewise, a claim that a school faced external pressure from the federal government can support a plausible inference of gender bias in the Second,[28] Sixth,[29] and Seventh Circuits[30]. AU does not cite to any decision in this District or by a United States court of appeals that says external pressure, even when combined with other factors, cannot contribute to a finding of plausible gender bias. Every single allegation that Mr. Doe makes does not have to be gender-specific in order to contribute to his total showing of a plausible inference of gender bias. That is not the law.

*Second*, AU argues that "most fatally, Doe does not assert a single fact that connects the alleged 'pressure' to gender bias in Doe's own case." (Def.'s Mem. at 18.) That argument flies in the face of Judge Collyer's decision in *GW*, the Second Circuit's opinion in *Columbia University*, the Sixth Circuit's opinion in *Baum*, and a host of other decisions from around the country, and—ironically enough—the case upon which AU relies the most in support of its Title

---

[28] *See Columbia Univ.*, 831 F.3d at 58.

[29] *See Miami Univ.*, 882 F.3d at 594; *Baum*, 903 F.3d at 586; *Cummins*, 662 F. App'x at 453.

[30] *See Doe v. Purdue Univ.*, 928 F.3d 652, 668-69 (7th Cir. 2019).

IX argument. *GW*, *Columbia University*, *Baum*, and numerous similar cases, all hold that external pressure—particularly when it is targeted at the school—supports an inference of gender bias, *whether or not it can be expressly connected to the underlying proceeding.*

In *GW*, none of the allegations taken into account by Judge Collyer specifically concerned plaintiff's own disciplinary proceeding. *GW*, 366 F. Supp. 3d at 13. In *Columbia University*, targeted external pressure upon the school to take female assault claims more seriously was enough, *by itself*, to support an inference of gender bias against the plaintiff. *Columbia Univ.*, 831 F.3d at 58.[31] The *Baum* court held that targeted pressure upon the school was not enough by itself but required only the slightest additional circumstantial evidence to make the claim plausible.[32] And not surprisingly, courts considering erroneous outcome claims have found sufficient evidence of gender bias where it was alleged that policies and procedures were motivated at a high level by gender bias, even though the plaintiff's proceeding itself contained no obvious evidence of it.[33]

And the case upon which AU relies more than any other, *Cummins*, confirms AU is wrong on the law. In that case, the court recognized that being investigated by the federal government for potential Title IX violations, as well a public criticism regarding how university officials handle Title IX investigations, are relevant allegations suggesting that the university might discriminate against males in sexual misconduct disciplinary proceedings. *Cummins*, 662 F. App'x at 453.

---

[31] *See also Cummins*, 662 F. App'x at 453; *Wells*, 7 F. Supp. 3d at 751.

[32] *See also Univ. of Pa.*, 2017 WL 4049033 at *16; *Ohio State Univ.*, 239 F. Supp. 3d at 1073; *Lynn Univ., Inc.*, 235 F. Supp. 3d at 1340-44; *Amherst College*, 238 F. Supp. 3d at 223.

[33] *See, e.g., Brown Univ.*, 166 F. Supp. 3d at 189; *Harris v. St. Joseph's Univ.*, Case No. 12 Civ. 3937, 2014 WL 12618072, at *2 n.3 (E.D. Pa. Nov. 26, 2014).

*Third*, AU tries desperately to blunt the significance of the active OCR investigations by claiming that they "precede the investigation and adjudication of Roe's complaint by a number of years." (Def.'s Mem. at 16 n.12.) That is not true with respect to the two latest OCR investigations, opened on November 7, 2018, and March 12, 2019, respectively (*see* Att. A), of which the Court could take judicial notice.[34] Even if the Court does not, AU's argument still fails. AU cites to *Doe v. University of Dayton*, 766 F. App'x 275, 282 (6th Cir. 2019) for its claim that the OCR investigations pled in the Complaint are too "temporally removed" to raise an inference of discrimination. (Def.'s Mem. at 16 n.13.) But in *Dayton*, the OCR investigations had been *closed* for years. *Univ. of Dayton*, 766 F. App'x at 282. In Mr. Doe's case, they were *pending* during the disciplinary proceeding—and thus not "temporally removed" at all. *See Baum*, 903 F.3d at 586 (OCR investigation opened "[a]round two years before Doe's disciplinary proceeding" supported inference of gender bias).

*Fourth*—with respect to the statements AU's Title IX Office made to Students Against Sexual Violence regarding the September 22, 2017, Dear Colleague Letter and the Q&A on Sexual Misconduct (¶¶ 87-88)—AU claims that "Doe misleadingly asserts that AU 'would not follow [ ] new guidance' [he] alleges is different from the prior 'Dear Colleague Letters.'" (Def.'s Mem. at 16 n.12.) According to AU, "[w]hile DoE has promulgated *proposed* Title IX regulations, these are not 'final' and thus no 'new guidance' exists." (*Id.* (emphasis in original).)

AU seems to be confusing the Department of Education's September 22, 2017, guidance documents with its November 16, 2018, proposed regulations under Title IX (which had not yet been proposed when AU's Title IX Office made its comments). On September 22, 2017, the

---

[34] *See, e.g., Pharm. Research and Mfrs. of Am. v. United States Dep't of Health and Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

27

Department of Education issued two new guidance documents: a "Dear Colleague Letter" and a "Q&A on Campus Sexual Misconduct." These are "guidance document[s] under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 432 (Jan. 25, 2007)." U.S. Dep't of Educ., Ltr. from Assistant Sec'y Candice Jackson at 2 (Sept. 22, 2017); U.S. Dep't of Educ., Q&A on Campus Sexual Misconduct at 7 (Sept. 22, 2017). The September 22, 2017, Dear Colleague Letter rebuked and rescinded the guidance issued by the Department of Education in 2011 and 2014.[35] Separately, on November 16, 2018, the Department of Education released proposed regulations under Title IX.

Given that AU is subject to Title IX, its argument that there was "no new guidance" in 2017 is bizarre and troubling.

*Fifth*, AU argues that the fact that the 2017 OCR investigation alleged in the Complaint was brought by a male student means that "[u]nder Doe's theory of the University responding to outside 'pressure,' AU would feel pressure to treat accused male students *more* favorably than non-males." (Def.'s Mem. at 16 (emphasis in original).) Of course it doesn't. AU knows that publicity concerning unfair treatment of female students who claim they have been sexually assaulted is not the same thing as publicity concerning unfair treatment of male students who have been accused of sexual assault. Indeed, "increased public scrutiny" regarding AU's mistreatment of male respondents *supports* a plausible inference of gender bias—because that sort of attention "cause[s] [schools] to buckle down in support of its policies." *See Rollins Coll.*,

---

[35] *See* U.S. Dep't of Educ., Ltr. from Assistant Sec'y Candice Jackson at 1 (Sept. 22, 2017) (rescinding the 2011 and 2014 guidance documents and stating that they placed pressure on schools to "establish[ ] procedures for resolving allegations that lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation" (internal quotation marks and footnote omitted)).

28

352 F. Supp. 3d at 1211 (negative publicity concerning how the college treated male respondents supported plausible inference of gender bias).

*Sixth*, AU argues that Mr. Doe cannot "allege facts plausibly demonstrating 'patterns of decision-making that also tend to show the influence of gender'" because the Investigator found H.S. not responsible on "all charges" in his case and found Mr. Doe not responsible on two of three charges. (Def.'s Mem. at 15.) AU makes a good argument for discovery. But it is not a proper one for a motion to dismiss.

As an initial matter, there is no requirement that a plaintiff allege a pattern of decision-making at the motion-to-dismiss stage—as Judge Collyer made clear in *GW*. *GW*, 366 F. Supp. 3d at 12-13 (identifying possible indicia of gender bias, including public pressure, and then noting that "*other* relevant allegations '*might include, inter alia* . . . patterns of decision-making that also tend to show the influence of gender.'" (quoting *Yusuf*, 35 F.3d at 715) (emphasis added).)[36]

As for AU's argument that the decisions in his and H.S.'s cases "refute [Mr. Doe's] Title IX claim" (Def.'s Mem. at 15 (emphasis in original)), the premise is absurd. AU claims, without citing to any authority, that if it finds a single male student not responsible for sexual misconduct then it is implausible that AU discriminates on the basis of gender in its student disciplinary process. But a school that makes it harder for male respondents to be found not responsible

---

[36] Still, Mr. Doe does allege a long pattern of decision-making, including: AU's decision to strip accused students of due process rights (¶¶ 74-78); the decision to hire an "advocate" to be the sole investigator and adjudicator of Title IX cases (¶¶ 79-80); the decision to cancel an event on Title IX, in response to pressure from a women's group (¶¶ 90-93); the decision to ignore the Department of Education's 2017 guidance (¶¶ 84-88); and the decision to refer students looking for help about their rights under Title IX to a group that focuses on non-male victims of sexual misconduct (¶¶ 94-95.).

because of their gender, still discriminates on the basis of gender even when it finds one male respondent (or more) not responsible, applying its harsher standard.

At least one school has recently made the same argument AU makes here. It failed for the same reason that AU's should. In *Norris v. University of Colorado, Boulder*, 362 F. Supp. 3d 1001 (D. Colo. 2019), the university "argue[d] that since Plaintiff was found not responsible" for one "allegation of sexual misconduct, [he] cannot plausibly allege a 'pattern of decision-making' suggesting that gender influences the University's disciplinary process." *Id.* at 1016. Citing *Twombly*, the court responded tersely: "Plaintiff's Complaint plausibly alleges that the university's actions may be based on bias and access to discovery may provide support for his claim." *Id.* at 1016. The plaintiff's allegations in *Norris* that the court found sufficient to state a plausible claim of gender bias regarded the "[p]laintiff's access to the investigative file, the alleged inconsistencies in the Investigators' findings, the process of the administrative review, combined with the issues of public pressure" (*id.* at 1012)—*i.e.*, the same sort of allegations that countless other courts have found sufficient to allege a plausible claim of gender bias (*see, e.g.*, cases cited *infra* note 27), and the same kind that Mr. Doe alleges here.

It also takes a particularly high degree of chutzpah for AU to argue that anything can be inferred from the H.S. case. AU has steadfastly refused to share any information about that case—even though it necessarily contains exculpatory material. AU cannot waive around a non-responsibility finding, argue it refutes that they discriminate—and then just say "take our word for it." AU's argument begs for discovery.

*          *          *

AU's motion to dismiss as to Mr. Doe's Title IX claim asks the Court to believe that its Investigator would have made the same decision had Ms. Roe been in Mr. Doe's position—that

30

if Mr. Doe pulled Ms. Roe's head into his crotch, Mr. Doe said "yes," when Ms. Roe asked him whether she wanted him to "do this," and Ms. Roe then touched him over his pants, it would find that she had committed sexual assault and suspend her for a year and a half. Based on Mr. Doe's overwhelming allegations in support of his Title IX claim, he has raised a plausible inference that Mr. Doe's gender was a motivating factor in the decision to find him responsible.

## II.     JOHN DOE HAS SUFFICIENTLY PLED A VIOLATION OF THE D.C. HUMAN RIGHTS ACT.

### A.     Mr. Doe States a Claim for Disparate Treatment.

For the same reasons stated in Section I, Mr. Doe will succeed in showing disparate treatment under the D.C. Human Rights Act. That is especially true given that the Act is violated when denial of an educational benefit is based "wholly *or partially*" on a discriminatory motivation. D.C. Code. § 2-1402.41(1) (emphasis added).

### B.     Mr. Doe Also States a Claim for Disparate Impact.

AU generally makes two arguments in support of its motion to dismiss as to Mr. Doe's disparate impact claim. First, relying on *GW* (finally), AU argues that Mr. Doe's "assertion[ ] that the vast majority of respondents in Title IX proceedings are male [ ] undercuts his disparate impact claim." (Def.'s Mem. at 20.) And, second, AU argues that Mr. Doe does not allege a "factual basis" for his claim that "[u]pon information and belief, the vast majority of respondents in the University's Title IX proceedings since the University switched to a single-investigator model have been male." (*Id.*)

As to the first argument, AU misstates the allegations in *GW*. The plaintiff in *GW* did not allege that "predominantly men" were accused of sexual misconduct at the school, as AU argues. (Def.'s Mem. at 20.) The plaintiff in *GW* alleged that "all" of the respondents in sexual misconduct cases at GW were men. 366 F. Supp. 3d at 13 (the plaintiff "pleads that from 2015

31

through 2017 '*all* of the respondents' in GW's sexual assault hearings were men" (emphasis added)). Judge Collyer held that was "fatal" because there was "no comparator group"—*i.e.*, the plaintiff could not have developed the necessary statistical evidence to survive summary judgment. *Id.*; *cf. Wu v. Special Counsel*, No. 14-7159, 2015 WL 10761295, at *2 (D.C. Cir. Dec. 22, 2015) ("Although Wu need not present statistical evidence in his complaint, he must be able to present such evidence at some point. And Wu's briefs confirm that he will not be able to do so." (citation omitted)).

That is not the case here. Mr. Doe alleges that the "vast majority"—not "all"—of respondents in AU's Title IX proceedings are men. (¶ 251.) Unlike the plaintiff in *GW*, Mr. Doe could develop, through discovery, the necessary statistical evidence to sustain his cause of action. *See also Boykin v. Gray*, 895 F. Supp. 2d 199, 213-14 (D.D.C. 2012) ("[I]n order to prevail the plaintiffs likely will need to provide statistical analyses supporting their allegation, . . . [a]s skeptical as the Court is that the plaintiffs' claim has any chance of success, that is a matter for summary judgment.").

With respect to AU's second argument, it boils down to: Mr. Doe should not get discovery because he does not allege facts he could only get through discovery. But "[c]ourts have . . . permitted claims for disparate treatment based upon information and belief." *See Jbari v. District of Columbia*, 304 F. Supp. 3d 201, 210 (D.D.C. 2018). And indeed, "[t]his is the type of case for which 'upon information and belief' pleading was designed."[37]

---

[37] *Ritter v. Okla. City Univ.*, Case No. 16 Civ. 0438, 2016 WL 3982554, at *2 (W.D. Okla. July 22, 2016); *see also Doe v. Coastal Carolina Univ.*, 359 F. Supp. 3d 367, 377 (D.S.C. 2019) ("Given the confidential nature of disciplinary proceedings against students accused of sexual misconduct, it is difficult to imagine how [p]laintiff[s] could plead the existence of such proceedings in greater factual detail."); *Doe v. Brown Univ.*, 166 F. Supp. 3d at 187 ("One particular challenge in these types of cases is that the best information for discerning whether the

32

### III.    JOHN DOE HAS SUFFICIENTLY PLED A BREACH OF CONTRACT CLAIM.

With respect to Mr. Doe's claim for breach of contract, AU argues that (1) the University's Code and Policy are not part of an enforceable contract and, (2) even if they were, AU has not committed any of the breaches Mr. Doe has alleged. Under the case law, and in light of the plain language of the Code and Policy, these arguments fail.

### A.    The Code and Policy Are Parts of an Enforceable Contract Between AU and Its Students, Including Mr. Doe.

Because the issues overlap, AU's arguments concerning the existence of an enforceable contract are addressed in Mr. Doe's motion for partial summary judgment, filed herewith.

### B.    John Doe Has Sufficiently Pled Six Breaches of Contract.

#### 1.    American University Breached Its Contract in Three Ways Related to the Investigation and Findings.

AU lumps together three contract breaches concerning the inadequacy of the school's investigation and the investigator's findings under one heading in its motion. (Def.'s Mem. at 24-27.) But to be clear, Mr. Doe has alleged that AU (1) failed to conduct a "thorough and impartial investigation" (¶¶ 271-73); (2) failed to provide Mr. Doe with an equal opportunity to be heard and present evidence (¶¶ 274-77); and (3) failed to apply a "preponderance of the evidence" standard required under the Code (¶¶ 278-80).

##### a.    AU's Failure to Conduct a Thorough and Impartial Investigation

Regarding the first breach, Mr. Doe has provided detailed factual allegations to support his claim, including, for example, that the Investigator (1) failed to ask Ms. Roe and H.S. simple

---

alleged discrimination was based on the plaintiff's gender as opposed to his status as an accused student is generally in the possession of the defendant: namely, what are the overall outcomes of such cases and, more specifically, how have cases been handled in which the accused student is female and/or the alleged victim is male?").

and obvious follow-up questions when the answers would have undermined Ms. Roe's allegations (¶¶ 137-46); (2) failed to interview at least three people to whom Ms. Roe gave contemporaneous accounts of the events of that night (¶¶ 147-50); and (3) withheld information and evidence gathered in the investigation of H.S. regarding the same set of events (¶¶ 151-58).

In response, AU, citing the Code, argues that these failures do not violate the Code or Policy because "the Investigator has discretion to determine the relevance and use of any specific evidence in disciplinary proceedings." (Def.'s Mem. at 25 (citing the Code at 18)). But that's not what the Code says. What the Code provides is that the Investigator "has the discretion to determine the relevance of any *submitted* evidence and to include or exclude certain types of evidence." (Compl. Ex. 6 (the "Code") at 18 (emphasis added).) The provision does not address or negate the separate obligation that the Investigator conduct a thorough and impartial investigation. And it does not excuse withholding relevant information and evidence. Mr. Doe is not alleging that the Investigator improperly determined the relevance of submitted evidence— he is alleging that she failed to even inquire as to potentially exculpatory evidence and withheld other evidence from Mr. Doe.

Unable to rebut the multiple ways the Investigator failed to conduct a thorough and impartial investigation, AU says "so what." AU argues that Mr. Doe does not "allege what any other witnesses would have said that might have compelled a different result." (Def.'s Mem. at 15.) But that argument proves Mr. Doe's point. AU does not even consider the possibility that had it conducted a thorough investigation, it would have uncovered evidence that supported Mr. Doe's innocence. What if one or more of the three AU officials told the Investigator that Ms. Roe told them that she engaged in *consensual* sexual contact with Mr. Doe, but that she regretted it? That should have changed the result. What if Ms. Roe described additional ways

34

that she showed clear signs of consent that night—actions or words that Mr. Doe didn't recall when he was interviewed over two-and-half years after that night? That should have changed the result. AU's position shows just how incomplete and unfair this process was to Mr. Doe. The Investigator didn't even consider the possibility he was innocent.[38]

AU also argues that a thorough and impartial investigation wouldn't have changed the ultimate outcome because the Investigator's finding was based solely on "conduct to which Doe admitted." (Def.'s Mem. at 25.) That's wrong. The Investigator's decision hinged on her finding that Ms. Roe was impaired, and that Mr. Doe could tell. (*See* Report at 17 (finding that—"*given Ms. Roe's impairment*"—Ms. Roe did not give "clear indication[s] of consent" (emphasis added).) Mr. Doe maintained he could not see any sign that Ms. Roe was impaired that night, and eyewitness testimony and Ms. Roe's own words supported that. The Investigator also made several key credibility determinations that factored into her decision to find that Ms. Roe's claim regarding her level of intoxication to be credible. (*See infra* pp. 8-10.)

                b.       AU's Failure to Provide an Equal Opportunity to Be Heard and Submit Evidence

Regarding AU's failure to disclose information and evidence gathered in the investigation of H.S., AU argues only that the Code includes no affirmative obligation to share information from other investigations. (Def.'s Mem. at 25-26.) AU does not argue that this information isn't relevant or that the contract does not otherwise require the school to disclose relevant information to a respondent. The fact that there is no affirmative, general obligation to

---

[38] AU argues (without support) that "Title IX is not a vehicle for accused sexual assault assailants to second guess how the university assesses the evidence before it . . . ." (Def.'s Mem. at 25.) But "[d]eference to the university's judgment does not require the Court to dismiss [an] otherwise valid complaint prior to discovery." *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 188 (D.D.C. 2016).

disclose information from another investigation does not negate this specific responsibility to disclose relevant information and evidence.

Next, AU speculates about what is essentially a potential affirmative defense—that disclosure of information from the H.S. investigation "*could* run afoul of the Family Educational Rights and Privacy Act (FERPA)." (Def.'s Mem. at 26 (emphasis added).) To the extent that AU now believes in hindsight that its FERPA obligation may have precluded it from sharing relevant information with Mr. Doe, this does not matter for purposes of a motion to dismiss. *McNamara v. Picken*, 866 F. Supp. 2d 10, 17 (D.D.C. 2012) ("The plaintiff was not required to anticipatorily negate [a] defense in his pleadings, and thus the Court cannot conclude, as a matter of law, that plaintiff cannot prove any set of facts entitling him to relief.") (internal quotation marks omitted).

c.        AU's Failure to Apply a Preponderance-of-the-Evidence Standard

With respect to its failure to apply the required preponderance-of-the-evidence standard, AU alleges that "it is clear that [the investigator] conducted a careful assessment of the evidence, including weighing evidence of Roe's credibility." (Def.'s Mem. at 26.) It is so because AU says it is so, apparently. Even if AU's conclusory opinion were sufficient to overcome the factual allegations in the Complaint, and putting aside whether this statement is true (it is not), the fact that an investigator may have "carefully assessed" evidence or "weighed evidence of Roe's credibility" says nothing about whether she applied the correct standard.[39]

In his Complaint, Mr. Doe includes numerous allegations to support a breach-of-contract claim through misapplication of the standard of proof. For example, he outlined specific

---

[39] AU also appears to argue that the investigator must have applied the proper standard because she did not find that Roe was incapacitated, that Doe had digitally penetrated Roe, or that Doe had kissed Roe or touched her buttocks without her consent. (Def.'s Mem. at 26 n.16.) Whether an investigator does *not* make a given finding, however, does not prove that she applied the correct standard for other findings she made.

evidence in nine bullet points that he contends undermine Ms. Roe's credibility. (¶ 279.) AU does not address any of these allegations. Mr. Doe further outlined five factual allegations that he contends show that the investigator's decision to find Mr. Doe was based on less than a preponderance of the evidence. *Id.* ¶ 280. Again, AU is silent.

    d.  <u>AU's Investigation of a Complaint Filed After the Stated Deadline in the Code and Policy</u>.

Because the issues overlap, AU's arguments concerning Mr. Doe's claim that AU breached the contract by permitting Ms. Roe's complaint after the stated deadline are addressed in Mr. Doe's motion for partial summary judgment, filed herewith.

### 2. AU Breached Its Contract in How It Conducted the Sanctions Hearing.

AU also breached its contract in two ways during the sanctioning phase of Mr. Doe's case: first, by precluding Mr. Doe from challenging members of the Sanctioning Panel or the Sanctioning Panel Administrator, and, second, by rescinding its explicit permission for Mr. Doe's advisor to attend the Sanctioning Panel hearing.

As to Mr. Doe's claim that AU breached its contract by not giving him the opportunity to object to members of the Sanctioning Panel, AU ignores the allegations. AU claims that Mr. Doe "had the information regarding his right to challenge the Sanctioning Panel members, but he does not allege that ever he [sic] sought to do so, much less that the university prohibited him from doing so" (Def.'s Mem. at 30)—*i.e.*, Mr. Doe had the opportunity to challenge members of the Panel, but he didn't take it. But this is what AU's Director of Student Conduct Katherine Porras, said at the Sanctioning Panel hearing: "[I]f the Respondent is not here, *he does not have*

37

*the opportunity* to recuse anyone." (¶ 209 (emphasis added.)[40] Mr. Doe had to show up to the hearing in order to be able to object to the members of the Panel—a rule Ms. Porras made up out of whole cloth, in breach of AU's contract with Mr. Doe.

With respect to the second claim regarding the Sanctioning Panel, weeks prior to the hearing, an AU representative told Mr. Doe by email that (1) he could participate in the Sanctioning Panel by "submit[ting] a written statement" or "choose to share a statement via Skype or phone" and (2) that his "advisor [would] be permitted to attend the sanctioning panel at 2pm EST." (¶¶ 200-01.) Relying on this statement, Mr. Doe, who was residing in Kuwait, elected to submit a written statement. An AU representative then emailed Mr. Doe a few hours before the Sanctioning Panel convened stating: "**Since you are not attending, this unfortunately also means your advisor cannot attend.**" (¶ 203).

AU argues that "the Policy limits the role of advisers [sic] in sexual misconduct proceedings to 'advis[ing] and accompany[ing] [the student] during any meeting related to the complaint,' and emphasizes that '[t]he advisor may not participate directly in any meeting or contact the Designated Official.'" (Def.'s Mem. at 29.) The full passage, however, simply states that the participating students "may be advised and accompanied." (Compl. Ex. 3 (the "Policy") at 8.) The only "limit" on the advisor's participation stated in the Policy is that an advisor "may not participate directly in any meeting or contact the Designated Official." (*Id.*) There is nothing in the Policy or Code that says an Advisor cannot attend a hearing if his or her advisee submits a written statement.

---

[40] As further alleged, Ms. Porras also stated the wrong standard for challenging a member of the Sanctioning Panel or Sanctioning Panel Administrator. See Compl. ¶ 212 (alleging that persons could be disqualified for "conflicts of interest," not only "personal bias")

### 3.   AU Breached Its Contract in Determining Whether Mr. Doe's Appeal Was Viable.

The Code provides for two stages of appellate review. In the first stage, an appellate board "determine[s] viability." (Code at 20.) "The appellate board will determine viability based on the following conditions: i. New information that significantly alters the findings of fact; ii. Evidence of improper procedure and / or; iii. Insufficient / excessive sanctions." (*Id.*) The Code refers to the party's submission as a "request for appeal." (*Id.*) If the appeal is "deemed viable," it is "forwarded to the vice president of Campus Life or designee for review and decision." (*Id.*) Here, according to the Code, "the Appellate Board's role is to determine whether the appeal is based on one or more of the above three bases." (¶ 288.)

In *GW*, the Court considered an almost identical issue under analogous facts. There, George Washington University had a similar appeal structure. In the first stage, "viability" of the appeal was to be determined by a university official. *Id.* at 124. At GW, the Code provided that "[a]ppeals must be based on new information that is relevant to the case, that was not previously presented . . . and that significantly alters the finding of fact . . . ." *Id.* at 121 (quoting the GW Code). Like at AU, "[i]f an appeal [was] found to be viable, the appeal [was to] be forwarded to," in the case of GW, "the Chair of the Committee on the Judicial System, who shall select a Panel . . . *to review and decide* the appeal." *Id.* (quoting the GW Code; emphasis added).

The Court in *GW* then observed: "In common parlance, viable means 'having a reasonable chance of succeeding,' 'able to be done or likely to succeed,' or 'possible,' 'within possibility.'" *Id.* at 126 (citations omitted). Given this, the Court held, the official reviewing for viability "was restricted to determining whether there was 'new' evidence . . . and whether that new evidence, combined with the record evidence, had a chance of success on appeal—without the substitution of his opinion on the merits for that of the appellate panel." *Id.* at 127.

39

Importantly, in construing the GW Code, the Court in *GW* also rejected the school's contention that "new" evidence under the Code must have been previously unavailable. *Id.* at 125.

Under these constructions, it is more than plausible that the AU Appellate Panel exceeded its role, thereby breaching the contract. Indeed, a July 25, 2019 letter, AU sent Mr. Doe acknowledges as much. (Def.'s Mem. Ex. 7.) AU informed Mr. Doe that the Appellate Panel "did not find evidence that the procedures . . . were improperly followed," "did not find that the new information provided significantly altered the original finding of fact," and "found that the sanctions imposed were not excessive." (*Id.*) This shows that the Appellate Panel reached the merits of Mr. Doe's appeal.

## IV.   AU BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

AU argues that Mr. Doe's claim for breach of the implied covenant of good faith and fair dealing is duplicative of his breach-of-contract claim. It is not. AU argues in support of its motion that the Investigator had discretion to decide the relevance of evidence. (*See, e.g.*, Mem. at 24, 25.) AU argues that the Investigator had the discretion to determine the "use of any specific evidence in disciplinary proceedings." (*Id.* at 25.) And AU claims that the Investigator had the discretion to analyze evidence anyway she wanted to. (*Id.*) Mr. Doe's claim for breach of the implied covenant seeks to hold AU accountable for exercising its purported discretion in ways that denied Mr. Doe the fruits of his contract with the school—*e.g.*, a fair disciplinary process and a diploma once he completed all course requirements. That is precisely what a claim for breach of the implied covenant of good faith and fair dealing is all about. *See, e.g.*, *Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40, 49 (D.D.C. 2010) ("[S]atisfaction of the implied covenant of good faith and fair dealing requires more than a showing that the contract conferred discretion, for such discretion must be exercised *reasonably*." (emphasis in original)).

40

AU also argues that Mr. Doe does not allege AU's conduct was arbitrary and capricious. He does. In the context of university discipline, performance on a contract is arbitrary and capricious when it "steer[s] [an] investigation" towards "preconceived conclusions regarding [] misconduct," *Kumar v. George Washington Univ.*, 174 F. Supp. 3d 172, 189 (D.D.C. 2016), when it "effectively disregard[s] evidence," *id.*, or when "there was no rational basis for the decision" or "it was motivated by bad faith or ill will," *Paulin v. George Washington School of Med. and Health Sci.*, 878 F. Supp. 2d 241, 247 (D.D.C. 2012). That is exactly what Mr. Doe alleges in the Complaint. (*See, e.g.*, ¶ 292-93.)[41]

## V.   JOHN DOE HAS SUFFICIENTLY PLED A NEGLIGENCE CLAIM.

To prove negligence in the District of Columbia, as in other jurisdictions, a plaintiff must show "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011). Here, AU argues that Mr. Doe has not adequately alleged the first and second elements and that his negligence claim is duplicative of his breach of contract claim.

### A.   American University Owes Its Students a Duty of Care.

"In general, courts rely on the concept of 'foreseeability' to determine whether the defendant owed a duty to the claimant in a negligence action and examine whether the risk to the claimant was 'reasonably foreseeable' to the defendant." *Hedgepeth*, 22 A.3d at 793. "If the

---

[41] Moreover, Mr. Doe may proceed on both his breach-of-contract claim and his claim for breach of the implied covenant of good faith and fair dealing as alternative theories of relief. *See Taylor v. Howard Univ.*, 200 F. Supp. 3d 196, 201 (D.D.C. 2016) (holding that, under Fed. R. Civ. P. 8(d)(2) and (3) providing for alternative claims, the plaintiff could proceed on claims of sex discrimination and tortious interference, despite defendant's arguments that both claims were based on the same factual allegations).

injury that befell the plaintiff was 'reasonably foreseeable' to the defendant, then courts will usually conclude that the defendant owed the plaintiff a duty to avoid causing that injury." *Id.*

Whether a risk is foreseeable "is determined, in large part, by the nature of the relationship between the parties." *Id.* at 794. When a defendant "enters into a relationship with a plaintiff, . . . a corresponding duty of care arises," and "'the scope of the defendant's undertaking determines the scope of its duty.'" *Id.* The "foreseeable risks" for which the defendant is liable are the ones "associated with the defendant's failure" adequately to complete the given undertaking. *Id.*

In the light of these principles, private universities owe a clear duty to their students to exercise reasonable care when disciplining them. It is readily foreseeable that private universities, which bring together thousands of people, will have to maintain order on campus and discipline students—that is why codes of conduct exist. It also is readily foreseeable that wrongful discipline, particularly for something as stigmatizing as sexual assault carries serious injury and "important and irreversible consequences" for the accused (¶ 297). That is why courts across the country have held that students disciplined by private universities, particularly for something as serious as sexual misconduct, are owed a duty of care in that process.[42]

AU counters that "[c]ourts—including courts in the District of Columbia—have *specifically declined* to find a duty of care where universities are conducting student disciplinary proceedings." (Def.'s Mem. at 32 (emphasis in original).) That's not true. AU cites to a *single*

---

[42] *See*, *e.g.*, *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 995 (D. Minn. 2017); *Case Western Reserve Univ.*, Case No. 1:17 Civ. 414, 2017 WL 3840418 at *12 (N.D. Ohio Sept. 1, 2017); *Tsuruta v. Augustana Univ.*, No. 4:16-cv-4107, Docket No. 13 (D.S.D. June 16, 2016); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011); *Doe v. Univ. of the South*, No. 4:09-cv-62, 2011 WL 1258104 at *21 (E.D. Tenn. March 31, 2011); *Rollins v. Cardinal Stritch Univ.*, 626 N.W.2d 464 (Minn. Ct. App. 1981).

case in this District—*North v. Catholic University of America*, 310 F. Supp. 3d 89, 96 (D.D.C. 2018)—stating that it held that a "student who was suspended after being found responsible for sexual assault failed to state a *negligence claim* as there is no common law 'duty of basic fairness' in a university's investigative and disciplinary process under D.C. law." (*Id* (emphasis added).) But that is not what the court in *North* held. Not even close.

The plaintiff in *North* didn't bring a "negligence claim"—so AU's statement that the court found the plaintiff "failed to state a negligence claim" is bizarre. The plaintiff characterized his "duty of basic fairness" claim as a tort in his complaint and a contract claim in his motion. *North*, 310 F. Supp. 3d at 96. In a single sentence, the Court determined that the plaintiff could not sustain his claim because he "cite[d] no authority to establish that [it] exists . . . and to the extent he claims it arises from the University's contractual obligations, it would duplicate his breach of contract claim." *Id.* (citation omitted).

In this District, in a different context, a court has found that AU owed a student-athlete a duty of care. The court in *Bradley v. National Collegiate Athletic Association*, 249 F. Supp. 3d 149, 180-81 (D.D.C. 2017), did what AU avoids doing in support of its motion—it "rel[ied] on the concept of 'foreseeability' to determine whether a defendant owed a duty to a plaintiff in a negligence action and examine[d] whether the risk to a plaintiff was 'reasonably foreseeable' to a defendant." *Id.* The court found that—"at this stage of the case"—the plaintiff's injuries were reasonably foreseeable and thus AU owed her a duty of care. *Id.* at 181. The court specifically noted that all of the cases cited by AU were "decided on motions for summary judgment after discovery was conducted." *Id.* 180-81.

AU has tried to take a shortcut to dismissal—because applying the concept of foreseeability to sexual misconduct disciplinary proceedings makes clear that AU owes its

students a duty of care in these cases. Or, at the very least, Mr. Doe has alleged facts sufficient at this stage of the litigation to pursue his claim of negligence through discovery.[43]

### B. Mr. Doe Pleads His Negligence Claim with Specificity.

AU next argues that "[w]hile Doe makes the conclusory assertion that AU acted negligently 'by carelessly, improperly, and negligently performing its assigned duties' (¶ 298), this is the classic mere 'formulaic recitation of the elements of a cause of action,' which is insufficient to plead a valid claim." (Def.'s Mem. at 33-34.) All AU does is cherry pick a single sentence from the Complaint and describes that sentence as conclusory. AU ignores every other factual allegation Mr. Doe makes. The rule is not that a single conclusory sentence voids all of the detailed factual allegations in a complaint—it is that the Court does not need to credit mere conclusory statements, and Mr. Doe is not asking the Court to do that here.

After claiming that Mr. Doe merely pleads a conclusory statement, AU schizophrenically then argues that "Doe's own [factual] allegations refute the notion that AU acted negligently in conducting his disciplinary proceeding." (Def.'s Mem. at 34.) AU identifies some of Mr. Doe's factual allegations—like that the "[t]he Investigator provided Doe the case file"—to argue that the facts show AU did not act negligently. (*Id.*) That is not how negligence works. If a person fulfills their duty of care once or twice, that does not absolve them for when they breach it. At bottom, AU just disagrees over the facts. That is not a proper argument on a motion to dismiss.

---

[43] *See*, *e.g.*, *Millennium Square Residential Ass'n v. 2200 M Street LLC*, 952 F. Supp. 2d 234, 246 (2013) ("[T]he Complaint asserts that [the defendants] owed a duty of care to [the plaintiff], identifies the basis for that duty, describes the circumstances in which the [defendants] allegedly did not fulfill their duty [to the plaintiff ], and alleges that the [defendants'] failure to act was a proximate cause of harm that occurred to [the plaintiff]. The claim of negligence against the [defendants] is adequately plead and will not be dismissed.").

**C.**     **Mr. Doe's Negligence Claim Is Not Duplicative of His Breach of Contract Claim.**

AU argues that Mr. Doe has not alleged that his negligence claim is based on any facts other than the breach of contractual duties. But that's not true. The Complaint alleges that AU was negligent in performing a series of acts that are not the subject of express promises in the Policy or the Code.[44] None of these acts violate a contract term, yet all of it served to deny Mr. Doe a fair proceeding and punish him arbitrarily. *See Tsuruta*, No. 4:16-cv-4107, Docket No. 13 at 7 (denying motion to dismiss negligence claim based on inadequate training of Title IX proceeding participants).[45]

Conclusion

For the foregoing reasons, John Doe respectfully requests that the Court deny Defendant's Motion to Dismiss the Complaint.

---

[44] *See* ¶¶ 299-300 (negligent training and supervision of AU employees involves in the sexual misconduct disciplinary process), 301 (employing a biased Investigator), 302 (negligent training of Sanctioning Panel and Panel administrator, Katherine Porras), and 303 (negligent training of Appellate Board).

[45] Even if AU is right that Mr. Doe's negligence claim is based on the same facts as his breach of contract claim—and it is not—Mr. Doe's negligence claim would not fail merely because he *alleges* a contractual relationship with AU, which is what AU seems to argue. (*See* Def.'s Mem. at 35.) Courts do not dismiss negligence claims based on the theory that they arise from a contractual relationship when there is no contractual relationship. The two cases to which AU cites in its argument on this issue make that clear. *See Amin v. Nyack Sch. of Adult and Distance Educ.*, 710 F. Supp. 2d 80, 83 (D.D.C. 2010) ("Since all the torts Amin asserts arose from his contractual relationship with Nyack, and do not exist independently of that contractual relationship, he cannot maintain an action in tort."); *Islar v. Whole Foods Mkt. Grp., Inc.*, 217 F. Supp. 3d 261, 266-67 (D.D.C. 2016) (negligent supervision claim dismissed where there was a contractual relationship between employer-employee and it was predicate for negligence claim).

DATED: December 23, 2019     Respectfully submitted,

KAISERDILLON PLLC,

Matthew G. Kaiser (D.C. Bar No. 486272)
Scott Bernstein (D.C. Bar No. 1013922)
William E. Zapf (D.C. Bar No. 987213)
1099 14th Street NW, 8th Floor West
Washington, DC 20005
(202) 640-2850
mkaiser@kaiserdillon.com
sbernstein@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

46