**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOHN DOE,<br><br>Plaintiff,<br>v.<br><br>AMERICAN UNIVERSITY,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:19-cv-03097-APM<br><br>**MEMORANDUM OF LAW** |

**MEMORANDUM OF LAW IN OPPOSITION TO DOE'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Laurel Pyke Malson (#317776)
Aryeh S. Portnoy (#464507)
Amanda Shafer Berman (#497860)
Nathiya Nagendra (#1031055)

CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2576
LMalson@crowell.com
APortnoy@crowell.com
ABerman@crowell.com
NNagendra@crowell.com

*Counsel for Defendant*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... ii

**INTRODUCTION** .......... 1

**FACTUAL BACKGROUND** .......... 3

**STANDARD OF REVIEW** .......... 3

**ARGUMENT** .......... 4

I. AU'S STUDENT CODE AND SEXUAL HARASSMENT POLICY DO NOT BAR THE UNIVERSITY FROM INVESTIGATING AND ADDRESSING ALLEGATIONS OF SEXUAL ASSAULT AFTER ONE YEAR. .......... 4

  A. The Code and Policy are Not Contracts to be Strictly Enforced. .......... 5

  B. The Provisions at Issue Do Not Vest in Students a "Right of Repose" from the University's Consideration of Allegations of Sexual Assault. .......... 8

II. THE 2015-16 CODE SHOULD NOT BE CONSTRUED TO CREATE A CONFLICT WITH AU'S OBLIGATION UNDER TITLE IX TO INVESTIGATE AND ADDRESS ALL ALLEGED SEXUAL ASSAULTS. .......... 16

III. AU REASONABLY APPLIED THE 2018-2019 CODE AND POLICY TO ROE'S 2019 ALLEGATIONS. .......... 19

IV. IF THE COURT DETERMINES THAT THE 2015-2016 CODE AND POLICY COULD BE READ ON THEIR FACE TO BAR AU FROM ADDRESSING ROE'S ALLEGATIONS OF SEXUAL ASSAULT, CONSIDERATION OF AU'S CUSTOM AND PRACTICE COMPELS A DIFFERENT CONCLUSION. .......... 20

**CONCLUSION** .......... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................4

*Barker v. Our Lady of Mount Carmel Sch.*,
2016 WL 4571388 (D.N.J. Sept. 1, 2016)....................6

*Barros v. Gov't Emps. Ins. Co.*,
79 F. Supp. 3d 32 (D.D.C. 2015)....................18

**Basch v. George Wash. Univ.*,
370 A.2d 1364 (D.C. 1977)....................10, 11

*Brown v. Sessoms*,
774 F.3d 1016 (D.C. Cir. 2014)....................4

*Burnett v. New York Central Railroad Co.*,
380 U.S. 424 (1965)....................15

*Doe v. Belmont Univ.*,
334 F. Supp. 3d 877 (M.D. Tenn. 2018)....................8

*Doe v. Brandeis Univ.*,
177 F. Supp. 3d 561 (D. Mass. 2016)....................19

*Doe v. George Wash. Univ.*,
305 F. Supp. 3d 126 (D.D.C. 2018)....................6

*Doe v. Johnson & Wales Univ.*,
2019 WL 6324905 (D.R.I. Nov. 26, 2019)....................7

*Doe v. Univ. of St. Thomas*,
240 F. Supp. 3d 984 (D. Minn. 2017)....................8

*Doe v. Vanderbilt Univ.*,
2019 WL 4748310 (M.D. Tenn. Sept. 30, 2019)....................7

*George v. Averett Univ. of Danville, Va.*,
2019 WL 3310517 (W.D. Va. July 23, 2019)....................7

*George Wash. Univ. v. Scott*,
711 A.2d 1257 (D.C. 1998)....................20

**Greene v. Howard Univ.*,
412 F.2d 1128 (D.C. Cir. 1969) ....................11, 22

*Hajjar-Nejad v. George Wash. Univ.*,
37 F. Supp. 3d 90 (D.D.C. 2014) ....................15

*Holcomb v. Powell*,
433 F.3d 889 (D.C. Cir. 2006) ....................3, 4

*Howard Univ. v. Best*,
547 A.2d 144 (D.C. 1988) ....................22

*United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
456 F. Supp. 2d 46 (D.D.C. 2006) ....................14

*Kaiser Steel Corp. v. Mullins*,
455 U.S. 72 (1982) ....................18

*Karimi v. Golden Gate Sch. of Law*,
361 F. Supp. 3d 956 (N.D. Cal. 2019) ....................8

*Mahavongsanan v. Hall*,
529 F.2d 448 (5th Cir. 1976) ....................19

*Manago v. D.C.*,
934 A.2d 925 (D.C. 2007) ....................5

*McConnell v. Howard Univ.*,
818 F.2d 58 (D.C. Cir. 1987) ....................22

*Mosby-Nickens v. Howard Univ.*,
864 F. Supp. 2d 93 (D.D.C. 2012) ....................5

*Napolitano v. Trs. of Princeton Univ.*,
453 A.2d 263 (N.J. Super. Ct. App. Div. 1982) ....................8

*Perez v. C.R. Calderon Constr., Inc.*,
221 F. Supp. 3d 115, 154 (D.D.C. 2016) ....................18

*Pollalis v. President & Fellows of Harvard Coll.*,
124 N.E.3d 159, 2019 WL 1261472 (Mass. App. Ct. 2019) ....................20

**Pride v. Howard University*,
384 A.2d 31 (D.C. 1978) ....................9, 14, 21, 22

**Richter v. Catholic Univ. of Am.*,
2019 WL 481643 (D.D.C. Feb. 7, 2019) ....................4, 5, 6

*Rolph v. Hobart & William Smith Colls.*,
271 F. Supp. 3d 386 (W.D.N.Y. 2017) ....................20

*Shaw v. Elon Univ.*,
400 F. Supp. 3d 360 (M.D.N.C. 2019) ....................6

*Shinabargar v. Bd. of Trs. of Univ. of D.C.*,
164 F. Supp. 3d 1 (D.D.C. 2016) ....................5

*Sifuna v. S. Coll. of Tenn., Inc.*,
2018 WL 3005814 (6th Cir. Apr. 5, 2018) ....................8

*Slaughter v. Brigham Young Univ.*,
514 F.2d 622 (10th Cir. 1975) ....................7

*Staropoli v. Donahoe*,
786 F. Supp. 2d 384 (D.D.C. 2011) ....................4

*Valente v. Univ. of Dayton*,
438 F. App'x 381 (6th Cir. 2011) ....................8

**Regulations**

34 CFR § 106.3(a) ....................17

34 CFR § 106.31(b) ....................17

**Rules**

Fed. R. Civ. P. 56(c) ....................3, 4

**Other Authorities**

66 Fed. Reg. 5512-01 (Jan. 19, 2001) ....................17

U.S. Dep't of Educ., Office of Civil Rights, *Q&A on Campus Sexual Misconduct*,
1 (Sept. 2017) ....................17

Defendant American University ("AU") respectfully submits this Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment and supporting Memorandum ("MPSJ").

**INTRODUCTION**

Plaintiff seeks to convert language in an outdated version of AU's Student Conduct Code ("Code") and Discrimination and Sexual Harassment Policy ("Policy")—which does no more than generally instruct students to bring complaints of sexual harassment within a year of the conduct at issue, a period subject to extension at the discretion of the University[1]—into a *contractual time-bar* that prohibits *the University* from investigating or initiating disciplinary proceedings to address a reported sexual assault if more than a year has passed. There are many reasons why the Code and Policy should not be construed to have that effect.

First, neither the Code nor the Policy are contracts. Rather, they set forth *guidelines* for both students and University administrators that convey the University's expectations, both for how students should comport themselves and how University administrators should handle alleged violations of those behavioral norms. While those guidelines provide the general framework for AU and its students and staff for addressing potential violations, both the Code and the Policy make clear that the University retains the right to take any action it deems necessary to fulfill its mission—which demonstrates that the University did not intend to be contractually bound by any particular provision thereof.

But even if the one-year language in the 2015-16 Code and Policy were considered "contractual" in terms of when a student must bring a complaint to guarantee timely review, on

[1] *See* Ex. 1 to MPSJ at 12 ("2015-16 Code") (allowing extensions where a "reasonable person might be justified" in filing later because of "relevant circumstances"); Ex. 5 to MPSJ at 6 ("2015-16 Policy") (allowing for later complaints where there are "extenuating circumstances").

its face that text does not bar *the University* from taking action to address an alleged sexual assault whenever it learns of it. Tellingly, the language in question is not listed in the enumerated "rights" afforded students when subject to disciplinary proceedings or otherwise. Nor should it be interpreted to vest in students a "right of repose" (MPSJ at 3) that bars the University from investigating allegations of sexual assault more than one year after the alleged occurrence. Such a construction would run counter to other provisions of the Code and Policy requiring AU to address all reports of sexual harassment to keep its campus safe and harassment-free, as well as AU's obligation under federal law to take action to address allegations of sexual assault whenever the University learns of them. Contractual provisions that conflict with federal law—or even just public policy—are unenforceable, and the courts will read contract language to avoid such an outcome.

Furthermore, even were the Code and Policy considered contracts and read to have the effect Doe desires, the referenced text would not be operative here. Roe did not report the sexual assault to the University's Title IX office until early 2019, at which point the University reasonably applied the procedures of the then-applicable Code and Policy, which contained no limit on the time in which a student could bring a complaint, or the University investigate and take action in response to a report of sexual assault. Nothing in either the 2015-16, or the 2018-19, version of the Code or Policy, addresses which version is to be applied where conduct occurs at one point in time but is reported later. The University's determination as to which version should be applied, and how the language in that version should be construed, is entitled to deference. Finally, even if the Court determined that the 2015-16 Code and Policy were applicable here and that those provisions could be construed to bar investigation of Roe's allegations, consideration of AU's practice of applying the procedures in effect at the time that it

receives reports of sexual misconduct would compel a different conclusion. Moreover, as reflected in the Affidavit of AU's Title IX Program Officer, Regina Curran, given the serious nature of the conduct alleged and the circumstances, AU would have extended the period for reporting had it believed that a one-year limitation provision applied to Roe's reporting of her allegations. Curran Aff. (Attach. A hereto) ¶ 9.

In short, there are myriad reasons why the language from the 2015-16 Code and Policy on which Doe predicates his motion for partial summary judgment does not have the effect he desires: to bar the University from investigating and addressing his alleged sexual assault of Roe. The Court should deny Plaintiff's legally flawed, and premature, motion for partial summary judgment.

## FACTUAL BACKGROUND

The facts giving rise to this case are set forth at length in AU's Motion to Dismiss (ECF No. 13) and Reply in Support (filed simultaneously with this Opposition), which should be considered alongside Plaintiff's Motion for Partial Summary Judgment and this Opposition, given that there is significant overlap between the legal issues and many of the same facts are relevant to both. AU also refers the Court to its Response to Plaintiff's Statement of Material Facts For Which There is No Dispute, as well as its own Statement of Material Facts For Which There is No Dispute, which identify provisions of the Code and Policy, as well as federal legal requirements, that require the Court to deny Plaintiff's motion, as discussed further below.

## STANDARD OF REVIEW

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that, first, 'there is no genuine issue as to any material fact' and, second, 'the moving party is entitled to a judgment as a matter of law.'" *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Fed. R. Civ.

P. 56(c)). At the summary judgment stage, the court must "view the evidence in the light most favorable to [the non-movant] and draw all reasonable inferences in [its] favor." *Holcomb*, 433 F.3d at 895; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("all justifiable inferences are to be drawn in [the non-movant's] favor"). The Court "may consider other materials in the record," in addition to those cited in the motion papers. *Staropoli v. Donahoe*, 786 F. Supp. 2d 384, 388 (D.D.C. 2011) (citing Fed. R. Civ. P. 56(c)(3)).

## ARGUMENT

### I. AU's Student Code and Sexual Harassment Policy Do Not Bar the University from Investigating and Addressing Allegations of Sexual Assault After One Year.

"Under D.C. law, '[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.'" *Richter v. Catholic Univ. of Am.*, 2019 WL 481643, at *2 (D.D.C. Feb. 7, 2019) (quoting *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014)). Doe cannot establish these core elements of a contract claim.

Doe alleges the University breached its "contract" with him by investigating and disciplining him more than a year after he allegedly sexually assaulted Roe, pointing to language in the 2015-16 Code and Policy that directs students to file complaints of sexual misconduct within a year of the underlying conduct. Doe brazenly asserts that, even if he sexually assaulted Roe (as the University's disciplinary process found), "AU was not permitted to discipline Mr. Doe under the terms of the agreement." MPSJ at 3. But even if the Code and Policy were enforceable contracts—which they are not—this extraordinary claim ignores those documents' text, structure, and framing, and eschews a holistic assessment of the documents for one that mischaracterizes a procedural instruction as a vested contractual right. When considered in the context of the full documents, as well as the University's obligations under Title IX of the

Education Amendments of 1972, the provisions on which Doe relies cannot be read as creating a binding "obligation or duty" for the University to decline to investigate and address an alleged sexual assault. Thus, even if those documents were considered contractual in nature, the University did not breach any obligation thereunder.

**A. The Code and Policy are Not Contracts to be Strictly Enforced.**

Doe asserts that the D.C. Circuit, relying on D.C. Court of Appeals jurisprudence, has characterized the university-student relationship as "contractual in nature." *See* MPSJ at 6. That is true, but it does not mean, however, that *university conduct codes and policies* are necessarily contracts, nor does it require the unyielding application of strict contractual principles in this non-commercial context even if such documents were considered "contractual" in nature.

Rather, many courts, including in the District of Columbia, have held that student conduct codes and other similar documents are *not* contracts. For example, in its recent decision in *Richter*, 2019 WL 481643, at *3, another court in this district concluded that Catholic University's Academic Rules were not contractual in nature. It explained that, while some courts have held that the university-student relationship is, broadly speaking, contractual, "[t]hat general proposition . . . does not absolve plaintiff of his burden . . . to prove that the parties entered into an enforceable contract." *Id.* (internal quotation marks and citation omitted). Looking at the Academic Rules, the court found no language indicating an intent to be bound, but rather that the rules "appear[ ] to be intended as a means for [CUA Law] to communicate its expectations regarding academic conduct to its students . . . ." *Id.* at *3 (citation omitted); *see also Shinabargar v. Bd. of Trs. of Univ. of D.C.*, 164 F. Supp. 3d 1, 29 (D.D.C. 2016) (holding that university honor code lacked evidence of the university's intent to be bound, rendering it not enforceable); *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 99 (D.D.C. 2012) (same with respect to Howard's "Graduate School Rules and Regulations"); *Manago v. D.C.*, 934 A.2d 925,

927 (D.C. 2007) (finding that student failed to demonstrate terms of the contract). Courts in other jurisdictions are in accord. *See, e.g.*, *Shaw v. Elon Univ.*, 400 F. Supp. 3d 360, 365 (M.D.N.C. 2019) (granting university's motion to dismiss and noting that courts "applying North Carolina law have found that university handbooks, bulletins, guidelines, codes of conduct, manuals, and the like are not independently enforceable contracts"); *Barker v. Our Lady of Mount Carmel School*, 2016 WL 4571388, at *16 (D.N.J. Sept. 1, 2016) (unpublished) ("[I]t is doubtful whether New Jersey law permits a contractual obligations [sic] based on provisions of student handbooks.").[2] As in these cases, Plaintiff has identified nothing in the Code or Policy that indicates that AU intended to be contractually bound by those documents. Rather, as in *Richter*, the Code and Policy are the University's means of communicating its expectations to students, faculty, and staff, and the means by which it endeavors to fulfill its mission to combat harassment and discrimination. *See, e.g.*, 2015-16 Policy at 4 (identifying "roles and responsibilities" in order "to assist the university in ensuring an educational environment and work place free from sexual harassment, discrimination, and discriminatory harassment").

Doe argues that the Code and Policy are contracts because they "do not just set one-way expectations and requirements of students." *See* MPSJ at 9-10. But while the Code also identifies procedures for the University to follow, it acknowledges that they must be applied

[2] To argue that the Code and Policy are contracts, Doe relies primarily on *Doe v. George Washington University*, 305 F. Supp. 3d 126, 131 (D.D.C. 2018) ("*GWU*")—a case that, in addition to not binding this court, is factually distinct. The court there found simply that the plaintiff had a likelihood of success on one aspect of his contract claim. Moreover, the provision of the Code that gave rise to that conclusion was very specific in what it required, and GW had obviously violated it: the provision explicitly gave a student the right to appeal a disciplinary decision based on new information, but GW had flatly refused to consider new information proffered by the plaintiff on appeal. *Id*. at 131-33. Here, in contrast, and as discussed further below, the text on which Plaintiff premises his bid for summary judgment does not, by its plain terms, compel AU to decline to investigate and address a sexual assault allegation, and cannot be so construed in light of other parts of the Code and its purpose.

flexibly, and notes that "deviations from prescribed procedures [will not] necessarily invalidate a decision[.]" 2015-16 Code at 11. The Code also reserves to the Board of Trustees the "right to review, and to take *any* action it deems necessary, in any conduct case." *Id.* at 2 (emphasis added). The Code further notes that the University has a *unilateral right* to amend the document at any time. *Id*. This language demonstrates that AU had no intent to be inflexibly bound by particular provisions, and the Code cannot be viewed as a contract. As one Virginia district court recently observed:

> The Student Handbook presented to Plaintiff upon his enrollment contained language permitting Defendants 'to make changes during the year' when necessary. Student Handbooks that permit the school to make unilateral changes at any given time are not binding contractual agreements. The ability of one party to make changes at will deprives the other party of the right to accept the changes as part of the bargain he struck, meaning any such agreement will necessarily lack mutuality between parties. In the absence of mutuality, there is no legal contract.

*George v. Averett Univ. of Danville, Va.*, 2019 WL 3310517, at *3 (W.D. Va. July 23, 2019).

Even where courts have found the student-university relationship to be "contractual" in nature, they have generally declined to apply strict contractual principles when interpreting and applying disciplinary codes and policies. "The student-university relationship is unique, and it should not be and cannot be stuffed into one doctrinal category." *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir. 1975), *cert. denied*, 423 U.S. 989 (1975) (cautioning against rigid application of contract theory as between students and universities); *see also Doe v. Johnson & Wales Univ.*, 2019 WL 6324905, at *3 (D.R.I. Nov. 26, 2019) ("[C]ontracts [between a university and student] have 'unique qualities' that warrant deference to the flexibility of the institution to 'properly exercise its educational responsibility.' That same deference excuses 'strict adherence to contract law.'") (internal citations omitted); *Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *12 (M.D. Tenn. Sept. 30, 2019) (dismissing breach of contract claim and stating that the provisions of a student handbook "'have unique

qualities and must be construed to allow the [university']s governing body to meet its educational and doctrinal responsibilities'") (quoting *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011) (unpublished)); *Karimi v. Golden Gate Sch. of Law*, 361 F. Supp. 3d 956, 974 (N.D. Cal. 2019) ("California courts have characterized the relationship between students and universities . . . as essentially contractual, but have also cautioned that contract law should not [necessarily] be strictly applied.") (internal quotation marks and citation omitted) (appeal filed); *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 890 (M.D. Tenn. 2018) ("courts 'have rejected a rigid application of contract law in this area'") (quoting *Sifuna v. S. Coll. of Tenn., Inc.*, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018)); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 993 (D. Minn. 2017) ("[E]lements of the law of contracts have been applied to the student-university relationship, but rigid importation of contractual doctrine has been rejected. Minnesota courts [have been] generally reluctant to find contractual obligations between students and their schools based upon student handbooks.") (internal quotation marks and citations omitted); *Napolitano v. Trs. of Princeton Univ.*, 453 A.2d 263, 272 (N.J. Super. Ct. App. Div. 1982) (declining to impose "rigid application of the law of contracts to students' disciplinary proceedings"). Thus, even if the relationship between Doe and AU has contractual elements, the Code and Policy should not be viewed as "contracts" to be strictly adhered to, so as to wholly bar the University from investigating and addressing sexual assault allegations where the respondent can point to some procedural deviation from those documents.

**B. The Provisions at Issue Do Not Vest in Students a "Right of Repose" from the University's Consideration of Allegations of Sexual Assault.**

Even if the Code and Policy were considered contractual in nature, the provisions on which Doe relies do not, on their face, bar the University from investigating and addressing

reports of rape and sexual assault, and should not be so construed in light of the content of the remainder of those documents and the intent behind them.[3]

In *Pride v. Howard University*, 384 A.2d 31, 36 (D.C. 1978), a medical student brought a breach of contract claim under a student Code of Conduct,[4] but the district court explained that it was "required . . . in construing the . . . Code, to view it 'as a whole'" keeping in mind that "it is not a detailed document purporting to anticipate and prescribe for every eventuality." If this Court determines that the relevant parts of AU's Code and Policy may be "contractual" in nature, it should take a similar holistic approach to construing them. Even assuming the 2015-16 version of the Code were applicable, the text in question does not prescribe how AU was to proceed if it learned of an alleged sexual assault more than a year after the fact, and must be viewed holistically with other provisions of the Code *requiring* the school to investigate and address reports of sexual harassment whenever it learns of them.[5]

To begin, the text at issue does not, on its face, bar *the University* from investigating and initiating disciplinary proceedings to address a report of sexual assault received more than a year after the alleged incident—or indeed from taking any action. Rather, it simply directs *students*

[3] The fact that Plaintiff failed to raise this argument in his Title IX proceeding or appeal demonstrates that it is far from apparent that the language in question could have any such binding contractual effect. To the contrary, for the reasons discussed below, any reasonable reader of those documents would decline to draw such an extreme conclusion.

[4] The parties in *Pride* "assume[d], and [the Court] accept[ed] this assumption," that the provisions of the Code in question were contractual in nature. 384 A.2d at 34. No such assumption is shared—or appropriate—here.

[5] Reading the Code and Policy to bar investigations and disciplinary proceedings after a year would make particularly little sense in the context of sexual assault claims, where victims are often hesitant to come forward in light of the emotional, social, and psychological costs of pursuing a complaint. Doe callously states "[i]t is difficult to imagine what extenuating circumstances would justify filing a complaint more than two-and-a-half years after the alleged incident." *See* MPSJ at 12 n.11. Sexual assault victims' experiences are replete with well-founded justifications for such hesitance.

that they are to file complaints within a year (*see* 2015-16 Code at 12; 2015-16 Policy at 6), no doubt as an effort "to assist the University in ensuring an educational environment and work place free from sexual harassment, discrimination, and discriminatory harassment." 2015-16 Policy at 4. And the Code explicitly provides that the University may accept later complaints where "a reasonable person might be justified in filing after the deadline because of relevant circumstances." 2015-16 Code at 12. Further, as noted in AU's Response to Doe's Statement of Material Facts For Which There is No Dispute (*see* ¶ 2), Roe did not in fact "bring a complaint," but rather simply reported the sexual assault to the University through its investigatory interview process in early 2019. Thus, the one-year complaint language in the 2015-16 Code and Policy does not apply to these circumstances at all.[6] Doe's argument for invalidating the University's investigation and disciplinary proceedings against him fails on its face, based on the plain text of the provisions he cites.

But even if the text could be viewed as implying that no investigation or disciplinary proceedings could move forward more than a year after an alleged sexual assault, those provisions must be read in light of other parts of the Code and Policy, the structure of those documents, as well as their underlying purposes—all of which indicate the contrary. *See Basch v. George Washington Univ.*, 370 A.2d 1364, 1367 (D.C. 1977) (stating that in construing the terms of any "contract" between the university and student, "the document itself must be viewed as a whole"). In *Basch*, a group of students sued the university for breach of contract over tuition increases that exceeded estimates published in the university's bulletin, contending that they had based their decision to attend the university on those estimates. The Court of Appeals

---

[6] As discussed further below, the University reasonably applied the 2018-19 Code and Policy, which contain no language instructing students to file complaints within a year, to Roe's 2019 report of sexual assault.

recognized, however, that "the mere fact that the bulletin contained language regarding projected tuition increases is not enough to support a finding that the language amounted to a contractual obligation." *Id.* at 1366. After considering the circumstances surrounding the formation of the bulletin, the parties' motives and purposes, the text, and the context (*i.e.*, surrounding provisions), the court concluded that a reasonable person would not have assumed that the tuition provisions of the bulletin constituted binding contractual obligations. *See id.* at 1368; *see also id* at 1369 (Harris, J., concurring) (listing rules of contract interpretation used, and adding that contracts must also be read in accordance with the "norms of conduct," particularly when addressing the "non-commercial" setting of a university) (quoting *Greene v. Howard University*, 412 F.2d 1128, 1135 (D.C. Cir. 1969)). A similar analysis of AU's Code and Policy yields similar conclusions.

First, the circumstances surrounding the formation of the Code and Policy do not indicate any intent by AU to be strictly bound by a one-year limitations provision for the filing of Title IX complaints. The 2015-16 Code and Policy make clear that they delineate the values and expectations to which AU community members aim to adhere. *See* 2015-16 Code at Statement of Common Purpose ("This Student Conduct Code is designed to benefit the American University community and to assist in forming the highest standards of ethics and morals among its members. It fosters the university's commitment to excellence and equity and affirms the shared values that make community life possible."), Preamble ("The central commitment of American University is to the development of thoughtful, responsible human beings in the context of a challenging yet supportive academic community."), 7 ("American University expects its students, wherever they are, to adhere to high standards of honor and good citizenship and to conduct themselves in a responsible manner that brings credit to themselves and the

university."), & 2 ("Non-academic disciplinary authority has been delegated by the president to the vice president of Campus life to implement student conduct policies and take all necessary and appropriate action to protect the safety and well-being of the campus community."); 2015-16 Policy at 4 ("AU Community members are expected to cooperate in the resolution or investigation of discrimination complaints."). Nothing in this language conveys any intent to be strictly bound by particular procedural mechanisms described in the Code or Policy, and the salutary goals that the Code and Policy are intended to promote refute any interpretation of those same documents as barring the University from investigating reports of sexual assault on "timeliness" of the complaint grounds.

Second, the parties' motives and purposes undermine any claim that either intended for the provisions at issue to have the binding effect that Doe would give them. Doe sought higher education, and the University promised a safe, honest, and inclusive community in which to study, facilitated by its Code and Policy. As Doe himself notes, the 2015-16 Policy stated that the "following roles and responsibilities and complaint resolution process is established to assist the University in ensuring an educational environment and work place free from sexual harassment, discrimination, and discriminatory harassment." *See* 2015-16 Policy at 4. Doe's proffered construction, wherein after one year the protections afforded by the Policy are null and void, would not only eviscerate that document's core purpose, but is inconsistent with the conduct and motivations of the parties in entering into a university/student relationship (contractual or not). Doe cannot be presumed to have matriculated at AU with the expectation that he could avoid any consequences for sexual assault so long as a year had passed since the act occurred—nor does he argue that he had any such expectation. And the University certainly did not intend, in placing the "one-year" complaint language in the Code and Policy, to entitle

students to bar AU from addressing any such allegations regardless of their seriousness. Rather, as explained in recent versions of the Policy, "[t]imely complaint filing gives the University the best chance *to resolve the [complaint]*." *See* Pl.'s Ex. 6, 2017 Policy at 7 (emphasis added). The one-year complaint language in earlier versions of the Policy and Code most reasonably should be read as intending to "assist" the University in resolving any complaints quickly and preventing any recurrence—not to bestow contractual rights that would allow a student accused of sexual assault to entirely avoid disciplinary action.

Third, as discussed above, the text of the Code and Policy counsels against strictly construing them as "contracts," much less granting a contractual "right of repose" (MPSJ at 3) to respondents. The disputed language states only that, for violations of AU's sexual harassment policy, the "*complainant* will have one year from the date of discovery to file a complaint as set forth in these policies." *See* 2015-16 Code at 12 (emphasis added). Nothing in the text bars *the University* from investigating a report of sexual assault *sua sponte*, nor is any contractual right expressly granted to respondents to avoid disciplinary action simply because the University did not receive a complaint or report within a year of the conduct at issue.

To the contrary, the Policy promises: "The University will respond promptly and effectively to reports of discrimination and will take appropriate action to prevent, to correct, and if necessary, to discipline individuals who violate this policy." 2015-16 Policy at 2. No time limitation is imposed on this general obligation to investigate and "take appropriate action" to address "reports" of discrimination (which includes sexual harassment and assault). The Policy also states that, when several processes or procedures for addressing an alleged violation may be applicable, the Title IX officer "will determine which resolution process and procedures will be used." *See id.* This further undercuts any claim that the language directing students to file

complaints within a year was intended to effectively trump the University's broader authority to investigate and address sexual harassment and assault as it deems necessary. Indeed, the very beginning of the Code states: "The Board of Trustees reserves the right to review, and *to take any action it deems necessary, in any conduct case*." 2015-16 Code at 2 (emphasis added). Such a reservation cannot be squared with any interpretation of the Code that would bar the University from investigating a report of sexual assault where the University believes it appropriate to do so. It would be unreasonable to read the "one-year" language as categorically barring the University from investigating and disciplining an alleged sexual assault in light of these other provisions indicating the contrary.

Doe cites *United States ex rel. K & R Ltd. Partnership v. Massachusetts Housing Finance Agency*, 456 F. Supp. 2d 46, 56 (D.D.C. 2006), for the proposition that construing the Code and Policy to obligate AU to investigate reports of sexual assault would render the one-year complaint provisions null and void, thereby violating the maxim that courts "construe[] contracts in a manner that gives effect to the words used by the parties, and assumes that the parties intend every part of a contract to mean something[.]" MPSJ at 14. As noted above, however, the intent behind those provisions is plain: to urge students to report misconduct promptly so as to assist the University in addressing it effectively—not to give an alleged perpetrator of sexual assault a "right of repose." Moreover, Doe's rigid application of the "one-year" language would render the portions of the Code and Policy confirming AU's standing obligation to investigate all reports of rape and sexual harassment *ineffective*, thereby violating the same contractual principle Doe cites. This contradiction further shows that the Code and Policy were neither intended to be construed as, nor written with the specificity of, commercial contracts. *See Pride*, 384 A.2d at 35 ("the readings of the market place are not invariably apt in this non-commercial

context"). Thus, even were the parts of the 2015-16 Code and Policy on which Plaintiff relies "contractual" in nature, when considered in the context of all the surrounding provisions—as well as the underlying intent to provide a safe and respectful educational environment—they plainly cannot be read to bar the University from investigating an alleged sexual assault when it learns of allegations of such, even if the event occurred more than a year prior.

The structure of the Code also clearly indicates that the one-year language on which Plaintiff relies does not confer any substantive "right of repose." Section II of the 2015-16 Code (as well as the later versions) specifically enumerates the "Responsibilities and Rights" thereunder—but does not include *any* limitation on the time to initiate an investigation or disciplinary proceeding. *See* 2015-16 Code at 2-3. The one-year language on which Plaintiff relies is, instead, set out in Section XIII, governing procedures for case resolution.[7] The fact that the language at issue is not included in the list of "Responsibilities and Rights" further supports the University's reasonable view that the one-year complaint provision of the 2015-16 Code did not give AU students any contractual "right" to avoid disciplinary action. *See Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 120-21 (D.D.C. 2014) (noting that deference to the University's interpretation of its regulation was appropriate).

Doe cites *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 428 (1965), for the unremarkable proposition that a limitations provision in a contract serves an important purpose. *See* MPSJ at 16. This is true, but irrelevant, as any comparison of the one-year complaint language in the Code and Policy to a time limitations period in a commercial contract is

[7] Section II on "Responsibilities and Rights" states that "[p]rovisions afforded to parties involved in cases subject to Title IX and the Campus Sexual Violence Elimination Act are italicized in applicable sections and stated in summary below, in part B." 2015-16 Code at 2. Notably, the one-year complaint provision is *not* summarized in Section II.B, thus further confirming that it is not a right afforded to respondents in Title IX related disciplinary proceedings.

inapposite for a variety of reasons. First, as previously discussed, the Code and Policy are not binding contracts and do not confer any substantive right similar to that extended via a limitations provision in a commercial contract. Second, when a limitations provision in a commercial contract is before a court, the only parties that matter are the parties to the contract; the court is disinterested and has no independent obligations. In contrast, here, the University, as the party tasked with enforcing any such "limitations" provision, also has independent interests under both the Code and Policy, as well as obligations under Title IX and its implementing regulations (discussed further below), to provide an educational environment free from sexual discrimination and harassment. Again, the analogy between the Code/Policy and a commercial contract is simply inapt.[8]

In short, the 2015-16 Code and Policy cannot be construed to *contractually bar* the University from investigating and addressing a reported sexual assault, even if that assault occurred more than a year prior. Such a construction would conflict with numerous specific provisions of those documents, their structure, and their very purpose.

## II. The 2015-16 Code Should Not Be Construed to Create a Conflict with AU's Obligation Under Title IX to Investigate and Address All Alleged Sexual Assaults.

There is another important reason that the Code and Policy cannot be read to bar AU from investigating and initiating disciplinary proceedings to address an alleged sexual assault simply because more than a year has passed since it occurred: AU has an independent federal obligation under Title IX to investigate and address alleged sexual violence whenever it learns of

[8] It is noteworthy that Plaintiff relies primarily on cases addressing insurance and commercial arbitration agreements to support his proposed reading of the one-year complaint language in the Code and Policy. *See* MPSJ at 13, 18-19. As discussed above, even where courts have viewed the student/university relationship through a contractual lens, they have recognized the inherent difference between that context and a typical commercial contract, and have deferred to the university's interpretation and application of its own rules and procedures. *Supra* at 7-8.

the allegations. The Department of Education made this explicit in a 2001 Guidance document, which explains that Title IX and its implementing regulations require institutions that receive federal funds (as AU does) to take "prompt and effective action calculated to end [ ] [sexual] harassment [of which it becomes aware], prevent its recurrence, and, as appropriate, remedy its effects." U.S. Dep't of Educ., Office of Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, iii (Jan. 2001) (notice published at 66 Fed. Reg. 5512-01 (Jan. 19, 2001)), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.[9] There is no time limit on that legal obligation to take steps to end, prevent, and remedy sexual harassment.

Even after revising its interpretation of the Title IX implementing regulations in recent years, the Department has continued to make clear that a school has this obligation. For example, in a September 2017 Q&A, the Department emphasized: "Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school *must* take steps to understand what occurred and to respond appropriately." U.S. Dep't of Educ., Office of Civil Rights, *Q&A on Campus Sexual Misconduct*, 1 (Sept. 2017), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf (emphasis added). Thus, for almost twenty years, the Department has made clear that federal law requires universities to take action to address sexual assault *whenever they learn of it*—which obviously includes the obligation to investigate such allegations when they are reported by a victim.

[9] As indicated in the 2001 Guidance, that obligation flows from 34 CFR §§ 106.3(a) & 106.31(b), which require universities to take remedial measures to address instances of gender-based discrimination. Those regulatory requirements would be meaningless if universities could simply decline to investigate allegations of sexual harassment or assault in the first place based on their own procedures.

The provisions Doe cites of the Code and Policy should not be construed so as to create a conflict between those documents and AU's obligations under Title IX or state law. Indeed, the 2015-16 Policy states that it is "intended to be consistent with the provisions of applicable local and federal laws and regulations." 2015-16 Policy at 1. But even if it did not, the courts will not enforce a provision of a contract that would require a party to violate its obligations under federal law—or even one that is simply contrary to public policy. *See Perez v. C.R. Calderon Constr., Inc.*, 221 F. Supp. 3d 115, 154 (D.D.C. 2016) (appeal filed) ("Illegal contracts will not be enforced, 'not out of any regard for the defendant who sets it up, but only on account of the public interest.'" (quoting *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1982)); *Barros v. Gov't Emps. Ins. Co.*, 79 F. Supp. 3d 32, 39 (D.D.C. 2015) ("It is well established that, under District of Columbia law, the express terms of a contract control and will be enforced as written unless there is an ambiguity, [or] *the terms violate a statute or public policy* . . . .") (emphasis added); *see also Kaiser Steel Corp.*, 455 U.S. at 77 ("our cases leave no doubt that illegal promises will not be enforced"). Thus, if Doe's view of the one-year language in the 2015-16 Code and Policy were correct, those provisions would be unenforceable because they conflict with AU's obligations under Title IX to address a report of campus sexual assault whenever it learns of one—and also with public policy, which strongly counsels against barring universities from investigating and taking disciplinary action to address allegations of sexual assault.

## III. AU Reasonably Applied the 2018-2019 Code and Policy to Roe's 2019 Allegations.

Even if AU's Code and Policy are deemed contractual and this Court were inclined to read the one-year language from the *2015-16 version* of those documents to bar the University from investigating and disciplining sexual assault after a year has passed, the operative versions of those documents—the *2018-19* Code and Policy—do not contain any such language.[10]

Roe did not report her sexual assault allegations to AU until January 9, 2019, at which point the 2018-19 version of AU's Code and Policy governed the procedures applicable to disciplinary investigations. The 2018-19 Code and Policy does not provide for the application of an earlier version of the Code where the reported events occurred during the pendency of a different version of the Code and Policy, nor does the 2015-16 version of those documents contain any provision dictating that it must apply to conduct reported after they have been superseded. Doe has no contractual right to force AU to apply a superseded version of its Code. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 597 (D. Mass. 2016) ("In general, a student does not have a contractual right to have disciplinary proceedings conducted under the specific procedures in effect at the time of the student's matriculation."); *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976) (holding that the concept of "a binding, absolute unchangeable contract" is inappropriate in the academic setting in view "of the wide latitude and discretion afforded by the courts to educational institutions").

The University's decision to apply the 2018-19 Code and Policy to a report of misconduct made in 2019 is reasonable and entitled to deference. *See Karimi*, 361 F. Supp. 3d at 974 ("Courts are deferential to university disciplinary processes, recogniz[ing] that [u]niversities are entitled to some leeway in modifying their programs from time to time to exercise their

[10] *See* MPSJ at Exs. 4 (2018-19 Code) & 6 (2018-19 Policy).

educational responsibility properly, and have been reluctant to apply contract law to general promises or expectations.") (internal quotation marks and citations omitted); *Pollalis v. President & Fellows of Harvard Coll.*, 124 N.E.3d 159 (Table), 2019 WL 1261472, at *2 (Mass. App. Ct. 2019) (unpublished) ("courts have granted a measure of deference toward a college's academic affairs and are cautious to interfer[e] with academic and disciplinary decisions made by private colleges and universities") (internal quotation marks and citation omitted); *see also Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 405 (W.D.N.Y. 2017) ("[W]hen a disciplinary dispute arises between the student and the institution, judicial review of the institution's actions is limited to whether the institution acted arbitrarily . . . .") (internal quotation marks and citation omitted).[11] Thus, even if the Code and Policy were viewed as contracts to be strictly applied, this Court should decline to conclude that AU breached any obligation it has under those documents since the 2018-19 versions contain no language that might be read to bar the University from investigating and addressing an allegation of sexual assault brought to its attention in January 2019, even if the alleged misconduct occurred several years prior.

## IV. If the Court Determines that the 2015-2016 Code and Policy Could be Read on their Face to Bar AU from Addressing Roe's Allegations of Sexual Assault, Consideration of AU's Custom and Practice Compels a Different Conclusion.

If the Court determines that the "one-year" provision of the 2015-16 Code and Policy would bar AU in 2019 from investigating Roe's sexual assault allegations, summary judgment

[11] Doe cites *George Washington University v. Scott*, 711 A.2d 1257 (D.C. 1998), for the proposition that "an amendment to an agreement or a new agreement made after the accrual of a right or claim is not applied retroactively." MPSJ at 17. Doe's cite to *Scott* is inapposite. That case addressed a "binding arbitration clause contained in a health plan contract," 711 A.2d at 1258, which cannot be analogized to a provision in a student conduct code—particularly where that provision was not identified as one of the "rights" afforded to students and does not, on its face, require the University to take, or not take, any particular action. *See* Section I.A & B, *supra*.

on that issue is still inappropriate. In such case, the University's custom and practice in interpreting its Code and Policy would be relevant—and salient—to determining whether it properly considered the report of conduct which allegedly occurred in April 2016 pursuant to the procedures set out in the 2018-19 Code and Policy. *See Pride*, 384 A.2d at 35 (finding, in the context of a contract claim brought by a medical student under the Code of Conduct, that the "usual disciplinary procedure and practice . . . in effect at the time . . . effectively constituted a part of their agreement").[12]

For example, as explained in the affidavit of Regina Curran, the Title IX Program Officer at AU (Attach. A), even before the Code and Policy were modified to eliminate the one-year language, it was customary for AU to initiate disciplinary proceedings when it found out about alleged violations, even if more than a year had passed. As Ms. Curran further explains, she is unaware of any instance where AU declined to investigate an allegation of sexual harassment based on the time that had passed since the conduct in question, and conversely is aware of instances—prior to 2018, when the Code and Policy were revised—where the University investigated alleged violations that had occurred more than a year prior. And Ms. Curran further explains that AU's practice is to apply the procedures in the Code and Policy in effect at the time the complaint or report is received when it considers allegations of sexual assault. To the extent that the Code were considered contractual in nature, that past practice strongly indicates that, as a whole, it cannot be considered to bar the University from proceeding with an investigation or proceeding to address sexual assault, particularly where the procedures in effect when the allegations were reported contained no temporal language.

---

[12] As previously noted, in *Pride* both parties assumed that the student conduct code was contractual in nature, and the court accepted that assumption without deciding the issue. *See* n.4, *supra*.

Doe argues that the parol evidence rule excludes any extrinsic evidence regarding the meaning of the Code or Policy. MPSJ at 5. But as the Court explained in *Pride*:

> Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is.

384 A.2d at 35 (citing *Greene*, 412 F.2d at 1135, and characterizing it as concluding, "in the face of an express term [of the employment contract] to the contrary," that "the University was contractually obligated to follow its usual practices"). Here, Doe argues that provisions of the Code and Policy that, on their face, say nothing about barring the University from taking any action, nonetheless have that effect. If the Court were at all inclined to interpret the relevant 2015-16 Code and Policy provisions in that way, then it should consider extrinsic evidence regarding the University's "usual [ ] procedure and practice" when handling reports of sexual harassment, including those brought more than a year after the fact. *Pride*, 384 A.2d at 35; *see also Howard Univ. v. Best*, 547 A.2d 144, 150 (D.C. 1988) (university custom and practice was extrinsic evidence necessary to interpret faculty handbook); *McConnell v. Howard Univ.*, 818 F.2d 58, 64 (D.C. Cir. 1987) (declining to grant summary judgment as to whether professor's failure to teach an assigned class was "neglect of professional responsibilities" within the meaning of employment contract,[13] which "must be construed in keeping with general usage and custom at the [u]niversity and within the academic community").

Finally, as reflected in Ms. Curran's affidait, the events leading to AU's investigation of Roe's sexual assault allegations were such that, if AU had believed a formal "extension" of time

[13] Notably, most cases in this district addressing whether provisions in university documents give rise to contractual obligations address *faculty* handbooks and employment agreements, which are inherently more contractual in nature than student conduct codes, given that they arise out of an employee/employer relationship—*i.e.*, a classic commercial contract. This court should accordingly be even more hesitant to conclude, at the summary judgment stage, that a student conduct code gives rise to binding contractual rights.

was necessary for it to consider those allegations in 2019, it would have taken such steps under the same provision of the Code on which Doe now relies to bar such consideration, given the serious nature of the conduct alleged and the circumstances. *See* 2015-16 Code at 12 (allowing complainant to request, and University to grant, an extension of the time to file a complaint where "a reasonable person might be justified in filing after the deadline"); Curran Affidavit, ¶ 9. While AU believes that Doe's contract claim fails as a matter of law for the reasons set forth above, if the Court does not agree, then AU should be given the opportunity to develop and present evidence relevant to that question as well. In any event, a grant of summary judgment on this issue is plainly not warranted.

**CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiff's motion for partial summary judgment on Count III of his Complaint.

Dated: January 16, 2020

Respectfully submitted

*/s/ Laurel Pyke Malson*
Laurel Pyke Malson (#317776)
Aryeh Portnoy (#464507)
Amanda Shafer Berman (#497860)
Nathiya Nagendra (#1031055)

CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Tel: (202) 624-2576
LMalson@crowell.com
APortnoy@crowell.com
ABerman@crowell.com
NNagendra@crowell.com

*Counsel for Defendant*