**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN UNIVERSITY,<br><br>Defendant. | 19 Civ. 03097 (APM)<br><br>HEARING REQUESTED |

# REPLY BRIEF IN SUPPORT OF JOHN DOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

January 31, 2020


KAISERDILLON PLLC
Matthew G. Kaiser (D.C. Bar No. 486272)
Scott Bernstein (D.C. Bar No. 1013922)
William E. Zapf (D.C. Bar No. 987213)
1099 14th Street NW, 8th Floor West
Washington, DC 20005
(202) 640-2850
mkaiser@kaiserdillon.com
sbernstein@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

## TABLE OF CONTENTS

TABLE OF CONTENTS ....... i

TABLE OF AUTHORITIES ....... ii

INTRODUCTION ....... 1

ARGUMENT ....... 2

I. The 2015-16 Code and Policy Are Part of an Enforceable Contract Requiring Students to Bring a Complaint Within One Year. ....... 2

A. The Code and Policy Are Part and Parcel of the Contract Between and Among American University and its Students. ....... 2

1. The Provisions of the Code and Policy Sufficiently Show an Intent by American University to Be Bound by Them Contractually. ....... 3

2. American University Has Provided No Basis for Flexible Enforcement of the Code and Policy. ....... 5

B. The One-Year Time-Limit Provision Is Enforceable By Mr. Doe ....... 9

1. The One-Year Deadline Inures to the Benefit of Mr. Doe. ....... 9

2. Nothing in the Rest of the Code or Policy Negates the Time Limit. ....... 11

II. Title IX Presents No Conflict that Would Render the Time-Limit Provision Illegal and Unenforceable. ....... 17

III. Revisions in the 2018-19 Code that Affect Mr. Doe's Substantive Vested Rights Cannot Be Applied Retroactively. ....... 21

IV. Evidence of Custom and Practice Contrary to an Unambiguous Contract Provision May Not Be Considered. ....... 24

CONCLUSION ....... 25

## TABLE OF AUTHORITIES

Cases

*2301 M St. Coop. Assoc. v. Chromium LLC*, 209 A.3d 82, 87 (D.C. 2019)................................13

*Abdelrhman v. Ackerman*, 76 A.3d 883, 891 (D.C. 2013) ..........................................................12

*Andrew v. Schlumberger Tech. Co.*, 808 F. Supp. 2d 1288 (D.N.M. 2011)................................22

*Barker v. Our Lady of Mt. Carmel Sch.*, No. 12-4308, 2016 WL 4571388 (D.N.J. Sept. 1, 2016) ...............................................................................................................................................4, 5

*Barros v. Gov't Empls. Ins. Co.*, 79 F. Supp. 3d 32 (D.D.C. 2015) .............................................20

*Basch v. George Washington Univ.*, 370 A.2d 1364 (D.C. 1977)...........................................5, 11

*Bd. of Regents v. Tomanio*, 446 U.S. 478 (1980) .........................................................................22

*Burnett v. New York Central R.R. Co.*, 380 U.S. 424 (1965) .......................................................10

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016) ..............................................21, 22

*Doe v. George Wash. Univ.*, 321 F. Supp. 3d 118 (D.D.C. 2018) .............................................5, 8

*Doe v. Johnson & Wales Univ.*, 18-CV-106, 2019 WL 6324905 (D.R.I. Nov. 26, 2019).............6

*Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984 (D. Minn. 2017) ...............................................6

*Doe v. Vanderbilt Univ.*, 3:18-cv-569, 2019 WL 4748310 (M.D. Tenn. Sept. 30, 2019)..............6

*Edwards v. Lateef*, 558 A.2d 1144 (D.C. 1989)..............................................................................22

*George v. Averett Univ. of Danville*, 2019 WL 3310517 (W.D. Va. July 23, 2019) ......................8

*Howard Univ. v. Best*, 547 A.2d 144 (D.C. 1988) .........................................................................24

*Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982).........................................................................20

*Karimi v. Golden Gate Sch. of Law*, 361 F. Supp. 3d 956 (N.D. Cal. 2019) ................................6

*Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976) .............................................................22

*Manago v. Dist. Of Columbia*, 934 A.2d 925 (D.C. 2007) ..........................................................4

*McConnell v. Howard Univ.*, 818 F.2d 58 (D.C. Cir. 1987) .......................................................24

*Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93 (D.D.C. 2012) ...........................................4

*Napolitano v. Trustees of Princeton Univ.*, 453 A.2d 263 (N.J. Super. 1982)............................6, 7

*Nat'l Mining Assoc. v. Dep't of Labor*, 292 F.3d 849 (D.C. Cir. 2002).......................................22

*Perez v. C.R. Calderon Constr., Inc*., 221 F. Supp. 3d 115 (D.D.C. 2016) ............................20, 21

*Pride v. Howard Univ.*, 384 A.2d 31 (D.C. 1978) ............................................................5, 11, 24

*Richter v. Catholic Univ. of Am.*, 18-00583 (RJL), 2019 WL 481643 (D.D.C. Feb. 7, 2019)........4

*See Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720 (E.D. Tex. 2001) ...23

*Shaw v. Elon Univ.*, 400 F. Supp. 3d 360 (M.D.N.C. 2019) ......................................................4, 5

*Shinabargar v. Board of Trustees of University of District of Columbia*, 164 F. Supp. 3d 1 (D.D.C. 2016) ...........................................................................................................................4

*Slaughter v. Brigham Young Univ.*, 514 F.2d 622 (10th Cir. 1975)................................................5

*United States v. Kubrick*, 444 U.S. 111 (1979) ..................................................................................22

*Washington Auto. Co. v. 1828 L St. Assocs.*, 906 A.2d 869 (D.C. 2006).....................................12

## INTRODUCTION

In its opposition to Mr. Doe's motion for partial summary judgment, American University ("AU") repeats most of the same arguments, and much of the same case law, that it set forth in its motion to dismiss addressing these issues. *See* ECF No. 13 ("MTD") at 21-24, 26-29. Mr. Doe has addressed those arguments in his motion for partial summary judgment. *See* ECF No. 17 ("MPSJ") at 1. Mr. Doe's responses to the motion to dismiss continue to apply. He further responds below.

Importantly, AU does not dispute any material fact, nor could it. The Code and Policy say what they say. The relevant events happened when they happened. Those are the only material facts needed to decide this motion.

Instead, AU makes legal arguments essentially asking the Court to ignore the plain, unambiguous meaning of the time-limit provision at issue and permit it to discipline Mr. Doe anyway for a litany of reasons: either because the Code and Policy are, in AU's view, only "flexible" guidelines; the provision at issue—even if interpreted as Mr. Doe asks—does not apply to the school itself and so does not protect Mr. Doe; the Court should simply defer to AU; Title IX renders the contract illegal and precludes its enforcement; AU's interpretation of the Code and Policy are "reasonable"; or because extrinsic evidence purportedly shows AU's custom and practice of investigating late-filed allegations. None of those arguments can overcome the plain meaning of the text.

Each of these arguments is essentially an effort to erase, revise, or render meaningless two sets of clear, unambiguous provisions in the Code and Policy, respectively. All appear to be driven by one theme: AU asserts that a contractual provision like the one at issue cannot possibly be interpreted to prevent it from disciplining students for allegations of sexual misconduct. But in its blind goal, AU fails to recognize that the protections for accused students in the Code and

Policy are equally important—so that an accused student is protected from runaway allegations without reliable evidence. The time-limit provision at issue here is one of those protections and should be enforced as it is written.

## ARGUMENT

### I. The 2015-16 Code and Policy Are Part of an Enforceable Contract Requiring Students to Bring a Complaint Within One Year.

AU begins with a two-part argument for why it should not be required to follow the time-limit provision—that, (1) at most, the Code and Policy are meant to be "flexible" guidelines, not binding in a contractual way; and, (2) if they are contractual in nature, the time-limit provision at issue applied only to Ms. Roe, not AU. AU's argument that it is not bound contractually by the Code and Policy fails based on the applicable law and the plain language of the Code and Policy themselves. Similarly, the notion that the time-limit provision does not inure to the benefit of the accused student runs contrary to the very purpose of limitations provisions.

#### A. The Code and Policy Are Part and Parcel of the Contract Between and Among American University and its Students.

Although AU argued in its motion to dismiss that the Code and Policy are simply not binding at all, AU now advances a slightly different approach—that these documents delineating the standards and procedures governing student conduct and the school's investigation and discipline of conduct violations—including a special set of rules for allegations of sexual misconduct—are meant to be only flexible "guidelines" "convey[ing] the University's expectations," including "how students *should* comport themselves and how University administrators *should* handle alleged violations."[1] ECF No. 21 ("Opp.") at 1 (emphasis added).

---

[1] AU also refers to the Code and Policy as a "general framework." *Id.* at 1. There is nothing "general" about a twenty-one-page, single-spaced Student Conduct Code, filled with rights, standards, and procedures, *see* MPSJ Ex. 1 (2015-16 Code), or the ten-page single-spaced Discrimination and Sexual Harassment Policy, *see* MPSJ Ex. 5 (Policy at time of incident).

No version of the Code or Policy in effect at any time during the relevant time periods, however, ever refers to the Code or Policy as "guidelines." Moreover, AU's characterization of these documents as setting forth "expectations" of how students "should" behave and how the school "should" handle violations is disingenuous at best.

### *1. The Provisions of the Code and Policy Sufficiently Show an Intent by American University to Be Bound by Them Contractually.*

Remarkably, AU argues that Mr. Doe "has identified *nothing* in the Code or Policy that indicates that AU intended to be contractually bound by those documents." Opp. at 6 (emphasis added). To the contrary, Mr. Doe listed numerous instances in which the language of the Code and Policy indicate AU's intent to be bound. *See* MPSJ at 7-8. AU does not respond to or even recognize this list in its opposition brief. Moreover, Mr. Doe pointed out that AU itself had argued in its motion to dismiss that it had an "independent commitment" to investigate claims of sexual misconduct, even pointing out that its Policy includes mandatory language regarding investigating claims. *Id.* at 8-9. AU does not respond.

Without addressing the intrinsic evidence cited by Mr. Doe, AU asserts that the Code and the Policy are merely "means of communicating its expectations to students, faculty, and staff, and the means by which it endeavors to fulfill its mission to combat harassment and discrimination." Opp. at 6. As support for this proposition, AU proffers page 4 of the 2015-16 Policy, which it says "identif[ies] roles and responsibilities' in order 'to assist the university in ensuring an educational environment and work place free from sexual harassment, discrimination, and discriminatory harassment.'" *Id.* Nothing about this statement indicates that the Policy is not meant to be binding. A contract can "assist" a party or parties in accomplishing a goal such as is stated in the Policy—that fact does not make it any less of a contract and it does not make its provisions any less binding.

In an effort to support its argument, AU asserts that "many courts, including in the District of Columbia, have held that student conduct codes and other similar documents are *not* contracts." Opp. at 5 (emphasis in original). This assertion, perhaps inartfully drafted, could be read to incorrectly infer that the cited decisions hold that such documents, *as a general matter*, are not contractual. This is not true. To clarify, both *Richter* and *Mosby-Nickens*, for example, explicitly recognize that such documents can be part of the contractual relationship between a student and school. *See Richter v. Catholic Univ. of Am.*, 18-00583 (RJL), 2019 WL 481643, *3 (D.D.C. Feb. 7, 2019); *Mosby-Nickens v. Howard Univ.*, 864 F. Supp. 2d 93, 98 (D.D.C. 2012).

Moreover, each of the cited cases is distinguishable. None support the notion that the Code and Policy here are not binding contractually on AU. To start, Mr. Doe has already explained why neither *Richter* nor *Mosby-Nickens* is persuasive here. *See* MPSJ at 9-10. AU does not answer those distinguishing aspects.

In *Shinabargar v. Bd. of Trustees of Univ. of Dist. of Columbia*, 164 F. Supp. 3d 1 (D.D.C. 2016), another case cited by AU, the Court relied on the fact that the Honor Code "disclaims any obligation whatsoever upon UDC," noting that the Student Handbook "explicitly states that it 'does not constitute a contract between the student and the [law school] or [the university].'" *Id.* at 29. The AU Code and Policy make no similar disclaimer.

In *Manago v. Dist. Of Columbia*, 934 A.2d 925 (D.C. 2007), a case involving academic standards, the Court found that the breach-of-contract claim failed because the plaintiff "fail[ed] to allege sufficient facts to demonstrate either the terms of the contract or reason to think it was breached" and served the wrong defendant. *Id.* at 927. Neither issue applies here.

AU also cites two cases outside the District, *Shaw v. Elon Univ.*, 400 F. Supp. 3d 360 (M.D.N.C. 2019), and *Barker v. Our Lady of Mt. Carmel Sch.*, No. 12-4308, 2016 WL 4571388

(D.N.J. Sept. 1, 2016). As AU notes, however, *Shaw's* holding explicitly rested on North Carolina law, which the Court interpreted to require that a college handbook must be explicitly included or incorporated into a separate, independently enforceable contract. *See* 440 F. Supp. 3d at 366. This is clearly not the law in the District of Columbia. *See Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977) ("It is . . . accepted that the terms set down in a university's bulletin become part of that contract"); *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) (applying the rule established in *Basch* to the school's Code of Conduct). *See also Doe v. George Wash. Univ.*, 321 F. Supp. 3d 118, 123-24 (D.D.C. 2018).

For *Barker*, AU highlights one isolated statement in the decision in which the Court expressed doubt (but not a holding) that elementary school handbooks create contractual obligations under New Jersey law. *See* 2016 WL 4571388, at *16. AU fails to note that this statement came after the Court had already held that the plaintiffs had neither identified what contract or contractual provision was allegedly breached or what the breach was. *Id.* at *15.

### ***2. American University Has Provided No Basis for Flexible Enforcement of the Code and Policy.***

Perhaps sensing that the facts and case law on the contractual nature of student disciplinary codes is not on its side, AU makes a fallback argument that, even if the Code and Policy are part of an enforceable contract, that contract should be applied "flexibly." *See* Opp. at 6-7. As illustrated by its citation to numerous cases from other jurisdictions, *id.* at 7-8, AU's legal argument is dubious at best. Moreover, even if the general principle held in the District, there are no grounds for applying a "flexible" interpretation of the one-year time limit at issue.

Each of the cases AU relies upon is readily distinguishable:

- In *Slaughter v. Brigham Young Univ.*, 514 F.2d 622 (10th Cir. 1975), although the Court criticized the trial court's "rigid application of commercial contract doctrine,"

e.g., it had permitted a damages award, *id.* at 626, it ultimately rested on a finding that no contract nor breach had been established at trial, *id.* at 627.

- In *Doe v. Johnson & Wales Univ.*, 18-CV-106, 2019 WL 6324905 (D.R.I. Nov. 26, 2019), the Court not only found that the conduct code "forms part of the overall contract between the student and university," it concluded that the code's promise of a "fair" proceeding potentially encompassed specific student rights. *Id.* at *3-4.
- In *Doe v. Vanderbilt Univ.*, 3:18-cv-569, 2019 WL 4748310 (M.D. Tenn. Sept. 30, 2019), the Sixth Circuit had previously held that the student handbook "may be enforced as an implied contract," *id.* at *11, but Doe had not adequately pled a breach of that contract, *see id.* at *12-16.
- In *Karimi v. Golden Gate Sch. of Law*, 361 F. Supp. 3d 956 (N.D. Cal. 2019), the Court recognized that "contract law should not [necessarily] be strictly applied," *id.* at 974 (alteration in original), but context is important—Karimi had claimed an insignificant breach; the dean alone had imposed his interim suspension, rather than "the Assistant Director [with] approv[al] by the dean," as required by the contract,[2] *id.* at 975-76.
- In *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984 (D. Minn. 2017), although the Court recognized the reluctance of Minnesota courts to find contractual obligations between students and their schools, it ultimately found that plaintiff "d[id] not point to any specific provisions of the Policy that [the university] had breached." *Id.* at 993.

[2] Notably, *Karimi* observed that "California courts have characterized the relationship between students and universities—*including the terms of that relationship described in handbooks*—as essentially contractual . . . ." *Id.* at 974 (emphasis added).

- Finally, in *Napolitano v. Trustees of Princeton Univ.*, 453 A.2d 263 (N.J. Super. 1982), a plagiarism case under New Jersey law, the Court repeatedly emphasized the difference between enforcing academic standards versus other misconduct. *See id.* at 270-71 (plaintiff had not "been disciplined for misconduct," but rather "an academic offense"); *id.* at 273 ("the problem [is] one involving academic standards and not a . . . violation of rules of conduct"); *id.* at 275 ("The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by the student of valid rules of conduct." (quoting *Bd. of Curators v. Horowitz*, 435 U.S. 78 (1978)); *id.* ("Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings . . .").[3]

AU concedes that the Code "identifies procedures for the University to follow," Opp. at 6, but highlights the Code's reservation that "deviations from prescribed procedures [will not] necessarily invalidate a decision" and its catch-all statement that the Board of Trustees has the right to review a conduct case and take *any* action it deems necessary, Opp. at 7. AU seeks to take away with one hand what it gave with the other, essentially negating entirely the pages and pages of specific rights, standards, and procedures laid out in the Code and Policy, including the Code's detailed list of "rights" to which accused and complaining students are entitled, *see* MPSJ Ex. 1 at 2-4; the twenty-eight applicable definitions, including ones for "consent," "rape," and "sexual assault," *id.* at 4-7, the thirty-two types of prohibited conduct, *id.* at 7-8, and the eight

---

[3] Moreover, the trial court's actions upheld in *Napolitano* were far from deferential—it had actually reviewed the sufficiency of the evidence (not merely compliance with procedural rules) and had remanded the case to the school for a new hearing with specific, detailed instructions for the school to follow. *Id.* at 269-70.

single-spaced pages of procedural rules to be followed by AU, which are nearly all couched in mandatory terms, *id.* at 10-17. After all, if "deviations" can happen and the Board can always do whatever it wants, such detail is not needed. Such reservations cannot be read to erase an otherwise binding set of rules, especially a clear provision like the time limit at issue.

AU also points to its "unilateral right to amend." Opp. at 7. Mr. Doe does not disagree that AU has such a right. Indeed, AU has amended the Code and Policy several times during the relevant periods.[4] As AU previously recognized in its motion to dismiss, however, a prior decision in this District has held that the unilateral right to modify a code of conduct does not make the code non-contractual.[5] *See* MTD at 23 n.15 (citing *Doe v. George Wash. Univ.*, 321 F. Supp. 3d 118, 123 (D.D.C. 2018)). This makes sense—although the school may amend the rules, those rules still must apply based on principles of contract interpretation.

Instead of abiding by the clear holding in *Doe v. George Washington*,[6] AU cites a case from the Western District of Virginia applying Virginia state law. Opp. at 7 (citing *George v. Averett Univ. of Danville*, 2019 WL 3310517, at *3 (W.D. Va. July 23, 2019)). In *George*, the Court declared flatly that a Student Handbook cannot be contractual if the school has the right to make unilateral changes. That, again, is simply not the law in the District.

[4] In fact, AU amended the Code and Policy to remove the one-year deadline at issue in this case, which would not have been necessary if the deadline was not binding.

[5] Although AU attempted to argue that authority is split on this issue, Mr. Doe distinguished the cases cited by AU. *See* MPSJ at 9 n.9. AU does not further address these distinctions.

[6] In a footnote, AU attempts to distinguish the *Doe v. George Washington* decision, arguing that the code provision there "was very specific in what it required, and GW had obviously violated it." Opp. at 6-7. It is unclear how a provision stating that a student "must" bring a complaint within a certain time period is any less specific than the provision in *George Washington* providing the right to an appeal.

### B. The One-Year Time-Limit Provision Is Enforceable By Mr. Doe

AU next argues that, even if the Code and Policy apply to Ms. Roe, AU is free to ignore the deadline and investigate and discipline Mr. Doe for something that happened more than 32 months before it was reported. AU posits two related theories for this proposition: (1) that technically the provision only talks about students filing complaints, not the school; and (2) a holistic reading of the Code and Policy reveals that the one-year time limit is not actually a time limit. Neither theory is supported by the law, the language of the Code and Policy, or the purpose of such limitations periods. Indeed, such a reading would render the provision a nullity.

#### *1. The One-Year Deadline Inures to the Benefit of Mr. Doe.*

According to AU, the purpose of the time limit is merely "to assist the University in ensuring an educational environment and work place free from sexual harassment, discrimination, and discriminatory harassment." Opp. at 10 (quoting 2015-16 Policy at 4).[7] As already reviewed, this purported purpose (which has no textual relationship to the time-limit provision), even if true, does not support AU's argument that the time limit is not enforceable. Enforceable contractual provisions help parties accomplish many goals. A time limit like this ensures that allegations are addressed in a timely manner to avoid loss of evidence, unavailability of witnesses, fading memories, etc.

More importantly, however, AU ignores that the Code and Policy are written to govern complainants, respondents, *and* the school, and that rules binding one of these parties often inure to the benefit of another party. For example, the 2015-16 Code states that "[t]he complainant will be required to file a case that meets the standard of a preponderance of the evidence." MPSJ Ex.

---

[7] In a footnote, AU tries to point to the fact that Mr. Doe did not raise the deadline issue during the disciplinary proceedings as support for the provision not being binding. Opp. at 9 n.3. Such parol evidence, of course, is irrelevant to the interpretation of the language at issue.

1 at 14. Although this provision applies only to the complainant, it surely inures to the benefit of respondents and is enforceable against the University if not imposed.

Such provisions are found throughout the Code. For example, a complainant/respondent may not rely upon evidence of the sexual character of the other party. *Id.* at 14-15. Any written statements submitted must be signed. *See id.* at 15. And both parties must submit any appeal in writing within seven business days of the notice of the case outcome. *Id.* at 16. By placing requirements on one or both parties, these types of provisions—like the one-year deadline—are designed to provide benefits and protect rights of the other party by ensuring a fair process: the right not to be judged on the basis of sexual character, the promotion of truthfulness by requiring signatures, and to hold all parties to reasonable deadlines, including the complainant and respondent.

In making its argument that the time limit has no effect on its own actions, AU also completely ignores the purpose of limitations periods. AU's argument is akin to the government arguing that a civil or criminal statute of limitation can be ignored because it is meant only to assist the government in enforcing the laws effectively. As reviewed in Mr. Doe's motion, the Supreme Court has explained that "[s]tatutes of limitations are primarily designed to assure fairness to defendants." *Burnett v. New York Central R.R. Co.*, 380 U.S. 424, 428 (1965). *See* MPSJ at 16 (quoting same). The same reasoning applies here.[8]

[8] In a passing statement, AU states that the time limit does not even apply here because Ms. Roe allegedly did not "file a complaint," claiming instead that she "reported a sexual assault." This is a distinction without a difference. It is ironic that AU is arguing that a provision of the code is not binding by arguing that another requirement stated in the Code (that a complaint be "written") was also not followed. Moreover, the Policy in effect at the time of the incident requires complainants to "[n]otify the appropriate Responsible Official as quickly as possible . . . and within one (1) year of the allegation violation." MPSJ Ex. 5 at 6.

AU's one-sided view is most apparent when it argues that Mr. Doe's proposed construction means that "after one year the protections afforded by the Policy are null and void." Opp. at 12. Precisely the opposite is true. The one-year deadline is a *vital* protection for students accused of the potentially life-altering charge of sexual misconduct. To ignore it, as AU proposes, is to make that protection, and the clear text of the Code and Policy, null and void.

### ***2. Nothing in the Rest of the Code or Policy Negates the Time Limit.***

AU also argues that the time-limit provision must be read in light of other parts of the Code and Policy, as well as the structure and purpose of the documents. To the extent courts have cited these principles, AU takes this concept too far and fishes out select passages expressing salutary goals, none of which are sufficient to negate the clear, specific, and mandatory time limit.

As an initial matter, AU overstates the role and importance of other parts of the Code and Policy outside the deadline provision. In support of its argument that the Code and Policy must be read holistically, AU relies principally on *Pride* and *Basch*. A closer look at each case, however, illustrates the limited reach of this principle.

In *Pride*, the issue was essentially a textual "gap" in the school's code. The plaintiff had argued that the school breached its contract by proceeding without two student members of the disciplinary board. 384 A.2d at 33. The code was silent on this issue. *Id.* at 34. Faced with this gap, the Court cited the impracticality of requiring the attendance of every member and the university's practice of not replacing student board members until the following term. *Id.* at 34-35. The difference here is that no gap exists. Mr. Doe is not arguing that Ms. Roe was simply too late in the face of a Code with no specific deadline provision.

In *Basch*, medical school students asserted breach of contract based on one paragraph in a bulletin listing "estimated" tuition increases for coming years. Although the students focused on

individual words, like "estimated," the Court "view[ed] the pertinent language as a whole," 370 A.2d at 1367—i.e., the paragraph—and granted summary judgment to the university "[i]n light of the language in the bulletin," *id.* at 1366. *Basch* did not involve a wide survey of a lengthy Code. Here, Mr. Doe has asked the Court to consider the full provision regarding the one-year deadline (which itself is actually much longer and more detailed than the *Basch* provision).

AU cites five general statements picked from the Preamble and other parts of the Code, arguing that "[n]othing in [them] conveys any intent to be strictly bound by particular procedural mechanisms." Opp. at 11-12. Of course they do not. Nor do they disclaim an intent to be bound. In AU's words, they are just statements of "salutary goals." *Id.* at 12. Nor do such statements "refute any interpretation of the one-year deadline that would preclude AU from investigating reports of sexual assault" brought after the deadline. *Id.* They are completely unrelated to the deadline found in the Code and Policy.

In citing such general statements, AU fails to recognize that, in the District of Columbia, courts "apply a familiar principle of contract interpretation, that 'specific terms and exact terms are given greater weight than general language.'" *Washington Auto. Co. v. 1828 L St. Assocs.*, 906 A.2d 869, 880 (D.C. 2006) (quoting Restatement (Second) of Contracts § 203(c)). "Where both the specific and general provisions may be given reasonable effect, both are to be retained. However, where they stand irreconcilably in conflict, specific clauses prevail over general clauses." *Abdelrhman v. Ackerman*, 76 A.3d 883, 891 (D.C. 2013) (original quotation marks and alterations omitted). Accordingly, AU's citations to general platitudes, preambles, and statements of purpose—even if they ran counter to the concept of a time limit—cannot have the effect of negating it.

Next, AU argues that enforcement of the one-year deadline would "eviscerate th[e] document's core purpose" and is "inconsistent with the conduct and motivations of the parties in entering into a university/student relationship." Opp. at 12. AU is choosing to see only half of the picture. Whereas AU sees the Code and Policy only as a means for stopping sexual misconduct by any means necessary, the text of the documents reveals that an equally important purpose is to establish a clear set of rules and procedures that both accused students and complainants can rightfully expect to be followed in any investigation conducted by AU.[9]

This mistaken view is vividly illustrated by AU's incendiary statement that "Doe cannot be presumed to have matriculated at AU with the expectation that he could avoid any consequences for sexual assault so long as a year had passed since the act occurred." Opp. at 12. Such a statement, in addition to implicitly presuming that Mr. Doe and all respondents are guilty of sexual assault, misses the point. It is not that potential respondents expect a get-out-of-jail-free card; it is that they were and are entitled to expect that the University will enforce the procedures and standards set forth in the Code and Policy. And, they are presumed to have expected that AU would not permit stale allegations to be brought against them years after the alleged events occurred, when evidence may have been lost and memories have faded.

Moreover, the same could be said for any number of protections in the Code and Policy that AU could deny to respondents: the preponderance of the evidence standard, his right to an

---

[9] AU argues in a footnote that it "would make particularly little sense" to abide by the language in the Code and Policy and require complainants to bring complaints within a year because, according to AU (without citation), "victims are often hesitant to come forward in light of the emotional, social, and psychological costs of pursuing a complaint." Opp. at 9 n.5. Even if this were evidence (it is not), it would be extrinsic evidence irrelevant to the Court's construction unless the term is determined to be ambiguous on its face. *See 2301 M St. Coop. Assoc. v. Chromium LLC*, 209 A.3d 82, 87 (D.C. 2019). Moreover, even if it were to be considered, the provision explicitly contemplates this issue by extending the fifteen-day deadline to one year for victims of alleged sexual misconduct. MPSJ Ex. 1 at 12.

advisor, reasonable time to prepare a response, hear and respond to evidence, present relevant witnesses, and his right to appeal the decision, just to mention a few examples.[10] After all, under AU's reasoning, if the guy did it, he should not expect to get away with it, no matter what rights in the Code or Policy are violated.

Finally, AU argues that the text itself negates the enforceability of the deadline, pointing to three passages. First, AU asserts that the Policy "promises" (note the contractual language) that it "will respond promptly and effectively" to reports and "take appropriate action to prevent, to correct, and if necessary, to discipline individuals who violate the policy." Opp. at 13 (citing 2015-16 Policy at 2). As AU recognizes, this is a "general obligation," not a specific provision like the deadline. *Id.* Even textually, this passage states only that it will take "appropriate" action. Given the time limit, it would not be appropriate to discipline individuals based on stale allegations, even if the school could investigate and take other appropriate action to redress the situation. Finally, it is not relevant that the Policy permits the Title IX officer to "determine which resolution process and procedures will be used" when several may be applicable, *see* Opp. at 13, because only one provision is applicable here.

The provisions at issue is specific, detailed, and stated in mandatory terms. Contrary to AU's wishes, they did not merely "encourage prompt reporting." MTD at 27. Nor did they "generally instruct students." Opp. at 1. To review, the provision first sets forth a default time

[10] AU also cites language in the one of the more recent versions of the Policy, requiring only "[t]imely complaint filing [to] give the University the best chance to resolve the [complaint]." Opp. at 13. That is precisely the point. If the complainant waits too long and evidence is lost or witnesses cannot remember what happened, the school cannot resolve the complaint effectively. AU chose to revise the timeliness provision in later versions of the Code, but this only reinforces the fact that the Code applicable at the time of the incident (and at the time the one-year deadline expired) required reporting within a specific deadline—one year.

limit of fifteen days for alleging disciplinary infractions:[11] MPSJ Ex. 1 at 12. To make sure everyone reading the Code knows how to count those days, it specifically excludes "weekends, official university holidays, [and] winter and spring breaks" from the 15 days. *Id.* The Code then methodically carves out a detailed and thorough exception applicable to very specific alleged violations, emphasized in italics:

> *The deadline for filing a case will be extended if there is an alleged violation of the university's Discrimination and Sexual Harassment Policy, Whistleblower Policy, or a Code violation involving sexual harassment, domestic violence, dating violence, rape, sexual assault, sexual exploitation, or stalking. In such cases, the complainant will have one year from the date of discovery to file a complaint as set forth in these policies.*

*Id.* (emphasis in original). The language is not a suggestion or encouragement; by its plain terms, it is a requirement.

The provision then goes on to set forth a specific and detailed required procedure and standard for requesting, considering, and deciding requests to extend the deadlines, including that they must be made in writing and to whom the request must be made:

> Requests for extension of the 15 day or one year filing periods must be made in writing to the director of Student Conduct and Conflict Resolution Services or designee, and will be evaluated based on whether a reasonable person might be justified in filing after the deadline because of relevant circumstances.

*Id.* In other words, requests (even if made) are not automatic. This reinforces the fact that the time limit is real.

This rule is then repeated *twice* in the Policy, First, under the section titled "INITIATING A COMPLAINT": "Notify the appropriate Responsible Official as quickly as possible of violations of this policy and within one (1) year of the alleged violation." MPSJ Ex. 5 at 6. The

[11] In contrast to this mandatory language, another provision stating a timeframe is clearly couched in non-mandatory language. See Policy at 7 ("The University strives to complete resolution of complaints within 60 days from when the University has notice of the grievance.").

Policy then provides the same mechanism for requesting an extension—explaining that complaints filed after the one-year deadline "may be considered by the Responsible Official, when requested in writing and there are extenuating circumstances." *Id.* The one-year time limit is then repeated later in the Policy: "Complainants may elect to file charges through the student disciplinary procedures at any time within one (1) year of the alleged incident." *Id.* at 8.

In an attempt to argue that this requirement does not inure to the benefit of Mr. Doe, AU highlights that the provision at issue is not listed in the enumerated "rights" section of the Code. Opp. at 2. As explained in the 2015-16 Code, however, the "rights" stated in Section II.B. are merely a "summary" of the "[p]rovisions afforded to parties." MPSJ Ex. 1 at 2. Moreover, numerous other provisions that are binding and inure to the benefit of students are not listed in Section II.B., including, for example, the rights (a) to "to speak with the dean of students or designee" if the student receives and interim suspension, *id.* at 10; (b) to have a hearing panel "comprised of . . . one (1) student and two (2) members of the faculty/staff," *id.* at 10-11; (c) to have the disciplinary hearing recorded and to get a transcript of the hearing, *id.* at 14; (d) to have "sexual history or sexual character" evidence excluded, *id.* at 14-15; (e) to have a "supplemental proceeding" to determine sanctions, *id.* at 15; (f) to have an appeal reviewed by an "appellate board . . . consist[ing] of . . . one (1) student and two (2) members of the faculty/staff," *id.* at 16; (g) to have the appellate board determine viability of an appeal by majority vote, *id.* at 16.

Moreover, while AU paints a scenario wherein, even if AU was aware that the time limit applied, it nevertheless would have pursued Ms. Roe's allegations, this means nothing. The fact that AU would breach its contract in such a scenario has no bearing on the enforceability of the

contract. Nor is this what happened.[12] AU's hindsight statements about what it supposedly would do are extrinsic evidence that cannot be considered unless the Court first determines as a matter of law that the provision is ambiguous, something it cannot do in the face of the plain, unambiguous text at issue here.

Moreover, AU misses the fact that AU unilaterally included this time limit in its Policy and Code, phrased in mandatory language. If it believed that such victims should be given unlimited time to bring a complaint, it should has said so. Indeed, it had already created a special provision allowing a longer time period for alleged victims of sexual assault (a year instead of fifteen days), presumably to give victims more time to process the experience and determine if a complaint should be brought. Later, it further revised the Code and Policy to eliminate any hard deadline, but these facts only reinforce the proper meaning of the original time limit.

## II. Title IX Presents No Conflict that Would Render the Time-Limit Provision Illegal and Unenforceable.

Next, AU contends that its own Code and Policy, which it unilaterally drafted and adopted, are essentially illegal contracts and, therefore, unenforceable against itself. Specifically, AU argues that Title IX creates "an independent federal obligation . . . to investigate and address alleged sexual violence whenever it learns of the allegations." Opp. at 16-17. AU, however, has pointed to no binding Title IX authorities requiring it to discipline respondents based on allegations brought to the university's attention past a time limit set by the school. Nor could it, especially given the nature of Title IX as a "contractual" Spending Clause statute.

[12] Nor does it matter that AU asserts it would have granted an extension to Ms. Doe if she had requested one. The fact that AU makes this assertion, without even a request from Ms. Doe or any explanation of the extenuating circumstances that might support such a request, only illustrates AU's intent to willfully breach its contract.

Before addressing the advisory documents AU has cited, it is important to recognize the nature of the relationship between a school like AU and the government under Title IX.[13] To receive certain federal funding, AU has entered into what is essentially a contract with the federal government to abide by the Title IX statute and regulations. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286-87 (1998) (contrasting Title VII, "which is framed [as] an outright prohibition"). *See also Barnes v. Gorman*, 536 U.S. 181, 185-86 (2002) (holding that contract law analogies apply to spending legislation). Moreover, enforcement is administrative and may not be initiated until the school has been notified of a violation and given a chance to comply.[14] *See Gebser*, 524 U.S. at 288 (citing 34 CFR §§ 100.7(d) & 100.8(c)-(d)). In other words, even if AU could show that enforcement of a time limit would violate Title IX (it cannot), the most that could result is an administrative enforcement action requiring it to either, e.g., amend the Code and Policy (after the fact), or potentially—if it chose to ignore the request—to voluntarily give up funding, which some schools do.[15]

Notably, AU does not actually rely upon any language of the Title IX statute or its implementing regulations (34 C.F.R. Part 106). Rather, AU relies on two advisory documents issued by the Department of Education's Office of Civil Rights: a January 2001 "Revised Sexual

[13] Although AU never cites it in its opposition brief, Title IX provides in relevant part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a).

[14] As the 2001 Guidance explains, "the process of administrative enforcement requires enforcement agencies . . . to make schools aware of potential Title IX violations and to seek voluntary corrective action before pursuing fund termination or other enforcement mechanisms." *Id.* at iii-iv. "[A] school does not risk losing its Federal funding solely because discrimination occurred." *Id.* at 15.

[15] *See* I. Caputo, "The Controversial Reason Some Religious Colleges Forgo Federal Funding," *The Atlantic*, *available at* https://www.theatlantic.com/education/archive/2016/07/the-controversial-reason-some-religious-colleges-forgo-federal-funding/490253/.

Harassment Guidance" ("2001 Guidance") and a September 2017 "Q&A on Campus Sexual Misconduct" ("2017 Q&A").[16] Even under the Title IX contractual arrangement, however, schools are not required to abide by such guidance.[17] *See* 34 C.F.R. § 106.4(a) (requiring "assurance of compliance with [34 C.F.R. Part 106]," including "whatever remedial action is necessary in accordance with § 106.3(a)." Indeed, the 2001 Guidance states that its purpose is merely "to provide the *principles* that a school should use to recognize and effectively respond to sexual harassment of students in its programs as a condition of receiving Federal financial assistance." 2001 Guidance at i (emphasis added).

Turning to the what the guidance documents say, AU claims that the 2001 Guidance makes "explicit" that "Title IX and its implementing regulations require" AU "to take 'prompt and effective action calculated to end [] [sexual] harassment [of which it becomes aware], prevent its recurrence, and, as appropriate, remedy its effects." Opp. at 17. The actual passage, which is included under the heading "Enduring *Principles* from the 1997 Guidance," *id.* at ii (emphasis added), merely identifies as "[a] *critical issue*. . . whether the school recognized that sexual harassment has occurred and took prompt and effective action calculated to end the harassment, prevent its recurrence, and, as appropriate, remedy its effects." *Id.* at iii. There is no mention of requirements or "implementing regulations."[18]

---

[16] In a footnote, AU references 34 C.F.R. §§ 106.3(a) and 106.31(b) as allegedly "requir[ing] universities to take remedial measures to address instances of gender-based discrimination." Opp. at 17 n.9. Section 106.3(a) addresses cases in which the Assistant Secretary has found that *a school has discriminated* against persons on the basis of sex. Section 106.31(b) precludes discrimination *by a school* on the basis of sex in providing any aid, benefit, or service. In this case, the one-year deadline applies to both men and women.

[17] It is ironic that AU argues that its Code and Policy are unenforceable "guidelines" (Opp. at 1) but then argues that Title IX guidance documents are binding.

[18] It is also far from clear how disciplining a student will "remedy its effects." Moreover, the quoted passage speaks of remedying effects of sexual harassment "as appropriate"—it certainly

AU also points to a September 2017 "Q&A" describing a school's responsibility as "tak[ing] steps to understand what occurred and to respond appropriately." 2017 Q&A at 1. The Q&A mentions that the Department of Education "intends to engage in rulemaking on the topic of schools' Title IX responsibilities" but that the Q&A and the 2001 Guidance provide "interim" "information about how OCR will assess a school's compliance with Title IX." *Id.* Similar to the 2001 Guidance, even this interim information purports to require only that the school "respond appropriately," general language that cannot be read—even if such a Q&A were binding—to preclude a reasonable time limit on bringing allegations that could result in discipline.[19]

Given all of this, AU has not alleged anything that, even if true, would preclude enforcement of the time limit provision as illegal or against public policy. AU has pointed to no case where a Court has refused to enforce a contract in a similar situation. In *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982), cited by AU, the Court held that petitioner was entitled to a ruling on whether a collective bargaining agreement violated the Sherman Act and the National Labor Relations Act. *Id.* at 74, 78. Title IX, as a Spending Clause statute establishing conditions for receipt of federal funds, cannot be compared to such mandatory remedial statutes.

---

does not require disciplinary punishment. Later in the 2001 Guidance, it states: "As long as the school, upon notice of the harassment, responds by taking prompt and effective action to end the harassment and prevent its recurrence, the school has carried out its responsibility under Title IX." *Id.* at 12 (no mention of remedying effects). Even the Code recognizes that this can be done without discipline, explaining that, in cases where the respondent is no longer a student, AU "will still seek to provide support for the complainant and take steps to end the alleged Prohibited Conduct, prevent its recurrence, and address its effects." Ex. 4 at 18.

[19] To the extent the Court is inclined to consider extrinsic evidence regarding AU's illegal-contract defense (Mr. Doe contends it should not), it should note that other schools have such deadlines, including the State University of New York system. *See Discrimination and Sexual Harassment Complaint Procedure* (Oct. 9, 2018) ("Students must file a complaint within 180 calendar days following the alleged discriminatory act, or, 90 calendar days after a final grade is received, for the semester during which the discriminatory acts occurred, if that date is later."), *available at* https://www.suny.edu/sunypp/documents.cfm?doc_id=451.

In *Perez v. C.R. Calderon Constr., Inc*., 221 F. Supp. 3d 115 (D.D.C. 2016), another case cited by AU,[20] workers had sued two subcontractors for violations of wage laws, including the Fair Labor Standards Act, and the subcontractors crossclaimed against each other for breach of contract related to those violations. *Id.* at 119. Importantly, the Court refused to enforce the subcontracts because both entities employed:

> multiple illegal means . . . , including underpayment and nonpayment of workers, altering information so that incorrect reports were submitted to the general contractor, unilateral re-classification of workers mid-job, hiring of undocumented workers, and sneaking unauthorized workers onto the Project site, all with the purpose of putting more money into their own pockets.

*Id.* at 156. Importantly, the Court denied relief to both parties because it found them to be *in pari delicto*, or equally at fault. *Id.* at 154-56. Again, AU has pointed to nothing close the illegal conduct found in *Barros*, nor can it be said that Mr. Doe and AU are *in pari dilecto*.

## III. Revisions in the 2018-19 Code that Affect Mr. Doe's Substantive Vested Rights Cannot Be Applied Retroactively.

AU again pleads for deference in arguing that, should the Court read the 2015-16 version of the Code to preclude AU from disciplining Mr. Doe, AU's application of the 2018-19 Code and Policy, with its open-ended time provision, was reasonable. Even if AU, as a general matter, is entitled to use the *procedural* rules in place at the time of an investigation, it may not divest Mr. Doe of a substantive, vested right through revisions to a contract that revive allegations not made by the deadline. AU is entitled to no deference on this issue.[21]

---

[20] Another case cited by AU, *Barros v. Gov't Empls. Ins. Co.*, 79 F. Supp. 3d 32, 39 (D.D.C. 2015), does not involve an illegal contract, but merely states that the express terms of a contract will not control if the terms violate a statute or public policy. *Id.* at 39.

[21] The cases cited by AU in favor of deference are from other jurisdictions, involve other schools, and dissimilar fact patterns. *See Karimi*, 361 F. Supp. 3d at 973-74 (applying California law to case involving non-sexual misconduct); *Pollalis v. Pres. & Fellows of Harvard Coll.*, 124 N.E.3d 159 (Table), 2019 WL 1261472, at *2 (Mass. App. Ct. 2019) (applying Massachusetts

Even if AU is entitled to apply the *procedural* rules in effect at the time of the investigation, the limitations period in effect at the time of the alleged incident must be enforced because it provides a substantive right. Although AU cites *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 597 (D. Mass. 2016), for the proposition that "a student is not entitled to have disciplinary proceedings conducted under the specific procedures in effect at the time of the student's matriculation," Opp. at 19, it misses the fact that Brandeis University "applied the substantive policies . . . for the academic year in which the alleged misconduct occurred," which included provisions defining sexual misconduct and consent. *Brandeis*, 177 F. Supp. 3d. at 582-83. *See also id.* at 597.

The same principle applies to statutes for the same reasons. In the District, "[t]he rule favoring prospective application [of a statute] applies where substantive rights are affected by a change in legislation." *Edwards v. Lateef*, 558 A.2d 1144, 1146 (D.C. 1989). "[A] rule is retroactive if it takes away or impairs vested rights acquired under existing law, or creates new obligations, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." *Nat'l Mining Assoc. v. Dep't of Labor*, 292 F.3d 849 (D.C. Cir. 2002).

This principle also applies to statutes of limitations, which generally cannot be applied retroactively after the original deadline has expired. *See Andrew v. Schlumberger Tech. Co.*, 808 F. Supp. 2d 1288, 1290 (D.N.M. 2011) (refusing to apply an extended statute of limitations

---

law to a dispute regarding tenure under a faculty handbook); *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 405 (W.D.N.Y.) (applying New York law in a challenge to procedures). Curiously, AU cuts short its parenthetical quotation from *Rolph*, Opp. at 20, which states that New York courts review whether the school acted arbitrarily "or whether it substantially complied with its own rules and regulations." 271 F. Supp. 3d at 405.

retroactively to revive causes of action that had already been extinguished under the prior limitations period). The reasons are the same as here. Statutes of limitations

> are statutes of repose; and although affording plaintiffs what the legislature deems a reasonable time to present their claims, they protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

*United States v. Kubrick*, 444 U.S. 111, 117 (1979). This principle applies "without respect to whether [a claim] is meritorious." *Bd. of Regents v. Tomanio*, 446 U.S. 478, 487 (1980).

AU cites a 1976 Fifth Circuit case for the proposition that the concept of "a binding, absolute unchangeable contract" is inappropriate in the academic setting. Opp. at 19 (citing *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976). This case is irrelevant to this issue. As already stated, Mr. Doe does not contend that AU was not permitted to amend its contract. Mr. Doe contends only that AU was not permitted take away a substantive, vested right through such amendment. For example, AU could expand the definition of "sexual assault" or "consent," but it could not do so and apply the new definitions retroactively to find a student responsible for conduct that fell outside those definitions at the time of an alleged incident.

AU admits that "[n]othing in the 2015-16, or the 2018-19, version of the Code or Policy, addresses which version is to be applied where conduct occurs a one point in time but is reported later." Opp. at 2. In other words, there is no language indicating that AU intended for the revised language to apply retroactively. *See Coffman v. Provost * Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720, 726-27 (E.D. Tex. 2001) (reasoning that the "plain grammatical language of the arbitration clause gives no indication that it will apply retroactively," and concluding that, "[t]o interpret the arbitration clause to apply retroactively would cause Plaintiff to forego her vested right to litigate an accrued claim").

## IV. Evidence of Custom and Practice Contrary to an Unambiguous Contract Provision May Not Be Considered.

Finally, AU argues that the Court should consider its "custom and practice" if the Court determines that the 2015-16 Code and Policy would bar AU from investigating Roe's sexual assault allegations, citing an affidavit submitted by AU's Title IX Program Officer. *See* Opp. At 20-21. Consideration of such extrinsic evidence is precluded, however, unless the Court determines that the language at issue is ambiguous. *2301 M St. Coop. Assoc.*, 209 A.3d 82 at 87. AU never once argues that the time-limit provision is ambiguous, nor is there a basis to do so. Accordingly, this extrinsic evidence may not be considered.[22]

In support of its argument, AU cites to several cases that are more than thirty to forty years before *2301 M Street*. For example, AU again attempts to rely on general language in *Pride*. As reviewed above, *supra* at 11, *Pride* involved an issue on which the disciplinary code was silent. 384 A.2d at 34-35. Oddly, AU cites *Howard Univ. v. Best*, 547 A.2d 144 (D.C. 1988), and *McConnell v. Howard Univ.*, 818 F.2d 58 (D.C. Cir. 1987), in arguing against the application of the parol evidence rule. Opp. at 22. But in *Best*, the Court specifically found that the phrase at issue "was susceptible of two reasonable interpretations," i.e., it was ambiguous, "and that therefore extrinsic evidence was necessary." 547 A.2d at 150. For *McConnell*, AU actually abbreviates the quote in its parenthetical to omit the Court's mention of ambiguity. Opp. at 22. The full statement in *McConnell* is: "So, at worst, the terms are ambiguous and must be construed in keeping with general usage and custom at the University and within the academic community." 818 F.2d at 64.

---

[22] Even if the Court were to determine sua sponte that the time-limit provision is ambiguous, most of the statements in the Curran affidavit are not proper evidence under Fed. R. Civ. P. 56(c)(4), as explained in Mr. Doe's Objections to the Affidavit of Regina Curran, filed herewith.

Finally, AU attaches an affidavit from Regina Curran, the current Title IX Program Officer at AU. For the reasons already stated, this parol evidence may not be considered. In any event, if the Court were to consider it, it provides no reliable information relevant to the issue at hand on which Ms. Curran is competent to testify. Ms. Curran admits that she did not work for AU from mid-July 2015 until May 21, 2017, a period that encompasses the time of the alleged incident at issue in this case, and the entire academic year in which the 2015-16 Code and Policy were in effect. She nevertheless states that she is "aware" that AU investigated complaints of sexual misconduct that were alleged to have occurred more than one year prior to the incident having been reported but provides no evidence that would be admissible at a hearing in support of this assertion. Moreover, evidence of prior breaches of a contract, even if not claimed by the accused student, cannot be evidence to overcome a provision setting a clear time limit.

## CONCLUSION

For the foregoing reasons, as well as for the reasons stated in Mr. Doe's motion for partial summary judgment, Mr. Doe respectfully requests that his Motion for Partial Summary Judgment be granted. Mr. Doe further requests that the Court enter an order requiring AU to rescind its finding of responsibility against Mr. Doe for sexual assault and lift the sanctions imposed on him based on that finding.

Respectfully submitted,

*<u>/s/ William E. Zapf</u>*

DATED: January 31, 2020

Matthew G. Kaiser (D.C. Bar No. 486272)
Scott Bernstein (D.C. Bar No. 1013922)
William E. Zapf (D.C. Bar No. 987213)
KAISERDILLON PLLC
1099 14th Street NW, 8th Floor West
Washington, DC 20005
T: (202) 640-2850
F: (202) 280-1034
mkaiser@kaiserdillon.com
sbernstein@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Plaintiff John Doe*