**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN UNIVERSITY,<br><br>Defendant. | 19 Civ. 03097 (APM) |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff John Doe hereby submits the attached decision from the United States Court of Appeals for the Third Circuit as supplemental authority for his Memorandum of Law in Opposition to Defendant's Motion to Dismiss. *See* Ex. 1. The decision, *John Doe v. University of the Sciences*, --- F.3d ----, 2020 WL 2786840 (3d Cir. May 29, 2020), was handed down last Friday. In *University of the Sciences*, the Third Circuit reversed the district court's decision to dismiss the plaintiff's Title IX and breach-of-contract claims, finding that the plaintiff had alleged sufficient facts to move forward.

With respect to the Title IX claim, the Court stated that the plaintiff "plausibly contend[ed] that [the University of the Sciences], in its implementation and enforcement of [its Sexual Misconduct Policy], succumbed to pressure from the federal government." *Id.* at *4. In his complaint, "Doe [had] allege[d] that, after the United States Department of Education . . . issued the 2011 Dear Colleague Letter, [the University of the Sciences] limited procedural protections afforded to male students like [the plaintiff] in sexual misconducts cases." *Id.* (internal quotation marks and footnote omitted). He also claimed that the University of the

Sciences, "encouraged by federal officials, ha[d] instituted solutions to sexual violence against women that abrogate[d] the civil rights of men and treat[ed] men differently than women." *Id.*

The *University of the Sciences* court went on to note that, while "allegations about pressure from [the Department of Education] and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination," they are "relevant to alleging a plausible Title IX discrimination claim." *Id.* at *5. In *University of the Sciences*, in addition to alleging pressure from the federal government, the plaintiff claimed that the school had not investigated three female students (the two purported victims and a witness) for possible violations of the Sexual Misconduct Policy. *Id.* The Third Circuit stated that these additional allegations were "like the plausible allegations in" *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018), where the plaintiff had alleged "that the board discredited all males, including the accused student, and credited all females, including the accuser, because of sex bias." *University of the Sciences*, 2020 WL 2786840, at *6 (alterations omitted).

In the instance case, John Doe's allegations of sex discrimination are similar to—and, indeed, go far beyond—what the plaintiff alleged in *University of the Sciences* (and *Baum*, for that matter).[1]

---

[1] *See* Compl. ¶¶ 68-73, 83 (pressure on AU to get tough on male respondents stemming from the Epsilon Iota scandal, Department of Education – Office for Civil Rights investigations, and the Faith Ferber matter); *id.* ¶¶ 74-78, 81-82 (changes AU made to its sexual misconduct disciplinary proceeding in response to the pressure it faced); *id.* ¶¶ 79-80 (AU's hiring of an advocate to investigate and adjudicate claims of sexual misconduct); *id.* ¶¶ 84-88 (AU's response to the Department of Education's decision to rescind the 2011 Dear Colleague Letter); *id.* ¶¶ 88-89 (AU's commitment to follow the rescinded Dear Colleague Letter); *id.* ¶¶ 90-93 (AU's cancellation of a libertarian student group's on-campus panel discussion regarding feminism, free speech, and Title IX, after a women's student group criticized the event); *id.* ¶¶ 94-95 (the Title IX Office's incorporation of Know Your IX materials); *id.* ¶¶ 110 (AU's decision to not apply the statute of limitations applicable to Roe's claim); *id.* ¶¶ 137-46 (AU's failure to pose obvious and critical questions to Roe and witnesses that would have undermined Roe's hard-to-believe story); *id.* ¶¶ 147-50 (AU's failure to investigate two contemporaneous accounts by

With respect to the breach-of-contract claim, the Third Circuit, applying Pennsylvania law, found that the plaintiff had plausibly alleged that the University of the Sciences had breached its promise—contained in the Student Handbook and the Sexual Misconduct Policy—to treat the plaintiff fairly. *University of the Sciences*, 2020 WL 2786840, at *9. The Third Circuit found that the University of the Sciences' "single-investigator model" for investigating and adjudicating claims of sexual misconduct "violated the fairness that [the school] promise[d] students accused of sexual misconduct"—because it did not provide the accused "a chance to cross-examine witnesses or any sort of real, live, and adversarial hearing." *Id.* Like the University of the Sciences, AU promised Doe a fair process. (*See*, *e.g.*, Compl. Ex. 6 at XI ("the purpose of this conduct process is to provide a fair review of alleged violations of this Code"); *id.* at XII ("Standards of Fair Process"); *id.* at XIX.A.2. (fairness in the sanctioning process); *id.* at XIX.A.3. (listing, as a ground for appeal, denial of a "fair investigation"); *see also id.* Ex. 3 at 8 (promising an "impartial investigation").) And just like the University of the Sciences, AU used a single-investigator model to investigate and adjudicate the claim against Doe. (*See*, *e.g.*, Compl. ¶¶ 28, 76, 78, and 229.)

---

Roe); *id.* ¶¶ 151-58 (AU's failure to share the investigative findings with respect to Roe's claims against H.S.); *id.* ¶¶ 161-71, 177-86 (misrepresentations of, and turning a blind eye to, the evidence); *id.* ¶ 173 (AU's illogical conclusions based on the available evidence); *id.* ¶¶ 188-91 (AU's failure to question Roe's implausible claims); *id.* ¶¶ 192-97 (AU's failure to reconcile Roe's allegations with H.S.'s testimony); *id.* ¶¶ 50-51, 193 (H.S.'s claim that, while he was extremely drunk, H.S. "forcefully put her tongue down his throat" (which AU never investigated as a possible violation of the Sexual Misconduct Policy)); *id.* ¶¶ 200-06 (AU's decision, after telling Doe that his advisor could attend the Sanctioning Panel hearing, to not allow his advisor to enter the hearing); *id.* ¶¶ 207-13 (AU's decision, in clear violation of its policies and procedures, to refuse Doe the opportunity to object to the members of the Sanctioning Panel); *id.* ¶ 23 (the Appellate Board's decision that Doe's appeal was not "viable," even though his appeal was limited to the grounds permitted by AU's Code of Conduct); *id.* ¶ 236 (the investigator giving greater weight to statements by the female complainant and female witnesses, while ignoring or dismissing the statements of the male respondent, the statements of male witnesses, and contemporaneous text messages).

Notably, the Third Circuit also emphasized that—while "courts are sometimes chary about reviewing too closely the manner in which a private university chooses to investigate and discipline its students . . . especially . . . for matters uniquely within the institution's province, such as academic integrity"—"[t]his [was] not such a case." The Third Circuit explained:

> The investigation and fair adjudication of alleged criminal activity like sexual assault is not uniquely within the province of colleges and universities. Yet accused students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct because the consequences are potentially dire and permanent: a finding of responsibility for a sexual offense can have a lasting impact on a student's personal life, in addition to his educational and employment opportunities, especially when the disciplinary action involves a long-term suspension.

*Id.* (quotation marks, citations, and alterations omitted). The Third Circuit in *University of the Sciences* thus rejected the exact same argument that AU makes in this case. (*See, e.g.*, Mem. in Support of Def.'s Mot. to Dismiss at 8, 11 (arguing that the Court should not "second-guess" AU's actions); *id.* at 28 (arguing that the Court should "defer[ ]" to AU when it comes to "interpreting and applying [the school's policies and procedures]"); *see also* Def.'s Reply in Support of Mot. to Dismiss Compl. at 6 ("The Investigator's finding . . . should be accorded deference."); *id.* at 19 (arguing that, "even were this Court to view the Code and Policy as binding contracts, a deferential standard of judicial review would apply" because there should be "deference" to a university's interpretation of its rules).)

DATED: June 3, 2020

Respectfully submitted,

KAISERDILLON PLLC,

______________________________

Matthew G. Kaiser (D.C. Bar No. 486272)
Scott Bernstein (D.C. Bar No. 1013922)

William E. Zapf (D.C. Bar No. 987213)
1099 14th Street NW, 8th Floor West
Washington, DC 20005
(202) 640-2850
mkaiser@kaiserdillon.com
sbernstein@kaiserdillon.com
wzapf@kaiserdillon.com

*Attorneys for Plaintiff John Doe*

# Exhibit 1

2020 WL 2786840
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

John DOE, Appellant
v.
UNIVERSITY OF the SCIENCES

No. 19-2966
|
Argued: March 31, 2020
|
(Filed: May 29, 2020)

**Synopsis**
**Background:** Male college student brought action against private university, alleging sex discrimination in violation of Title IX and breach of contract, after student was expelled for violating sexual misconduct policy. The United States District Court for the Eastern District of Pennsylvania, Juan R. Sánchez, Chief Judge, 2019 WL 3413821, dismissed. Student appealed.

**Holdings:** The Court of Appeals, Porter, Circuit Judge, held that:

[1] student stated claim for sex discrimination under Title IX, and

[2] student stated claim for breach of contract.

Reversed and remanded.

West Headnotes (15)

**[1] Federal Courts**

Appellate court exercises de novo review over the grant of a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[2] Federal Civil Procedure**

To survive a motion to dismiss for failure to state claim, the complaint must set forth enough factual allegations to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 8(a)(2), 12(b)(6).

**[3] Federal Civil Procedure**

A "facially plausible claim," as required to survive motion to dismiss for failure to state a claim, is one that permits a reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 8(a)(2), 12(b)(6).

**[4] Federal Civil Procedure**

When assessing the merits of a motion to dismiss for failure to state a claim, court accepts as true all factual allegations in the complaint and views those facts in the light most favorable to the non-moving party. Fed. R. Civ. P. 12(b)(6).

**[5] Federal Civil Procedure**

To decide a motion to dismiss for failure to state a claim, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. Fed. R. Civ. P. 12(b)(6).

**[6] Federal Civil Procedure**

Document integral to or explicitly relied upon in the complaint may be considered without converting a motion to dismiss for failure to state a claim into one for summary judgment. Fed. R. Civ. P. 12(b)(6).

**[7] Civil Rights**

Because Title IX prohibits subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline when sex is a motivating factor in the decision to discipline. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

**[8] Civil Rights**

To state a claim for sex discrimination under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

**[9] Civil Rights**

Male college student, who was expelled for violating sexual misconduct policy, sufficiently alleged that sex was motivating factor in private university's investigation and decision to expel him, so as to state claim for sex discrimination under Title IX; student alleged that university investigated him but chose not to investigate three female students who allegedly violated policy. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

**[10] Contracts**

Under Pennsylvania law, three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages.

**[11] Contracts**

Under Pennsylvania law, in determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect.

**[12] Contracts**

Under Pennsylvania law, when interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.

**[13] Contracts**

Under Pennsylvania law, when a contract evidences care in its preparation, it will be presumed that the contract's words were employed deliberately and with intention.

**[14] Contracts**

Under Pennsylvania law, in determining what the parties intended by their contract, the law must look to what they clearly expressed; courts in interpreting a contract do not assume that its language was chosen carelessly.

**[15] Contracts**

College student, who was expelled for violating sexual misconduct policy, sufficiently alleged that private university failed to provide him fairness that university promised students accused of sexual misconduct, so as to state claim for breach of contract under Pennsylvania law; student alleged that he never received chance to cross-examine witnesses or any sort of real, live, and adversarial hearing.

On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civil No. 2-19-cv-00358), District Judge: Honorable Juan R. Sánchez

**Attorneys and Law Firms**

Zainab K. Ali, Riley H. Ross III, Mincey Fitzpatrick Ross, 1500 John F. Kenney Boulevard, Two Penn Center, Suite 1525, Philadelphia, PA 19102, Joshua A. Engel, [ARGUED], Engel & Martin, 4660 Duke Drive, Suite 101, Mason, OH 45040, Counsel for Plaintiff-Appellant John Doe

Leslie M. Greenspan, [ARGUED], Joe H. Tucker, Jr., Tucker Law Group, Ten Penn Center, 1801 Market Street, Suite 2500, Philadelphia, PA 19103, Counsel for Defendant-Appellee University of the Sciences

David A. Super, Nancy Chi Cantalupo, Georgetown University Law Center, 600 New Jersey Avenue, N.W., Suite

312, Washington, DC 20001, Counsel for Amicus/Appellee Law Professors

Before: RESTREPO, PORTER, and MATEY, Circuit Judges.

OPINION OF THE COURT

PORTER, Circuit Judge.

***1** The University of the Sciences ("USciences") is a private college in Philadelphia, Pennsylvania. John Doe, a student at USciences, had completed nearly all the coursework required to earn a degree in biomedical science. Before Doe could finish his degree, two female students accused him of violating USciences's Sexual Misconduct Policy (the "Policy"). After investigating Doe, USciences concluded that he violated the Policy and expelled him.

Doe filed a lawsuit in the District Court alleging that USciences was improperly motivated by sex when it investigated and enforced the Policy against him. Doe also asserted that USciences breached its contract with him by failing to provide him the fairness promised to students under the Policy. The District Court dismissed Doe's complaint.

Doe's complaint contains plausible allegations supporting both claims. So we will reverse the District Court's order dismissing Doe's complaint.

## I

### A

USciences distributes to its students a series of policies governing disciplinary issues. These documents include the Student Handbook and the Policy, which USciences considers "companion documents." App. 191. The Student Handbook promises that USciences will "[e]ngag[e] in investigative inquiry and resolution of reports that are adequate, *reliable*, *impartial*, prompt, *fair* and *equitable*[.]" App. 149 (emphasis added). And the Student Handbook states that USciences will "[s]upport[ ] complainants and respondents equally[.]" *Id.*

The Policy specifically addresses allegations of sexual misconduct. Like the Student Handbook, the Policy makes the same promises about providing fairness to accused students. The Policy also includes substantive rules governing prohibited misconduct and procedures that outline the process for investigating and adjudicating alleged violations of the Policy.

#### 1

The Policy forbids students from engaging in "prohibited conduct." App. 123. One form of prohibited conduct is sexual assault, which "consists of sexual contact and/or sexual intercourse that occurs without affirmative consent." *Id.* A student gives affirmative consent "through the demonstration of clear and coherent words or actions[ ] ... indicat[ing] permission to engage in mutually agreed-upon sexual activity." App. 124.

The Policy states that certain circumstances may undermine a student's ability to give affirmative consent. For example, "[a]ffirmative consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating sexual activity knew or reasonably should have known that the other was incapacitated." *Id.* Incapacitation occurs when "a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity." *Id.* A student may become "incapacitated as a result of the consumption of alcohol or other drugs[.]" *Id.*

The Policy also forbids students from revealing confidential information after a formal investigation begins. The "consequences" for violating the confidentiality provision "may include suspension or dismissal from USciences, being barred from residing on campus, or being prohibited from participating in extracurricular activities, including varsity athletics." App. 142.

#### 2

***2** USciences "deem[s itself] to have had notice [of alleged sexual misconduct] if a responsible employee knew, or in the exercise of reasonable care should have known, about [sexual] misconduct." App. 128. A "responsible employee" is defined as "any employee who is required to share all reports of sexual misconduct with [USciences] administrative officials (i.e., Title IX Coordinator/Deputy Coordinator)." *Id.* The Title IX Coordinator is responsible for the "[o]versight of a prompt, fair, [and] equitable investigation and resolution process for reports of prohibited conduct at [USciences]." App. 122.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works. 

If the Title IX Coordinator decides to launch a formal investigation into alleged sexual misconduct, USciences employs the so-called "single-investigator model." Under that model, USciences hires an outside attorney to serve as an investigator. USciences then tasks the investigator with interviewing witnesses, gathering evidence, and determining the accused's culpability. USciences, however, does not offer the accused student, or the "respondent," a chance to cross-examine witnesses or the opportunity to participate in any sort of live, adversarial hearing in which he or she may put on a defense or otherwise challenge the investigator's findings.

If the investigator determines that the respondent violated the Policy, he or she will not make a recommendation on any sanctions. Instead, a three-person panel appointed by the Title IX Coordinator—the Title IX Administrative Panel—will issue a letter detailing the sanctions imposed on the respondent.

The Policy permits certain appeals. For instance, a student may appeal if he "believes the decision regarding responsibility was in error[.]" App. 141. If the respondent timely files his appeal, the Title IX Coordinator "will convene a Title IX Appeals Panel," which is "a [three-person] panel of appropriately trained faculty and staff[.]" *Id.* The Title IX Appeals Panel "may request clarification on the facts from the investigator[ ]." *Id.* "If no merit is found," the panel "will notify the Title IX Coordinator that the [a]ppeal will not move forward." *Id.*

**B**

Two female students at USciences, Jane Roe 1 and Jane Roe 2, filed formal complaints alleging that Doe committed sexual misconduct in violation of the Policy. As for Doe's allegations about his encounter with Roe 1, she and Doe knew each other for more than a year as of the fall 2017 semester. At the time, Roe 1 had been in an "open relationship" with a student at a different university. App. 97. On November 3, 2017, Roe 1 and Doe discussed over Snapchat her desire for someone "to provide physical affection in the absence of her boyfriend." *Id.* Doe invited Roe 1 to his home, and she accepted his invitation. In doing so, Roe 1 understood that they may engage in sexual activity.

Roe 1 arrived at Doe's house between 11:00 p.m. and 12:00 a.m. Doe alleges that they engaged in consensual sexual intercourse and then fell asleep in Doe's bed. His complaint also states that, during the night, Roe 1 and Doe engaged in sexual intercourse at least two more times. Nine months later, in August 2018, Roe 1 and Witness 1, the president of Roe 1's sorority, reported to USciences that Doe sexually assaulted Roe 1. Specifically, Roe 1 alleged that all their sexual encounters on that night were consensual except for their last one, which she claimed was not consensual because Doe did not use a condom.

As for Doe's allegations about his encounter with Roe 2, she and Doe had a "friends with benefits" relationship throughout the fall 2017 semester. App. 99. Over that time, they had consensual sexual intercourse about ten times, including after parties. At the beginning of the spring 2018 semester, Doe and his roommates hosted a party. Doe alleges that he asked Roe 2 if she wanted to come to the party and then spend the night with him; Roe 2 agreed. Roe 2 attended the party, and both Doe and Roe 2 consumed alcohol. Specifically, Roe 2 recalls drinking "three or four" cups of "juice," App. 212, a cocktail made of vodka and mixers. Doe recalls having three or four cups of beer and a cup of "juice." App. 251.

***3** During the party, Roe 2 was elbowed on the dance floor, fell, and bloodied her nose. Doe tried to assist her. Afterwards, Doe asked Roe 2 if she wanted to lay down in his room and spend the night. Roe 2 agreed. Doe alleges that he and Roe 2 then went to his room, where they soon had sexual intercourse. Doe alleges that Roe 2 was "an active participant" and "fully engaged the entire time." App. 100. Seven months later, in August 2018, Roe 2 reported that Doe had sexually assaulted her during the party. She alleged that she passed out in Doe's bedroom and woke up to him having nonconsensual sexual intercourse with her.

**C**

In his complaint, Doe alleges that USciences "permitted and encouraged" Roe 1 and Witness 1 to disclose confidential information about Roe 1's complaint "to find other women willing to make a complaint against" him. App. 98. Doe further alleges that, after Roe 1 reported him to USciences, she and Witness 1 "convinced" their sorority sister, Roe 2, to file her own complaint against him. App. 98–99. Within days, Roe 2 reported that Doe committed sexual assault during their January 2018 "hookup." App. 195.

A member of the Title IX Coordinator's team determined that if Roe 1's and Roe 2's allegations were true, then Doe would have violated the Policy. For that reason, the Title IX Coordinator gave Doe a Notice of Sexual Misconduct Investigation, which notified him that Roe 1 and Roe 2 had accused him of sexual assault. According to Doe's complaint, "the Notice did not provide [Doe] with any specifics about the allegations against him despite the fact that [USciences] possessed specific details about the allegations against [him]." App. 101.

USciences retained a Philadelphia attorney to serve as the investigator. The investigator interviewed Roe 1, Roe 2, Doe, and ten witnesses. She also conducted follow-up interviews with Roe 1, Roe 2, and Doe. After completing her investigation, the investigator credited the allegations made by Roe 1 and Roe 2 and concluded that Doe violated the Policy by engaging in sexual intercourse without Roe 1's or Roe 2's affirmative consent. A Title IX Administrative Panel expelled Doe. Doe appealed to a Title IX Appeals Panel, but it denied his appeal.

Doe then sued USciences. He alleges that USciences violated Title IX and breached its contract with him. The District Court dismissed Doe's complaint. He timely appealed.

## II

**[1]** The District Court had subject-matter jurisdiction over Doe's case under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction over Doe's appeal under 28 U.S.C. § 1291. And we exercise de novo review over the grant of a motion to dismiss. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 n.2 (3d Cir. 2016).

**[2]** **[3]** **[4]** To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must set forth enough factual allegations to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A facially plausible claim is one that permits a reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When assessing the merits of a Rule 12(b)(6) motion, we accept as true all factual allegations in the complaint and view those facts in the light most favorable to the non-moving party. *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).

**[5]** **[6]** "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). In addition, "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks, citation, and emphasis omitted). Because the investigator's report, which USciences attached to its motion to dismiss, is integral to Doe's complaint, we may consider the report.

## III

***4** **[7]** Title IX of the Education Amendments of 1972 states that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance[.]" 20 U.S.C. § 1681(a). "Because Title IX prohibits ... subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline [when sex] is a motivating factor in the decision to discipline." *Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (internal quotation marks, alteration, and citation omitted). No one disputes that USciences receives federal financial assistance under Title IX and that, by expelling Doe, it "excluded [him] from participation in [or] denied [him] the benefits of ... [an] education program." *See* 20 U.S.C. § 1681(a).

Some Courts of Appeals have examined Title IX claims using the doctrinal framework announced by the Second Circuit in *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994).[1] *Yusuf* recognized two theories under which one may allege a Title IX violation: erroneous outcome and selective enforcement. *Id.* at 715. The Sixth Circuit added two additional theories: deliberate indifference and archaic assumptions. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018). In *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019), the Seventh Circuit observed that "[a]ll of these [theories] simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Id.* at 667. Ultimately, the

Seventh Circuit "ask[ed] the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] 'on the basis of sex'?" *Id.* at 667–68.

**[8]** We agree with the Seventh Circuit and "see no need to superimpose doctrinal tests on the [Title IX] statute." *See id.* at 667. Thus, we adopt the Seventh Circuit's straightforward pleading standard and hold that, to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex. Although parties are free to characterize their claims however they wish, this standard hews most closely to the text of Title IX. *See* 20 U.S.C. § 1681(a).

Doe's complaint contains plausible allegations supporting the reasonable inference that USciences discriminated against him on account of his sex. His allegations fit into two categories. First, Doe alleges that USciences yielded to external pressure when implementing and enforcing the Policy. Second, he alleges that sex was a motivating factor in USciences's investigation and decision to impose discipline.

To begin, Doe plausibly contends that USciences, in its implementation and enforcement of the Policy, succumbed to pressure from the federal government. Doe alleges that, after the United States Department of Education ("DoEd") issued the 2011 Dear Colleague Letter, [2] USciences "limited procedural protections afforded to male students like [Doe] in sexual misconduct cases." App. 96. He further alleges that USciences, "encouraged by federal officials, has instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women." App. 109.

***5** The 2011 Dear Colleague Letter "ushered in a more rigorous approach to campus sexual misconduct allegations." *Purdue Univ.*, 928 F.3d at 668. Three of our sister circuits have found that alleged university overreaction to DoEd or other public pressure is relevant to alleging a plausible Title IX discrimination claim. *See id.* at 668–69; *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); *Miami Univ.*, 882 F.3d at 594; *Columbia Univ.*, 831 F.3d at 58. Like our colleagues on the Sixth and Seventh Circuits, we also recognize that allegations about pressure from DoEd and the 2011 Dear Colleague Letter cannot alone support a plausible claim of Title IX sex discrimination. *See Purdue Univ.*, 928 F.3d at 669 ("That said, the letter, standing alone, is obviously not enough to get [the plaintiff] over the plausibility line." (citation omitted)); *Baum*, 903 F.3d at 586 (noting that pressure from DoEd "alone is not enough to state a claim that the university acted with bias in this particular case").

**[9]** Doe also claims that USciences was improperly motivated by sex when it investigated him but chose not to investigate three female students who allegedly violated the Policy: Roe 2, Roe 1, and Witness 1. As for Roe 2, Doe alleges that USciences "[e]ngaged in selective investigation and enforcement of [its] policies by failing to consider [Doe's] alcohol consumption and whether [Roe] 2 should have been charged with violations of [the Policy] if [Doe] was intoxicated when they had sex[.]" App. 104. According to the investigator's report, Roe 2 and Doe consumed between three and five drinks each. [3] Doe further alleges that "[a]lthough both [he] and [Roe] 2 had been drinking [during the party], [USciences] identified [Doe] as the initiator of sexual activity, notwithstanding the comparable intoxication of both participants." App. 110. [4]

Drawing all reasonable inferences in the light most favorable to Doe, as we must at this stage, it is plausible that, as he alleges, sex was a motivating factor in USciences's investigation and decision to expel him. Under the Policy, USciences considers itself to have notice of potential sexual misconduct whenever a responsible employee knows or reasonably should know about the misconduct. *See* App. 133, 134, 137. And even though USciences never investigated Roe 2, Doe plausibly alleges that, at the latest, USciences had notice that she may have violated the Policy when the investigator submitted her report to the Title IX coordinator. *See Miami Univ.*, 882 F.3d at 596.

***6** Doe also contends that USciences was motivated by sex when it chose not to investigate Roe 1 and Witness 1—both female students—despite having notice that both allegedly violated the Policy. In his complaint, Doe alleges that Roe 1 and Witness 1 breached the Policy's confidentiality provision by colluding with each other about the investigation. Under the Policy, "[i]f it is determined that anyone involved in a report or complaint either as a complainant, respondent[,] or witness[ ] colluded or shared information with another, sanctions may be imposed by USciences." App. 142. According to Doe's complaint, Roe 1 and Witness 1 "disclose[d] information about [Roe] 1's complaint ... in an effort to find other women willing to make a complaint against" him. App. 98. And Doe alleges that USciences knew that Roe 1 and Witness 1 violated the

Policy because USciences "permitted and encouraged" them to disclose confidential information in order to recruit Roe 2 to file a complaint against him. *Id.*

Doe plausibly alleges that USciences enforced the Policy against him alone because of his sex. In *Baum*, the court found that the plaintiff stated a viable claim because, "[w]hen viewing th[e] evidence in the light most favorable to [the accused student], ... one plausible explanation is that the [b]oard discredited all males, including [the accused student], and credited all females, including [the accuser], because of [sex] bias." 903 F.3d at 586. Doe's allegations of sex-motivated investigation and enforcement are like the plausible allegations in *Baum*. And when Doe's allegations about selective investigation and enforcement are combined with his allegations related to pressure applied by the 2011 Dear Colleague Letter, we conclude that he states a plausible claim of sex discrimination. *See Purdue*, 928 F.3d at 668–70; *Baum*, 903 F.3d at 586–87. For these reasons, we will reverse the District Court's order dismissing Doe's Title IX claim.

## IV

**[10]** Next, we turn to Doe's breach-of-contract claim. Under Pennsylvania law,[5] "three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms[;] (2) a breach of the contract; and[ ] (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 635 Pa. 427, 137 A.3d 1247, 1258 (2016) (citation omitted). The parties do not dispute that the relationship between USciences and Doe is contractual. *See Barker v. Trs. of Bryn Mawr Coll.*, 278 Pa. 121, 122 A. 220, 221 (1923). Likewise, USciences does not dispute that, if it breached its contract with Doe, that breach would have caused damages. Thus, we focus our analysis on whether USciences breached a duty imposed by its contract with Doe. As explained below, we conclude that Doe states a plausible breach-of-contract claim.

### A

In the Student Handbook, USciences promises all students that it will "[e]ngag[e] in investigative inquiry and resolution of reports that are adequate, reliable, impartial, prompt, fair and equitable[.]" App. 149. USciences also promises in the Student Handbook to "[s]upport[ ] complainants and respondents equally[.]" *Id.* USciences makes these same promises in the companion Policy. App. 168. The Policy also tasks the Title IX Coordinator with the responsibility of overseeing "a prompt, fair, [and] equitable investigation and resolution process for reports of prohibited conduct at [USciences]." App. 122. And the Student Handbook states that "[p]rocedures and rights in student conduct [proceedings] are conducted with fairness to all, but do not include all of the same protections afforded by the courts." App. 150.

***7** **[11]** USciences contends that the fairness promised in the Student Handbook and the Policy consists of the procedures provided by those documents. USciences essentially argues that because it provided some procedural protections in the Policy, Doe was treated fairly. We disagree. "[I]n determining the intent of the contracting parties, all provisions in the agreement will be construed together and *each will be given effect*." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 962 A.2d 639, 647–48 (2009) (emphasis added) (citation omitted). Nowhere in either the Policy or the Student Handbook is fairness defined, let alone explicitly defined as the procedural protections contained in the Student Handbook and the Policy. Because the fairness promised in the Student Handbook and the Policy must "be given effect," *see id.*, we reject USciences's circular argument.

### B

**[12]** **[13]** **[14]** Given that neither the Student Handbook nor the Policy defines fairness, we must construe that promise as a matter of contract interpretation. "When interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Halpin v. LaSalle Univ.*, 432 Pa.Super. 476, 639 A.2d 37, 39 (1994) (citations omitted). When "the contract evidences care in its preparation, it will be presumed that [the contract's] words were employed deliberately and with intention. In determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract do not assume that its language was chosen carelessly." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 662 (1982) (internal quotation marks and citations omitted).

The plain meaning of the word "fair" is "just, unbiased, equitable, legitimate, in accordance with rules." *See Fair*, The Concise Oxford Dictionary 347 (7th ed. 1982). Here,

the fairness promised by the Student Handbook and the Policy relates to procedural protections for students accused of sexual misconduct, and Doe alleges that he did not receive a "fair and impartial hearing." App. 114. In this context, a "fair hearing" or "fair process" "is a term of art used to describe a 'judicial or administrative hearing conducted in accordance with due process.' " *Wojchowski v. Daines*, 498 F.3d 99, 102 n.5 (2d Cir. 2007) (quoting *Fair hearing*, Black's Law Dictionary 738 (8th ed. 1999)).

Doe's allegations of unfairness arise in a breach-of-contract claim between two private parties—a private university and one of its students. Under those circumstances, courts are sometimes chary about reviewing too closely the manner in which a private university chooses to investigate and discipline its students. That is especially appropriate for matters uniquely within the institution's province, such as academic integrity or faculty development and discipline. *See, e.g.*, *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 n.2 (Pa. Super. Ct. 2007) (discussing *Murphy v. Duquesne Univ. Of The Holy Ghost*, 565 Pa. 571, 777 A.2d 418 (2001)); *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, 392 Pa.Super. 502, 573 A.2d 575, 579–82 (1990).

This is not such a case. The investigation and fair adjudication of alleged criminal activity like sexual assault is not uniquely within the province of colleges and universities. Yet accused "students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct," *Baum*, 903 F.3d at 582, because the consequences are potentially dire and permanent: "[a] finding of responsibility for a sexual offense can have a 'lasting impact' on a student's personal life, in addition to his 'educational and employment opportunities,' especially when the disciplinary action involves a long-term suspension." *Miami Univ.*, 882 F.3d at 600 (citation omitted). Under the Policy, for example, students accused of sexual misconduct face grave consequences, including a suspension of up to two years or—as in Doe's case—permanent expulsion.

***8** Moreover, this case and others like it differ from garden-variety breach-of-contract disputes involving colleges and universities because of the impact of the 2011 Dear Colleague Letter and colleges' and universities' reactions to it. Although the 2011 Dear Colleague Letter was provided as "guidance," DoEd backed it up by investigating alleged noncompliance. An official from DoEd's Office of Civil Rights ("OCR") warned that "[s]ome schools still are failing their students by responding inadequately to sexual assaults on campus. For those schools, my office [in DoEd] and [the] Administration have made it clear that the time for delay is over." *Purdue Univ.*, 928 F.3d at 668 (citing Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.)). That official cautioned that OCR was "committed to using all its tools to ensure that all schools comply with [T]itle IX so campuses will be safer for students across the country." *Id.* To ensure compliance, OCR put all of "a school's federal funding ... at risk if [the school] could not show that it was vigorously investigating and punishing sexual misconduct." *Id.*; *see also Baum*, 903 F.3d at 586; *Miami Univ.*, 882 F.3d at 594. In another context, the Supreme Court has described the total withdrawal of federal funding as "economic dragooning" and "a gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581, 582, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). Similarly, for most colleges and universities, the loss of federal funds would be ruinous. [6]

Doe's complaint focuses on this background. He alleges that, after the 2011 Dear Colleague Letter issued, "educational institutions like [USciences] limited procedural protections afforded to ... students like [Doe] in sexual misconduct cases." App. 96. And he claims that, although the 2011 Dear Colleague Letter was rescinded before his investigation and expulsion, USciences kept in place the policies enumerated in that letter. In related contexts, Courts of Appeals have carefully considered allegations of unfairness against colleges or universities that were allegedly intimidated by the 2011 Dear Colleague Letter and associated threats of litigation or DoEd scrutiny. *See, e.g.*, *Purdue Univ.*, 928 F.3d at 668; *Baum*, 903 F.3d at 586; *Miami Univ.*, 882 F.3d at 594; *cf. Columbia Univ.*, 831 F.3d at 58 (recognizing plausibility of allegations that university acted with bias because of public criticism of its handling of Title IX claims). The backdrop of Doe's complaint informs our consideration of the fairness that USciences promises students accused of sexual misconduct.

### 1

Procedural fairness is a well-worn concept. Pennsylvania courts have made clear that, at private universities, "basic principles of ... fundamental fairness [are] adhered to [when] the students involved[ ] ... [are] given notice of the charges and evidence against them, [are] allowed to be present and to participate in the hearing assisted by faculty, to call their

own witnesses and to cross-examine the witnesses against them, and [are] fully apprised of the findings of the [h]earing [p]anel." *Psi Upsilon of Phila. v. Univ. of Pa.*, 404 Pa.Super. 604, 591 A.2d 755, 758 (1991).

In other private-university cases, Pennsylvania courts have similarly determined that fairness includes the chance to cross-examine witnesses and the ability to participate in a live, adversarial hearing during which the accused may present evidence and a defense. In *Boehm*, the court held that the private university's disciplinary proceedings were "fundamentally fair" because the procedures included (1) giving notice of charges to the accused students; (2) presenting the accused students with the evidence against them; (3) allowing the accused students to be present for and to participate in a live hearing; (4) permitting the accused students to be assisted by a faculty adviser during the hearing; (5) allowing the cross-examination of witnesses; and (6) permitting the accused students to call their own witnesses. 573 A.2d at 582. And in *Reardon*, the court found that a private university provided the accused with a fair process by "provid[ing] for minimum procedural safeguards—notice, the admission of relevant testimony, the right to call witnesses and present evidence, and the right to be represented by a member of the college community." 926 A.2d at 482. [7]

***9** In short, notions of fairness in Pennsylvania law include providing the accused with a chance to test witness credibility through some form of cross-examination and a live, adversarial hearing during which he or she can put on a defense and challenge evidence against him or her.

**2**

As a private university, USciences is not subject to the Constitution's due process guarantees. Nevertheless, we observe that federal notions of fairness in student disciplinary proceedings are consistent with those recognized in Pennsylvania's jurisprudence. They require, at a minimum, "rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). And as in Pennsylvania, the basic elements of federal procedural fairness in a Title IX sexual-misconduct proceeding include a real, meaningful hearing and, when credibility determinations are at issue, the opportunity for cross-examination of witnesses. *See Purdue Univ.*, 928 F.3d at 663–64 (holding that, among other things, procedural fairness requires "a hearing [to] be a real one, not a sham or pretense" and some "attempt to examine [the accuser's] credibility" (citation omitted)); *Baum*, 903 F.3d at 581 (holding that procedural fairness means that "(1) if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and (2) when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination").

* * *

We hold that USciences's contractual promises of "fair" and "equitable" treatment to those accused of sexual misconduct require at least a real, live, and adversarial hearing and the opportunity for the accused student or his or her representative to cross-examine witnesses—including his or her accusers. [8] We do not, however, attempt to prescribe the exact method by which a college or university must implement these procedures.

**C**

**[15]** We now consider whether Doe plausibly alleges that USciences failed to provide him fairness. In his complaint, Doe claims that "[t]he conduct of the entire process ... violat[ed] the guarantees of fundamental fairness and fair and impartial hearing." App. 114. Doe also alleges that he "was prohibited from confronting his accusers" and that he "was not allowed to have a hearing before a panel." *Id.* In particular, Doe alleges that the sexual assault claims against him hinged on credibility and so, without a hearing, the charges went unexamined in a meaningful way. From these allegations, we draw the reasonable inference that USciences failed to provide Doe a fair, equitable investigation and resolution process. In other words, Doe plausibly alleges that USciences deprived him of fairness because he never received a chance to cross-examine witnesses or any sort of real, live, and adversarial hearing.

USciences argues that, under Pennsylvania law, it need not provide Doe with a "full-dress judicial hearing." Appellee's Br. at 31. We agree. Basic fairness in this context does not demand the full panoply of procedural protections available in courts. But it does include the modest procedural protections of a live, meaningful, and adversarial hearing and the chance to test witnesses' credibility through some method of cross-examination.

***10** USciences also claims that the procedures outlined in the Student Handbook and the Policy satisfy the requirements of basic fairness because Doe had a chance to be heard by the investigator and received other procedural protections. The District Court accepted this argument, concluding that Doe received a fair and equitable process because USciences afforded him the following procedural protections:

> (1) the time, date, sexual nature, and locations of the alleged incidents, as well as the identities of his accusers; (2) more than one opportunity to review the witness statements attached to the Report; (3) more than one opportunity to defend himself before the investigator, including the opportunity to provide *an additional statement* to her after reviewing the investigator's preliminary report; (4) the benefit of an administrative panel, distinct from the investigator, to determine his punishment, and yet another administrative panel to review his appeal of the initial panel's determination; and (5) the opportunity to identify witnesses in his defense—a right which he exercised with such alacrity that seven of the ten total witnesses (excluding Roes 1 & 2) were people *Doe identified*[.]

App. 22–23 (emphasis in original) (citations omitted). USciences therefore argues that the process it provided Doe—its implementation of the single-investigator model—is fair.

To be sure, the investigator listened to Doe during her two interviews with him. But USciences did not provide Doe a real, live, and adversarial hearing. Nor did USciences permit Doe to cross-examine witnesses—including his accusers, Roe 1 and Roe 2. As we explained above, basic fairness in the context of sexual-assault investigations requires that students accused of sexual assault receive these procedural protections. Thus, Doe states a plausible claim that, at least as it has been implemented here, the single-investigator model violated the fairness that USciences promises students accused of sexual misconduct.

## V

Doe's complaint includes enough factual allegations to state a claim for relief under Title IX. Doe also states a plausible claim that USciences breached its contractual obligation to provide him fairness. We will reverse the District Court's order and remand this case for proceedings consistent with our opinion.

**All Citations**

--- F.3d ----, 2020 WL 2786840

Footnotes

1 *See, e.g.*, *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018); *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018); *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 90–91 (1st Cir. 2018); *Plummer v. Univ. of Houston*, 860 F.3d 767, 777 (5th Cir. 2017); *cf. Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 (9th Cir. 2019).

2 *See* United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter (2011), https:/www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html.

3 The District Court erred when it noted that it was "skeptical" of Doe's claim "because it appears to flow from a faulty premise—namely, the consumption of *any* alcohol renders a person unable to give affirmative consent under the" Policy. App. 16. Doe's argument does not "flow from a faulty premise," but from his allegations and the reasonable inferences that can be drawn from them. By indulging its skepticism, the District Court misapplied the familiar standard that governs motions to dismiss under Rule 12(b)(6). To the contrary, the District Court should have viewed the allegations in Doe's complaint in the light most favorable to him and drawn all reasonable inferences from those allegations in his favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).

4 Doe initially told the investigator that his sexual encounter with Roe 2 was mutually consensual. *See, e.g.*, App. 252 ("[Doe] state[d] that [Roe 2] fully participated in the sex and he had no doubt about her consent."). But under the Policy, Doe's allegation that he and Roe 2 were comparably intoxicated undermined his ability to give affirmative consent, just as it impaired hers. *See Doe v. Miami Univ.*, 882 F.3d 579, 596 (6th Cir. 2018).

5 The parties assume that Pennsylvania contract-interpretation principles govern their contract, and we agree. *See, e.g., In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 523 n.5 (3d Cir. 2019) (interpreting a collective bargaining agreement under New Jersey law because the parties assumed New Jersey law applied).

6 "Although the [2011 Dear Colleague Letter] was fashioned as a guidance document that itself did not impose any new binding legal obligations, OCR initiated investigations into dozens of schools for noncompliance with Title IX, utilizing interpretations and requirements specified only in the [2011 Dear Colleague Letter]. The explicit threat was (and remains) to terminate all federal funding—upon which virtually all institutions of higher education significantly rely—if schools did not change their policies and disciplinary procedures to comply." Jacob Gersen & Jeannie Suk, *The Sex Bureaucracy*, 104 Calif. L. Rev. 881, 931–32 (2016).

7 Consistent with Pennsylvania's private-university decisions, the Pennsylvania Administrative Code requires universities in the State System of Higher Education to adopt procedures that guarantee a hearing with "[a]n opportunity for submission of written, physical and testimonial evidence and for reasonable questioning of witnesses by both parties." 22 Pa. Code § 505.3; *see also Ruane v. Shippensburg Univ.*, 871 A.2d 859, 862 (Pa. Commw. Ct. 2005).

8 Doe does not allege that USciences failed to provide him fairness by employing the preponderance-of-the-evidence standard to adjudicate charges of sexual assault, so we do not address that question.

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.