UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Case No. 19-cv-03097 (APM) |
| | ) |
| AMERICAN UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>MEMORANDUM OPINION AND ORDER</u>

## I.   INTRODUCTION

Plaintiff is an American University student proceeding under the pseudonym John Doe. He filed this lawsuit against American University alleging that the school mishandled a sexual assault investigation into Doe, which resulted in a year-and-a-half suspension.   Plaintiff brings five causes of action—one each under Title IX and the District of Columbia Human Rights Act, two breach of contract claims, and one negligence claim.   Defendant moves to dismiss all five claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and Plaintiff moves for partial summary judgment on a portion of his contract claims.   For the reasons that follow, the court grants in part and denies in part Defendant's motion to dismiss and denies Plaintiff's motion for partial summary judgment.

## II.   BACKGROUND

### A.   Factual Background

Plaintiff John Doe was enrolled at American University ("AU" or "the University") from the fall of 2015 through the spring of 2019.   Compl., ECF No. 3 [hereinafter Compl.], ¶ 1. On April 22, 2016, Doe, his friend, H.S., and a woman, Jane Roe, spent the evening at Doe's

apartment, *id.* ¶ 2, where Doe and H.S. drank alcohol and Roe ate a marijuana-laced brownie, *id.* From there, Doe and Roe's accounts of the evening differ dramatically, but each agrees that some sort of physical contact occurred between the two of them, after which Roe and H.S. left Doe's apartment. *Id.* ¶¶ 3–5; *see also* Mot. to Dismiss Compl., ECF No. 13 [hereinafter Mot. to Dismiss], Sealed Exhibits, ECF No. 15 [hereinafter MTD Ex. __], MTD Ex. 1, Investigation Report [hereinafter Investigation Report], at 3–4.

        *1.   Doe's Account*

Doe describes the events of April 22, 2016, as follows.   H.S. and Roe came over to Doe's apartment that evening.   Roe ate a portion of a marijuana-laced brownie, and Doe and H.S. drank alcohol.   Compl. ¶¶ 2, 96–97.   Doe says that "[t]he brownie did not appear to have a noticeable effect on Ms. Roe while she was at Mr. Doe's apartment."   *Id.* ¶ 98.   At some point during the evening, H.S. left the living room and went into the bathroom—either because he became ill from drinking too much alcohol, or to speak with a friend over video chat.   *Id.* ¶¶ 3, 100.[1]   While H.S. was in the bathroom, Roe initiated kissing Doe.   Both were fully clothed.   *Id.* ¶ 3.   Roe then guided Doe's head to her breasts, at which point he began to touch her chest over her clothing. Roe did not object.   *Id.* ¶¶ 3, 101.   Roe then guided Doe's head to her crotch, where he then placed his mouth over her clothing.   *Id.* ¶¶ 3, 102.   Before doing so, Doe says, he asked Roe, "is this what you want me to do?" and she responded, "yes."   *Id.* ¶¶ 3, 103.   According to Doe, "[t]hroughout the time that they were physical with each other in his apartment, Mr. Doe asked for Ms. Roe's consent."   *Id.* ¶ 4.   Soon after their interaction, Roe ordered an Uber, and she and H.S. left.   Before leaving, Roe hugged Doe and thanked him for being caring.   *Id.* ¶ 5.   When Roe got back to her dorm room, she texted Doe to tell him that H.S. had vomited in the Uber on the way

---

[1] The Complaint appears to be inconsistent on this point.

home but that he was "fine" and "OK."   *Id.* ¶¶ 6, 105.   Doe texted Roe the following morning to

ask how she was doing, and she responded that she was "doing okay."   *Id.* ¶ 106.   Roe then texted

Doe that evening asking if he was "okay with everything."   *Id.* ¶¶ 6, 107.   He responded, "[y]eah,

I am," and asked whether Roe was okay.   She replied, "[y]eah I'm tired but okay."   *Id.*

> ### 2.   *Roe's Account*

Roe's account of the evening, recorded in the Title IX Investigation Report, differs

dramatically.   *See generally* Investigation Report.   Roe met Doe in the fall of 2015, during her

freshman year at AU.   *Id.* at 3.   She and Doe lived in the same residence hall that semester, but

Doe moved out during the 2016 spring semester.   *Id.*   Roe met Doe through a mutual friend, H.S.

*Id.*   During her spring semester, Roe mentioned to H.S. that she wanted to try using marijuana.

She and H.S. decided she would try marijuana on April 22, 2016.   *Id.*   Roe estimated that she and

H.S. arrived at Doe's apartment around 10:00 p.m.   *Id.*   She remembers being surprised that Doe

and H.S. were drinking, because Doe had abstained in the past due to his religion, and H.S. had

promised not to drink since Roe was trying marijuana that night.   *Id.*   H.S. brought a marijuana

brownie, which he had purchased from someone in their residence hall.   *Id.*   H.S. broke off a

portion of the brownie, which Roe ate.   *Id.*

About 45 minutes after eating the brownie portion, Roe reports that she "hit the floor like

a rock."   *Id.*   She felt dizzy and fell to the floor.   *Id.*   From that point forward, her memory was

"a bit blurry," but she remembers that Doe and H.S. moved her to the couch.   *Id.*   She continued

to feel "out of it."   *Id.*   At some point, Roe believes she agreed to receive a back massage from

Doe, which prompted him to sit beside her on the couch.   *Id.*   Doe began to massage her back

and neck, but then Doe's hands moved lower "towards her hip area."   *Id.*   H.S. was still in the

room at this point.   *Id.*   Roe reports that she was having difficulty understanding what was

happening but felt that it was "something bad." *Id.* at 3–4. She remembers Doe asking, "where do you want to put my hand," "do you want me to go lower," and "do you consent." She felt confused and answered "yes," "maybe," and "what" to Doe's questions. *Id.* Doe and H.S. kept telling Roe to "say yes" when asked if she "consented," and because she was having difficulty processing what was happening, she kept responding "yes." *Id.* at 4.

Roe says that Doe continued to massage her and moved his hands closer to her breasts. *Id.* Roe stood up to leave and fell, hitting her hip on the coffee table. *Id.* Doe and H.S. asked why she had gotten up. Afraid to tell them that she wanted to leave, Roe said that she needed to use the bathroom. *Id.* Doe helped her to the bathroom, and then helped her back to the couch. *Id.* Back on the couch, Doe began to massage her again, and Doe and H.S. continued to talk to her about "consent." *Id.* Doe and H.S. also conducted a hushed conversation between themselves. *Id.* She heard H.S. reassure Doe that everything was "fine" because it was consensual, and that if Roe told anyone is was not consensual, Doe and H.S. would tell people she was "crazy." *Id.* When Doe returned to the couch, he placed Roe's head near his crotch. *Id.* Doe then moved Roe to a sitting position, at which point H.S. placed the rest of the marijuana-laced brownie in her mouth and told her to eat it. *Id.* Roe reported that she was afraid and felt that she had no choice but to eat the brownie. After finishing the brownie, Roe began to feel dizzy "and became more disoriented and confused." *Id.* Doe then sat back down on the couch, pulled her shirt up, put his hands under her bra, and touched her breasts while kissing her mouth and neck. *Id.* Next, he began to touch "her butt and crotch over her pants." *Id.*

At some point, Roe heard H.S. speaking with a friend over video chat. She heard the friend say "[Roe] doesn't look good," "[w]hy is she on [Doe] like that," and "why is [Doe] touching her." *Id.* at 4–5. H.S. then left the room to continue the conversation. *Id.* at 5. While

4

H.S. was out of the room, Doe continued to kiss her and touch her breasts.   When H.S. returned

to the room, he asked Roe if she consented to what was happening, and she did not respond.

H.S. then told her to "say yes," so she said "yes."   *Id.*   Next, Roe stated that H.S. leaned over the

couch and kissed her "violently," put his tongue in her mouth, and grabbed her breast.   *Id.*

H.S. then stood up, starting to scream, and vomited.   Doe got up from the couch and took H.S. to

the bathroom where she could hear him continue to vomit.   *Id.*

Doe came back into the living room and, without saying anything, pulled Roe's leggings

and underwear down, and inserted his fingers into her vagina.   *Id.*   Roe was scared and in a lot

of pain.   *Id.*   She reported that the pain was so extreme that she screamed "no," "no," and "stop."

*Id.*   Doe removed his fingers and crossed to the other side of the room.   *Id.*   At that point, Roe

says she realized that if she did not leave immediately "something bad was going to happen."   *Id.*

She pulled her leggings back up and sat on the couch, staring at her shoes and trying to figure out

how she could tie her laces.   *Id.*   She hugged Doe goodbye because she did not want him to know

she was upset, afraid that, if he knew, "something bad could happen."   *Id.*

Roe ordered an Uber, at which point H.S. came out of the bathroom and said he was leaving

with her.   *Id.*   She told him "no," but he insisted, and she agreed.   *Id.*   While waiting for the car,

H.S. told Roe not to "tell anyone what happened," especially not Roe's roommate.   *Id.*

H.S. vomited during the car ride home; Roe apologized to the Uber driver and told H.S. to go

upstairs.   *Id.*   When she reached her dorm room, Roe reports that she "was hysterical, and began

to cry."   *Id.*   Roe's roommate asked if she was okay, and Roe asked her to go check on H.S.

because she was worried that he had alcohol poisoning.   *Id.*   When Roe's roommate returned, the

roommate told Roe to go to bed.   *Id.*   Roe went to sleep.   She awoke around 7:30 a.m. the next

day and still felt high.   *Id.*   She went back to sleep; when she woke up later in the day "she felt more clearheaded but slightly delirious."   *Id.* at 6.

Roe's roommate again asked Roe what happened the previous night.   Roe told her roommate that H.S. and Doe said she had consented, but in fact she had not wanted what they did to her.   *Id.*   Her roommate clarified whether she meant H.S., and Roe said "no, no with [Doe], but [H.S.] was there."   *Id.*   Roe remembers feeling delirious during this conversation and she spent the rest of the day in bed.   *Id.*   She still felt high that afternoon.   *Id.*

On April 24, 2016, Roe felt better physically and told her roommate more about what she experienced at Doe's apartment.   Her roommate encouraged her to call a sexual assault hotline and reported to their resident advisor ("RA") that Roe had been sexually assaulted.   *Id.*   Roe's RA and the RA's supervisor spoke with Roe.   *Id.*   Roe told them that she had been high and was touched and kissed without her consent, but she did not reveal either Doe's or H.S.'s name.   *Id.* Roe also attended an appointment with an advocate with AU's Office of Advocacy Services for Interpersonal and Sexual Violence along with her roommate.   *Id.*

A few days later, Roe went to H.S.'s room and told him that she was upset with him.   *Id.* Roe detailed what happened when she was alone with Doe.   *Id.*   H.S. told Roe she had "said yes" to everything and "if anything happened between her and [Doe] it wasn't [H.S.'s] fault" because he was not in the room at the time.   *Id.*   Roe was upset and walked out of the room.   *Id.*

Roe told the investigator that she did not have contact with Doe after April 22, 2016. On April 27, 2016, Roe went to AU's health center for a physical exam because she was continuing to experience pain in her pelvis and vagina.   The Title IX investigator verified documentation of the appointment.   *Id.*

3.      *The Title IX Complaint and Investigation*

On January 9, 2019, over two-and-a-half years after the night in question, Roe filed a complaint against Doe with AU's Title IX Office.   Compl. ¶ 7.   She alleged that Doe had taken advantage of her on the night of April 22, 2016, when he kissed her, touched her, and digitally penetrated her without her consent.   *Id.* ¶ 7; Investigation Report at 4–5.   Roe filed a similar complaint against H.S.   Compl. ¶¶ 8–10.

At the time, AU followed a single-investigator model for review of Title IX complaints. Under such model, a single person conducts the investigation, makes findings of fact, and determines whether a violation has occurred.   *Id.* ¶ 76.   At the time Roe filed her complaint, the University's Title IX investigator was Fariha Quasem.   *Id.* ¶ 79.   During January and February of 2019, Quasem interviewed Roe, Doe, H.S., Roe's roommate, and other witnesses. *See* Investigation Report.   After completing the interviews, Quasem prepared an investigative report dated May 22, 2019.   The 18-page report summarized each interview, noted the facts common to Roe's and Doe's versions, set forth Quasem's findings as to what occurred, and drew conclusions as to whether Doe had violated AU's Student Conduct Code.   *Id.* at 14–18.

Quasem issued a split decision.   The Student Conduct Code defines consent to mean "words or conduct indicating a freely given agreement to have sexual intercourse or to participate in sexual activities."   *Id.* at 15.   Quasem found that "witness statements indicate[d] that based on a preponderance of evidence [Doe] sexually touched [Roe's] breasts and vulva, without [Roe's] consent."   *Id.* at 17.   Nothing "indicate[d] that [Doe] asked [Roe] if he could touch her breasts or vulva" or that Roe "indicated verbally or non-verbally that [Doe] could touch her breasts or vulva." *Id.*   On the more serious charge of rape, Quasem found insufficient evidence to determine whether Doe "digitally penetrated [Roe's] vagina," and therefore concluded that Doe could not be found

responsible for rape by a preponderance of the evidence.   *Id.* at 17-18.   She also found Doe not responsible for sexual exploitation: "[T]he evidence presented shows that [Roe] consumed the marijuana edible of her own volition, and that [Doe] did not force, induce or ask [Roe] to consume the marijuana in order to commit acts of sexual misconduct."   *Id.* at 17.   Accordingly, "[b]ased on the totality of the circumstances and the information obtained pursuant to this investigation," Quasem found "the evidence is insufficient to support a finding of responsibility for" sexual exploitation or rape, but that "the preponderance of the evidence indicates that [Doe] . . . engag[ed] in the prohibited conduct of [ ] Sexual Assault."   *Id.* at 18.   Quasem sent both Doe and Roe a notice of her findings, along with the report.   MTD Ex. 4, Notice of Finding.

Quasem submitted her Investigation Report to AU's office of Student Conduct and Conflict Resolution Services, which convened a sanctioning panel.   Compl. ¶ 198.   On June 3, 2019, Doe was informed that he could participate in the sanctioning panel by giving a statement by Skype or phone, or by submitting a written statement.   *Id.* ¶ 200.   Doe also was told that an "advisor [would] be permitted to attend the sanctioning panel."   *Id.* ¶ 201.   Doe was in Kuwait at the time, so he chose to submit a written statement.   He also intended to have his advisor attend the panel. *Id.* ¶ 202.   But on the day the sanctioning panel convened, Doe received an email stating: "Since you are not attending, this unfortunately also means your advisor cannot attend," and Doe's advisor was later barred from entering the panel meeting.   *Id.* ¶ 203; *see also* MTD Ex. 5.   Roe attended the sanctioning panel and gave a statement.   Compl. ¶ 208.

During the sanctioning panel, the Director of Student Conduct and Conflict Resolution explained that members of the sanctioning panel could be disqualified on the ground of personal bias.   *Id.*   She stated, however, that "if the Respondent is not here, he does not have the

opportunity to recuse anyone." *Id.* ¶ 209.   To this day, Doe does not know the identities of two of the three sanctioning panel members.   *Id.* ¶ 213.

The sanctioning panel suspended Doe from July 1, 2019 through December 31, 2020.   The suspension would be permanently recorded on Doe's transcript.   *Id.* ¶¶ 214–15.   The panel also required Doe to complete a "Reflection Paper."   *Id.* ¶ 215.

On July 15, 2019, Doe appealed the sanctioning panel's decision.   Compl. ¶¶ 216–20; *see also* MTD Ex. 6, Statement in Support of Appeal [hereinafter Statement in Support of Appeal]. He appealed on three grounds.   First, he claimed not to have received "a fair and thorough disciplinary process."   Statement in Support of Appeal at 3.   To support that claim, Doe cited AU's failure to provide him with Roe's written complaint, the findings from the investigation against H.S., and the names of the sanctioning panel members.   He also pointed to Quasem's failure to interview certain people as part of her investigation.   Compl. ¶ 217.   Second, Doe argued that he had new information based on recent conversations between his advisor and H.S., and that he had learned Quasem had failed to include an important witness interview summary in her investigation report.   *Id.* ¶¶ 218–19.   Finally, Doe argued that the sanctions imposed were excessive.   *Id.* ¶ 220.   On July 25, 2019, Doe was informed that his appeal was found "not viable."   Compl. ¶¶ 286–89; *see also* MTD Ex. 7.

### 4.   *AU's Student Conduct Code and Discrimination and Sexual Harassment Policy*

Relevant to Plaintiff's breach of contract claim is an aspect of AU's Student Conduct Code that materially changed during the relevant period of time.   The April 2016 version of the Code contained a timing provision for bringing complaints of sexual assault.   It provided that, in cases involving

9

> an alleged violation of the university's Discrimination and Sexual
> Harassment Policy, Whistleblower Policy, or a Code violation
> involving sexual harassment, domestic violence, dating violence,
> rape, sexual assault, sexual exploitation, or stalking . . . the
> complainant will have one year from the date of discovery to file a
> complaint as set forth in these policies.

Pl.'s Mot. for Partial Summ. J., ECF No. 17 [hereinafter Pl.'s Mot.], Ex. 1, ECF No. 17-4 [hereinafter 2016 Code], at 12.   The 2016 Code further provided that the one-year complaint period could be extended but a request for more time "must be made in writing . . . and will be evaluated based on whether a reasonable person might be justified in filing after the deadline because of relevant circumstances."   *Id.*   The 2016 version of AU's "Discrimination and Sexual Harassment Policy" confirms the importance of the one-year period.   *See* Pl.'s Mot., Ex. 5, ECF No. 17-8 [hereinafter 2016 Policy].   The 2016 Policy states, under the section titled "initiating a complaint," that "[c]omplaints filed after the (1) year period may be considered by the Responsible Official, when requested in writing and there are extenuating circumstances."   2016 Policy at 6. It is undisputed that Roe never made a written request for more time to file a complaint against Doe.   *See* Def.'s Mem. of Law in Opp'n to Doe's Mot. for Partial Summ. J., ECF No. 21, Resp. to Pl.'s Statement of Undisputed Material Facts, ECF No. 21-2, ¶ 17 (explaining instead that Roe was not required to request an extension of time to file her complaint).

By 2019, however, when Roe filed her complaint, the Student Conduct Code no longer contained the one-year timing provision.   *See* Pl.'s Mot., Ex. 4, ECF No. 17-7 [hereinafter 2019 Code].   Instead, the 2019 Code provided that the ordinary 15-day period for lodging a complaint "does not apply to written complaints involving sexual misconduct and discrimination and is subject to the procedures described in Section XIX of this Code."   *Id.* at 13.   Section XIX is entitled "Procedures Related to Violations of the Discrimination and Sexual Harassment Policy."

*See id.* at 17–24.   It sets forth the procedures for addressing alleged "violations of university policy on the basis of sex and gender including sexual violence," which "are the exclusive procedures that govern the formal resolution of all written complaints of sexual misconduct."   *Id.* at 17.   A "[s]tudent seeking formal resolution must file a formal complaint with the Title IX Program Officer," but no deadline for such filing is provided.   *Id.* at 18.   Rather, complainants are now told to "file a formal complaint as soon as possible following the alleged discrimination."   *Id.*   Consistent with this change, the 2019 version of the University's "Discrimination and Sexual Harassment Policy" states that "[a] complaint should be filed as soon as possible following the alleged discrimination."   *See* Pl.'s Mot., Ex. 6, ECF No. 17-9 [hereinafter 2019 Policy], at 7.

### B.    Procedural History

On October 10, 2019, Plaintiff filed this action and asked to proceed under the pseudonym John Doe.   His request was granted.   *See* ECF Nos. 1–3.   Two months later, American University moved to dismiss the complaint in its entirety.   *See generally* Mot. to Dismiss Complaint, ECF No. 13 [hereinafter Def.'s Mot.].   And shortly thereafter, Plaintiff filed a partial motion for summary judgment.   *See* Pl.'s Mot.   Briefing was completed on January 31, 2020, and the court held oral argument on both motions on August 6, 2020.

## III.   LEGAL STANDARDS

### A.    Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* (citing

*Twombly*, 550 U.S. at 556).   At the motion to dismiss stage, the court must accept as true a plaintiff's well-pleaded factual contentions and draw all reasonable inferences in the plaintiff's favor, but it need not accept thread-bare recitals of the elements of standing or legal conclusions disguised as factual allegations.   *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

Factual allegations are not required to be "detailed," but they must be more than "an unadorned, the defendant-unlawfully-harmed-me accusation."   *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).   "A plaintiff alleging racial or gender discrimination by a university must do more than recite conclusory assertions": He or she "must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent."   *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994).

On a motion to dismiss, the court may consider certain "[m]atters that are not 'outside' the pleadings" including "'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,' or documents 'upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss."   *Hinton v. Corrs. Corp. of Am.*, 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009)   (internal citations omitted).

### B.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A fact is "material" if it might affect the outcome of the litigation.   *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).   An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant.   *Wheeler v. Georgetown Univ. Hosp.*,

812 F.3d 1109, 1113 (D.C. Cir. 2016).   When determining whether a genuine dispute of material fact exists, the court must view the evidence in the light most favorable to the non-moving party, *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017), and draw all reasonable inferences in that party's favor, *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

## IV. DISCUSSION

### A. Title IX Claim

The court begins with AU's challenge to Doe's Title IX Claim.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."   20 U.S.C. § 1681(a).   Although the D.C. Circuit has not spoken on the issue, federal courts have recognized four theories that a plaintiff may use to "attack[] a university disciplinary proceeding on grounds of gender bias" under Title IX: (1) "erroneous outcome," (2) "selective enforcement," (3) "deliberate indifference," and (4) "archaic assumptions."   *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (citations omitted).   Doe's claim falls under the "erroneous outcome" rubric.   "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding."   *Yusuf*, 35 F.3d at 715. To succeed under such a theory at the motion-to-dismiss stage, a plaintiff must plausibly allege: (1) "particular facts sufficient to cast some articulable doubt on the outcome of the disciplinary proceeding," and (2) "circumstances showing that 'gender bias was a motivating factor behind the erroneous finding.'"   *Doe v. George Washington Univ.*, 366 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Yusuf*, 35 F.3d at 715).

13

More recently, several circuits have moved away from using strict categorical tests under Title IX, like "erroneous outcome."   As the Seventh Circuit explained in *Doe v. Purdue University*,

> [w]e see no need to superimpose doctrinal tests on the statute.   All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student.   We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] "on the basis of sex"?

928 F.3d 652, 667–68 (7th Cir. 2019).   The Third Circuit has followed suit, stating: "[W]e adopt the Seventh Circuit's straightforward pleading standard and hold that, to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex."   *Doe v. Univ. of the Scis.*, 961 F.3d 203, 209 (3d Cir. 2020).   This pleading standard, "hews most closely to the text of Title IX."   *Id.* The Ninth Circuit has adopted the same approach.   *See Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) ("Although our court has acknowledged some of the doctrinal tests that other courts have employed in this context and assumed their application, we have not expressly adopted any of them. . . [W]e find persuasive the Seventh Circuit's approach to Title IX claims in this context." (citing *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137–38 (9th Cir. 2019); *Purdue*, 928 F.3d at 667)).   This court adopts the straightforward pleading standard set forth by the Seventh Circuit in *Doe v. Purdue University*.   Under that standard, the court finds that Doe has successfully pleaded that "sex was a motivating factor in a university's decision to discipline" him.

That conclusion stems from the Title IX investigator's credibility findings, which plausibly reflect bias based on sex.   *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (finding a Title IX claim plausible where a review board "credited exclusively female testimony (from Roe and her witnesses) and rejected all of the male testimony (from Doe and his witnesses)").

14

Quasem indicated twice in her report that she found Doe not to have been credible.  First, she found that Doe's "claim that [Roe's] behavior was not affected, even in the slightest, by her marijuana consumption decreases the credibility of his account of what occurred on April 22nd." Investigation Report at 15.  Second, Quasem explained that a text message that Doe sent to H.S. stating that Roe "gave her full consent every time I asked, and I asked more than once—Multiple times actually," "negatively impacted [Doe's] credibility" because it "contradict[ed] his statements during the investigation, which only indicate[d] that he asked [Roe] for consent when she moved his head towards her crotch area."  *Id.* at 17.  These are arguably minor critiques of Doe's credibility, given that the events in question had occurred more than two-and-a-half years earlier.

Whether fair or not, these credibility determinations stand in stark contrast to how Quasem viewed Roe in the report.  Roe's testimony presented a raft of potential problems, yet Quasem made *no credibility findings* as to Roe at all.  For example, Roe said that H.S. had video-called a friend that evening, C.S., who could see what was transpiring in the room and who said "[Roe] doesn't look good," "[w]hy is she on [Doe] like that," and "why is [Doe] touching her."  *Id.* at 4– 5.  But when C.S. was interviewed by Quasem, he did not remember saying any such thing.  In fact, he told Quasem that "he did not speak to or see [Roe] or [Doe] via FaceTime that night."  *Id.* at 11.  Quasem made no effort to reconcile this significant inconsistency.  Roe's account of that night also differed dramatically from the only witness present, H.S.  Roe recounted that both Doe and H.S. repeatedly asked her whether she consented to being touched by Doe; H.S. fed her the remainder of the brownie; H.S. was in the room when Doe began to kiss and touch her; and H.S. left the room and, upon his return, "violently" kissed her and grabbed her hair and breast.  *Id.* at 4–5.  H.S. told a very different story.  Although he admitted to drinking heavily, he said that Roe asked to kiss him and he consented but that he never touched her breasts; he and Doe did not

repeatedly ask Roe for her consent to be touched; and that he did not witness any physical contact between Doe and Roe.   H.S. also said that he never saw Roe fall to the ground or have mobility issues, even though Roe had said otherwise.   *Id.* at 9–10.   These are major inconsistencies, and Quasem failed to grapple with any of them or explain how they affected her view of Roe's credibility.

In addition, Roe admitted that as a result of eating the brownie, her "memory of the evening [was] a bit blurry."   *Id.* at 3.   Quasem never considered how Roe's memory impairment might have affected her ability to recount events more than two-and-a-half years later.   Yet, she faulted Doe for a modest testimonial deviation from a text message written within days of the events at issue.

And then there is the following very odd, perhaps revealing, statement in the investigation report.   Quasem provided this description of what Doe's roommate, C.G., and H.S. told her:

> [C.G.] stated on April 24, 2016, [Roe] told her that [Doe] kissed her, touched her breasts under her shirt, and "fingered" her vagina, without her consent.   [H.S.] stated that he only witnessed [Doe] massaging [Roe's] neck and shoulders.   [H.S.] stated that after speaking to [C.G.], he learned that sexual contact may have occurred between [Doe] and [Roe], so he called [Doe] and asked what happened between him and [Roe].   [H.S.] stated that [Doe] said that when [Roe] asked him to stop touching her, [Doe] listened and stopped.   *It is important to note that [H.S.'s] understanding of what occurred between [Roe] and [Doe], was learned from [Doe] and not from [Roe] or [C.G.].*

*Id.* at 16 (emphasis added).   The italicized statement begs an obvious question: Why was it "important" for Quasem to "note" that H.S.'s information came from Doe and not Roe or C.G.? Quasem offers no explanation.   Her statement plausibly could be read to discount H.S.'s reporting merely because it came from an accused male, as opposed to a female accuser and her female roommate.   Thus, it is evidence of plausible gender bias.   *See Baum*, 903 F.3d at 586.

Plaintiff also points to various near-in-time events that AU was facing when the University investigated and punished Doe to support his Title IX claim.   Courts uniformly have recognized that such evidence may be relevant to a claim of sex discrimination.   In *Baum*, for instance, the Sixth Circuit held that a "specific allegation of adjudicator bias, combined with the external pressure facing the university," made the plaintiff's claim plausible.   903 F.3d at 586.   In *Doe v. Miami University*, the Sixth Circuit held that, "[c]onsidering all of the[ ] factual allegations relating to Miami University's pattern of activity respecting sexual-assault matters and the asserted pressures placed on the University, [the plaintiff] . . . pleaded sufficient specific facts to support a reasonable inference of gender discrimination."   882 F.3d at 594.   And in *Doe v. Columbia University*, the Second Circuit found a Title IX claim plausible where the University was facing "substantial criticism . . . both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students." 831 F.3d 46, 57 (2d Cir. 2016); *see also Univ. of the Scis.*, 961 F.3d at 209–10 ("[The plaintiff] plausibly contends that USciences, in its implementation and enforcement of the [University's Sexual Misconduct] Policy, succumbed to pressure from the federal government."); *George Washington Univ.*, 366 F. Supp. 3d at 13 ("[T]he combination of OCR investigations, publicized demonstrations, and the GW statement [regarding the high percentage of sexual assault cases that resulted in a finding of violation] are sufficient to avoid dismissal.").

As in these cases, Plaintiff here alleges that, at the time of his investigation and sanction, AU was under pressure to hold accountable men accused of sexual assault.   Doe alleges that since his freshman year, "the school has been under relentless pressure to appear tough at all costs on sexual misconduct claims brought by women against men, and it has responded to that pressure by infusing its Title IX enforcement regime with gender bias."   Compl. ¶ 25.   This pressure began,

says Doe, "in at least April 2014, when leaked text messages and emails revealed members of a popular male society at the University making sexist comments and bragging about assaulting women." *Id.* ¶ 26.   This led to protests on campus and "calls from students for the University to do something about the 'misogyny' and 'rape culture.'" *Id.*   This public pressure apparently continued over the next few years, and the Department of Education's Office for Civil Rights ("OCR") opened two investigations, in 2015 and 2016, into how the University handled sexual misconduct complaints. *Id.* ¶ 27.   The 2016 investigation was prompted by a female student who went public with her claims "alleging that the University administration tried to silence her when she wanted to speak out about her sexual assault." *Id.*   The student wrote an op-ed in the student newspaper, which went viral, and in response alumni threatened to withhold financial support from American University. *Id.*   In the fall of 2017, the University "scrapped the hearing process it had in place for sexual misconduct disciplinary cases," adopted a "survivor-friendly" model with a single investigator, and hired Quasem, whose previous advocacy, Doe claims, "had been biased against male respondents." *Id.* ¶¶ 28–29.   In September 2017, the University also assured students that it would not follow Education Secretary Betsy DeVos's new guidance on sexual misconduct and cancelled an event on campus that "likely would have been critical of the Title IX disciplinary process after a women's student group complained that it would traumatize marginalized students." *Id.* ¶ 30.   Lastly, in November 2017, American University's Title IX Office "began referring students who wanted to learn about their rights under the law—including male respondents—to an organization that actually advocated for fewer legal rights for male respondents and focused on protections for non-male victims of sexual misconduct." *Id.*

Defendant counters that these events are far too remote in time to allow for any inference of discrimination at the time of Doe's investigation.   Rough Hr'g Tr., Aug. 6, 2020 [hereinafter

Rough Tr.], at 27–29.   The court disagrees.   The most recent allegation cited by Plaintiff, when the University began referring students to an organization that "advocated for fewer legal rights for male respondents," was approximately 15 months prior to Roe's complaint.   Compl. ¶ 30. It is not implausible that just over a year after instituting this policy, American University continued to be sensitive to pressure regarding its handling of sexual assault allegations in the face of significant scrutiny in previous years.   At the motion-to-dismiss phase, these additional allegations bolster the already plausible allegations of discrimination based on sex.

None of the foregoing is meant to take a position on what in fact occurred between Doe and Roe.   That is not the purpose of the court's inquiry at this stage.   Rather, the question before the court is whether Doe has pleaded a plausible case of gender discrimination under Title IX. *See Columbia Univ.*, 831 F.3d at 59 (observing that "[t]he role of the court at this stage of the proceedings is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed"). Plaintiff has met his burden.   *See Baum*, 903 F.3d at 586 (holding that "specific allegation of adjudicator bias, combined with the external pressure facing the university," rendered the plaintiff's Title IX claim plausible).

### B.    DCHRA Claim

Doe's second count alleges violations of the D.C. Human Rights Act ("DCHRA"). *See* Compl. ¶¶ 246–59.   The DCHRA provides:

> It is an unlawful discriminatory practice . . . for an educational institution . . . [t]o deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived . . . sex . . . [or] gender identity or expression . . . of any individual.

D.C. Code § 2-1402.41.   The statute further states that "[a]ny practice which has a discriminatory effect and which would otherwise be prohibited by this chapter shall not be deemed unlawful if it can be established that such practice is not intentionally devised or operated to contravene the prohibitions of this chapter and can be justified by business necessity."   *Id.* § 2-1401.03.   This latter provision is known as the "effects" clause.

Plaintiff advances two theories under the DCHRA: disparate treatment and disparate impact.   Compl. ¶¶ 249–59.   As explained below, Plaintiff's disparate treatment claim survives, but his disparate impact does not.

### 1.   *Disparate Treatment*

The parties agree that if Plaintiff's Title IX claim survives, his disparate treatment claim under the DCHRA survives as well.   *See id.* ¶¶ 249–50; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss, ECF No. 16 [hereinafter Pl.'s Opp'n], at 31; Rough Tr. at 36.   Accordingly, Defendant's motion to dismiss is denied as to Plaintiff's disparate treatment claim under Count II of the Complaint.

### 2.   *Disparate Impact*

Doe's disparate impact claim alleges that "[t]he University's Title IX enforcement regime has the effect of disproportionately burdening male students based upon their sex."   Compl. ¶ 256; *see also id.* ¶¶ 251–59.   Doe further contends "[u]pon information and belief" that "the vast majority of respondents in the University's Title IX proceedings since the University switched to a single-investigator model have been male," *id.* ¶ 251, and the University's Title IX investigator "brings a bias in favor of female complainants into every case she investigates and adjudicates," *id.* ¶ 253.

The D.C. Court of Appeals "has already spoken directly on [the] issue [of disparate impact] and found that D.C. 'imported into the Human Rights Act, by way of the effects clause, the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).'"[2]   *George Washington Univ.*, 366 F. Supp. 3d at 13 (D.D.C. 2018) (quoting *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc)).   A disparate impact claim alleges that a facially neutral practice "causes a disparate impact on the basis of race, color, religion, sex, or national origin." *Tolton v. Jones Day*, No. 19-945 (RDM), 2020 WL 2542129, at *22 (D.D.C. May 19, 2020).   "To state a disparate impact claim, the plaintiff must do more than allege a gender . . . *imbalance*." *Id.* (cleaned up).   Rather, "a plaintiff must [ ] demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group." *Id.* (cleaned up) (quoting *Wu v. Special Counsel*, No. 14-7159, 2015 WL 10761295, at *1 (D.C. Cir. Dec. 22, 2015)).   To withstand a Rule 12(b)(6) motion, however, "a plaintiff is not required to offer prima face proof or detailed factual allegations." *Id.* (cleaned up).   "It is enough to allege facts, if accepted as true, that are sufficient to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged and to raise a right to relief above the speculative level." *Id.* (cleaned up).

In *Doe v. George Washington University*, the plaintiff brought a similar disparate impact claim against his university.   366 F. Supp. 3d at 13–14.   The court held that "without showing that women go through the same disciplinary process and receive disproportionately different outcomes, there is no showing of disparate impact" because "there is no comparator group." *Id.* at 13.   That same flaw is present in this case.   Doe has not offered a comparator group that the

---

[2] The Court in *Griggs* held that "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability."   401 U.S. at 432.

court can use to determine that men "receive disproportionately different outcomes" during American University's Title IX sexual assault investigation process.   Indeed, as AU correctly points out, "the *only* point of comparison Doe presents at all is H.S.," another male respondent, who was found "'*not responsible*' for all of the applicable charges during a disciplinary proceeding that involved the exact same process" and investigator.   Def.'s Mot. at 20–21; *see also* Compl. ¶¶ 10–11; Statement in Support of Appeal at 11–15.   Doe argues that his case is distinguishable from *Doe v. George Washington University* because in that case, only men were accused of sexual assault, so there was no *possible* comparator group.   Whereas here, Doe "alleges that the 'vast majority'—not 'all'—of respondents in AU's Title IX proceedings are men."   Pl.'s Opp'n at 32. Therefore, "[u]nlike the plaintiff in *GW*, Mr. Doe could develop, through discovery, the necessary statistical evidence to sustain his cause of action."   *Id.* (citing *Boykin v. Gray*, 895 F. Supp. 2d 199, 213–14 (D.D.C. 2012) ("[I]n order to prevail the plaintiffs likely will need to provide statistical analyses supporting their allegation, . . . [a]s skeptical as the Court is that the plaintiffs' claim has any chance of success, that is a matter for summary judgment.")).   The court takes Plaintiff's point, but creative wordsmithing not supported by well-pleaded facts cannot "raise a right to relief above the speculative level."   *Tolton*, 2020 WL 2542129 at *22.

Plaintiff also alleges that, "*[u]pon information and belief*, the vast majority of respondents in the University's Title IX proceedings since the University switched to a single investigator system have been male," Compl. ¶ 251 (emphasis added), and contends that "[t]his is the type of case for which 'upon information and belief' pleading was designed," Pl.'s Opp'n at 32 (quoting *Ritter v. Okla. City Univ.*, No. 16-0438-HE, 2016 WL 3982554, at *2 (W.D. Okla. July 22, 2016)). Plaintiff cites *Jbari v. District of Columbia* in support, but there the plaintiff brought only a disparate treatment claim, not a disparate impact claim.   *See* 304 F. Supp. 3d 201, 209 (D.D.C.

2018) (observing that "courts have also permitted claims for disparate treatment based upon information and belief"). *Jbari* is therefore inapposite.   In any event, although "information and belief" pleading remains permissible post-*Twombly*, the "belief" still must be "based on factual information that makes the inference of culpability plausible." *Evangelou v. Dist. of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).   Doe's Complaint is devoid of such "factual information" that would render his "belief" plausible.   He does not, for example, explain the basis for his assertion that, since switching to a single-investigator model, most Title IX respondents have been men.   Nor does he offer any support for his contention that the single-investigator model "has the effect of producing false findings of responsibility," Compl. ¶ 254, or that such alleged false findings have disproportionately affected males.   These are no more than conclusory allegations.   Defendant's motion to dismiss is therefore granted as to Doe's disparate impact claim.

### C.     Breach of Contract

Count III alleges a breach of contract claim.   *See* Compl. ¶¶ 260–65.   Plaintiff asserts that a contractual relationship existed between himself and the University, and that "the University's Policies and Codes were part of that contract." *Id.* ¶¶ 261–62.   Plaintiff advances six distinct theories as to how AU breached this contractual relationship: (1) "The University failed to apply its one-year statue of limitations," which existed in the 2015-2016 Code, *id.* ¶¶ 266–70; (2) the Title IX investigator failed to conduct a "thorough and impartial investigation," as required by the University's policies, *id.* ¶¶ 271–73; (3) the University failed to "provide an investigation that afforded [Plaintiff] the opportunity to present evidence," *id.* ¶¶ 274–77; (4) "[t]he University . . . failed to apply the preponderance of the evidence standard," *id.* ¶¶ 278–80; (5) the University refused to allow Doe's advisor to attend the sanctioning panel and failed to tell Doe

23

that he could challenge any of the panel members for "personal bias," *id.* ¶¶ 281–85; and finally, (6) the University breached the contractual relationship when it decided that Doe's appeal was not "viable," *id.* ¶¶ 286–289.   For its part, Defendant argues that "Doe has not alleged the breach of an enforceable contract" because the school's Student Conduct Code and Discrimination and Sexual Harassment Policy do not constitute enforceable contracts.   Def.'s Mot. at 21–24. Furthermore, even if these could be considered contracts, "AU and its employees complied with the Code and Policy."   *Id.* at 24–30.

### 1.   The Existence of an Enforceable Contract

Under D.C. law, generally speaking, "the relationship between a university and its students is contractual in nature."   *Basch v. George Washington Univ.*, 370 A.2d 1364, 1366 (D.C. 1977); *see also Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017) (confirming that "the relationship between a university and its students is contractual in nature" (quoting *Manago v. District of Columbia*, 934 A.2d 925, 927 (D.C. 2007))).   Whether a specific university policy gives rise to contractual rights, the D.C. Court of Appeals has held, "depend[s] upon general principles of contract construction."   *Basch*, 370 A.2d at 1367.   "'[T]he [policy] document itself must be viewed as a whole' and 'the court should view the language of the document as would a reasonable person in the position of the parties.'"   *Pride v. Howard Univ.*, 384 A.2d 31, 34 (D.C. 1978) (quoting *Basch*, 370 A.2d at 1367).

With these principles in mind, the court agrees with Doe that a contractual relationship exists between AU and Doe, and that the Student Code of Conduct and the Discrimination and Sexual Harassment Policy form a part of that relationship.   Looking at the University's Code and Policy as a whole, they set forth specific procedures that both the student and University must

follow, and they show both parties' clear intent to be bound.   For example, the 2016 version of the Discrimination and Sexual Harassment Policy describes the scope of the policy as follows:

> This policy covers all faculty, staff, and students of American University, applicants for admission and employment, as well as vendors, guests, and contractors ("AU Community").   This policy applies to all University programs and activities.   The University will address complaints related to an AU Community member's participation in those programs and activities, regardless of whether the offending conduct occurred on or off campus.   The policy is intended to be consistent with the provisions of applicable local and federal laws and regulations.

2016 Policy at 1.   A later version of the Policy adds: "When several processes/procedures may be applicable in resolving a discrimination complaint, the Designated Official . . . will determine which process will be used for resolving the complaint."   2019 Policy at 1–2.   The Policy imposes certain obligations on both students and other American University community members *and* on the University itself.   It says that "[t]he University *will* address complaints," and the "Designated Official . . . *will* determine which process" to use.   *Id.* (emphasis added).   The Policy also goes on to provide detailed definitions of prohibited conduct and sets forth procedures for the complaint and investigation processes.   *See* 2016 Policy at 2–9; 2019 Policy at 2–9.

Similarly, the Student Conduct Code sets out "responsibilities and rights," which "[e]very student has a duty to understand."   2016 Code at 2.   Students must "abide by the rules and regulations of the university."   *Id.*   The Code is described as "the university's policy for nonacademic conduct offenses and applies to all students, recognized student organizations, and provisionally recognized student groups."   *Id.* at 4.   The Code lists prohibited conduct, *id.* at 7–8, and specifies the procedures for disciplinary conferences, disciplinary hearings, sanctions, and appeals, among other things, *id.* at 12–17; *see also* 2019 Code at 8, 12–16.   Like the sexual harassment policy, the Code sets forth detailed obligations, processes, and procedures, which bind

both students and the University.   *See, e.g.*, 2019 Code at 13 (noting that the Director of Student Conduct and Conflict Resolution Services "*will* review all disciplinary conference decisions to ensure their procedural integrity and consistency" with prior cases) (emphasis added).   The Code therefore also creates enforceable contractual rights and obligations.   *See Doe v. George Washington Univ.*, 321 F. Supp. 3d 118, 124 (D.D.C. 2018) (holding the university's Code of Conduct to be a contract because it "governs student behavior while studying at the University and its sections on appeals from panel decisions on non-academic discipline set forth clear procedures that impose requirements on the University, to which the University expressed a clear intent to be bound").

The cases that Defendant cites applying District of Columbia law[3] are not to the contrary. In *Shinabargar v. Board of Trustees of University of District of Columbia*, the court held that the University of the District of Columbia's ("UDC") Honor Code did not constitute an enforceable contract because it lacked "both an intent to be bound and mutuality of obligation."   164 F. Supp. 3d 1, 29 (D.D.C. 2016).   Rather, the court found, the Honor Code was "merely an acknowledgement and pledge that a student [would] read and become familiar with the UDC-DCSL Student Handbook . . . [and] abide by the UDC-DCSL Honor System."   *Id.* (cleaned up). In so concluding, the court observed that "[t]he UDC Student Handbook, which outline[d] the UDC Honor System, explicitly state[d] that it 'd[id] not constitute a contract between the student and the David A. Clarke School of Law or the University of the District of Columbia.'"   *Id.*   Here, as discussed, the Code and Policy demonstrate both an intent to be bound and a mutuality of obligation, and there is no comparable contract disclaimer.

---

[3] Defendant also cites a number of cases from other districts, which the court does not address.   *See* Def.'s MSJ Opp'n at 5–8.

In *Mosby-Nickens v. Howard University*, another case cited by Defendant, the court observed that the university's Graduate School Rules and Regulations at issue "appear[ed] to be intended as a means for the university to communicate its expectations regarding academic conduct to its students."  864 F. Supp. 2d 93, 99 (D.D.C. 2012).  "It [did] not appear," the court concluded, "that the university intended to bind itself to the handbook's provisions."  *Id.* at 99 (noting, for example, that the document stated that completion of minimum course and credit requirements "d[id] not guarantee receipt of the degree").  Defendant also looks to *Richter v. Catholic University of America*, No. 18-00583 (RJL), 2019 WL 481643 (D.D.C. Feb. 7, 2019), where the court found that Catholic University's Academic Rules were merely intended to communicate its academic expectations to students and were "*not* an intentional effort by the university to bind itself to the Rules' provisions."  *Id.* at *3.  The opposite is true in this case, where the University's Code and Policy impose obligations and requirements on the University itself, thus evincing a clear intent to be bound.  *See supra* 24–26.  Finally, Defendants cite *Manago v. District of Columbia*, where the court found that plaintiff had "fail[ed] to allege sufficient facts to demonstrate either the terms of the contract or reason to think it was breached" because the documents at issue were not attached to or incorporated by reference in the complaint.  934 A.2d at 927.  Here, though, relevant versions of the Code and Policy *were* attached to Plaintiff's Complaint, thus rendering the comparison to *Manago* inapposite.

> 2. *Breach of Contract & Breach of Implied Covenant of Good Faith and Fair Dealing*

Having established that an enforceable contract exists between the parties, the court must next determine whether Plaintiff has stated a plausible claim for breach of contract.  "Under D.C. law, '[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty;

and (4) damages caused by breach.'"   *Richter*, 2019 WL 481643, at *2 (quoting *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014)); *see also Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).

In addition to his breach of contract claim, Plaintiff brings a separate claim for breach of the implied covenant of good faith and fair dealing.   Compl. ¶¶ 290–95 (Count IV).   Under D.C. law, "[a]ll contracts contain an implied duty of good faith and fair dealing, which means that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."   *Doe v. George Washington Univ.*, 366 F. Supp. 3d at 7 (quoting *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 247–48 (D.D.C. 2012)).   This duty is breached when a party "evad[es] the spirit of the contract, willfully render[s] imperfect performance, or interfer[es] with performance by the other party."   *Id.*   "[T]o show that a university breached the implied covenant of good faith and fair dealing, a plaintiff must allege 'either bad faith or conduct that is arbitrary and capricious,' and, in resolving such cases, courts must not 'substitut[e] their judgment improperly for the academic judgment of the school.'"   *Chenari*, 847 F.3d at 745 (quoting *Wright v. Howard Univ.*, 60 A.3d 749, 754–55 (D.C. 2013)).   As the same allegations underlie Plaintiffs' breach of contract and breach of the duty of good faith and fair dealing claims, the court considers them together.   *See id.*

a.   <u>Statute of limitations</u>

Doe's first theory of breach alleges that "[t]he University failed to apply its one-year statute of limitations to Ms. Roe's nearly three-year old claims against Mr. Doe."   Compl. ¶ 266.   This claim turns on how one reads AU's Student Conduct Code and the version of the Code that applies. The Code in effect on April 22, 2016, when the alleged assault occurred, provided that when there is an alleged violation of the Discrimination and Sexual Harassment Policy, "or a Code violation

involving sexual harassment, domestic violence, dating violence, rape, sexual assault, sexual exploitation, or stalking . . . the complainant will have one year from the date of discovery to file a complaint."   2016 Code at 12.   The 2016 Code also provided an exception, stating: "Requests for extensions of the . . . one year filing period[] must be made in writing to the director of Student Conduct and Conflict Resolution Services or designee, and will be evaluated based on whether a reasonable person might be justified in filing after the deadline because of relevant circumstances." *Id.*   In sharp contrast, the version of the Code in effect at the time Doe filed her complaint on January 9, 2019, did not contain a presumptive one-year complaint period for reporting claims of sexual harassment or assault.   It provided instead that the typical "15 calendar day filing period does not apply to written complaints involving sexual misconduct and discrimination . . . "   2019 Code at 12–13.   Notwithstanding this change, Doe alleges that, by allowing Roe to file a complaint after one year without an approved written request, "the University failed to apply the policies and procedures it promised to Mr. Doe, thereby breaching its contract with him."   Compl. ¶ 270.   AU responds that the one-year period in the 2016 Code is not akin to a statute of limitations, but is a procedural processing rule and, in any event, the 2019 Code that contains no one-year limit is controlling, as that is when Roe filed her complaint.   *See* Rough Tr. At 31, 55.

It would be premature for the court to decide at this stage whether Doe's or the University's interpretation of the 2016 Code is correct, or whether the 2019 version is controlling. In interpreting the contractual terms and nature of a university policy, it may be appropriate to consider evidence of how that policy has been interpreted and implemented.   *See Pride*, 384 A.2d at 34–35 (observing that in the university setting "the *usual practices* surrounding a contractual relationship can themselves be raised to the level of a contractual obligation") (emphasis added). The D.C. Circuit observed long ago in the context of a contract between a university and a

professor that "[t]he readings of the market place are not invariably apt in this noncommercial context," and that the need to interpret a contract by reference to the "norms of conduct and expectations founded upon them" is "especially true" in the university setting. *Greene v. Howard Univ.*, 412 F.2d 1128, 1133 (D.C. Cir. 1969). Those principles apply equally to a contract, as here, between a university and a student. It thus suffices at this stage to conclude that Doe's reading of the 2016 Code is not so implausible as to warrant dismissal of his contract claim. *Cf. Debnam v. Crane Co.*, 976 A.2d 193, 197–98 (D.C. 2009) ("[I]f the provisions of the contract are ambiguous, the correct interpretation becomes a question for a factfinder.").

For much the same reason, however, the court denies Doe's motion for partial summary judgment on this theory of breach. *See generally* Pl.'s Mem. in Supp. of John Doe's Mot. for Partial Summ. J., ECF No. 17-1. The 2016 Code's language concerning the one-year complaint period is not unambiguously a limitation period, and AU has presented evidence to the effect that the University has never treated it as such. *See* Mem. of Law in Opp'n to Doe's Mot. for Partial Summ. J., ECF No. 21, Aff. of Regina Curran, ECF No. 21-1. According to Regina Curran, the University's Title IX Program Officer since 2017, "AU has never declined to investigate a complaint or report (whether oral or written) of sexual assault on the ground that such complaint or report was untimely." *Id.* ¶ 6. Thus, there remains a genuine dispute of material fact as to the meaning of the one-year complaint period, which precludes Doe's demand for summary judgment at this juncture.

b.   Thorough and Impartial Investigation

Returning to Doe's remaining contract theories, he next asserts that American University failed to conduct "a thorough and impartial investigation." Pl.'s Opp'n at 33. Plaintiff alleges that the "University's Policy requires its Investigator to conduct a 'thorough and impartial

investigation that afford[s] all parties notice and opportunity to present evidence in determining whether a policy violation has occurred."   Compl. ¶ 271 (citing 2019 Policy at 8).   As evidence of a deficient investigation, Plaintiff points to three examples of things that were not "thorough and impartial" about Quasem's investigation: (1) she "failed to ask Ms. Roe and H.S. simple and obvious follow-up questions when the answers would have undermined Ms. Roe's allegations"; (2) she "failed to interview at least three people to whom Ms. Roe gave contemporaneous accounts of the events of that night"; and (3) she "withheld information and evidence gathered in the investigation of H.S. regarding the same set of events."   Pl.'s Opp'n at 33–34; *see also* Compl. ¶ 272.

The court is skeptical that the Policy's requirement that an investigator conduct a "thorough and impartial investigation" can give rise to an enforceable contractual right.   Under District of Columbia law, "[a] contract must be sufficiently definite as to its material terms . . . that the promises and performance to be rendered by each party are reasonably certain."   *Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008) (quoting *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990)); *see also, e.g.*, *Doe v. Cal. Inst. of Tech.*, No. 2:19-cv-01005-AB (KSx), 2019 WL 8645652, at *5 (C.D. Cal. Aug. 13, 2019) ("[G]eneral and vague declarations or promises in university publications do not creat[e] contractual obligations.") (cleaned up); *Doe v. DiStefano*, No. 18-cv-1462-WJM-KLM, 2019 WL 1254943, at *3 (D. Colo. Mar. 19, 2019) ("Vague policy pronouncements in [a university's] policy documents are usually an insufficient basis for a breach of contract claim.");   *Doe v. Univ. of Dayton*, No. 3:17-cv-134, 2018 WL 1393894, at *7 (S.D. Ohio Mar. 20, 2018) ("Vague, hortatory pronouncements in a contract are insufficient to support a breach of contract claim.") (citation omitted).   *But see Doe v. Amherst Coll.*, 238 F. Supp. 3d 195, 217 n.3 (D. Mass. 2017) ("The *Policy* and *Procedures*

31

contain express promises that investigations regarding alleged sexual misconduct will be 'thorough, impartial and fair.'  Doe's claim is based on this language rather than the type of '"generalized representations" to treat students with "fairness and beneficence"' that are '"too vague and indefinite to form an enforceable contract"' between a student and college.") (citation omitted).   At the same time, '"[a]ll the terms contemplated by the agreement need not be fixed with complete and perfect certainty for a contract to [be enforceable].'"  *Eastbank*, 940 A.2d at 1002 (quoting *Rosenthal*, 573 A.2d at 370).   "All agreements have some degree of indefiniteness and some degree of uncertainty," *id.* (quoting *Rosenthal*, 573 A.2d at 370), and a "contract is enforceable if it is 'sufficiently definite so that the parties can be reasonably certain as to how they are to perform,'" *id.* (quoting *Duffy v. Duffy*, 881 A.2d 630, 638 (D.C. 2005)).

Because whether the commitment to conduct a "thorough and impartial" investigation gives rise to a contractual right may depend on how the University has given that term meaning in other Title IX investigations, *see Pride*, 384 A.2d at 34–35, the court will permit Doe to proceed to discovery on this theory of breach, *see Iqbal*, 556 U.S. at 678.

### c.    The Opportunity to Present Evidence

Next, Plaintiff argues that "[t]he University broke its promises when it withheld from Mr. Doe the details of [ ] its investigation of H.S. for alleged acts he committed in Mr. Doe's apartment on April 22, 2016," as well as the details of a different investigation into a complaint filed by Roe against H.S. relating to an incident that allegedly occurred in February 2016.   Compl. ¶¶ 275.   By denying Doe this information, Doe says, the University denied him "the right to be heard with respect to the relevant evidence and information Ms. Quasem gathered in her investigation."   *Id.* ¶ 276.   Further, Doe "was denied the right to submit information in connection with what Ms. Quasem learned during her investigation of H.S., identify witnesses who

could refute or support what Ms. Quasem found during her investigation of H.S., or pose follow-up questions to the witnesses Ms. Quasem interviewed during her investigation of H.S." *Id.* "At the very least," Doe asserts, the information Ms. Quasem gathered during her investigation into H.S. is "relevant to the credibility of" Doe and H.S. *Id.* ¶ 277.

American University's Code requires that the Title IX investigator provide "all parties notice and opportunity to present evidence" and, "[d]uring the investigation, the parties will have equal opportunity to be heard, to submit information and corroborating evidence, to identify witnesses who may have relevant information, and to submit questions that they believe should be addressed by the investigator to the other party or to any witness." *Id.* ¶ 274; 2019 Code at 18. The Code also gives the Title IX investigator "the discretion to determine the relevance of any submitted evidence and to include or exclude certain types of evidence." 2019 Code at 18.

Doe has not, however, pointed to anything in the University's Code or Policy that required it to give him information pertaining to an investigation of *another student*, even if such evidence would be considered exculpatory under principles of criminal law. Arguably, disclosing such evidence could run afoul of federal privacy laws protecting educational records. *See* 20 U.S.C. § 1232g. In any event, Doe has not put forward any facts that would support a plausible claim that the University breached a promise to him by refusing to disclose information relating to the investigation into H.S. His assertion that the University failed to allow him to present evidence concerning its investigation of H.S. fails for the same reason.

                d.    <u>Preponderance of the Evidence Standard</u>

Plaintiff alleges that "[t]he University also failed to apply the preponderance of the evidence standard in concluding that the evidence tending to show that Ms. Roe did not consent to sexual activity . . . outweighed evidence to the contrary." Compl. ¶ 278. In the section on

"procedures for disciplinary hearings," the Code requires that, at a disciplinary hearing, the complainant must "present a case that meets the standard of a preponderance of the evidence," 2019 Code at 14, and additionally states that "[t]he allegations against the respondent must be established by a preponderance of the evidence," *id*.   Furthermore, in the section specific to "procedures related to violations of the discrimination and sexual harassment policy," the Code states that "the investigator will prepare an investigation report, which will include a finding of responsible or not responsible, by a Preponderance of the Evidence, for each alleged violation." *Id.* at 18.   "Preponderance of the Evidence" is defined as "a measure of proof that a reasonable person would accept as 'more likely than not' that a fact is true or that an incident occurred."   *Id.* at 7.

In her investigation report, Quasem found that: (1) "witness statements indicate[d] that based on a preponderance of the evidence [Doe] sexually touched [Roe's] breasts and vulva, without [Roe's] consent," Investigation Report at 17; (2) "based on a preponderance of the evidence [Doe] violated the Code by sexually touching Roe[ ] . . . without her consent," *id.* at 18; and (3) "[b]ased on the totality of the circumstances and the information obtained pursuant to this investigation, the preponderance of the evidence indicate[d] that [Doe] violated [the Code] by engaging in the prohibited conduct of . . . [s]exual [a]ssault," *id.*

Notwithstanding Quasem's repeated reference to the proper standard, Doe says that "[t]he University, through Ms. Quasem and the Appellate Board, was aware of a large amount of evidence that called Ms. Roe's credibility into question and therefore undermined her claims." Compl. ¶ 279.   As evidence of this, Plaintiff points to the following: (1) Roe's claim that "she could not stand or walk without assistance," which "was contradicted by all of the available, objective evidence"; (2) Roe's claim that "her memory went 'blurry' after she 'hit the floor like a

rock,'" which was contradicted by her claimed ability to remember in detail events from three years prior; (3) Roe's "claims that both H.S. and [his friend] witnessed Mr. Doe touch her sexually without her consent," which "was refuted by both witnesses"; (4) Roe's failure to state, in her initial interview, that she hugged Doe goodbye; (5) Roe's failure to mention that she texted Doe when she returned to her dorm room and the next day; (6) "[t]he content of Ms. Roe's text messages to Mr. Doe, which undermined her claims regarding her level of inebriation and consent to sexual activity"; (7) Roe's "plainly false stated reasons for sending Mr. Doe text messages the night of the incident and the next day"; (8) Roe's "apparent decision to withhold" text messages from Quasem; and (9) Roe's claims against H.S. were found to be without merit. *Id.* Because of these inconsistencies and apparent problems with Roe's credibility, Doe contends, Quasem found him "responsible for Sexual Assault based on less than a preponderance of the evidence." *Id.* ¶ 280. That decision, says Doe, "was arbitrary and capricious, was without reasoned basis, ignored contrary evidence, and was the product of her pre-determined bias in favor of Ms. Roe." *Id.*

As framed, Doe's theory of breach amounts to a demand that the court conduct a sufficiency-of-the-evidence, appellate-style review of Quasem's findings, which it cannot do. *See Plummer v. Univ. of Hous.,* 860 F.3d 767, 772 (5th Cir. 2017) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion."); *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 13 (D. Me. 2005) ("This Court's review is substantially circumscribed; the law does not allow this Court to retry the University's disciplinary proceeding."); *accord Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 672 (M.D. Tenn. 2018); *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015). Doe therefore

has not stated a plausible theory of breach based on the University's alleged failure to apply a preponderance of the evidence standard.

e.     Sanctioning Panel

Plaintiff advances two theories of breach with respect to his appearance before the sanctioning panel.   First, he argues that AU acted improperly by declining to allow his advisor to attend the sanctioning panel's hearing.   Compl. ¶¶ 282–84.   But that is not a plausible claim of breach.   AU's Discrimination and Sexual Harassment Policy provides that "the Complainant and the Respondent may be advised *and accompanied* by advisors of their choice during any meeting related to the complaint."   2019 Policy at 8 (emphasis added).   The term "accompany" means "to go with as an associate or companion,"[4] or "to go with someone or to be provided or exist at the same time as something."[5]   Here, Plaintiff decided not to attend the sanctioning panel hearing, either in person or via videoconference, because he was in Kuwait.   Compl. ¶¶ 200–02.   He therefore had no right to have an advisor "go with," or "accompany," him to a hearing that he himself did not attend.   Doe cannot complain that the University denied him a right that he intentionally relinquished.

Second, Plaintiff asserts that a breach occurred during the sanctioning panel phase because he was not told the identities of his sanctioning panel members nor given the opportunity to request their recusal.   Pl.'s Opp'n at 37–38.   This claim has more legs.   The Student Conduct Code states that "[s]tudents accused of conduct violations are entitled to . . . request that any person conducting a disciplinary proceeding or serving as a Conduct Council member or hearing administrator, be disqualified on the grounds of conflict of interest."   2019 Code at 4.   The Code further states that

---

[4] *Accompany*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/accompany (last visited Sept. 17, 2020).

[5] *Accompany*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/accompany (last visited Sept. 17, 2020)

"[a]ny party may challenge a panel member or the hearing administrator on the ground of a conflict of interest." *Id.* at 14. Yet, at the hearing, American University's Director of Student Conduct announced: "[I]f the Respondent is not here, he does not have the opportunity to recuse anyone." Compl. ¶ 209. Nothing in the text of the Code of Conduct suggests that Plaintiff was required to be present at the hearing to challenge the panel members due to a conflict of interest. Accordingly, Plaintiff has plausibly shown that American University breached its contractual relationship with him by denying him the opportunity to request recusal of sanctioning panel members.[6]

### f.    Viability of Doe's Appeal

Lastly, Plaintiff argues that the University breached their contractual relationship when it "did not provide Mr. Doe with an appeals process that complied with its obligations." Compl. ¶ 286. He asserts that by finding Doe's appeal "not viable" "without any meaningful explanation," the University was able "to avoid having to actually decide the arguments Mr. Doe made in his appeal." *Id.* ¶ 288.

The 2019 Code provides a two-step appeals process. At the first step, an appellate board of the Conduct Council will "determine viability based on the follow conditions": (1) new information that could "significantly alter[]" the Investigator's finding of fact; (2) "[e]vidence of improper procedure and/or;" (3) insufficient or excessive sanctions. 2019 Code at 20. "Decisions of the appellate board about the viability of the appeal are determined by majority vote and are final." *Id.* If an appeal is deemed viable, as a second step, it will "be forwarded to the vice president of Campus Life or designee for review and decision." *Id.*

---

[6] The court leaves for another day the question of whether Doe was entitled to receive the panel members' names in advance of the hearing, or whether he had to affirmatively request that information. The Complaint's allegations shed no light on that issue.

Doe appealed Quasem's findings and the sanctioning panel's decision on all three available grounds. *See* Statement in Support of Appeal. In particular, he pointed to four errors that, he claimed, demonstrated the "specific ways in which the investigation against [him] violated the procedures guaranteed in the University's Code of Conduct": (1) Doe was never provided with "relevant information, evidence, and the findings made concerning" the investigation into H.S.; (2) Doe was not provided with Roe's written complaint; (3) Quasem "failed to gather critical evidence," including reports and witness statements; and (4) Doe was not provided with the names of the sanctioning panel members. *Id.* at 3. Doe also felt that "[t]he [s]anctions [were] simply not commensurate with [his] conduct." *Id.* at 16. On July 25, 2019, the Appellate Board sent Doe a letter informing him that his appeal was found "not viable." MTD Ex. 7. The Board explained that it "determines viability of an appeal based on whether there is new information that significantly alters the finding of fact, evidence of improper procedure, or excessive/insufficient sanction." *Id.* The Board stated that it had "careful[ly] and through[ly]" examined Doe's appeal and reviewed "all case materials and information submitted." *Id.*

In his Complaint, Doe asserts a theory of breach predicated upon the Appellate Board's failure to provide a "meaningful explanation" for its decision. *See* Compl. ¶ 288. But nowhere does the Code require such an explanation. The Appellate Board considered the three grounds for a viable appeal, and reviewed the relevant evidence, *see* MTD Ex. 7—in doing so, it fulfilled its obligations under the Student Conduct Code. Plaintiff has not pointed to any policy or practice that would have required the Appellate Board to provide additional explanation for its decision.

In his opposition papers, Doe advances a different theory concerning the Appellate Board's conduct. He now asserts that the Appellate Board "exceeded its role, thereby breaching the contract," by "reach[ing] the merits of Mr. Doe's appeal," instead of the presumably lesser

standard of "viability."   Pl.'s Opp'n at 40.   Doe cannot, however, amend his complaint through his opposition brief, and so the court does not consider this modified contention.   *See Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014) (stating that "a plaintiff cannot amend his or her complaint by the briefs in opposition to a motion to dismiss").

Plaintiff likens his case to *Doe v. George Washington University*, 321 F. Supp. 3d 118 (D.D.C. 2018), but the comparison is inapt.   There, the court found that the university breached its contract when it found the plaintiff's appeal "not viable" under a similar two-level appeals system.   *Id.* at 124–28.   The court explained that "[i]n common parlance, viable means 'having a reasonable chance of succeeding,'" and thus, the university's role was "to determine whether an appeal had 'a reasonable chance of succeeding' or was 'likely to succeed.'"   *Id.* at 126 (citation omitted).   In that case, however, the plaintiff presented two new pieces of evidence—a toxicology report and an affidavit, which supported the plaintiff's testimony.   *Id.* at 125.   The toxicologist's report in particular raised doubts about the complainant's version of events.   *Id.*   This case is different.   Doe's only qualm is that the Appellate Board failed to provide a "meaningful explanation."   Compl. ¶ 288.   His theory of breach, unlike in *Doe v. George Washington University*, does not rest on the alleged "viability" of his appeal.

*          *          *

In sum, Plaintiff's breach of contract claim survives the motion to dismiss on three theories: the University breached (1) the purported promise of repose afforded under the 2016 Code's one-year complaint period by allowing Roe to file her complaint against Doe nearly three years after the alleged incident without requiring a written complaint and extenuating circumstances, (2) the duty to conduct a "thorough and impartial" investigation; and (3) the obligation to afford Doe the

39

chance to seek recusal of sanctioning panel members based on a conflict of interest.   Plaintiff's

other theories of breach of contract do not rise to the level of plausibility and are dismissed.

> ### D.   Negligence Claim`

Finally, Doe brings a negligence claim against the University.   He alleges that "the

University owed a common law duty to [Plaintiff] to exercise reasonable care," and it "breached

that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating

a process that violated [his] rights and interests."   Compl. ¶¶ 297–98.   "In particular," Doe

asserts, "the University has negligently trained and supervised the people it employs to investigate

claims of sexual misconduct, adjudicate those claims, or otherwise implement its policies and

procedures."   *Id.* ¶ 299.   In addition, the University has acted negligently by employing a Title

IX investigator "who brings a bias in favor of complainants into every case" and by negligently

training the members of Doe's sanctioning panel and appellate board.   *Id.* ¶¶ 301–03.   And as a

result of that negligence, "Doe has been seriously and irreparably damaged."   *Id.* ¶ 304.

To succeed on a negligence claim in the District of Columbia, a Plaintiff must show: (1) "a

duty of care owed by the defendant to the plaintiff," (2) "a breach of that duty by the defendant,"

and (3) "damage to the interests of the plaintiff proximately caused by the breach."   *District of*

*Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001) (citation omitted).   A negligence claim "must

exist in its own right independent of the contract, and any duty upon which the tort is based must

flow from considerations other than the contractual relationship.   The tort must stand as a tort

even if the contractual relationship did not exist."   *Friends Christian High Sch. v. Geneva Fin.*

*Consultants*, 39 F. Supp. 3d 58, 63 (D.D.C. 2014) (quoting *Choharis v. State Farm Fire & Cas.*

*Co.*, 961 A.2d 1080, 1089 (D.C. 2008)).   A negligence claim that is "based solely on a breach of

the duty to fulfill one's obligations under a contract . . . is duplicative and unsustainable." *Id.* at 63–64 (citations omitted).

The court agrees with the University that Plaintiff does not plead a negligence claim independent of his breach of contract claims.   Def.'s Mot. at 35–36.   For his part, Plaintiff only halfheartedly disputes this contention.   *See* Pl.'s Opp'n at 45.   Plaintiff's allegations—that the university negligently facilitated a Title IX process that was careless and violated Plaintiff's rights, negligently trained those involved in the Title IX investigation and sanctioning process, and hired a Title IX investigator who was biased in favor of complainants—all stem from the University's duties that arise out of its contractual relationship with Plaintiff.   In other words, Doe has not identified any duty owed to him by the University independent of the University's Code or Policy, which set forth the applicable rights and procedures for Title IX investigations.   His negligence claim therefore cannot stand alone; it is "duplicative and unsustainable."   *See Friends Christian High Sch.*, 39 F. Supp. 3d at 63–64.   Accordingly, the court dismisses Plaintiff's negligence claim.[7]

## V.   CONCLUSION AND ORDER

For the foregoing reasons, the court grants in part and denies in part Defendant American University's Motion to Dismiss, ECF No. 13, as follows:

- Defendant's Motion is denied as to Count I (Title IX).

- Defendant's Motion is denied as to Count II (DCHRA) with respect to Plaintiff's disparate treatment claim and granted as to Plaintiff's disparate impact claim.

---

[7] Because Doe has not sufficiently pleaded a negligence claim independent of his breach of contract claims, the court need not address the University's arguments that it did not owe a duty of care to Doe and that Doe did not plead facts sufficient to show negligence by its employees.   Def.'s Mot. at 32–35.

- Defendant's Motion is denied as to Counts III (Breach of Contract) and IV (Breach of Implied Covenant of Good Faith and Fair Dealing) insofar as Plaintiff alleges a breach of (1) the one-year complaint period set forth in the 2016 Code, (2) the duty to conduct a "thorough and impartial" investigation, and (3) the obligation to provide Doe the opportunity to move to recuse members of the sanctioning panel; Defendant's Motion is granted as to all other theories of breach.

- Defendant's Motion is granted as to Count V (Negligence).

Plaintiff's Partial Motion for Summary Judgment, ECF No. 17, is denied.   The University shall answer the Complaint in the time afforded under Federal Rule of Civil Procedure 12(a)(4)(A).

Dated:   September 18, 2020

Amit P. Mehta
United States District Court Judge

42